UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| WELL-COM ASSOCIATES, L.P., | **05 · 10056 JLT** |
| Plaintiff, | Civil Action No. |
| v. | RECEIPT #_____<br>AMOUNT $ _____ 150.00<br>SUMMONS ISSUED___ 1<br>LOCAL RULE 4.1____ — |
| HONEYWELL INTERNATIONAL, INC., | WAIVER FORM____ —<br>MCF ISSUED____ — |
| Defendant. | BY DPTY. CLK.___ M.P.<br>DATE_____ 1/10/05 |

## COMPLAINT

Well-Com Associates, L.P. ("Well-Com") brings this complaint for relief under the

Comprehensive Environmental Response, Compensation, and Liability Act of 1980

("CERCLA"), 42 U.S.C. § 9601 et seq., and Massachusetts G.L. c. 21E, against Honeywell

International, Inc. ("Honeywell"), and alleges as follows:

### THE PARTIES

MAGISTRATE JUDGE____ MBB

1.      Plaintiff Well-Com is a Massachusetts limited

partnership, with a principal place of business at 300 Commercial Street, Malden, Massachusetts.

2.      Defendant Honeywell is a corporation organized and existing under the laws of

Delaware with its principal place of business in Morristown, New Jersey.  Honeywell is in the

business of manufacturing products and technologies related to homes, buildings, automobiles,

power generations systems, chemicals, fibers, and plastics, among other things.

3.      Honeywell is the corporate successor of AlliedSignal, Inc. ("Allied"), a Delaware

corporation with a principal place of business in New Jersey, and the Barrett Company

("Barrett"), a chemical company that began as a wholly owned subsidiary of Allied and eventually merged into an operating division of Allied. The corporate history of Allied and Barrett is set forth below in paragraphs 6 and 7.

## JURISDICTION AND VENUE

4.     The Court has subject matter jurisdiction pursuant to 42 U.S.C. § 9601, et seq. and 28 U.S.C. §§ 1331 and 2201. The Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over all claims arising under Massachusetts law.

5.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because it is where both the events giving rise to the claim occurred, and where the property that is the subject of the action is situated.

## FACTS

### The Defendant

6.     On information and belief, Allied began its corporate history as Allied Chemical and Dye Corporation, which was formed in 1920 as an amalgamation of five chemical companies: Barrett, Solvay Process Company, General Chemical Company, National Aniline & Chemical Company, and Semet-Solvay Company. The five companies operated as wholly owned subsidiaries until their merger in the 1940s, at which point they became operating divisions of Allied Chemical and Dye Corporation.

7.     On information and belief, Barrett merged with Allied in 1941.

8.     In 1958, Allied Chemical and Dye Corporation changed its name to Allied Chemical Corporation. In 1981, Allied Chemical Corporation changed its name to Allied Corporation. In 1985, Allied-Signal Inc. was formed when Allied Corporation

00887346                                    2

merged with The Signal Companies, Inc. In 1993, Allied-Signal, Inc. changed its name to AlliedSignal. In 1999, Honeywell and Allied merged, and the new company has operated under the name of Honeywell.

## The Site

9.     On information and belief, in 1932, Barrett acquired a parcel of land of approximately 9.5 acres located at what is now known as 378 Commercial Street, Malden, Massachusetts ("Site").

10.     On information and belief, the Site was undeveloped marshland at the time of Barrett's purchase of the property.

11.     At the time of its purchase in 1932, Barrett had already received a license from the Commonwealth of Massachusetts for the rights to: 1) dredge the Malden River; 2) fill a portion of the tidal creek on the Site; and 3) build a pier on the Malden River. On information and belief, at some point between 1932 and 1939 Barrett exercised all of those rights under the license.

12.     On information and belief, on or about 1936 Barrett began construction of a coal tar processing plant at the Site ("Plant"), and on or about 1937 Barrett opened the Plant for the business of manufacturing and selling a variety of coal tar products, industrial chemicals, lead-based paints, and protective coatings.

13.     On information and belief, Barrett received raw coal tar for processing via barge and rail car.

14.     On information and belief, the Plant included a number of above and below ground tanks for the storage and processing of coal tar and other chemicals. A drainage pipe led from the tanks and process areas into an adjacent water body on the southern border of the Site

00887346                                             3

known as Little Creek, which feeds directly into the Malden River, located on the eastern border of the Site.

15.     On information and belief, a sand filter bed was located on the southwestern corner of the Site, immediately south of a railroad spur and immediately north of Little Creek. A sump structure and connecting drainage pipe led from the railroad spur in the direction of the filter bed, adjacent to Little Creek. A true copy of a photograph of the Site taken in approximately 1939 is attached hereto as Exhibit A.

