UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| WELL-COM ASSOCIATES, L.P., ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> HONEYWELL INTERNATIONAL INC., ) <br> ) <br> Defendant. ) <br> ) | Docket No. 05-10056-JLT |

**MOTION FOR PARTIAL SUMMARY JUDGMENT AND**
**LOCAL RULE 56.1 STATEMENT OF UNDISPUTED FACTS**

**MOTION**

Defendant, Honeywell International Inc., hereby respectfully moves, pursuant to Rule 56 of the Federal Rules of Civil Procedure, for partial summary judgment dismissing Count I of the Complaint and, on Counts II and III, limiting Wel-Com's recovery to an equitable share, not 100%, of its past and future response costs. The grounds for the motion are set forth in detail in the accompanying memorandum. In brief:

1. Count I, a cost recovery claim under § 107 of CERCLA, will not lie because Wel-Com is itself liable under CERCLA.

2. Count II, a contribution claim under § 107, and Count III, a Chapter 21E claim, are flawed because under them Wel-Com seeks 100% of its past and future response costs. Wel-Com is not entitled to 100% because (a) when it acquired the property at issue, it knew full well that the property was contaminated, (b) it was

and is a sophisticated buyer, and (c) it acquired the property at a discount to reflect its contaminated condition.

WHEREFORE, Honeywell respectfully requests that the Court dismiss Count I of the Complaint with prejudice and that, on Counts II and II, it enter partial summary judgment that Wel-com is not entitled to 100% of its past and future response costs.

## LOCAL RULE 56.1 STATEMENT OF UNDISPUTED FACTS[1]

### A.   The Parties And The Site

1. Wel-Com is a Massachusetts limited partnership. (Christo Dec., Ex. A, ¶ 1.)

2. Wel-Com owns the real property known as 378 Commercial Street in Malden, a 9.5 acre parcel, on which are two large commercial buildings (the "Site"). (Christo Dec., Ex. A, ¶¶ 9, 25; Ex. C at 0001318.)

3. Wel-Com has been wholly owned by John M. Pereira since 1996. (Christo Dec., Ex. S at 25, 28-29.)

4. Honeywell is a Delaware corporation. Its principal place of business is in Morristown, New Jersey. Honeywell is the corporate successor to AlliedSignal, Inc., and the Barrett Company, which at various times owned and operated a plant at the Site. (Christo Dec., Ex. A, ¶¶ 2, 3, 17.)

5. The Site is contaminated with coal tar residues, heavy metals, and other hazardous substances. (Christo Dec., Ex. A, ¶¶ 30, 34, 35, 51.)

6. Wel-Com alleges that all or virtually all of the contamination on the site is the by-product of Honeywell's predecessors' operations there. (Christo Dec., Ex. A, ¶¶ 17, 18, 28, 29; Ex. S at 132-35.)

7.   There is evidence that this allegation is incorrect. (Christo Dec., Ex. J at 0000986.)

**B.   Plaintiff's Knowledge Concerning The Condition Of The Site**

**Honeywell's Predecessors' Ownership Of The Site.**

8.   Wel-Com alleges that Honeywell's predecessors owned the Site from 1932 to 1965, when it was sold to Wellington Realty Corporation. (Christo Dec., Ex. A, ¶¶ 17, 19.)

**The 1984 Purchase And Sale Agreement.**

9.   On or about November 8, 1984, Wellington Realty Company (a successor-in-interest to Wellington Realty Corporation), entered into a Purchase and Sale Agreement (the "P&S") with Carabetta Enterprises, Inc. ("Carabetta"), pursuant to which Wellington agreed to sell the Site to Carabetta. (Christo Dec., Ex. B.)

10.   The principal of Carabetta was Joseph Carabetta. He and Stanton Black were joint venturers (through various, distinct entities) in real estate, including the Site. (Christo Dec., Ex. S at 31-32; Ex. D at 0001588; Ex. E at 0000391; Ex. M at 0000682-92.)

11.   The purchase price under the P&S was $3.8 million. (Christo Dec., Ex. B at 0000366.)

12.   The P&S called for the closing to occur on or before December 31, 1986. (Christo Dec., Ex. B at 0000371.)

13.   Carabetta's obligation to purchase the Site was conditional on, among other things, the Site being "in conformity with all applicable . . . environmental requirements . . .." The P&S gave Carabetta the right to enter the "property for the purpose of inspecting the

---

[1]   Citations are to the accompanying Declaration of Thomas K. Christo.

- 3 -

property, making surveys of the same, conducting borings, percolation tests, soil tests and the like." (Christo Dec., Ex. B at 0000371, 0000373-74.)

14.    In 1984, Mr. Pereira was a real estate attorney with Sherin & Lodgen. (Christo Dec., Ex. S at 12-13.)

15.    He acted as an attorney for Messrs. Black and Carabetta in connection with the purchase of the Site. (Christo Dec., Ex. S at 31-32.)

