UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| WELL-COM ASSOCIATES, L.P., | ) |
| Plaintiff, | ) |
| v. | ) |
| HONEYWELL INTERNATIONAL INC., | ) |
| Defendant. | ) |

Docket No. 05-10056-JLT

**MEMORANDUM IN SUPPORT OF MOTION**
**FOR PARTIAL SUMMARY JUDGMENT**

Dated:  January 18, 2006

HONEYWELL INTERNATIONAL INC.,

By its attorneys,

Thomas K. Christo (BBO #083240)
David B. Chaffin (BBO #549245)
HARE & CHAFFIN
160 Federal Street
Boston, Massachusetts 02110-1700
(617) 330-5000

Of Counsel:

Brian D. Israel, Esq.
Arnold & Porter, LLP
555 12th Street, NW
Washington, D.C. 20004
(202) 942-6546

## Table of Contents

Page

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

Preliminary Statement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Statement Of Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

A.     The Parties And The Site . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

B.     Plaintiff's Knowledge Concerning The Condition Of The Site . . . . . . . . . . . . . . . . . . . . 2

             Honeywell's Predecessors' Ownership Of The Site . . . . . . . . . . . . . . . . . . . . . . . 2

             The 1984 Purchase And Sale Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

             The Early Environmental Studies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

             Mr. Pereira's Early Awareness That The Site Is Contaminated . . . . . . . . . . . . . 4

             The 1985 Cost Estimates . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

             Carabetta And Black's Purchase Of The Site With Knowledge . . . . . . . . . . . . . 4

             The Early 1987 Appraisal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

             Wellington's Response To The NOR . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

             Mr. Pereira's Joining Of The Black Companies . . . . . . . . . . . . . . . . . . . . . . . . 5

             Events Of The Late 1980s To 1996 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

             The Proof Of Claim Against Mr. Carabetta . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

             Mr. Pereira's Acquisition Of The Site
             With Knowledge Of The Contamination . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

             The Restructuring Of The Loan . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

             Wel-Com's Dealings With The DEP . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

C.     Wel-Com's Claims  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

I.     COUNT I WILL NOT LIE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

       A.     A Responsible Party Cannot Sue For
              Cost Recovery Under Section 107 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

              1.     Statutory Framework  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

              2.     Cost Recovery Claims Are Distinct From Contribution Claims  . . . . . . 10

       B.     Wel-Com Is A Responsible Party And
              Therefore Has No Cost Recovery Claim  . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

II.    WEL-COM IS NOT ENTITLED TO COMPLETE INDEMNITY
       ON ITS CERCLA CONTRIBUTION CLAIM OR ITS CLAIM
       UNDER CHAPTER 21E . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

       A.     Any Recovery Under Section 107 Must Be Limited  . . . . . . . . . . . . . . . . . . . 13

       B.     Any Recovery Under Chapter 21E Must Be Limited  . . . . . . . . . . . . . . . . . . . 15

              1.     Contribution Under Chapter 21E . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

              2.     Wel-Com Is Itself Liable Under Chapter 21E  . . . . . . . . . . . . . . . . . . . 16

              3.     Wel-Com's Equitable Share Must Be Reduced . . . . . . . . . . . . . . . . . . . 18

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

## Table of Authorities

Cases                                                                    Page

Amoco Oil Co. v. Borden, Inc.,
889 F.2d 664 (5th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 18

Axel Johnson, Inc. v. Carroll Carolina Oil Co.,
191 F.3d 409 (4th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 11

City of Portland v. Boeing Co.,
179 F. Supp. 2d 1190 (D. Or. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Commonwealth v. Boston Edison Co.,
828 N.E.2d 16 (Mass. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 16

Cooper Indus., Inc. v. Aviall Services, Inc.,
543 U.S. 157, 125 S. Ct. 577 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 11

Envtl. Transp. Sys. v. ENSCO, Inc.,
969 F.2d 503 (7th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

In re Hemingway Transport, Inc.,
933 F.2d 915 (1st Cir.), cert. denied, 510 U.S. 914 (1993) . . . . . . . . . . . . . . . . . . . . . . . 12, 14, 18

In re Hemingway Transport, Inc.,
174 B.R. 148 (D. Mass. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13 n.6

Kerr-McGee Chem. Corp. v. Lefton Iron & Metal Co.,
14 F.3d 321 (7th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Martignetti v. Haigh-Farr, Inc.,
680 N.E.2d 1131 (Mass. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 16, 17, 18

Nassr v. Commonwealth,
477 N.E.2d 987 (Mass. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17 n.7

Oliveira v. Pereira,
605 N.E.2d 287 (Mass. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17 n.7

One Wheeler Road Assoc. v. The Foxboro Co.,
1995 WL 791937 (D. Mass. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Smith Land & Improvement Corp. v. Celotex Corp.,
851 F.2d 86 (3rd Cir. 1988), cert. denied, 488 U.S. 1029 (1989) . . . . . . . . . . . . . . . . . . . . . . 14, 18