16.     In 1941, Barrett deeded the Site to Allied Chemical and Dye Corporation in connection with the merger of the two companies.

17.     On information and belief, between the years 1937 and 1965, Barrett, and then Allied Chemical and Dye Corporation in 1941, operated the Plant at the Site, and there were a number of incidents in which tanks and stills on the Site experienced spills, leaks, fires, or explosions, including in approximately 1937, a 30,000 gallon spill that occurred at the Site.

18.     On information and belief, in filling the Site and operating the Plant, Allied and Barrett released hazardous substances and materials, including coal tar, coal tar related compounds, and other materials related to Plant operations, at the Site.

19.     In 1965, Allied Chemical Corporation sold the Site to Wellington Realty Corporation; at that time the Site was in a contaminated condition, and Allied did not remove or otherwise remediate the contamination at the Site upon the sale to Wellington.

20.     On information and belief, after the sale of the Site to Wellington Realty Corporation, Allied Chemical Corporation retained a facility on a leased back portion of the Site, which was occupied and operated by the Plastics Division of Allied Chemical Corporation until

00887346                                                4

at least 1970.

21.     In 1981, Wellington Realty Corporation deeded the Site to Wellington Realty Co., a Massachusetts Limited Partnership.

22.     In 1983, Wellington Realty Co., L.P. deeded the Site to Wellington Realty Co., a Massachusetts general partnership.

23.     In December of 1986, Wellington Realty Co. deeded the Site to Wellington Realty Company Limited Partnership.  That same month, Wellington Realty Company deeded a 50% undivided interest in the Site to Commercial Street Properties, Inc., a 49% undivided interest in the Site to Well-Com Associates, Inc., and a 1% undivided interest to Well-Com, Inc.

24.     In July of 1996, Commercial Street Properties, Inc. deeded its 50% undivided interest in the Site to Well-Com Associates, Inc.

25.     In November of 1996, Well-Com, Inc. deeded its 1% undivided interest in the Site to Plaintiff Well-Com Associates, L.P.  That same month, Well-Com Associates Inc. deeded its 99% interest in the Site to Well-Com, giving Well-Com full ownership of the Site.

26.     On information and belief, the above ground storage tanks at the Site were removed on or about 1966, and certain below ground storage tanks were removed on or about 1974.

27.     On information and belief, at some point in the mid 1970s, certain buildings associated with the plant were demolished and new buildings or additions to existing buildings were built.

28.     Since Allied's sale of the Site to Wellington Realty Corporation, the Site has been used for storage, warehousing, and parking of commercial vehicles.

29.     No release of oil or hazardous materials has occurred

at the Site as a result of Site usage by Well-Com or any of its predecessors in interest since

Wellington Realty Co. sold the Site in 1986.

30.     A number of environmental studies of the area known as the "Lower Commercial

Street Area," in which the Site is located, were conducted throughout the mid to late 1980s,

leading to the discovery of coal tar, coal tar related compounds, and other hazardous substances

and materials on the Site.

31.     In December of 1986, Wellington Realty Co., Allied Corporation, and Well-Com,

Inc., each received a "Notice of Responsibility Pursuant to M.G.L. Chapter 21E" from the

Massachusetts Department of Environmental Quality Engineering, now known as the

Massachusetts Department of Environmental Protection ("DEP"), informing those parties of their

potential financial responsibility for environmental conditions at the Site.  All three parties

shared in the costs of the investigations of the entire lower Commercial Street area, which also

included 326 and 356 Commercial Street.

32.     In 1987, DEP assigned a release tracking number and designated the Site as a

Confirmed Disposal Site.

33.     In 2000, acting in accordance with revised Massachusetts Contingency Plan

("MCP") regulations, Rizzo Associates, Inc. ("Rizzo") prepared a Phase I Initial Site

Investigation and Tier Classification Submittal ("Phase I report") for the Site and submitted it to

DEP on behalf of Well-Com.  The Phase I report classified the Site as a Tier II disposal site

pursuant to the MCP.

34.     The Phase I report subsurface investigation revealed elevated concentrations

above the Reportable Concentrations ("RCs") under the MCP of polycyclic aromatic hydrocarbon ("PAH") compounds, lead, and arsenic in the soil.

35.    The subsurface investigation also revealed elevated concentrations above the applicable RCs of PAH compounds, extractable petroleum hydrocarbon ("EPH") compounds, cadmium, and cyanide in the groundwater.

36.    In April, 2001, Rizzo provided Well-Com with a proposal to implement a subsurface investigation at the Site and to prepare a Phase II Comprehensive Site Assessment and Phase III Remedial Action Alternatives Report ("Phase II/III report").

37.    On July 3, 2001, Well-Com served Honeywell with notice, pursuant to Mass. G. L. c. 21E, §4A, of its intent to seek contribution from Honeywell for the costs of environmental remediation at the Site, including costs already expended on the Phase I report.