**The Early Environmental Studies.**

16.    In 1985 and 1986, environmental firms, including TRC Environmental Consultants ("TRC") and Norwood Engineering ("Norwood"), conducted environmental assessments of the Site and nearby properties and prepared reports on their work. They reported that the Site was contaminated. TRC, for example, wrote:

> Coal tar wastes were detected at depths from five to ten feet across parts of the [Site] . . .. Most of the tars which underlay the [Site] were not free flowing but were bound up either in sediment, fill or peat. The exception to this was in the area immediately to the west of the trucking terminal section of the [Site]. There, a distinct floating fraction was noted on the ground water. . . . A trace (sic) dichlorobenzene, not typically associated with the coal tar wastes was noted in a ground water sample from the east side of the property (MW-5).
>
> [Certain] readings across the site . . . would appear to indicate the presence of light coal tar fractions (i.e., benzene and toluene) at the water table.
>
> Several metals are found in the soils on the [Site] which generally exceed background levels. Of particulate note are the arsenic levels in TP-3 and the generally elevated levels of the lead and nickel in MW-1. . . .
>
> Cyanides and phenols are typically associated with coal tars and are detected in both soil and water samples on the [Site]. Elevated concentrations of cyanide were found in ground water samples . . ..

(Christo Dec., Ex. C at 0001333, 0001339, 0001342.)

**Mr. Pereira's Early Awareness That The Site Is Contaminated.**

17.     The P&S gave Messrs. Carabetta and Black a two year window within which to assess the environmental condition of the Site and, if dissatisfied, to back out of the deal. (Christo Dec., Ex. S at 75.)

18.     During this period, Mr. Pereira, as attorney for Messrs. Black and Carabetta, reviewed the environmental reports on the Site. (Christo Dec., Ex. S at 31-32.)

19.     In addition, he had discussions with the engineers from TRC and other firms concerning the environmental condition of the Site. (Christo Dec., Ex. S at 32-33.)

20.     He was attempting, as counsel for Messrs. Black and Carabetta, to gain an understanding of the contamination of the Site. (Christo Dec., Ex. S at 34.)

**The 1985 Cost Estimates.**

21.     On December 20, 1985, Mr. Carabetta forwarded to Mr. Black "site recommendations which we spoke about." The "site recommendations" estimated that it would cost in excess of $4 million to remediate the Site and an adjacent property, with the bulk of that amount related to the Site. (Christo Dec., Ex. D at 0001588-89, 0001591-94.)

**Carabetta And Black's Purchase Of The Site With Knowledge.**

22.     Although fully aware that the Site was contaminated, Messrs. Carabetta and Black went ahead with the purchase, at the contract price, in December 1986. (Christo Dec., Ex. E.)

23.     Wellington deeded the Site to three entities, with two Black-affiliated entities receiving a 50% undivided interest and one Carabetta-affiliated entity receiving a 50% undivided interest. (Christo Dec., Ex. E at 0000391; Ex. F.)

24. The last paragraph of the deed provides:

Pursuant to the provisions of Massachusetts General Laws Chapter 21C Section 7, the Grantor hereby notifies Grantee, its successors and assigns, that a release of hazardous materials has occurred at the premises conveyed herein.

(Christo Dec., Ex. F at 0000138.)

**The Early 1987 Appraisal.**

25. At the request of Mr. Black, on March 6, 1987, Robert Donnelly, R.A., of Donnelly & Reed Real Estate, provided to Bank of Boston Connecticut an Appraisal Report on the Site. (Christo Dec., Ex. G at 000517.)

26. The report acknowledged that the Site was contaminated, yet estimated the "Market Value of the [Site] as of February 20, 1987, for the purpose of a possible sale, to be: TEN MILLION DOLLARS ($10,000,000)." (Christo Dec., Ex. G at 000519, 000525.)

27. This is $6.2 million more than the price Messrs. Black and Stanton had paid less than two months earlier.

28. Mr. Pereira acknowledges that Messrs. Black and Stanton purchased the Site for substantially less than its appraised value. (Christo Dec., Ex. S at 68.)

**Wellington's Response To The NOR.**

29. On March 12, 1987, Rosanna Sattler, counsel for Wellington, wrote to Richard Chalpin of the Massachusetts DEQE in response to a Notice of Responsibility as to the Site that the DEQE had issued to Wellington on December 17, 1986. (Christo Dec., Ex. H.)