State of New York v. Shore Realty Corp.,
759 F.2d 1032 (2nd Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 11

United Technologies Corp. v. Browning-Ferris Indus., Inc.,
33 F.3d 96 (1st Cir. 1994), cert. denied, 513 U.S. 1183 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . 10

**Statutes**

42 U.S.C. § 9601(35)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

42 U.S.C. § 9607 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

42 U.S.C. § 9613 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Mass. Gen. L. ch. 21E, §4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Mass. Gen. L. ch. 21E, §4A . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9 n.2

Mass. Gen. L. ch. 21E, §5(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Mass. Gen. L. ch. 21E, §5(c)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16-17

**Secondary Source**

5 C.A. Wright & A.R. Miller, Federal Practice and Procedure § 1278 (2d ed. 1990) . . . . . . 16 n.6

Defendant, Honeywell International Inc., respectfully submits this memorandum in support of its motion for partial summary judgment.

## Preliminary Statement

Plaintiff, Wel-Com Associates, L.P., owns 378 Commercial Street in Malden. Predecessors to Honeywell used to own the property. The property is contaminated. Wel-Com alleges that Honeywell's predecessors caused the contamination, and it sues for its past and future response costs.

The Complaint contains three counts. The first is a cost recovery claim under § 107 of CERCLA. This claim will not lie because Wel-Com is itself liable under CERCLA. Therefore, the claim should be dismissed.

The second count is a contribution claim under § 107, and the third is a claim under Chapter 21E of the Massachusetts General Laws. Wel-Com is laboring under the mistaken impression that it can recover 100% of its past and future response costs on these claims. It cannot. Wel-Com is sophisticated in real estate matters. When it acquired the property in 1996, it knew full well that the property was contaminated and that it could cost millions to clean it up. Further, it acquired the property at a discount. Under these circumstances, Wel-Com is not entitled to recover 100% of its response costs. Honeywell seeks partial summary judgment to this effect on Wel-Com's second and third counts.

- 1 -

## Statement Of Facts

### A.      The Parties And The Site

Wel-Com is a Massachusetts limited partnership that has been wholly owned by John M. Pereira since 1996.  Wel-Com owns 378 Commercial Street in Malden, a 9.5 acre parcel, on which are two large commercial buildings (the "Site").

Honeywell is a Delaware corporation.  Its principal place of business is in Morristown, New Jersey.  Honeywell is the corporate successor to AlliedSignal, Inc., and the Barrett Company, which at various times owned and operated a plant at the Site.

The Site is contaminated with coal tar residues, heavy metals, and other hazardous substances.  Wel-Com alleges that all or virtually all of the contamination on the site is the by-product of Honeywell's predecessors' operations there.  Whether Wel-Com's allegation is correct is not relevant to this motion, and it is assumed to be correct for present purposes.[2]

### B.      Plaintiff's Knowledge Concerning The Condition Of The Site

**Honeywell's Predecessors' Ownership Of The Site.**  Wel-Com alleges that Honeywell's predecessors owned and occupied the Site from 1932 to 1965, when it was sold to Wellington Realty Corporation.

**The 1984 Purchase And Sale Agreement.**  On or about November 8, 1984, Wellington Realty Company (a successor-in-interest to Wellington Realty Corporation), entered into a Purchase and Sale Agreement (the "P&S") with Carabetta Enterprises, Inc. ("Carabetta"), pursuant to which Wellington agreed to sell the Site to Carabetta.  The principal of Carabetta was Joseph Carabetta.  He and Stanton Black were joint venturers in real estate, including the Site.

---

[2]      There is evidence that the allegation is not correct.

The purchase price under the P&S was $3.8 million. The P&S called for the closing to occur on or before December 31, 1986. Carabetta's obligation to purchase the Site was conditional on, among other things, the Site being "in conformity with all applicable . . . environmental requirements . . .." The P&S gave Carabetta the right to enter the "property for the purpose of inspecting the property, making surveys of the same, conducting borings, percolation tests, soil tests and the like."

In 1984, Mr. Pereira was a real estate attorney with Sherin & Lodgen. He was counsel to Messrs. Black and Carabetta in connection with the purchase of the Site.

**The Early Environmental Studies.** In 1985 and 1986, environmental firms, including TRC Environmental Consultants ("TRC") and Norwood Engineering ("Norwood"), conducted environmental assessments of the Site and nearby properties and prepared reports on their work. They reported that the Site was contaminated. TRC, for example, wrote:

> Coal tar wastes were detected at depths from five to ten feet across parts of the [Site] . . .. Most of the tars which underlay the [Site] were not free flowing but were bound up either in sediment, fill or peat. The exception to this was in the area immediately to the west of the trucking terminal section of the [Site]. There, a distinct floating fraction was noted on the ground water. . . . A trace (sic) dichlorobenzene, not typically associated with the coal tar wastes was noted in a ground water sample from the east side of the property (MW-5).