38.    In November of 2001, acting pursuant to the procedure set forth in G. L. c. 21E, §4A, representatives of Well-Com and Honeywell met to discuss settlement. The parties were unsuccessful in reaching an agreement for allocating the costs of remediation amongst themselves.

39.    Since the parties' meeting, Well-Com undertook an extensive investigation of the history of the Site and Barrett and Allied's operations at the Site in order to enhance future remedial efforts.

40.    Well-Com's investigation also included a survey of other environmental reports related to the surrounding area, which is now part of an EPA-funded redevelopment project known as Telecom City.

41.    On November 26, 2003, DEP issued a Notice of Noncompliance with the MCP to

Well-Com, stating that the MCP deadlines had expired for submission of the Phase II/III report and a Phase IV Remedy Implementation Plan ("Phase IV plan").

     42.     Well-Com requested an extension from DEP and received a revised deadline of July 1, 2004 for submission of the Phase II/III report, and a September 1, 2004 deadline for submission of the Phase IV plan.

     43.     On March 25, 2004, Rizzo provided Well-Com with an updated proposal to implement the Phase II/III report, which Well-Com forwarded to Honeywell.

     44.     On April 23, 2004, representatives of Well-Com hosted a meeting with representatives of Honeywell to share the results of its historic research of the Site and discuss plans for Site remediation.

     45.     In May of 2004, Rizzo commenced subsurface investigations at the Site in connection with the Phase II/III report.

     46.     On June 1, 2004, Well-Com and Honeywell entered into a "Memorandum of Agreement and Tolling Agreement" ("Tolling Agreement"), tolling any applicable statute of limitations while Rizzo prepared the Phase II/III report in accordance with the DEP deadline and the parties further discussed settlement.

     47.     On June 3, 2004, Well-Com hosted another meeting with Honeywell to discuss the Phase II/III Report.

     48.     On June 15, 2004, at Honeywell's request, Well-Com applied for and received from DEP an additional extension for the filing of the Phase II/III report of July 21, 2004.

     49.     On July 20, 2004, at Honeywell's request, Well-Com applied for and received additional extensions from DEP of August 6, 2004 for the Phase II Comprehensive Site

Assessment, August 27, 2004 for the Phase III Remedial Action Alternatives Report, and December 17, 2004 for the Phase IV plan.

50.     Throughout the month of July, Well-Com and Honeywell prepared and circulated written comments to a draft Phase II Comprehensive Site Assessment provided by Rizzo, which they discussed with Rizzo during telephone conference calls. The Phase II Comprehensive Site Assessment was filed in accordance with the deadline of August 6, 2004.

51.     The Phase II report's subsurface investigation further delineated the extent of soil and groundwater contamination at the Site and also identified an area of Little Creek sediments containing elevated concentrations of EPH, PAH, lead, arsenic, cadmium, chromium, and mercury. The subsurface investigation revealed certain hot spots of soil and groundwater contamination on the Site, including two large areas of viscous and semi-viscous coal tars that represented non aqueous phase liquid (NAPL) under the MCP. These contaminants are by-products of Barrett operations including coal tar processing, paint and dye production and industrial chemical production.

52.     The Phase II report included a risk assessment, which found a condition of "significant risk" to human health, the environment and public welfare.

53.     On August 20, 2004, Well-Com and Honeywell discussed the draft Phase III report provided by Rizzo in late July of 2004, and had additional conferences concerning the Site.

54.     On August 27, 2004, the Phase III report was filed in accordance with the DEP deadline.

55.     The Phase III report evaluated a number of remedial alternatives and selected

00887346                                      9

excavation and off-site disposal as the remedy for contaminated soils and Little Creek sediments. The Phase III report also selected natural attenuation with spot pump and treat, in-situ chemical oxidation, and enhanced bioremdiation as the remedy for contaminated groundwater, after evaluating a number of alternatives.

56.     On September 15, 2004, the parties extended the Tolling Agreement until November 22, 2004, in order to provide Honeywell with an opportunity to prepare an alternative proposal to that contained in the Phase III report ("Honeywell Proposal").

57.     On November 5, 2004, Rizzo conducted additional soil and Little Creek sediment sampling on the Site, at Honeywell's request and in consultation with MACTEC, Inc., Honeywell's contractor in charge of preparing the Honeywell Proposal.  Rizzo provided MACTEC, Inc. with split samples of all samples collected.

58.     The parties further extended the Tolling Agreement until December 16, 2004, and again to January 9, 2005.

59.     On December 1, 2004, Honeywell provided Well-Com with the Honeywell Proposal.

60.     On December 16, 2004, representatives of Well-Com and Honeywell met to discuss the Honeywell Proposal and the possibility of settlement.