30. Ms. Sattler copied Mr. Pereira's partner Morton Brown on the letter. (Christo Dec., Ex. H at 0001167.)

31.   She said, among other things:

> The purchase and sale agreement governing the sale of the Property was signed in November, 1984 at a price approximately $2,000,00 (sic) below 1985 fair market value. Under the terms of the purchase and sale agreement, Carabetta and Black (the "Buyers") represented to our client (the "Seller"), that environmental studies would be performed upon the property as part of its "development costs". The Buyers had the option of cancelling the agreement in the event they were not satisfied with the environmental condition of the property.
>
> After receiving the environmental site assessment for the Property, the Buyers asked our client to lower the purchase price by $600,000 to compensate them for their anticipated clean-up costs. Our client offered to cancel the agreement and to return the deposit to the Buyers. However, the Buyers opted to go forward with the purchase at the original purchase price and waived cancellation of the transaction under the terms of the agreement. At the closing on December 30, 1986, our client placed an acknowledgement on the deed transferring the Property, pursuant to M.G.L. c.21c, and the deed was accepted by the Buyers' nominees.

(Christo Dec., Ex. H at 0001166.)

32.   There is no evidence that Messrs. Black, Stanton, Pereira, or anyone on their behalf disputed Ms. Sattler's statements.

**Mr. Pereira's Joining Of The Black Companies.**

33.   In November 1987, Mr. Pereira became Vice President and General Counsel of Combined Properties, Inc., one of Mr. Black's companies. He received equity in the company. In 1989 or 1990, he was promoted to Executive Vice President. In 1991, he became President. (Christo Dec., Ex. S at 13, 16-17.)

**Events Of The Late 1980s To 1996.**

34.   During the late 1980s and early to mid-1990s, there was extensive correspondence, and there were numerous meetings, among the Site owners (and Combined Properties, their affiliate), the Malden Redevelopment Authority, Wellington, Allied, the

environmental consultants working on the Site, and the DEQE concerning the contamination of the Site. The substance of the correspondence and meetings leaves no doubt that Mr. Pereira was fully aware of the condition of the Site. For example:

- On June 21, 1988, Mr. Pereira attended a meeting among representatives of the Malden Redevelopment Authority, Carabetta, Combined Properties, Allied, and Norwood Engineering. The participants "determined ("crudely") long term remediation costs" for the Site and the adjacent property to be nearly $6 million.

- On February 14, 1990, Combined Properties wrote Allied and the prior owner of the Site, the latter care of Ms. Sattler, proposing further environmental studies of the Site conditions and a cost-sharing arrangement among the owners, Allied, and the prior owner. "Combined Properties, Inc./Carabetta Enterprises, Inc." offered to act as coordinator for the studies.

- On March 13, 1990, Ms. Sattler responded to the February 14, 1990, letter. She repeated the points in her March 12, 1987, letter to the DEP, pointing out that there had been an "assumption of the risk by the Buyers."

(Christo Dec., Ex. I; Ex. J at 000986-87; Ex. K at 000826-27; Ex. L at 0000478.)

### The Proof Of Claim Against Mr. Carabetta.

35. On or about October 5, 1992, Mr. Black filed two proofs of claim in Mr. Carabetta's bankruptcy proceedings in Connecticut. One of them related to the Site. In it, Mr. Black sought $933,153 based on "[a]mounts due on a personal guarantee and other alleged joint liability for environmental clean-up." A rider attached to the proof of claim said:

> In addition to the liability described in the Proof of Claim, [Carabetta] and [Black] may be required to remove certain hazardous materials and oil from [the Site]. [Carabetta] is jointly liable with [Black] for the cost of such removal.

(Christo Dec., Ex. M at 0000708-09.)

**Mr. Pereira's Acquisition Of The Site With Knowledge Of The Contamination.**

36.     In early 1996, Mr. Pereira, who already had a minority interest in the Site, acquired from Mr. Black's estate all of Mr. Black's remaining interest in the Site and numerous other properties. (Christo Dec., Ex. S at 8-9, 29-30, 135-36.)

37.     For these interests, Mr. Pereira paid a small amount of money and assumed all of the associated liabilities. The liabilities associated with the Site included a mortgage loan from Bank of Boston Connecticut that Messrs. Carabetta and Black had obtained in 1987. (Christo Dec., Ex. S at 142-43; Ex. N at 0000149; Ex. Q at 0000752-53.)

38.     In the Summer of 1996, Mr. Carabetta conveyed his 50% interest in the Site and his interest in another property that Carabetta and Black had jointly owned to Wel-Com Associates, Inc., which by then apparently was wholly-owned by Mr. Pereira. In exchange, Carabetta received no cash, but (a) an agreement that Mr. Pereira (or his affiliates/nominees) would indemnify Carabetta against any and all liability, including environmental liability, involving the Site and the other property; (b) an agreement by Mr. Pereira (or his affiliates/nominees) to share a small percentage of any profits on any sale or transfer of the Site and the other property before July 16, 2006; and (c) the withdrawal of the proofs of claim filed by Mr. Black and any affiliates in the Carabetta bankruptcy. The conveyance was conditional on Carabetta's receipt of a release from Bank of Boston and its affiliates in respect to the Site. (Christo Dec., Ex. M at 0000682-92; Ex. N.)