> [Certain] readings across the site . . . would appear to indicate the presence of light coal tar fractions (i.e., benzene and toluene) at the water table.

> Several metals are found in the soils on the [Site] which generally exceed background levels. Of particular note are the arsenic levels in TP-3 and the generally elevated levels of the lead and nickel in MW-1. . . .

> Cyanides and phenols are typically associated with coal tars and are detected in both soil and water samples on the [Site]. Elevated concentrations of cyanide were found in ground water samples . . ..

- 3 -

**Mr. Pereira's Early Awareness That The Site Is Contaminated.**  The P&S gave Messrs. Carabetta and Black a two-year window within which to assess the environmental condition of the Site and, if dissatisfied, to back out of the deal.  During this period, Mr. Pereira, as counsel for Messrs. Black and Carabetta, reviewed the environmental reports on the Site.  In addition, he had discussions with the engineers from TRC and other firms concerning the environmental condition of the Site.  He was attempting, as counsel for Messrs. Black and Carabetta, to gain an understanding of the contamination of the Site.

**The 1985 Cost Estimates.**  On December 20, 1985, Mr. Carabetta forwarded to Mr. Black "site recommendations which we spoke about."  The "site recommendations" estimated that it would cost in excess of $4 million to remediate the Site and an adjacent property, with the bulk of that amount related to the Site.

**Carabetta And Black's Purchase Of The Site With Knowledge.**  Although fully aware that the Site was contaminated, Messrs. Carabetta and Black went ahead with the purchase, at the contract price, in December 1986.  Wellington deeded the Site to three entities, with two Black-affiliated entities receiving a 50% undivided interest and one Carabetta-affiliated entity receiving a 50% undivided interest.  The last paragraph of the deed provides:

> Pursuant to the provisions of Massachusetts General Laws Chapter 21C (sic) Section 7, the Grantor hereby notifies Grantee, its successors and assigns, that a release of hazardous materials has occurred at the premises conveyed herein.

**The Early 1987 Appraisal.**  At the request of Mr. Black, on March 6, 1987, Robert Donnelly, R.A., of Donnelly & Reed Real Estate provided to Bank of Boston Connecticut an Appraisal Report on the Site.  The report acknowledged that the Site was contaminated, yet estimated the "Market Value of the [Site] as of February 20, 1987, for the purpose of a possible

- 4 -

sale, to be: TEN MILLION DOLLARS ($10,000,000)." This is $6.2 million more than the price

Messrs. Black and Stanton had paid less than two months earlier. Mr. Pereira acknowledges that

Messrs. Black and Stanton purchased the Site for substantially less than its appraised value.

**Wellington's Response To The NOR.** On March 12, 1987, Rosanna Sattler, counsel for

Wellington, wrote to Richard Chalpin of the Massachusetts DEQE in response to a Notice of

Responsibility as to the Site that the DEQE had issued to Wellington on December 17, 1986.

Ms. Sattler copied Mr. Pereira's partner Morton Brown on the letter. She said, among other

things:

> The purchase and sale agreement governing the sale of the Property was signed in
> November, 1984 at a price approximately $2,000,00 (sic) below 1985 fair market
> value. Under the terms of the purchase and sale agreement, Carabetta and Black
> (the "Buyers") represented to our client (the "Seller"), that environmental studies
> would be performed upon the property as part of its "development costs". The
> Buyers had the option of cancelling the agreement in the event they were not
> satisfied with the environmental condition of the property.
>
> After receiving the environmental site assessment for the Property, the Buyers
> asked our client to lower the purchase price by $600,000 to compensate them for
> their anticipated clean-up costs. Our client offered to cancel the agreement and to
> return the deposit to the Buyers. However, the Buyers opted to go forward with
> the purchase at the original purchase price and waived cancellation of the
> transaction under the terms of the agreement. At the closing on December 30,
> 1986, our client placed an acknowledgement on the deed transferring the
> Property, pursuant to M.G.L. c.21c (sic), and the deed was accepted by the
> Buyers' nominees.

There is no evidence that Messrs. Black, Stanton, Pereira, or anyone on their behalf disputed Ms.

Sattler's statements.

**Mr. Pereira's Joining Of The Black Companies.** In November 1987, Mr. Pereira

became Vice President and General Counsel of Combined Properties, Inc., one of Mr. Black's

- 5 -

companies. He received equity in the company. In 1989 or 1990, he was promoted to Executive Vice President. In 1991, he became President.