61.     Well-Com and Honeywell remain unable to reach an agreement for addressing Site contamination and allocating the costs of remediation.

62.     Well-Com has spent and continues to spend substantial sums for the investigation, assessment, and remedial response (collectively, "response costs") at the Site in accordance with the MCP.

00887346                                             10

63.     Well-Com's incurrence of response costs has been ongoing and is expected to continue.

64.     A substantial portion of the response costs result directly from contamination at the Site caused by Allied's use of the Site; Allied has had the benefit of the money it received to the sale of the Site since 1965, but has failed the clean up or remediate the contamination at the Site.

## COUNT I

### (CERCLA cost recovery)

65.     Well-Com incorporates by reference paragraphs 1 through 64 as if fully set forth herein.

66.     Honeywell is a person liable under 42 U.S.C. § 9607(a)(2) for the release of hazardous substances on the site.

67.     Honeywell's release of hazardous substances has caused the Well-Com to incur, and will continue to cause Well-Com to incur, "necessary costs of response" as defined by 42 U.S.C. § 9607(a)(4)(B).

68.     Well-Com's response actions are reasonable and consistent with the National Contingency Plan ("NCP").

71.     Well-Com has not caused any of the contamination at the Site.

72.     Well-Com is eligible for the defense to liability set forth in 42 U.S.C. § 9607(b)(3).

73.     Honeywell is subject to strict and joint and several liability pursuant to 42 U.S.C. § 9607(a).

74.     By reason of the foregoing, Well-Com is entitled to:  a) recover from Honeywell all of its necessary costs of response expended, including all costs spent by Well-Com in researching the Site history; and b) a judgment declaring Honeywell liable for necessary costs of response that Well-Com will expend in the future, in accordance with its final remediation plan.

## COUNT II

### (CERCLA contribution)

75.     Well-Com incorporates by reference paragraphs 1 through 74 as if fully set forth herein.

76.     The same prima facie elements that support Well-Com's claim for cost recovery, set forth above, also support Well-Com's claim in the alternative for contribution and equitable allocation pursuant to 42 U.S.C. § 9607.

77.     By reason of the foregoing, Well-Com is entitled to:  a) recover from Honeywell an equitable allocation of all of its necessary costs of response expended, including all costs spent by Well-Com in researching the Site history; and b) a judgment declaring Honeywell liable for necessary costs of response that Well-Com will expend in the future, in accordance with its final remediation plan.

## COUNT III

### (Massachusetts G.L. c. 21E)

78.     Well-Com incorporates by reference paragraphs 1 through 77 as if fully set forth herein.

79.     Honeywell is a person liable under Mass. G.L. c. 21E, § 5(a)(2).

80.     Honeywell's release of hazardous materials has caused Well-Com to incur, and

will continue to cause Well-Com to incur, reasonable costs of "response" as defined by G.L. c.
21E §§ 2 and 4.

81.     Well-Com's has complied with Mass. G.L. c. 21E, § 4A, and its response actions
are necessary, appropriate and consistent with the MCP.

82.     By reason of the foregoing, Well-Com is entitled to recover from Honeywell all of
its response costs, both past and future, including all costs spent by Well-Com in researching the
Site history, and all reasonable attorneys' fees, pursuant to G.L. c. 21E, §§ 4 and 4A.

<u>PRAYER FOR RELIEF</u>

WHEREFORE, Well-Com respectfully requests that this Court enter:

1.     Against Honeywell, a judgment for all response costs incurred at the Site,
pursuant to 42 U.S.C. § 9607(a), or, in the alternative, an equitable allocation for the full amount
pursuant to 42 U.S.C. § 9607;

2.     Against Honeywell, a judgment for all response costs incurred at the Site,
pursuant to G.L. c. 21E, §§ 4 and 4A;

3.     Against Honeywell, a declaratory judgment establishing its liability in any action
seeking recovery of further response costs related to its release at the Site, pursuant to 42 U.S.C.
§ 9613(g)(2) and G.L. c. 21E, §§ 4 and 4A;

4.     Against Honeywell, a judgment for attorneys' fees, pursuant to G.L. c. 21E, § 4A;
and

5.     Such other relief as the Court deems appropriate.

00887346                                                13

Plaintiff claims a trial by jury for all claims so triable.

Well-Com Associates, L.P.

A.  Neil Hartzell, Esq. (BBO #544752)
Matthew M. O'Leary (BBO #~~544987~~)
652033
Donovan Hatem LLP
Two Seaport Lane
Boston, MA  02110
(617) 406-4500

Brian A. Cafferty, Esq. (BBO #637781)
Combined Properties
300 Commercial Street
Suite 25
Malden, MA  02148
(781) 321-7800

Dated:  January 10, 2004