39.     In November 1996, title to the Site was consolidated in Wel-Com, which as noted, is wholly owned by Mr. Pereira. (Christo Dec., Ex. O; Ex. P; Ex. A, ¶ 25.)

40. Mr. Pereira was well aware in 1996 that the Site was contaminated. He admitted during his deposition that when he acquired full ownership of the Site, he was aware that it was contaminated:

> A. Okay. When I purchased the property in '96, was I aware that the property was contaminated?
> Q. Yes.
> A. Yes.

(Christo Dec., Ex. S at 131-32; see also Ex. S at 39-40.)

**The Restructuring Of The Loan.**

41. In December 1996, Mr. Pereira restructured the mortgage loan on the Site with Bank of Boston Connecticut. The amount due on the loan at the time was roughly $3.9 million. By making a one-time payment of $188,129 and providing certain guarantees, commitments, and security, Mr. Pereira succeeded in reducing the principal amount due to $2 million, with a further $1.7 million due and payable only upon the occurrence of certain events, including a sale or refinancing of the Site before December 31, 1999, on which date, if no such event had occurred the $1.7 million obligation would be forgiven. Apparently, none of these events has occurred, and the $1.7 million obligation has been forgiven. (Christo Dec., Ex. Q at 000751-58, 0000761-63.)

**Wel-Com's Dealings With The DEP.**

42. Wel-Com has had extensive dealings with the DEP since at least 2000 concerning the contamination at the Site. On October 2, 2005, the DEP issued a proposed Administrative Consent Order to Wel-Com, owing to, DEP stated, Wel-Com's failure to comply with requirements of the Massachusetts Contingency Plan, the regulatory scheme governing hazardous waste site clean-ups. As the proposed Administrative Consent Order indicates, the

DEP views Wel-Com, as the Site owner and operator, as liable under Chapter 21E with respect to the contamination. (Christo Dec., Ex. R at 1-3.)

### C.     **Wel-Com's Claims.**

43.    Wel-Com's Complaint contains three counts. The first is entitled "CERCLA cost recovery" and is brought pursuant to 42 U.S.C. § 9607. Wel-Com alleges that it is entitled on this claim to:

> a) recover from Honeywell all of its necessary costs of response expended, including all costs spent by Well-Com in researching the Site History; and b) a judgment declaring Honeywell liable for necessary costs of response that Well-Com will expend in the future, in accordance with its final remediation plan.

(Christo Dec., Ex. A, ¶ 74.)

44.    Wel-Com's second count is entitled "CERCLA contribution" and also is brought pursuant to 42 U.S.C. § 9607. On this claim, Wel-Com alleges that it is entitled to:

> a) recover from Honeywell an equitable allocation of all its necessary costs of response expended, including all costs spent by Well-Com in researching the Site history; and b) a judgment declaring Honeywell liable for necessary costs of response that Well-Com will expend in the future, in accordance with its final remediation plan.

(Christo Dec., Ex. A, ¶ 77.)

45.    Wel-Com's third count is entitled "Massachusetts G.L. 21E." On this claim, Wel-Com alleges that it is entitled "to recover from Honeywell all of its response costs, both past and future, including all costs spent by Wel-Com in researching the Site history, and all reasonable attorneys' fees, pursuant to G.L. c. 21E §§ 4 and 4A." (Christo Dec., Ex. A, ¶ 82.)

46.    During his deposition, Mr. Pereira testified that (a) his position is that Honeywell should pay 100% of the costs to clean up the contaminants that Honeywell's predecessors put there, (b) he does not think that there are any contaminants at the site that Honeywell did not put

there, and (c) it is irrelevant that he acquired the property knowing it was contaminated. His position is, in other words, that Honeywell is responsible for 100% of the response costs associated with the Site. (Christo Dec., Ex. S at 132-35.)

Dated: January 18, 2006

HONEYWELL INTERNATIONAL INC.,

By its attorneys,

/s/David B. Chaffin
Thomas K. Christo (BBO #083240)
David B. Chaffin (BBO #549245)
HARE & CHAFFIN
160 Federal Street
Boston, Massachusetts 02110-1700
(617) 330-5000

Of Counsel:

Brian D. Israel, Esq.
Arnold & Porter, LLP
555 12th Street, NW
Washington, D.C. 20004
(202) 942-6546

### CERTIFICATE OF CONSULTATION

I certify that counsel have conferred and have attempted in good faith to resolve or narrow the issues presented by this motion.

/s/David B. Chaffin
David B. Chaffin

104114.010305