**Events Of The Late 1980s To 1996.** During the late 1980s and early to mid-1990s, there was extensive correspondence, and there were numerous meetings, among the Site owners (and Combined Properties, their affiliate), the Malden Redevelopment Authority, Wellington, Allied, the environmental consultants working on the Site, and the DEQE concerning the contamination of the Site. The substance of the correspondence and meetings leaves no doubt that Mr. Pereira was fully aware of the condition of the Site. For example:

- On June 21, 1988, Mr. Pereira attended a meeting among representatives of the Malden Redevelopment Authority, Carabetta, Combined Properties, Allied, and Norwood Engineering. The participants "determined ("crudely") long term remediation costs" for the Site and the adjacent property to be nearly $6 million.

- On February 14, 1990, Combined Properties wrote Allied and the prior owner of the Site, the latter care of Ms. Sattler, proposing further environmental studies of the Site conditions and a cost-sharing arrangement among the owners, Allied, and the prior owner. "Combined Properties, Inc./Carabetta Enterprises, Inc." offered to act as coordinator for the studies.

- On March 13, 1990, Ms. Sattler responded to the February 14, 1990, letter. She repeated the points in her March 12, 1987, letter to the DEP, pointing out that there had been an "assumption of the risk by the Buyers."

**The Proof Of Claim Against Mr. Carabetta.** On or about October 5, 1992, Mr. Black filed two proofs of claim in Mr. Carabetta's bankruptcy proceedings in Connecticut. One of them related to the Site. In it, Mr. Black sought $933,153 based on "[a]mounts due on a personal guarantee and other alleged joint liability for environmental clean-up." A rider attached to the proof of claim said:

> In addition to the liability described in the Proof of Claim, [Carabetta] and [Black] may be required to remove certain hazardous materials and oil from [the Site]. [Carabetta] is jointly liable with [Black] for the cost of such removal.

- 6 -

**Mr. Pereira's Acquisition Of The Site With Knowledge Of The Contamination.**  In

early 1996, Mr. Pereira acquired from Mr. Black's estate all of Mr. Black's remaining interest in

the Site and numerous other properties.  For these interests, Mr. Pereira paid a small amount of

money and assumed the associated liabilities.  The liabilities associated with the Site included a

mortgage loan from Bank of Boston Connecticut that Messrs. Carabetta and Black had obtained

in 1987.

In the summer of 1996, Mr. Carabetta conveyed his 50% interest in the Site and his

interest in another property that Carabetta and Black had jointly owned to Wel-Com Associates,

Inc., which by then apparently was wholly-owned by Mr. Pereira.  In exchange, Carabetta

received no cash, but (a) an agreement that Mr. Pereira (or his affiliates/nominees) would

indemnify Carabetta against any and all liability, including environmental liability, involving the

Site and the other property; (b) an agreement by Mr. Pereira (or his affiliates/nominees) to share

a small percentage of any profits on any sale or transfer of the Site and the other property before

July 16, 2006; and (c) the withdrawal of the proofs of claim filed by Mr. Black and any affiliates

in the Carabetta bankruptcy.  The conveyance was conditional on Carabetta's receipt of a release

from Bank of Boston and its affiliates in respect to the Site.  In November 1996, title to the Site

was consolidated in Wel-Com, which as noted, is wholly owned by Mr. Pereira.

Mr. Pereira was well aware in 1996 that the Site was contaminated.  He admitted this

during his deposition:

  A.  Okay.  When I purchased the property in '96, was I aware that the
      property was contaminated?
  Q.  Yes.
  A.  Yes.

- 7 -

**The Restructuring Of The Loan.** In December 1996, Mr. Pereira restructured the mortgage loan on the Site with Bank of Boston Connecticut. The amount due on the loan at the time was roughly $3.9 million. By making a one-time payment of $188,129 and providing certain guarantees, commitments, and security, Mr. Pereira succeeded in reducing the principal amount due to $2 million, with a further $1.7 million due and payable only upon the recurrence of certain events, including a sale or refinancing of the Site before December 31, 1999, on which date, if the events had not occurred, the $1.7 million obligation would be forgiven. Apparently, none of these events has occurred, and the $1.7 million obligation has been forgiven.

**Wel-Com's Dealings With The DEP.** Wel-Com has had extensive dealings with the DEP since at least 2000 concerning the contamination at the Site. On October 21, 2005, the DEP issued a proposed Administrative Consent Order to Wel-Com, owing to, DEP stated, Wel-Com's failure to comply with requirements of the Massachusetts Contingency Plan, the regulatory scheme governing hazardous waste site clean-ups. As the proposed Administrative Consent Order indicates, the DEP views Wel-Com, as the Site owner and operator, as liable under Chapter 21E with respect to the contamination.

## C.    Wel-Com's Claims.

Wel-Com's Complaint contains three counts. The first is entitled "CERCLA cost recovery" and is brought pursuant to 42 U.S.C. § 9607. Wel-Com alleges that it is entitled on this claim to:

> a) recover from Honeywell all of its necessary costs of response expended, including all costs spent by Well-Com in researching the Site History, and b) a judgment declaring Honeywell liable for necessary costs of response that Well-Com will expend in the future, in accordance with its final remediation plan.

Wel-Com's second count is entitled "CERCLA contribution" and also is brought

pursuant to 42 U.S.C. § 9607. On this claim, Wel-Com alleges that it is entitled to:

> a) recover from Honeywell an equitable allocation of all its necessary costs of response expended, including all costs spent by Well-Com in researching the Site history; and b) a judgment declaring Honeywell for necessary costs of response that Well-Com will expend in the future, in accordance with its final remediation plan.

Wel-Com's third count is entitled "Massachusetts G.L. 21E." On this claim, Wel-Com

alleges that it is entitled

> to recover from Honeywell all of its response costs, both past and future, including all costs spent by Wel-Com in researching the Site history, and all reasonable attorneys' fees, pursuant to G.L. c. 21E §§ 4 and 4A.

During his deposition, Mr. Pereira testified that (a) his position is that Honeywell should

pay 100% of the costs to clean up the contaminants that Honeywell's predecessors put there, (b)

he does not think that there are any contaminants at the Site that Honeywell did not put there,

and (c) it is irrelevant that he acquired the Site knowing it was contaminated. His position is, in

other words, that Honeywell is responsible for 100% of Wel-Com's response costs associated

with the Site.[2]

## I. <u>COUNT I WILL NOT LIE</u>

Counts I is brought under Section 107 of CERCLA, 42 U.S.C. § 9607. It is a so-called

cost recovery claim, by which Wel-Com seeks <u>all</u> of its past and future response costs. This

claim will not lie.

---

[2]     On multiple occasions, Honeywell has offered to pay the lion's share of reasonable response costs associated with the contamination of the Site. These offers have been rejected. Mr. Pereira's position explains why the offers have been rejected. (In view of Wel-Com's claim under Mass. Gen. L. ch. 21E, §4A, evidence as to the parties' settlement discussions is admissible.)

A.    **A Responsible Party Cannot Sue**
      **For Cost Recovery Under Section 107**

   1.    **Statutory Framework**

Under Section 107(a), four categories of parties, known as potentially responsible parties

or PRPs, are strictly liable for response costs incurred in connection with a release or threatened

release of hazardous substances at a facility.  Liability under § 107(a) can be avoided based only

on one of the three defenses set forth in § 107(b).  See, e.g., Cooper Indus., Inc. v. Aviall

Services, Inc., 543 U.S. 157, 125 S. Ct. 577, 580-81 (2004); State of New York v. Shore Realty

Corp., 759 F.2d 1032, 1044 (2nd Cir. 1985); Axel Johnson, Inc. v. Carroll Carolina Oil Co., 191

F.3d 409, 413 (4th Cir. 1999).

   2.    **Cost Recovery Claims Are Distinct  From Contribution Claims**

In United Technologies Corp. v. Browning-Ferris Indus., Inc., 33 F.3d 96 (1st Cir. 1994),

cert. denied, 513 U.S. 1183 (1995), the First Circuit explained the difference between CERCLA

cost recovery claims and CERCLA contribution claims, observing that they are "distinct, non-

overlapping anodynes."  Id. at 103.  Describing contribution claims, the court wrote:

> Contribution is a standard legal term that enjoys a stable, well-known denotation.
> It refers to a claim "by and between jointly and severally liable parties for an
> appropriate division of the payment one of them has been compelled to make."

Id. at 99 (footnote and citations omitted).  The court explained that when "[a]dapted to an

environmental case, [contribution] refers to an action by a responsible party to recover from

another responsible party that portion of its costs that are in excess of its *pro rata* share of the

aggregate response costs . . . ."  Id.  A cost recovery action, in  contrast, involves a claim for "full

recovery" of all the response costs incurred by a non-responsible party in connection with a site,

i.e., "complete indemnity."  Id. at 100.

- 10 -

**B.**    **Wel-Com Is A Responsible Party And**
**Therefore Has No Cost Recovery Claim**

As noted, a cost recovery claim is one in which a party that is not itself liable under
CERCLA seeks to recover all of its response costs from a party that is liable.  Whether Wel-Com
has a cost recovery claim depends, therefore, on whether it is liable under § 107.  It is liable, as a
matter of law.  Because it is liable, it has no cost recovery claim.

Owner/operators of a site are one of "four classes of potentially responsible parties
(PRPs)" who "shall be liable" under CERCLA.  Aviall Services, 125 S. Ct. at 580-81.  "[S]ection
9607(a)(1) unequivocally imposes strict liability on the current owner of a facility from which
there is a release or threat of release, without regard to causation."  Shore Realty, 759 F.2d at
1044.

There is and can be no dispute that Wel-Com is the owner/operator of the Site.  As such,
it is strictly liable for response costs associated with the Site (and thus has no claim under § 107),
unless it can establish one of the statutory defenses to liability.  42 U.S.C. § 9607(a) ("[S]ubject
only to the defenses set forth in subsection (b) of this section – (1) the owner and operator of a . .
. facility . . . shall be liable for . . .");  see, e.g., Axel Johnson, Inc., 191 F.3d at 413 (PRPs are
liable subject only to the statute's limited defenses).

There are three, and only three, statutory defenses:  An otherwise liable party can avoid
liability only if it can establish that the release or threat of release and the damages resulting
therefrom were caused solely by (1) an act of God; (2) an act of war; or (3) "an act or omission
of a third party other than an employee or agent of the defendant, or than one whose act or
omission occurs in connection with a contractual relationship, existing directly or indirectly, with

the defendant  . . . ."  42 U.S.C. § 9607(b); see also City of Portland v. Boeing Co., 179 F. Supp.

2d 1190, 1202 (D. Or. 2001).

Wel-Com invokes the third defense, alleging innocent landowner status.  (Complaint, ¶

72.)  It cannot, however, establish the defense.  By its terms, the third-party defense does not

apply where the act or omission in question occurs in connection with a "contractual

relationship."  The phrase "contractual relationship is defined in § 101(35)(A):

> The term "contractual relationship," for the purpose of section 9607(b)(3),
> includes, but is not limited to, land contracts, deeds, easements, leases, or other
> instruments transferring title or possession, unless the real property on which the
> facility concerned is located was acquired by the defendant after the disposal or
> placement of the hazardous substance on, in, or at the facility, and one or more of
> the circumstances described in clause (i), (ii), or (iii)[3] is also established by the
> defendant by a preponderance of the evidence: (i) At the time the defendant
> acquired the facility the defendant did not know and had no reason to know that
> any hazardous substance which is the subject of the release or threatened release
> was disposed of on, in, or at the facility  . . . .

42 U.S.C. § 9601(35)(A) (emphasis added).  Under this express language, the third-party

defense is not available to a party that acquired a contaminated facility with knowledge of the

contamination.

In In re Hemingway Transport, Inc., 933 F.2d 915 (1st Cir.), cert. denied, 510 U.S. 914

(1993), the First Circuit confirmed the limited scope of the third-party defense.  The court noted

that once a party falls within one of the categories of "covered persons" under § 107(a), "[t]he

harsh effects of the strict liability rule are subject to mitigation through resort to certain

affirmative defenses."  Id. at 932.  Explaining the third-party/innocent landowner defense, the

court wrote, "Section 9607(b)(3) would afford a complete defense to CERCLA liability" if the

---

5    Well-Com does not meet the definitional conditions of subsections ii or iii; therefore, they are not
addressed.

facility owner were to establish by a preponderance of the evidence that: (1) it acquired the facility after the deposit of hazardous substances; (2) "at the time of its acquisition, it did not know and had 'no reason to know' that any hazardous substance was deposited at the facility"; and (3) it exercised due care with respect to the hazardous substances. Id. If these three criteria are not met, the court explained, the facility owner would be "exposed . . . to the harsh consequences of strict, joint and several liability under CERCLA." Id. at 934.[4]

When it acquired the Site, Wel-Com was fully aware that the Site was contaminated. Therefore, under the statutory provisions discussed above, and as a matter of law, Wel-Com cannot establish the third-party/innocent landowner defense. Accordingly, Wel-Com is a PRP. Because it is a PRP, it has no cost recovery claim. The cost recovery claim – Count I of the Complaint – should be dismissed.

## II.    WEL-COM IS NOT ENTITLED TO COMPLETE INDEMNITY ON ITS CERCLA CONTRIBUTION CLAIM OR ITS CLAIMS UNDER CHAPTER 21E

As noted above, Wel-Com contends that it is entitled to 100% of its response costs in connection with the Site (and more). To the extent it contends that this entitlement arises under Section 107 of CERCLA (Count II) or Chapter 21E (Count III), it is in error.

### A.    Any Recovery Under Section 107 Must Be Limited

Wel-Com cannot recover 100% of its response costs from Honeywell on its Section 107 contribution claim. In a CERCLA contribution action, a court may use "such equitable factors as the court determines are appropriate" in allocating liability. 42 U.S.C. § 113(f)(1); see, e.g., One

---

[6]     On remand, the United States Bankruptcy Court for the District of Massachusetts ruled that even though the facility owner had had no *actual* knowledge of the contamination at the time of purchase, it still could not establish the innocent landowner defense. This was so, the court ruled, because the owner was deemed to have had reason to know of the contamination because it failed to demonstrate that it had undertaken "all appropriate inquiries" into

- 13 -

Wheeler Road Assoc. v. The Foxboro Co., 1995 WL 791937 at * 11 (D. Mass. 1995) ("the apportionment of remediation costs is typically an inexact science"); Kerr-McGee Chem. Corp. v. Lefton Iron & Metal Co., 14 F.3d 321, 326 (7th Cir. 1994); Envtl. Transp. Sys. v. ENSCO, Inc., 969 F.2d 503, 509 (7th Cir. 1992) (a court may consider any appropriate factors to "balance the equities" under the circumstances).

Many courts have held that pre-acquisition knowledge of contamination, a reduced purchase price, and sophistication on the part of a buyer are equitable factors that weigh against a plaintiff landowner. See, e.g., Smith Land & Improvement Corp. v. Celotex Corp., 851 F.2d 86, 90 (3rd Cir. 1988), cert. denied, 488 U.S. 1029 (1989). In Celotex Corp., as here, the plaintiff's predecessor in title, a "sophisticated company which had inspected the land" multiple times, purchased the property from the defendant "without concealment" at a price that "reflected the possibility of environmental risks." 851 F.2d at 88. In language that applies foursquare here, the court explained:

> [I]f the tract's price is reduced to allow for future environmental clean-up claims, the purchaser should not be entitled to double compensation. Nonetheless, the amount of the discount, if any, the cost of response, and other considerations may enter into the allocation of contribution by the district court in its exercise of discretion.

Id. at 90. Accord Amoco Oil Co. v. Borden, Inc., 889 F.2d 664, 673 (5th Cir. 1989) ("the circumstances and conditions involved in the property's conveyance, including the price paid and discounts granted, should be weighed in allocating response costs"). Notably, in In re Hemingway Transp., the First Circuit cited Celotex with approval. 933 F.2d at 933.

---

environmental conditions prior to its purchase of the facility.    In re Hemingway Transport, Inc., 174 B.R. 148 (D. Mass. 1994).

Wel-Com, a sophisticated buyer, acquired the Site at a discounted price,[5] knowing that the Site was contaminated. Therefore, under the authorities discussed above, Wel-Com may not recover 100% of its response costs on its contribution claim under CERCLA. Partial summary judgment on Count II indicating that Wel-Com's potential recovery shall be reduced to reflect its sophistication, knowledge, and discount should enter.

**B.    Any Recovery Under Chapter 21E Must Be Limited**

**1.    Contribution Under Chapter 21E**

Section 4 of Chapter 21E provides the cost recovery mechanism for one who has incurred response costs. Section 4 provides only for several liability:

> Any person who undertakes a necessary and appropriate response action regarding the release or threat of release of oil or hazardous material shall be entitled to reimbursement from any other person liable for such release or threat of release for the reasonable costs of such response action. If two or more persons are liable pursuant to section five for such release or threat of release, each shall be liable to the others for their equitable share of the costs of such response action . . . .

Mass. Gen. Laws c. 21E § 4. Under this express language, when a plaintiff is itself liable under Chapter 21E, it is entitled to recover from other liable parties only their equitable shares of response costs; it may not obtain "complete indemnity." See, e.g., Commonwealth v. Boston Edison Co., 828 N.E.2d 16, 31-33 (Mass. 2005); Martignetti v. Haigh-Farr, Inc., 680 N.E.2d 1131, 1140-45 (Mass. 1997).

---

[5]    It would appear that Mr. Pereira obtained full ownership of the Site by, at most, paying a small amount to the Black estate and assuming $3.9 million in debt, which he promptly reduced substantially. Honeywell is exploring when Mr. Pereira obtained the commitment to restructure the financing; if it pre-dated the conveyances from the Black estate and Carabetta, he actually assumed much less than $3.9 in debt. In any event, $3.9 million is far less than $10 million, the appraised value in 1987, and land values certainly have not decreased since 1987.

In Martignetti, for example, the Supreme Judicial Court ruled that because the plaintiff site owner was itself strictly liable to the Massachusetts Department of Environmental Protection under § 5(a)(1), any action by the plaintiff against other liable parties was one for contribution, entitling the plaintiff to recover only an equitable share from such other liable parties. 680 N.E.2d at 1140-45. The Martignetti court explained that the language of § 4 "authoriz[es] an action for the sharing of response costs, i.e., contribution, among parties whose underlying liability to the Commonwealth is imposed by the provisions of § 5." Id. at 1141-42. It also explained that such a contribution action is only for the recovery of a party's proportionate share, "and the party seeking contribution may do so only for what it has paid in excess of such a share." Id. at 1145 (citations omitted). See also Boston Edison, 828 N.E.2d at 31-33 (same).

## 2.     Wel-Com Is Itself Liable Under Chapter 21E

Wel-Com is liable under Chapter 21E, just as it is liable under Chapter 21E's federal counterpart. Section 5(a)(1) of Chapter 21E, Mass. Gen. L. ch. 21E, § 5(a)(1), provides, "Except as otherwise provided in this section, (1) the owner or operator of a . . . site from or at which there is or has been a release or threat of release of . . . oil or hazardous material . . . shall be liable, without regard to fault, . . .." Thus, a site owner is strictly liable under Chapter 21E, unless, as under CERCLA, it can establish one of the exclusive statutory defenses to liability. See, e.g., Martignetti, 680 N.E.2d at 1135-39.

Although it has not properly pleaded it (see Complaint, ¶¶ 78-82), Well-Com apparently will attempt to rely on the "innocent landowner" defense to liability under Chapter 21E.[6] The attempt will fail. Chapter 21E's third-party/innocent landowner defense is found in § 5(c)(3) of

---

[6]     "Generally, a failure to plead an affirmative defense results in the waiver of that defense and its exclusion from the case." 5 C.A. Wright & A.R. Miller, Federal Practice and Procedure § 1278 at 477 (2d ed. 1990).

Chapter 21E, which is virtually identical to Section 107(b) of CERCLA.  Section 5(c)(3)

provides:

> [T]here shall be no liability under paragraph (a) for a person otherwise liable who
> can establish by a preponderance of the evidence, (A) that the release or threat of
> release of oil or hazardous material and the damages resulting therefrom were
> caused by: (1) an act of God; (2) an act of war; (3) an act or omission of a third
> party other than an employee or agent of the person, or than one whose act or
> omission occurs in connection with a contractual relationship existing directly or
> indirectly, with the person,  .  ..

Mass. Gen. L. ch. 21E, § 5(c)(3).

The Massachusetts courts have not had occasion to address whether, as under CERCLA,

the third party defense is unavailable to a party that acquired a site with knowledge that it was

contaminated.[7]  The Supreme Judicial Court has instructed, however, that "CERCLA and G. L.

c. 21E have similar objectives and overlap in coverage.  To the extent that there are similarities

in language and structure, it is desirable to arrive at similar interpretations . . .." Martignetti, 680

N.E.2d at 1137 n.12.  Under this directive, because the language of ch. 21E, § 5(c)(3) , is

virtually identical to the language of CERCLA's third party defense, § 5(c)(3) should be

interpreted in the same way that the third party defense under CERCLA is interpreted.  Under

this interpretation, the defense is not available to a party, such as Wel-Com, that acquires a site

with knowledge that it is contaminated.

Accordingly, Well-Com is strictly liable under chapter 21E and is ineligible for the

innocent landowner defense.  It therefore may pursue from Honeywell only Honeywell's

equitable share of response costs.

---

[7]      In neither of the reported Massachusetts decisions discussing the innocent landowner defense, Oliveira v.
Pereira, 605 N.E.2d 287, 288-89 n.5 (Mass. 1992), and Nassr v. Commonwealth, 477 N.E.2d 987, 992 n.5 (Mass.
1985), is the defense addressed in the context of an owner's knowing acquisition of contaminated property.

### 3.    Wel-Com's Potential Recovery Must Be Reduced

The Supreme Judicial Court has not provided a precise formula for determining a responsible party's equitable share under Chapter 21E, much less done so in circumstances such as this case presents.  The court has said simply that the determination must "be done on a case-by-case basis."  Martignetti, 680 N.E.2d at 1145.  At the same time, the court has indicated, as noted above, that precedent under CERCLA should guide the interpretation and application of Chapter 21E.  There is ample relevant precedent under CERCLA.  Applying this precedent to Chapter 21E pursuant to the Supreme Judicial Court's directive in Martignetti, the share that Wel-Com may pursue from Honeywell must be reduced to reflect that Wel-Com is a sophisticated buyer that acquired the Site at a discounted price and with full knowledge that it was contaminated.  See, e.g., Celotex Corp., 851 F.2d at 90; Amoco Oil Co., 889 F.2d at 673; In re Hemingway Transp., 933 F.2d at 933.  Partial summary judgment on Count III indicating that Wel-Com's potential recovery shall be reduced to reflect its sophistication, knowledge, and discount should enter.

**Conclusion**

For the foregoing reasons, Honeywell respectfully requests that the Court dismiss Count I of the Complaint with prejudice and that, on Counts II and III, it enter partial summary judgment that Wel-Com is not entitled to 100% of its past and future response costs.

Dated: January 18, 2006

HONEYWELL INTERNATIONAL INC.,

By its attorneys,

/s/David B. Chaffin
Thomas K. Christo (BBO #083240)
David B. Chaffin (BBO #549245)
HARE & CHAFFIN
160 Federal Street
Boston, Massachusetts 02110-1700
(617) 330-5000

Of Counsel:

Brian D. Israel, Esq.
Arnold & Porter, LLP
555 12th Street, NW
Washington, D.C. 20004
(202) 942-6546

- 19 -