UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| WELL-COM ASSOCIATES, L.P.,    ) | |
|    ) | |
|       Plaintiff,    ) | |
|    ) | |
|    v.    ) | Docket No. 05-10056-JLT |
|    ) | |
| HONEYWELL INTERNATIONAL INC.,    ) | |
|    ) | |
|       Defendant.    ) | |

**DECLARATION OF THOMAS K. CHRISTO IN SUPPORT
OF HONEYWELL'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

I, Thomas K. Christo, declare, under the penalties of perjury, as follows:

1.     I am a member of the bar of this Court.

2.     I am lead counsel for Honeywell International, Inc.

3.     I make this declaration in support of Honeywell's motion for partial summary judgment.

4.     Attached hereto as Exhibit A is a true and correct copy of Plaintiff's Complaint.

5.     Attached hereto as Exhibit B is a true and correct copy of a Purchase and Sale Agreement, dated November 8, 1984, which was produced by Plaintiff.

6.     Attached hereto as Exhibit C is a true and correct copy of excerpts of an Environmental Site Assessment prepared by TRC Environmental Consultants, Inc., and dated November 15, 1995, which was produced by Plaintiff.

7.      Attached hereto as Exhibit D is a true and correct copy of a letter (with enclosure) from Joseph F. Carabetta to Stanton Black, dated December 20, 1985, which was produced by Plaintiff.

8.      Attached hereto as Exhibit E is a true and correct copy of the Closing Agreement relating to the December 1986 purchase by Messrs. Carabetta and Black of 378 Commercial Street, Malden, which was produced by Plaintiff.

9.      Attached hereto as Exhibit F is a true and correct copy of the deed conveying 378 Commercial Street to entities owned/controlled by Messrs. Carabetta and Black in December 1986, which was produced by Plaintiff.

10.      Attached hereto as Exhibit G is a true and correct copy of the March 6, 1987 appraisal report on 378 Commercial Street prepared by Robert Donnelly, which was produced by Plaintiff.

11.      Attached hereto as Exhibit H is a true and correct copy of a March 12, 1987 letter from Rosanna Sattler to Richard Chalpin, which was produced by Plaintiff.

12.      Attached hereto as Exhibit I is a true and correct copy of an attendance sheet relating to a June 21, 1988 meeting, which was produced by Plaintiff.

13.      Attached hereto as Exhibit J is a true and correct copy of a July 13, 1988 memorandum by Mike DiDiano, which was produced by Plaintiff.

14.      Attached hereto as Exhibit K is a true and correct copy of a February 14, 1990 letter from F. Michael DiGiano to David Cooke and Edward Kosangian (sic), which was produced by Plaintiff.

15.    Attached hereto as Exhibit L is a true and correct copy of a March 13, 1990 letter from Rosanna Sattler to F. Michael DiGiano, which was produced by Plaintiff.

16.    Attached hereto as Exhibit M is a true and correct copy of excerpts from the documents relating to the 1996 transfer of the interests of Joseph Carabetta and Commercial Street Properties in 378 Commercial Street and another property to Wel-Com Associates, Inc., and Combined Special Holdings Limited Partnership, which were produced by Plaintiff.

17.    Attached hereto as Exhibit N is a true and correct copy of a deed, dated July 19, 1996, conveying the interest of Commercial Street Properties, Inc., in 378 Commercial Street, Malden, to Wel-Com Associates, Inc., which was produced by Plaintiff.

18.    Attached hereto as Exhibit O is a true and correct copy of a deed, dated November 1, 1996, conveying the interest of Wel-Com, Inc., in 378 Commercial Street, Malden, to Wel-Com Associates Limited Partnership, which was produced by Plaintiff.

19.    Attached hereto as Exhibit P is a true and correct copy of a deed, dated November 1, 1996, conveying the interest of Wel-Com Associates, Inc., in 378 Commercial Street, Malden, to Wel-Com Associates Limited Partnership, which was produced by Plaintiff.

20.    Attached hereto as Exhibit Q are true and correct copies of excerpts from the documents relating to the 1996 restructuring of the Bank of Boston Connecticut loan relating to 378 Commercial Street, which were produced by Plaintiff.

21.    Attached hereto as Exhibit R is a true and correct copy of a letter from the DEP to John Pereira, dated October 21, 2005, which was produced by Plaintiff.

22.     Attached hereto as Exhibit S are true and correct copies of excerpts from the transcript of the deposition of John M. Pereira.

SIGNED UNDER THE PENALTIES OF PERJURY
THIS 18th DAY OF JANUARY 2006

/s/Thomas K. Christo_____
Thomas K. Christo

EXHIBIT A

I 10.05

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

WELL-COM ASSOCIATES, L.P.,

Plaintiff,

v.

HONEYWELL INTERNATIONAL, INC.,

Defendant.

Civil Action No.

## COMPLAINT

Well-Com Associates, L.P. ("Well-Com") brings this complaint for relief under the

Comprehensive Environmental Response, Compensation, and Liability Act of 1980

("CERCLA"), 42 U.S.C. § 9601 et seq., and Massachusetts G.L. c. 21E, against Honeywell

International, Inc. ("Honeywell"), and alleges as follows:

## THE PARTIES

1.     Plaintiff Well-Com is a Massachusetts limited

partnership, with a principal place of business at 300 Commercial Street, Malden, Massachusetts.

2.     Defendant Honeywell is a corporation organized and existing under the laws of

Delaware with its principal place of business in Morristown, New Jersey.  Honeywell is in the

business of manufacturing products and technologies related to homes, buildings, automobiles,

power generations systems, chemicals, fibers, and plastics, among other things.

3.     Honeywell is the corporate successor of AlliedSignal, Inc. ("Allied"), a Delaware

corporation with a principal place of business in New Jersey, and the Barrett Company

("Barrett"), a chemical company that began as a wholly owned subsidiary of Allied and eventually merged into an operating division of Allied. The corporate history of Allied and Barrett is set forth below in paragraphs 6 and 7.

## JURISDICTION AND VENUE

4.    The Court has subject matter jurisdiction pursuant to 42 U.S.C. § 9601, et seq. and 28 U.S.C. §§ 1331 and 2201. The Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over all claims arising under Massachusetts law.

5.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because it is where both the events giving rise to the claim occurred, and where the property that is the subject of the action is situated.

## FACTS

### The Defendant

6.    On information and belief, Allied began its corporate history as Allied Chemical and Dye Corporation, which was formed in 1920 as an amalgamation of five chemical companies: Barrett, Solvay Process Company, General Chemical Company, National Aniline & Chemical Company, and Semet-Solvay Company. The five companies operated as wholly owned subsidiaries until their merger in the 1940s, at which point they became operating divisions of Allied Chemical and Dye Corporation.

7.    On information and belief, Barrett merged with Allied in 1941.

8.    In 1958, Allied Chemical and Dye Corporation changed its name to Allied Chemical Corporation. In 1981, Allied Chemical Corporation changed its name to Allied Corporation. In 1985, Allied-Signal Inc. was formed when Allied Corporation

00887346                                          2

merged with The Signal Companies, Inc. In 1993, Allied-Signal, Inc. changed its name to

AlliedSignal. In 1999, Honeywell and Allied merged, and the new company has operated under

the name of Honeywell.

<u>The Site</u>

9.      On information and belief, in 1932, Barrett acquired a parcel of land of

approximately 9.5 acres located at what is now known as 378 Commercial Street, Malden,

Massachusetts ("Site").

10.     On information and belief, the Site was undeveloped marshland at the time of

Barrett's purchase of the property.

11.     At the time of its purchase in 1932, Barrett had already received a license from the

Commonwealth of Massachusetts for the rights to: 1) dredge the Malden River; 2) fill a portion

of the tidal creek on the Site; and 3) build a pier on the Malden River. On information and belief,

at some point between 1932 and 1939 Barrett exercised all of those rights under the license.

12.     On information and belief, on or about 1936 Barrett began construction of a coal

tar processing plant at the Site ("Plant"), and on or about 1937 Barrett opened the Plant for the

business of manufacturing and selling a variety of coal tar products, industrial chemicals, lead-

based paints, and protective coatings.

13.     On information and belief, Barrett received raw coal tar for processing via barge

and rail car.

14.     On information and belief, the Plant included a number of above and below

ground tanks for the storage and processing of coal tar and other chemicals. A drainage pipe led

from the tanks and process areas into an adjacent water body on the southern border of the Site

known as Little Creek, which feeds directly into the Malden River, located on the eastern border of the Site.

15.     On information and belief, a sand filter bed was located on the southwestern corner of the Site, immediately south of a railroad spur and immediately north of Little Creek. A sump structure and connecting drainage pipe led from the railroad spur in the direction of the filter bed, adjacent to Little Creek. A true copy of a photograph of the Site taken in approximately 1939 is attached hereto as Exhibit A.

16.     In 1941, Barrett deeded the Site to Allied Chemical and Dye Corporation in connection with the merger of the two companies.

17.     On information and belief, between the years 1937 and 1965, Barrett, and then Allied Chemical and Dye Corporation in 1941, operated the Plant at the Site, and there were a number of incidents in which tanks and stills on the Site experienced spills, leaks, fires, or explosions, including in approximately 1937, a 30,000 gallon spill that occurred at the Site.

18.     On information and belief, in filling the Site and operating the Plant, Allied and Barrett released hazardous substances and materials, including coal tar, coal tar related compounds, and other materials related to Plant operations, at the Site.

19.     In 1965, Allied Chemical Corporation sold the Site to Wellington Realty Corporation; at that time the Site was in a contaminated condition, and Allied did not remove or otherwise remediate the contamination at the Site upon the sale to Wellington.

20.     On information and belief, after the sale of the Site to Wellington Realty Corporation, Allied Chemical Corporation retained a facility on a leased back portion of the Site, which was occupied and operated by the Plastics Division of Allied Chemical Corporation until

at least 1970.

21.   In 1981, Wellington Realty Corporation deeded the Site to Wellington Realty Co., a Massachusetts Limited Partnership.

22.   In 1983, Wellington Realty Co., L.P. deeded the Site to Wellington Realty Co., a Massachusetts general partnership.

23.   In December of 1986, Wellington Realty Co. deeded the Site to Wellington Realty Company Limited Partnership.  That same month, Wellington Realty Company deeded a 50% undivided interest in the Site to Commercial Street Properties, Inc., a 49% undivided interest in the Site to Well-Com Associates, Inc., and a 1% undivided interest to Well-Com, Inc.

24.   In July of 1996, Commercial Street Properties, Inc. deeded its 50% undivided interest in the Site to Well-Com Associates, Inc.

25.   In November of 1996, Well-Com, Inc. deeded its 1% undivided interest in the Site to Plaintiff Well-Com Associates, L.P.  That same month, Well-Com Associates Inc. deeded its 99% interest in the Site to Well-Com, giving Well-Com full ownership of the Site.

26.   On information and belief, the above ground storage tanks at the Site were removed on or about 1966, and certain below ground storage tanks were removed on or about 1974.

27.   On information and belief, at some point in the mid 1970s, certain buildings associated with the plant were demolished and new buildings or additions to existing buildings were built.

28.   Since Allied's sale of the Site to Wellington Realty Corporation, the Site has been used for storage, warehousing, and parking of commercial vehicles.

00887346

5

29.    No release of oil or hazardous materials has occurred at the Site as a result of Site usage by Well-Com or any of its predecessors in interest since Wellington Realty Co. sold the Site in 1986.

30.    A number of environmental studies of the area known as the "Lower Commercial Street Area," in which the Site is located, were conducted throughout the mid to late 1980s, leading to the discovery of coal tar, coal tar related compounds, and other hazardous substances and materials on the Site.

31.    In December of 1986, Wellington Realty Co., Allied Corporation, and Well-Com, Inc., each received a "Notice of Responsibility Pursuant to M.G.L. Chapter 21E" from the Massachusetts Department of Environmental Quality Engineering, now known as the Massachusetts Department of Environmental Protection ("DEP"), informing those parties of their potential financial responsibility for environmental conditions at the Site. All three parties shared in the costs of the investigations of the entire lower Commercial Street area, which also included 326 and 356 Commercial Street.

32.    In 1987, DEP assigned a release tracking number and designated the Site as a Confirmed Disposal Site.

33.    In 2000, acting in accordance with revised Massachusetts Contingency Plan ("MCP") regulations, Rizzo Associates, Inc. ("Rizzo") prepared a Phase I Initial Site Investigation and Tier Classification Submittal ("Phase I report") for the Site and submitted it to DEP on behalf of Well-Com. The Phase I report classified the Site as a Tier II disposal site pursuant to the MCP.

34.    The Phase I report subsurface investigation revealed elevated concentrations

00887346

6

above the Reportable Concentrations ("RCs") under the MCP of polycyclic aromatic hydrocarbon ("PAH") compounds, lead, and arsenic in the soil.

35.    The subsurface investigation also revealed elevated concentrations above the applicable RCs of PAH compounds, extractable petroleum hydrocarbon ("EPH") compounds, cadmium, and cyanide in the groundwater.

36.    In April, 2001, Rizzo provided Well-Com with a proposal to implement a subsurface investigation at the Site and to prepare a Phase II Comprehensive Site Assessment and Phase III Remedial Action Alternatives Report ("Phase II/III report").

37.    On July 3, 2001, Well-Com served Honeywell with notice, pursuant to Mass. G. L. c. 21E, §4A, of its intent to seek contribution from Honeywell for the costs of environmental remediation at the Site, including costs already expended on the Phase I report.

38.    In November of 2001, acting pursuant to the procedure set forth in G. L. c. 21E, §4A, representatives of Well-Com and Honeywell met to discuss settlement. The parties were unsuccessful in reaching an agreement for allocating the costs of remediation amongst themselves.

39.    Since the parties' meeting, Well-Com undertook an extensive investigation of the history of the Site and Barrett and Allied's operations at the Site in order to enhance future remedial efforts.

40.    Well-Com's investigation also included a survey of other environmental reports related to the surrounding area, which is now part of an EPA-funded redevelopment project known as Telecom City.

41.    On November 26, 2003, DEP issued a Notice of Noncompliance with the MCP to

Well-Com, stating that the MCP deadlines had expired for submission of the Phase II/III report and a Phase IV Remedy Implementation Plan ("Phase IV plan").

42.    Well-Com requested an extension from DEP and received a revised deadline of July 1, 2004 for submission of the Phase II/III report, and a September 1, 2004 deadline for submission of the Phase IV plan.

43.    On March 25, 2004, Rizzo provided Well-Com with an updated proposal to implement the Phase II/III report, which Well-Com forwarded to Honeywell.

44.    On April 23, 2004, representatives of Well-Com hosted a meeting with representatives of Honeywell to share the results of its historic research of the Site and discuss plans for Site remediation.

45.    In May of 2004, Rizzo commenced subsurface investigations at the Site in connection with the Phase II/III report.

46.    On June 1, 2004, Well-Com and Honeywell entered into a "Memorandum of Agreement and Tolling Agreement" ("Tolling Agreement"), tolling any applicable statute of limitations while Rizzo prepared the Phase II/III report in accordance with the DEP deadline and the parties further discussed settlement.

47.    On June 3, 2004, Well-Com hosted another meeting with Honeywell to discuss the Phase II/III Report.

48.    On June 15, 2004, at Honeywell's request, Well-Com applied for and received from DEP an additional extension for the filing of the Phase II/III report of July 21, 2004.

49.    On July 20, 2004, at Honeywell's request, Well-Com applied for and received additional extensions from DEP of August 6, 2004 for the Phase II Comprehensive Site

Assessment, August 27, 2004 for the Phase III Remedial Action Alternatives Report, and December 17, 2004 for the Phase IV plan.

50.    Throughout the month of July, Well-Com and Honeywell prepared and circulated written comments to a draft Phase II Comprehensive Site Assessment provided by Rizzo, which they discussed with Rizzo during telephone conference calls. The Phase II Comprehensive Site Assessment was filed in accordance with the deadline of August 6, 2004.

51.    The Phase II report's subsurface investigation further delineated the extent of soil and groundwater contamination at the Site and also identified an area of Little Creek sediments containing elevated concentrations of EPH, PAH, lead, arsenic, cadmium, chromium, and mercury. The subsurface investigation revealed certain hot spots of soil and groundwater contamination on the Site, including two large areas of viscous and semi-viscous coal tars that represented non aqueous phase liquid (NAPL) under the MCP. These contaminants are by-products of Barrett operations including coal tar processing, paint and dye production and industrial chemical production.

52.    The Phase II report included a risk assessment, which found a condition of "significant risk" to human health, the environment and public welfare.

53.    On August 20, 2004, Well-Com and Honeywell discussed the draft Phase III report provided by Rizzo in late July of 2004, and had additional conferences concerning the Site.

54.    On August 27, 2004, the Phase III report was filed in accordance with the DEP deadline.

55.    The Phase III report evaluated a number of remedial alternatives and selected

00887346

9

excavation and off-site disposal as the remedy for contaminated soils and Little Creek sediments. The Phase III report also selected natural attenuation with spot pump and treat, in-situ chemical oxidation, and enhanced bioremdiation as the remedy for contaminated groundwater, after evaluating a number of alternatives.

56.    On September 15, 2004, the parties extended the Tolling Agreement until November 22, 2004, in order to provide Honeywell with an opportunity to prepare an alternative proposal to that contained in the Phase III report ("Honeywell Proposal").

57.    On November 5, 2004, Rizzo conducted additional soil and Little Creek sediment sampling on the Site, at Honeywell's request and in consultation with MACTEC, Inc., Honeywell's contractor in charge of preparing the Honeywell Proposal.  Rizzo provided MACTEC, Inc. with split samples of all samples collected.

58.    The parties further extended the Tolling Agreement until December 16, 2004, and again to January 9, 2005.

59.    On December 1, 2004, Honeywell provided Well-Com with the Honeywell Proposal.

60.    On December 16, 2004, representatives of Well-Com and Honeywell met to discuss the Honeywell Proposal and the possibility of settlement.

61.    Well-Com and Honeywell remain unable to reach an agreement for addressing Site contamination and allocating the costs of remediation.

62.    Well-Com has spent and continues to spend substantial sums for the investigation, assessment, and remedial response (collectively, "response costs") at the Site in accordance with the MCP.

00887346                                              10

63.     Well-Com's incurrence of response costs has been ongoing and is expected to continue.

64.     A substantial portion of the response costs result directly from contamination at the Site caused by Allied's use of the Site; Allied has had the benefit of the money it received to the sale of the Site since 1965, but has failed the clean up or remediate the contamination at the Site.

## COUNT I

### (CERCLA cost recovery)

65.     Well-Com incorporates by reference paragraphs 1 through 64 as if fully set forth herein.

66.     Honeywell is a person liable under 42 U.S.C. § 9607(a)(2) for the release of hazardous substances on the site.

67.     Honeywell's release of hazardous substances has caused the Well-Com to incur, and will continue to cause Well-Com to incur, "necessary costs of response" as defined by 42 U.S.C. § 9607(a)(4)(B).

68.     Well-Com's response actions are reasonable and consistent with the National Contingency Plan ("NCP").

71.     Well-Com has not caused any of the contamination at the Site.

72.     Well-Com is eligible for the defense to liability set forth in 42 U.S.C. § 9607(b)(3).

73.     Honeywell is subject to strict and joint and several liability pursuant to 42 U.S.C. § 9607(a).

00887346                                11

74.    By reason of the foregoing, Well-Com is entitled to: a) recover from Honeywell all of its necessary costs of response expended, including all costs spent by Well-Com in researching the Site history; and b) a judgment declaring Honeywell liable for necessary costs of response that Well-Com will expend in the future, in accordance with its final remediation plan.

<u>COUNT II</u>

(CERCLA contribution)

75.    Well-Com incorporates by reference paragraphs 1 through 74 as if fully set forth herein.

76.    The same prima facie elements that support Well-Com's claim for cost recovery, set forth above, also support Well-Com's claim in the alternative for contribution and equitable allocation pursuant to 42 U.S.C. § 9607.

77.    By reason of the foregoing, Well-Com is entitled to: a) recover from Honeywell an equitable allocation of all of its necessary costs of response expended, including all costs spent by Well-Com in researching the Site history; and b) a judgment declaring Honeywell liable for necessary costs of response that Well-Com will expend in the future, in accordance with its final remediation plan.

<u>COUNT III</u>

(Massachusetts G.L. c. 21E)

78.    Well-Com incorporates by reference paragraphs 1 through 77 as if fully set forth herein.

79.    Honeywell is a person liable under Mass. G.L. c. 21E, § 5(a)(2).

80.    Honeywell's release of hazardous materials has caused Well-Com to incur, and

will continue to cause Well-Com to incur, reasonable costs of "response" as defined by G.L. c. 21E §§ 2 and 4.

81.    Well-Com's has complied with Mass. G.L. c. 21E, § 4A, and its response actions are necessary, appropriate and consistent with the MCP.

82.    By reason of the foregoing, Well-Com is entitled to recover from Honeywell all of its response costs, both past and future, including all costs spent by Well-Com in researching the Site history, and all reasonable attorneys' fees, pursuant to G.L. c. 21E, §§ 4 and 4A.

<u>PRAYER FOR RELIEF</u>

WHEREFORE, Well-Com respectfully requests that this Court enter:

1.    Against Honeywell, a judgment for all response costs incurred at the Site, pursuant to 42 U.S.C. § 9607(a), or, in the alternative, an equitable allocation for the full amount pursuant to 42 U.S.C. § 9607;

2.    Against Honeywell, a judgment for all response costs incurred at the Site, pursuant to G.L. c. 21E, §§ 4 and 4A;

3.    Against Honeywell, a declaratory judgment establishing its liability in any action seeking recovery of further response costs related to its release at the Site, pursuant to 42 U.S.C. § 9613(g)(2) and G.L. c. 21E, §§ 4 and 4A;

4.    Against Honeywell, a judgment for attorneys' fees, pursuant to G.L. c. 21E, § 4A; and

5.    Such other relief as the Court deems appropriate.

Plaintiff claims a trial by jury for all claims so triable.

Well-Com Associates, L.P.

A. Neil Hartzell, Esq. (BBO #544752)
Matthew M. O'Leary (BBO #~~544752~~)
                                    652033
Donovan Hatem LLP
Two Seaport Lane
Boston, MA  02110
(617) 406-4500

Brian A. Cafferty, Esq. (BBO #637781)
Combined Properties
300 Commercial Street
Suite 25
Malden, MA  02148
(781) 321-7800

Dated:  January 10, 2004

00887346                          14

# EXHIBIT B

## PURCHASE AND SALE AGREEMENT

This _____ 8TH _____ day of _____ November _____ 19 84

**1. PARTIES**
*(fill in)*

**Wellington Realty Company,    a Massachusetts**
**general partnership,**
hereinafter called the SELLER, agrees to SELL and

**Carabetta Enterprises, Inc., a Connecticut corporation**
hereinafter called the BUYER or PURCHASER, agrees to BUY, upon the terms hereinafter set forth, the following described premises:

**2. DESCRIPTION**
*(fill in and include title reference)*

**The land together with the buildings and structures thereon situated on Commercial Street, Malden, Massachusetts and shown on Exhibit A hereto attached and hereby made a part hereof, meaning and intending to be all of the property of SELLER at that location on Commercial Street in Malden, Massachusetts. ("property or premises")**

**3. BUILDINGS, STRUCTURES, IMPROVEMENTS, FIXTURES**

*(fill in or delete)*

Included in the sale as a part of said premises are the buildings, structures, and improvements now thereon and the fixtures belonging to the SELLER and used in connection therewith including, if any, all venetian blinds, window shades, screens, screen doors, storm windows and doors, awnings, shutters, furnaces, heaters, heating equipment, stoves, ranges, oil and gas burners and fixtures appurtenant thereto, hot water heaters, plumbing and bathroom fixtures, electric and other lighting fixtures, mantels, ~~outside television antennas~~, fences, gates, trees, shrubs, plants, and, if built in, air conditioning equipment, ventilators, ~~garbage disposers, dishwashers, washing machines and driers; and~~
~~but excluding~~

**4. TITLE DEED**
*(fill in)*

*Include here by specific reference any restrictions, easements, rights and obligations in party walls not included in (b), leases, municipal and other liens, other encumbrances, and make provision to protect SELLER against BUYER'S breach of SELLER'S covenants in leases, where necessary.*

Said premises are to be conveyed by a good and sufficient **quitclaim** deed running to the BUYER, or to the nominee designated by the BUYER by written notice to the SELLER at least seven days before the deed is to be delivered as herein provided, and said deed shall convey a good and clear record and marketable title thereto, free from encumbrances, except

(a) Provisions of existing building and zoning laws; **(but not in violation thereof**
(b) ~~Existing rights and obligations in party walls which are not the subject of written agreement;~~
(c) Such taxes for the then current year as are not due and payable on the date of the delivery of such deed;
(d) Any liens for municipal betterments assessed after the date of this agreement;

**5. PLANS**

If said deed refers to a plan necessary to be recorded therewith the SELLER shall deliver such plan with the deed in form adequate for recording or registration.

**6. REGISTERED TITLE**

In addition to the foregoing, if the title to said premises is registered, said deed shall be in form sufficient to entitle the BUYER to a Certificate of Title of said premises, and the SELLER shall deliver with said deed all instruments, if any, necessary to enable the BUYER to obtain such Certificate of Title.

**7. PURCHASE PRICE**
*(fill in); space is allowed to write out the amounts if desired (provide for payment by certified or Bank's Check acceptable to the SELLER, if required)*

The agreed purchase price for said premises is **$3,800,000.00 payable as provided** in **(and subject to) the attached Rider** ~~dollars, of which~~

$ ~~have been paid as a deposit this day and~~

$ ~~are to be paid at the time of delivery of the deed in cash, or by certified, cashier's, treasurer's or bank check.~~

$

$                    ~~TOTAL~~                    0000366



**COPYRIGHT © 1978**
**GREATER BOSTON REAL ESTATE BOARD**

All rights reserved. This form may not be copied or reproduced in whole or in part in any manner whatsoever without the prior express written consent of the Greater Boston Real Estate Board.

**8. TIME FOR PERFORMANCE; DELIVERY OF DEED** *(fill in)*

Such deed is to be delivered at ~~o'clock~~ ~~M. on the~~ the closing (defined in said Rider) ~~at the~~ ~~Registry of Deeds~~, unless otherwise agreed upon in writing. It is agreed that time is of the essence of this agreement.

**9. POSSESSION and CONDITION of PREMISES.** *(attach a list of exceptions, if any)*

Full possession of said premises free of all tenants and occupants, except as herein provided, is delivered at the time of the delivery of the deed, said premises to be then (a) in the same condition as now are, reasonable use and wear thereof excepted, and (b) not in violation of said building and laws, and (c) in compliance with the provisions of any instrument referred to in clause 4 hereof. BUYER shall be entitled to an inspection of said premises prior to the delivery of the deed in order to determine whether the condition thereof complies with the terms of this clause.

**10. EXTENSION TO PERFECT TITLE OR MAKE PREMISES CONFORM** *(Change period of time if desired)*

If the SELLER shall be unable to give title or to make conveyance, or to deliver possession of the premises, all as herein stipulated, or if at the time of the delivery of the deed the premises do not conform with provisions hereof, then ~~any payments made under this agreement shall be refunded and all other obligations of the parties hereto shall cease and this agreement shall be void without recourse to the parties hereto~~ unless the SELLER shall use ~~reasonable~~ efforts to remove any defects in title, or to deliver possession as provided herein, or to make the said premises conform to the provisions hereof, as the case may be, ~~in which event the SELLER shall give written notice thereof to the BUYER at or before the time for performance hereunder~~, and thereupon the time for performance hereof shall be extended for a period of ~~thirty~~ ninety (90) days.

**11. FAILURE TO PERFECT TITLE OR MAKE PREMISES CONFORM, etc.**

If at the expiration of the extended time the SELLER shall have failed so to remove any defects in title, deliver possession, or make the premises conform, as the case may be, all as herein agreed, ~~or if at any time during the period of this agreement or any extension thereof, the holder of a mortgage on said premises shall refuse to permit the insurance proceeds, if any, to be used for such purposes, then, at the BUYER's option, any payments made under this agreement shall be forthwith refunded and all other obligations of all parties hereto shall cease and this agreement shall be void without recourse to the parties hereto.~~

**12. BUYER'S ELECTION TO ACCEPT TITLE**

The BUYER shall have the election, at either the original or any extended time for performance, to accept such title as the SELLER can deliver to the said premises in their then condition and to pay therefor the purchase price without deduction, in which case the SELLER shall convey such title, except that in the event of such conveyance in accord with the provisions of this clause, if the said premises shall have been damaged by fire or casualty insured against, then the SELLER shall, unless the SELLER has previously restored the premises to their former condition, either

(a) pay over or assign to the BUYER, on delivery of the deed, all amounts recovered or recoverable on account of such insurance, less any amounts reasonably expended by the SELLER for any partial restoration, or

(b) if a holder of a mortgage on said premises shall not permit the insurance proceeds or a part thereof to be used to restore the said premises to their former condition or to be so paid over or assigned, give to the BUYER a credit against the purchase price, on delivery of the deed, equal to said amounts so recovered or recoverable and retained by the holder of the said mortgage less any amounts reasonably expended by the SELLER for any partial restoration.

**13. ACCEPTANCE OF DEED**

The acceptance of a deed by the BUYER or his nominee as the case may be, shall be deemed to be a full performance and discharge of every agreement and obligation herein contained or expressed, except such as are, by the terms hereof, to be performed after the delivery of said deed.

**14. USE OF PURCHASE MONEY TO CLEAR TITLE**

To enable the SELLER to make conveyance as herein provided, the SELLER may, at the time of delivery of the deed, use the purchase money or any portion thereof to clear the title of any or all encumbrances or interests, provided that all instruments so procured are recorded simultaneously with the delivery of said deed.

**15. INSURANCE** *(Insert amount) (list additional types of insurance and amounts as agreed)*

Until the delivery of the deed, the SELLER shall maintain insurance on said premises as follows:

| Type of Insurance | Amount of Coverage |
|---|---|
| (a) Fire | $3,000,000.00 |
| (b) Extended coverage | |
| (c) | |

**16. ASSIGNMENT OF INSURANCE** *(delete entire clause if insurance is not to be assigned)*

~~Unless otherwise notified in writing by the BUYER at least seven days before the time for delivery of the deed, and unless prevented from doing so by the refusal of the insurance company(s) involved to issue the same, the SELLER shall assign such insurance and deliver binders therefor in proper form to the BUYER at the time for performance of this agreement. In the event of refusal by the insurance company(s) to issue the same, the SELLER shall give notice thereof to the BUYER at least business days before the time for performance of this agreement.~~

0000367

| 17. | ADJUSTMENTS (list operating expenses if any or attach schedule) | Collected rents, mortgage interest, prepaid premiums on insurance if assigned as herein provided, water, sewer use charges, operating expenses (if any) according to the schedule attached hereto or set forth and taxes for the then current year, shall be apportioned and fuel value shall be adjusted, as of the performance of this agreement and the net amount thereof shall be added to, or deducted from, as the case may be, the purchase price payable by the BUYER at the time of delivery of the deed. Uncollected rents for the current rental period shall be apportioned if and when collected by party. |

| 18. | ADJUSTMENT OF UNASSESSED AND ABATED TAXES | If the amount of said taxes is not known at the time of the delivery of the deed, they shall be apportioned on the basis of the taxes assessed for the preceding year, with a reapportionment as soon as the new tax rate and valuation can be ascertained; and, if the taxes which are to be apportioned shall thereafter be reduced by abatement, the amount of such abatement, less the reasonable cost of obtaining the same, shall be apportioned between the parties, provided that neither party shall be obligated to institute or prosecute proceedings for an abatement unless herein otherwise agreed. |

| 19. | BROKER'S FEE (fill in fee with a dollar amount or percentage; also name of Broker(s)) | A broker's fee for professional services of is due from the SELLER to the Broker(s) herein, but if the SELLER pursuant to the terms of clause 22 hereof retains the deposit made hereunder by the BUYER, said Broker(s) shall be entitled to receive from the SELLER an amount equal to one-half the amount so retained or an amount equal to the broker's fee for professional services according to this contract, whichever is the lesser. |

| 20. | BROKER(S) WARRANTY (fill in name) | The Broker(s) named herein warrant(s) that he (they) is (are) duly licensed as such by the Commonwealth of Massachusetts. |

| 21. | DEPOSIT (fill in, or delete reference to broker(s) if SELLER holds deposit) | All deposits made hereunder shall be held by the Escrowees specified in paragraph (A)(III) of the Rider, subject to the terms of this agreement and shall be duly accounted for at the time for performance of this agreement. |

| 22. | BUYER'S DEFAULT; DAMAGES | If the BUYER shall fail to fulfill the BUYER'S agreements herein, all deposits made hereunder by the BUYER shall be retained by the SELLER as liquidated damages unless within thirty days after the time for performance of this agreement or any extension hereof, the SELLER otherwise notifies the BUYER in writing. and retention of such deposits shall be SELLER'S sole and exclusive remedy at law or in equity. |

| 23. | SALE OF PERSONAL PROPERTY (fill in and attach list or delete entire clause) | The BUYER agrees to buy from the SELLER the articles of personal property enumerated on the attached list for the price of $ and the SELLER agrees to deliver to the BUYER upon delivery of the deed hereunder, a warranty bill of sale therefor on payment of said price. The provisions of this clause shall constitute an agreement separate and apart from the provisions herein contained with respect to the real estate, and any breach of the terms and conditions of this clause shall have no effect on the provisions of this agreement with respect to the real estate. |

| 24. | RELEASE BY HUSBAND OR WIFE | The SELLER'S spouse hereby agrees to join in said deed and to release and convey all statutory and other rights and interests in said premises. |

| 25. | BROKER AS PARTY | The broker(s) named herein, join(s) in this agreement and become(s) a party hereto, in so far as any provisions of this agreement expressly apply to him (them), and to any amendments or modifications of such provisions to which he (they) agree(s) in writing. |

| 26. | LIABILITY OF TRUSTEE, SHAREHOLDER, BENEFICIARY, etc. | If the SELLER or BUYER executes this agreement in a representative or fiduciary capacity, only the principal or the estate represented shall be bound, and neither the SELLER or BUYER so executing, nor any shareholder or beneficiary of any trust, shall be personally liable for any obligation, express or implied, hereunder. |

| 27. | WARRANTIES AND REPRE-SENTATIONS (fill in); if none, state "none"; if any listed indicate by whom each warranty or representation was made | The BUYER acknowledges that the BUYER has not been influenced to enter into this transaction nor has he relied upon any warranties or representations not set forth or incorporated in this agreement or previously made in writing, except for the following additional warranties and representations, if any, made by either the SELLER or the Broker(s): |

0000368

OF AGREEMENT
*delete "triplicate"
and substitute
"quadruplicate"
if required-

— is to be construed as a Massachusetts c
to take effect as a sealed instrument, sets forth the entire contract between the parties, is binding
enures to the benefit of the parties hereto and their respective heirs, devisees, executors, admir
successors and assigns, and may be cancelled, modified or amended only by a written instrument
by both the SELLER and the BUYER. If two or more persons are named herein as BUYER the
tions hereunder shall be joint and several. The captions and marginal notes are used only as a r
convenience and are not to be considered a part of this agreement or to be used in determining the
the parties to it.

29.  ADDITIONAL       The initialed  Rider   attached hereto,  is  incorporated herein by reference.
     PROVISIONS

CARABETTA ENTERPRISES, INC.          WELLINGTON REALTY COMPANY
BUYER                                 SELLER

By: _____          By: _____
    Its Treasurer duly authorized         Its duly authorized
                                          Managing General Partner

EXTENSION

The time for the performance of the foregoing agreement is extended until _____ o'clock __
the _____ day of _____ 19 ____ time still being of the essence of this agreement as extended
all other respects, this agreement is hereby ratified and confirmed.
     This extension, executed in triplicate, _____ is intended to take effect as a sealed instrument.

SELLER (or spouse) _____          SELLER _____

BUYER _____                        BUYER _____

Broker(s) _____

0000369

SJB  11/7/84

MB-26 #15
D-3   9/4/84
D-4 - 9/17/84

## RIDER TO PURCHASE AND SALE AGREEMENT
## BETWEEN WELLINGTON REALTY COMPANY AND
## CARABETTA ENTERPRISES, INC., MALDEN, MASSACHUSETTS

This Rider is attached to the printed portion of the within Purchase and Sale Agreement and supersedes any and all contrary provisions contained in such printed portion.

(A)(I)   The purchase price for the property is Three Million Eight Hundred Thousand Dollars ($3,800,000.00).

(A)(II)  The purchase price shall be payable as follows:

(a)   Two Hundred Thousand Dollars ($200,000.00) has been paid as a deposit this day.

(b)   $2,800,000.00 shall be paid in accordance with a purchase money note, which note shall provide for interest (fixed at the execution thereof) at the then prime rate of The Bank of Boston less two percent (2%) per annum, payable interest only on a monthly basis, with all accrued interest and principal payable in one year from Closing. Said note shall provide that it may be pre-paid without penalty, and said note shall be secured by a purchase money first mortgage. The form of such note and mortgage shall be subject to the reasonable approval of the parties.

(c)   The amount by which the purchase price (adjusted in accordance with the provisions of clause 17 of the printed portion of this Agreement) exceeds the total of (a) and (b) immediately above (and giving effect to any deduction under (D)(vii) below) shall be paid by certified, cashier's, treasurer's or bank check or checks at the time of delivery of the Deed.

(A)(III)  The deposit shall be held in escrow in an interest-bearing money market account to be selected by the Escrowees. The Escrowees shall be the respective attorneys for SELLER and BUYER. SELLER and BUYER agree that the Escrowees shall be liable to each of them only for the willful misconduct of the Escrowees and shall have no personal liability for any action taken by the Escrowees in good faith. BUYER shall be entitled to interest earned on said deposit for the first six months following the placing of such deposit in the interest-bearing money market account. All interest earned on said deposit thereafter shall be payable to SELLER. The Escrowees are authorized to pay over to SELLER or BUYER (as applicable) interest as earned in accordance with the

- 1 of 7 -

0000370

foregoing provisions.  The party to whom the
interest is ultimately paid shall be responsible
for income taxes thereon.


(B)   BUYER represents to SELLER that, in BUYER'S reasonable
business judgment, there will be expended by BUYER and
others for "Development Costs" (defined below) a sum of
approximately One Hundred Thousand Dollars
($100,000.00).  As used herein, the phrase "Development
Costs" means and includes, without limitation, the
following related to the property and the proposed
development thereon: environmental studies; engineering,
architect, surveying, legal and accounting fees; the
cost of so-called "in-house" labor and services of
BUYER, BUYER's associates, and public agencies such as
Malden Redevelopment Authority; the cost of certifica-
tions, title examinations and approvals; filing and
recording fees; and all other costs and expenses com-
monly incurred in connection with development similar to
the contemplated development of the property.  In the
event that this Agreement is not consummated because of
failure of one or more conditions precedent, BUYER shall
deliver to SELLER without charge (and without warranty
as to accuracy or completeness) such surveys, plans,
environmental reports, opinions, and similar material
relating to the property (except confidential material),
belonging to BUYER.

(C)   The delivery of the Deed and payment of the purchase
price ("closing") shall take place on December 31, 1986,
or such earlier date as BUYER may designate by not less
than thirty (30) days prior written notice to SELLER.
The closing shall take place at the offices of BUYER's
attorney or at the offices of BUYER'S lender or attor-
ney, as BUYER shall designate in writing to SELLER.

(D)   BUYER'S obligation to purchase the property is condi-
tioned upon fulfillment, to BUYER'S satisfaction, of
each of the following conditions:

   (i)   The property presently is in conformity with all
applicable urban renewal plans, zoning and envir-
onmental requirements.

   (ii)  The applicable urban renewal plans, zoning require-
ments and environmental requirements shall permit
BUYER's intended development of the property, and
BUYER shall have obtained all necessary approvals
with respect thereto in form acceptable to BUYER
and with the expiration of all applicable appeal
periods.

- 2 of 7 -

0000371

(iii)    BUYER shall have received from its title insurance company an owner's and a mortgagee title insurance policy at normal rates affirmatively insuring access to public way and affirmatively insuring its mortgagee against the lien for hazardous waste pursuant to Massachusetts General Laws Chapter 21E.

The foregoing conditions ((D)(i) through (iii)) shall be deemed to have been satisfied unless BUYER shall otherwise notify SELLER not later than six (6) months from the date of this Agreement; provided however, that if the conditions set forth in clause (D) (iii) above are satisfied or deemed satisfied, but because of subsequent activities on the property such affirmative insurance against the lien for hazardous waste shall not be available at closing, then BUYER shall have the right to cancel this Agreement.

(iv)    All buildings on the property shall be structurally sound and all mechanical systems in good operating condition. The condition set forth in this clause (iv) shall be deemed to have been satisfied unless BUYER shall otherwise notify SELLER not later than one month from the date of this Agreement.

(v)    If required by BUYER'S Title Insurance Company, there shall be in existence at the closing a valid irrevocable license to fill (issued by the Commonwealth of Massachusetts or other appropriate governmental authority) affecting the property.

(vi)    Except as set forth below with respect to the existing lease to Nelson and Small, the property shall at closing be subject to no leases or other tenancy or occupancy agreements, except only for (a) tenants at will on a month to month basis, terminable by the lessor on not more than thirty (30) days prior written notice, (b) the leases listed on Exhibit B, and (c) such other leases as may be executed by Seller from and after the date hereof provided said other leases are terminable by the Lessor on sale of the property or demolition of the buildings thereon on not more than six (6) months prior written notice without payment of consideration. SELLER agrees to obtain BUYER's approval to such cancellation language inserted in any leases hereafter executed, and SELLER further agrees not to execute any lease in contravention of the provisions of this clause (vi).

- 3 of 7 -

0000372

In the event that any one or more of the foregoing conditions precedent set forth in this paragraph (D) shall not have been fulfilled and be in effect as of the closing (or such earlier date as specifically provided above), or if BUYER terminates this Agreement pursuant to this clause (D), this Agreement and all rights and obligations hereunder not then accrued shall cease and terminate, and the escrowee shall refund the deposit to BUYER.

(E)     This Agreement is subject to BUYER obtaining a so-called "official action notice" from the Massachusetts Industrial Finance Agency or local IDFA confirming that the "Project" (meaning BUYER's development on the property) as set forth in the applicable Project Information Statement meets the requirements for non-taxable industrial revenue bond financing.  If BUYER does not obtain the so-called "official action notice" within six months from the date of this Agreement then BUYER may terminate this Agreement by written notice to SELLER, in which event BUYER shall forfeit its deposit to SELLER as liquidated damages and all other obligations of the parties hereto shall cease and this Agreement shall be void and without further recourse to the parties hereto.

(F)     At the closing, SELLER shall deliver to BUYER the following:

(a)     A recordable Certificate of Vote of SELLER authorizing the sale of the premises and execution of all documents required in connection therewith;

(b)     A recordable Certificate of Legal Existence of SELLER issued by the Secretary of the Commonwealth of Massachusetts;

(c)     Opinion of SELLER's counsel, reasonably satisfactory to BUYER's counsel, concerning authority, due execution and validity; and

(d)     Either (i) a recordable waiver under M.G.L. c.62C, § 52 of the corporate excise tax lien applicable to the sale of the premises by SELLER to BUYER or (ii) such documentation as is required by BUYER's title insurer to enable it to delete an exception for such lien from BUYER's owner's title insurance policy and from any title insurance policies issued to any mortgages of BUYER.

(G)     BUYER and its agents, independent contractors and invitees shall have the right, at BUYER's expense and risk, to enter upon the property from and after the date of this Agreement (without undue interference with the

- 4 of 7 -

0000373

conduct of business on the property) for the purpose of
inspecting the property, making surveys of the same,
conducting borings, percolation tests, soil tests and
the like.  BUYER shall indemnify and hold harmless
SELLER from and against all liability for damage to
persons or property arising out of or in connection with
any of BUYER's activities on the property and shall
restore the property to its original grade after comple-
ting such activities.  Following the execution of this
Agreement, Buyer shall have the right to construct signs
on or about the property advertising the property for
rental and/or indicating a telephone number for infor-
mation concerning the property, as BUYER elects.  SELLER
shall have the right to approve of the form, wording and
placement of such signs, which approval shall not be
unreasonably withheld or delayed.

(H)     SELLER agrees to execute at or prior to closing such
affidavits and indemnities as BUYER's title insurer or
mortgagee may reasonably require in connection with
parties in possession and mechanics liens.

(I)     If, during the period beginning with the date of this
agreement and continuing for a period of ten
(10) years following the conveyance of the property in Malden,
Massachusetts pursuant to this Purchase and Sale Agree-
ment, SELLER or an affiliate or affiliates of SELLER
receives any acceptable bona fide offer to buy all or
any part of premises ("Premises") in Medford, Massachu-
setts on Corporation Way,

> extending
> easterly to
> the Malden
> River, being
> bounded north-
> erly by the
> property of the
> SELLER which
> is the subject
> of this Agree-
> ment, and
> southerly by
> land now or
> formerly of
> Wellington
> Realty Co.,
> which area
> is shown on

Exhibit C hereto attached , SELLER or such affiliate or
affiliates shall furnish BUYER with a complete copy of
the purchase and sale agreement ("P&S") acceptable to
SELLER or its affiliate or affiliates, which shall
constitute an offer to sell to BUYER all or such portion
of such Premises on the terms of the P&S.  THE P&S shall
be accompanied by a list of all existing leases, with
details thereof, and with other pertinant information
reasonably required by BUYER to review the P&S.  BUYER
shall have a period of ninety (90) days after receipt of
the P&S to accept the P&S or reject it; failure to
accept within such period of time shall be deemed a
rejection.  If BUYER accepts the P&S, then the parties
shall comply with the terms of the P&S.  If BUYER re-
jects the P&S, SELLER shall have a period of forty-five
(45) days to sign the P&S, and shall have the period of
time stated in the P&S to consummate the sale under the
P&S; otherwise the terms of this paragraph shall remain
in effect.  If the P&S applies to only a part of the
Premises, the remainder of the Premises shall continue
to be subject to this Section.  This Section shall apply
not only to offers to purchase all or part of the Prem-

- 5 of 7 -

0000374

ises but shall also apply so so-called groundleases or similar long term leasing arrangements (i.e., leases for terms, including options, of more than five years) of all or part of the premises, and shall be applicable to the SELLER, its affiliates, nominees, heirs, executors or assigns and to property now owned or hereafter purchased or assembled. The provisions of this paragraph shall be contained in the deed of conveyance of the Malden property.

SELLER shall have the right to develop all of such premises in Medford in its own name, but shall not, directly or indirectly, enter into a joint venture or similar arrangement relating to the Premises without offering BUYER the same right, upon all the same terms and conditions (including submission of a copy of the proposed joint venture or other arrangements) as set forth above in this Paragraph I.

(J)   Notices hereunder shall be sent by certified or regis-tered mail, return receipt requested, if intended for SELLER to be addressed to SELLER at P.O. Box 122, Medford, MA 02155, Attn: Edward Kazanjian and if intended for BUYER to be addressed to BUYER at 200 Pratt Street, Meriden, Connecticut 06450, with a copy mailed in the same manner to Stephen J. Buchbinder, Esquire, 1200 Walnut Street, Newton, MA 02161   All notices hereunder shall be deemed given when mailed as aforesaid.

(K)   With respect to the existing lease to Nelson and Small (copy of which is hereto attached as Exhibit D), BUYER reserves the right to negotiate with the tenant thereof to effect the termination of such lease prior to its expiration date. In the event that BUYER shall arrange such agreement with the tenant of the Nelson and Small lease, SELLER shall reimburse BUYER for one half of the total amount payable by BUYER to such tenant to effect such agreement, except that in no event shall SELLER be obligated to pay more than $200,000.00. If SELLER shall fail to make such payment, BUYER shall have the right to deduct such amount from the purchase price hereunder. In the event that such tenant has not entered into an agreement terminating its tenancy on a date earlier than the expiration date of the lease, then the existence of such lease shall not affect BUYER'S obligation to make the purchase hereunder, except that in such event the purchase price shall be reduced by the total sum of $200,000.00, resulting in a purchase price of $3,600,000.00, except that if BUYER'S payment to Nelson and Small is less than Four Hundred Thousand Dollars ($400,000.00), the Purchase Price shall be reduced only by fifty percent (50%) of such lesser amount.

- 6 of 7 -

0000375

(L)    The parties have executed a notice of this Agreement and will execute modifications thereof (without details as to price) if required for recording.

0000376



Exhibit

0000377

EXHIBIT B

| LESSEE | TERMINATION DATE |
|---|---|
| Coastal Inc. | 9/30/85 with option to extend for 1 year which option may be terminated by Lessor's notice to Lessee upon entering into agreement to sell premises or by the actual sale of premises. SELLER agrees to issue such notice immediately upon the execution of this Agreement. |
| Wellington Trading Corp. | 10/31/86 |

0000378



Exhibit C

0000379

**REALTOR®**

Exhibit D

## STANDARD FORM COMMERCIAL LEASE

Member Greater Boston Real Estate Boar

WELLINGTON REALTY COMPANY, P.O. Box 122
40 Canal St., Medford, MA 02155

**1. PARTIES**
*(fill in)*

LESSOR, which expression shall include _its_ heirs, successors, and assigns where th context so admits, does hereby lease to Nelson & Small, Inc., a Maine corporat with principal offices at 212 Canco Rd., Portland, ME 04103

LESSEE, which expression shall include _its_ successors, executors, administra tors, and assigns where the context so admits, and the LESSEE hereby leases the following described premises

**2. PREMISES**
*(fill in and include, if applicable, suite number, floor number, and square feet)*

20,000 square feet of warehouse space at 378 Commercial St. Malden, MA, which premises are outlined on the attached sep- arate site and floor plans together with full access rights from Commercial St. and exclusive parking areas as outlined on said Plan. Subject to square footage adjustment as set forth in Rider.

together with the right to use in common, with others entitled thereto, the hallways, stairways, and elevators necessary for access to said leased premises, and lavatories nearest thereto.

**3. TERM**
*(fill in)*

The term of this lease shall be for five (5) years plus fifteen (15) days commencing on December 15, 1983 and ending on December 31, 1988, subje to option set forth in Rider, attached hereto.

**4. RENT**
*(fill in)*

The LESSEE shall pay to the LESSOR rent at the rate of $4 per sq.ft. per year for ~~xxxx~~ ~~xxxxx~~ payable in advance in monthly installments of the first 3 years = 15 days equal thereafter as set forth in :

**5.** ~~SECURITY~~ ~~DEPOSIT/MONTH'S~~ **RENT**
*(fill in)*

Upon the execution of this lease, the LESSEE shall pay to the LESSOR the ~~xxxxxxxx~~ 1st mo. rent ~~xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx~~ ~~xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx~~

**6. RENT ADJUSTMENT**

**A. TAX ESCALATION**
*(fill in or delete)*

If in any tax year commencing with the fiscal year 1985, the real estate taxes on the land and buildings, of which the leased premises are a part, are in excess of the amount of the real estate taxes thereon for the fiscal year 1984 (hereinafter called the "Base Year"), LESSEE will pay to LESSOR as additional rent hereunder, when and as designated by notice in writing by LESSOR, 17.69 per cent of such excess that may occur in each year of the term of this lease or any extension or renewal thereof and proportionately for any part of a fiscal year. If the LESSOR obtains an abatement of any such excess real estate tax, a proportionate share of such abatement, less the reasonable fees and costs incurred in obtaining the same, if any, shall be refunded to the LESSEE. The entire building contains 113,000 sq.ft. The percen stated above will be adjusted upward or downward depending on ~~xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx~~

**B.** ~~OPERATING~~ ~~COST~~ ~~ESCALATION~~
*(fill in or delete)*

~~xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx~~ ~~xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx~~

B. Deleted

0000380

~~xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx~~

**C.** ~~CONSUMER~~ ~~PRICE~~ ~~ESCALATION~~
*(fill in or delete)*

~~xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx~~ ~~xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx~~ ~~xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx~~ ~~xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx~~ ~~xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx~~ ~~xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx~~

C. Deleted

**the exact number of square feet which Lessee leases using the exact square feet as the numerator and 113,000 sq.ft. as the denominator.

COPYRIGHT © 1968
GREATER BOSTON REAL ESTATE BOARD
REVISED 1981

All rights reserved. This form may not be copied or reproduced in whole or in part in any manner whatsoever without the prior ex press written consent of the Greater Boston Real Estate Board

[struck-through illegible text block]

[struck-through illegible text block]

**7.  UTILITIES**

*"delete "air conditioning"*
*if not applicable*

The LESSEE shall pay, as they become due, all bills for electricity and other utilities (whether they are used for furnishing heat or other purposes) that are furnished to the leased premises and presently separately metered and all bills for fuel furnished to a separate tank servicing the leased premises exclusively. [struck-through text block]

LESSOR shall have no obligation to provide utilities or equipment other than the utilities and equipment with the premises as of the commencement date of this lease. In the event LESSEE requires additional utilities or equipment, the installation and maintenance thereof shall be the LESSEE's sole obligation, provided that such installation shall be subject to the written consent of the LESSOR.

**8.  USE OF LEASED**
**PREMISES**
*(fill in)*

The LESSEE shall use the leased premises only for the purpose of offices and/or ware-housing and/or distribution.

**9.  COMPLIANCE**
**WITH LAWS**

The LESSEE acknowledges that no trade or occupation shall be conducted in the leased premises or use made thereof which will be unlawful, improper, noisy or offensive, or contrary to any law or any municipal by-law or ordinance in force in the city or town in which the premises are situated, except Lessor ack-ledges that offices & warehousing are permissible.

**10.  FIRE INSURANCE**

The LESSEE shall not permit any use of the leased premises which will make voidable any insurance on the property of which the leased premises are a part, or on the contents of said property or which shall be contrary to any law or regulation from time to time established by the New England Fire Insurance Rating Association or any similar body succeeding to its powers. The LESSEE shall on demand reimburse the LESSOR, and all other tenants, all extra insurance premiums caused by the LESSEE's use of the premises.

**11.  MAINTENANCE**

**A. LESSEE'S**
**OBLIGATIONS**

The LESSEE agrees to maintain the leased premises in good condition, damage by fire and other casualty only excepted, and whenever necessary, to replace plate glass and other glass therein, acknowledging that the leased premises are now in good order and the glass whole. The LESSEE shall not permit the leased premises to be overloaded, damaged, stripped, or defaced, nor suffer any waste. LESSEE shall obtain written consent of LESSOR before erecting any sign on the premises. Lessee shall make routine maintenance repairs only. Lessor shall be responsible for capital repair on

**B. LESSOR'S**
**OBLIGATIONS**

The LESSOR agrees to maintain the structure of the building of which the leased premises are a part in the same condition as it is at the commencement of the term or as it may be put in during the term of this lease, reasonable wear and tear, damage by fire and other casualty only excepted, unless such maintenance is required because of the LESSEE or those for whose conduct the LESSEE is legally responsible.

**2.  ALTERATIONS –**
**ADDITIONS**

The LESSEE shall not make structural alterations or additions to the leased premises, but may make non-structural alterations provided the LESSOR consents thereto in writing, which consent shall not be unreasonably withheld or delayed. All such allowed alterations shall be at LESSEE's expense and shall be in quality at least equal to the present construction. LESSEE shall not permit any mechanics' liens, or similar liens, to remain upon the leased premises for labor and material furnished to LESSEE or claimed to have been furnished to LESSEE in connection with work of any character performed or claimed to have been performed at the direction of LESSEE and shall cause any such lien to be released of record forthwith without cost to LESSOR. All alterations or improvements made by the LESSEE shall become the property of the LESSOR at the termination of occupancy as provided herein. See Rider attached.

**3.  ASSIGNMENT-**
**SUBLEASING**

The LESSEE shall not assign or sublet the whole or any part of the leased premises without LESSOR's prior written consent. Notwithstanding such consent, LESSEE shall remain liable to LESSOR for the payment of all rent and for the full performance of the covenants and conditions of this lease.

*        ling the foundation & the roof, weather & water tight
**            consent not to be unnecessarily withheld or delayed.

0000381

14. SUBORDINATION

This lease shall be subject and subordinate to any and all mortgages, deeds of trust and other instruments in the nature of a mortgage, now or at any time hereafter, a lien or liens on the property of which the leased premise are a part and the LESSEE shall, when requested, promptly execute and deliver such written instruments a shall be necessary to show the subordination of this lease to said mortgages, deeds of trust or other such instruments in the nature of a mortgage. See Rider attached.

15. LESSOR'S
ACCESS

The LESSOR or agents of the LESSOR may, at reasonable times, enter to view the leased premises and may remove placards and signs not approved and affixed as herein provided, and make repairs and alterations a LESSOR should elect to do and may show the leased premises to others, and at any time within three (3) months before the expiration of the term, may affix to any suitable part of the leased premises a notice for letting or selling the leased premises or property of which the leased premises are a part and keep the same so affixed without hindrance or molestation.

6. INDEMNIFI-
CATION AND
LIABILITY
(fill in)

The LESSEE shall save the LESSOR harmless from all loss and damage occasioned by the use or escape of water or by the bursting of pipes, as well as from any claim or damage resulting from neglect in not removing snow and ice from the roof of the building or from the sidewalks bordering upon the premises so leased, or by any nuisance made or suffered on the leased premises, unless such loss is caused by the neglect of the LESSOR The removal of snow and ice from the sidewalks bordering upon the leased premises shall be
        Lessee's          responsibility.

7. LESSEE'S
LIABILITY
INSURANCE
(fill in)

The LESSEE shall maintain with respect to the leased premises and the property of which the leased premises are a part comprehensive public liability insurance in the amount of $500,000 with property damage insurance in limits of $100,000 in responsible companies qualified to do business in Massachusetts and in good standing therein insuring the LESSOR as well as LESSEE against injury to persons or damage to property as provided. The LESSEE shall deposit with the LESSOR certificates for such insurance at or prior to the commencement of the term, and thereafter within thirty (30) days prior to the expiration of any such policies. All such insurance certificates shall provide that such policies shall not be cancelled without at least ten (10) days prior written notice to each assured named therein.

8. FIRE,
CASUALTY –
EMINENT
DOMAIN

Should a substantial portion of the leased premises, or of the property of which they are a part, be substantially damaged by fire or other casualty, or be taken by eminent domain, the LESSOR may elect to terminate this lease. When such fire, casualty, or taking renders the leased premises substantially unsuitable for their intended use, a just and proportionate abatement of rent shall be made, and the LESSEE may elect to terminate this lease if:

    (a) The LESSOR fails to give written notice within thirty (30) days of intention to restore leased premises, or

    (b) The LESSOR fails to restore the leased premises to a condition substantially suitable for their intended use within ninety (90) days of said fire, casualty or taking.

The LESSOR reserves, and the LESSEE grants to the LESSOR, all rights which the LESSEE may have for damages or injury to the leased premises for any taking by eminent domain, except for damage to the LESSEE's fixtures, property, or equipment.

DEFAULT
AND
BANKRUPTCY
(fill in)

In the event that:

    (a) The LESSEE shall default in the payment of any installment of rent or other sum herein specified and such default shall continue for ten (10) days after written notice thereof; or

    (b) The LESSEE shall default in the observance or performance of any other of the LESSEE's covenants, agreements, or obligations hereunder and such default shall not be corrected within thirty (30) days after written notice thereof; or

    (c) The LESSEE shall be declared bankrupt or insolvent according to law, or, if any assignment shall be made of LESSEE's property for the benefit of creditors,

then the LESSOR shall have the right thereafter, while such default continues, to re-enter and take complete possession of the leased premises, to declare the term of this lease ended, and remove the LESSEE's effects, without prejudice to any remedies which might be otherwise used for arrears of rent or other default. The LESSEE shall indemnify the LESSOR against all loss of rent and other payments which the LESSOR may incur by reason of such termination during the residue of the term. If the LESSEE shall default, after reasonable notice thereof, in the observance or performance of any conditions or covenants on LESSEE's part to be observed or performed under or by virtue of any of the provisions in any article of this lease, the LESSOR, without being under any obligation to do so and without thereby waiving such default, may remedy such default for the account and at the expense of the LESSEE. If the LESSOR makes any expenditures or incurs any obligations for the payment of money in connection therewith, including but not limited to, reasonable attorney's fees in instituting, prosecuting or defending any action or proceeding, such sums paid or obligations insured, with interest at the rate of 12 per cent per annum and costs, shall be paid to the LESSOR by the LESSEE as additional rent. Lessor will pay Lessee's legal fees if Lessee prevails in dispute with Lessor.

NOTICE
(fill in)

Any notice from the LESSOR to the LESSEE relating to the leased premises or to the occupancy thereof, shall be deemed duly served, if left at the leased premises addressed to the LESSEE, or if mailed to the leased premises, registered or certified mail, return receipt requested, postage prepaid, addressed to the LESSEE.*Any notice from the LESSEE to the LESSOR relating to the leased premises or to the occupancy thereof, shall be deemed duly served, if mailed to the LESSOR by registered or certified mail, return receipt requested, postage prepaid, addressed to the LESSOR at such address as the LESSOR may from time to time advise in writing. All rent notices shall be paid and sent to the LESSOR at P.O. Box 122, Medford, MA 02155

    * At the address stated above, or that Lessee may advise from
    time to time in writing.

0000382

21. SURRENDER

The LESSEE shall at the expiration or other termination of this lease remove all LESSEE's goods and effects from the leased premises, (including, without hereby limiting the generality of the foregoing, all signs and lettering affixed or painted by the LESSEE, either inside or outside the leased premises). LESSEE shall deliver to the LESSOR the leased premises and all keys, locks thereto, and other fixtures connected therewith and all alterations and additions made to or upon the leased premises, in good condition, damage by fire or other casualty only excepted. In the event of the LESSEE's failure to remove any of LESSEE's property from the premises LESSOR is hereby authorized, without liability to LESSEE for loss or damage thereto, and at the sole risk of LESSEE, to remove and store any of the property at LESSEE's expense, or to retain same under LESSOR's control or to sell at public or private sale, without notice any or all of the property not so removed and to apply the net proceeds of such sale to the payment of any sum due hereunder, or to destroy such property.

22. ~~BROKERAGE~~
    (fill in or delete)

~~It is hereby understood~~

~~...................................................................................~~
~~...................................................................................~~
~~...................................................................................~~

~~...................................................................................~~
~~...................................................................................~~

~~...................................................................................~~

### 22.  Deleted

23. OTHER
    PROVISIONS

It is also understood and agreed that  Rider attached hereto is part of this Lease.

IN WITNESS WHEREOF, the said parties hereunto set their hands and seals this _____3rd_____ day of ____November____, 19 83.

ELSON & SMALL, INC.                          WELLINGTON REALTY

By _____                By _____
LESSEE  Its  Pres                           LESSOR  Its
                                            Mng. Agt.    Partner

LESSEE                                       LESSOR


BROKER(S)


0000383

RIDER TO LEASE BETWEEN
WELLINGTON REALTY CO., LESSOR
AND
NELSON & SMALL, INC.
DATED: Nov. 3rd 1983

24.    Lessor will promptly undertake and complete at its expense the Schedule of work described as "Lessor's Work" attached hereto, to ready the Premises for Lessee's occupancy. Lessee and Lessor shall each pay for one-half the cost of the items of Lessor's Work designated "Shared Expense."

25.    The term of the Lease shall begin on December 15, 1983, so long as substantially all of Lessor's work shall be complete; otherwise to begin when so complete. Lessee can begin its improvements immediately.

26.    Lessor shall at all times keep the area (marked on the Plan "Open Area") fronting on Commercial Street free and clear of vehicles, trailers, equipment or other obstacles so that there is always clear unobstructed visibility of the Premises from Commercial Street.

27.    The Rent in the Lease year beginning January 1, 1987 shall be $4.30 per square foot, payable monthly and $4.30 in Lease year beginning January 1, 1988 plus a one time supplemental rent payment of $3,000 on the first day of January, 1988.

28.    Provided Lessee is not then in default, Lessee shall have an option to extend the original term for an additional term of five (5) years on all the same terms and conditions as during the initial term except that the annual base rent shall be $5.00 per square foot payable in equal monthly installments during the first two and one-half (2 1/2) years of the extended term and $5.75 during each of the last two and one-half (2 1/2) years of the extended term, payable 1/12 monthly. Lessee shall exercise its option by written notice to Lessor not less than six (6) months prior to the end of the initial five (5) year term. Lessee can terminate the Lease during the optional renewal term by giving notice any time in the last six (6) months of the second year of said renewal term that it will terminate as of the last day of the thirtieth (30th) month of said renewal term.

29.    Notwithstanding any provision of paragraph 15, Lessee shall not subordinate this Lease to any future mortgagee unless the mortgagee gives Lessee a recognition agreement suitable to Lessee's counsel. Lessor warrants that the present mortgage on the leased premises is less than $310,000 principal balance.

30.    The Lessor warrants to the Lessee that the Premises are zoned for Lessee's intended use, that there are no restrictions prohibiting or restricting Lessee's right to use the premises for offices and warehousing and distribution purposes or the parking of trucks at the premises, and that construction described in the Schedule attached hereto are in substantial conformance with all applicable laws and regulations. It is





0000384

-2-

further understood that the Lessor's covenant to remove vehicles and all other obstacles from the area in front of adjacent premises as shown in the Plan and keep the area clear of obstructions during the term is a material inducement to Lessee's execution of this Lease and undertaking the improvement described herein.

31.   The Lessor is contemplating the construction of a new warehouse building on the land separately indicated on the site Plan.   The Lessor hereby grants to the Lessee a right of first negotiation to lease or purchase these premises prior to the commencement of construction.

32.   In the event truck access to or from Route 16 via Commercial Street is materially interfered with for over ten (10) consecutive business days, the rent shall abate by 50% until the interference terminates; if the interference continues for over sixty (60) consecutive calendar days, Lessee shall have the right to terminate this Lease as of the last day of any month.  If Lessee does not terminate within four months, the rent thereafter shall be equitably abated.

33.   Lessor will cooperate with Lessee and assist Lessee at all times in connection with the acquisition of necessary building permits.  Lessee's obligations hereunder are conditional upon the issuance within thirty (30) days of all building permits required to carry out the improvements described on the attached work schedule.  If said permits are not issued within thirty (30) days, lessee shall be free to terminate this lease without any further obligations and shall also be entitled to the return of all rent payments made.

34.   All Lessor's improvements and Lessee's improvements will comply with the building code of Malden.

35.   Lessee shall be entitled to remove its trade fixtures at any time.

36.   The attached floor plan describes Sections A, B and C of the building. Lessee will occupy all of Section A.  Lessee can also add Sections B and C to the Lease at any time prior to December 31, 1983.  Lessee may use Sections B and C without charge until Lessor's work is completed. Section B will be at the same rent per square foot as Section A.  Section C shall be at a lower rate to Lessee to be determined by Lessor prior to November 15, 1983.  $6666 of rent will be paid at Lease signing (to be applied to the rent due for the month of January 1984, with such additional amounts as shall be due if more than 20,000 square feet is ultimately leased) and one-half (1/2) a month's rent on December 15, 1983.  Regular rent will commence on January 1, 1984 and the correct monthly amount due will be ascertained and adjusted at that time dependent on how much space has actually been leased, and the rent as actually determined to the extent that Section C is utilized.

1201.001

[SCHEDULE OF LESSOR'S WORK - AT LESSOR'S EXPENSE]

1.  Demising wall - as located.  Full ceiling height.  Fire rated board.

2.  One load leveler at Tenant's designated location.

3.  Dock bumpers for all loading docks.

4.  Repair and/or replace all roll-up doors to first class condition and appearance, weather and water tight.

5.  Clean and reseal entire floor.

6.  Repair and grade all asphalt in parking lot, first class appearance.

7.  Recement front steps and new door assembly, including lites; first class quality.

8.  Exterior Mercury vapor lamps (no less than 3); building mount.

9.  Paint all visible exteriors of building.

10. Repair and/or replace all existing strip lighting fixtures in warehouse area to Tenant's standard needs for Armstrong-type warehouse.

11. Obtain and pay for cost of outside building permits including window cuts.

12. Landscape triangle as per site plan.

[SCHEDULE OF LESSOR'S WORK - AT SHARED EXPENSE 50/50 WITH LESSEE]

1.  Interior paint - white - all warehouse walls.

2.  Cutouts for exterior windows/windows/installation.

3.  Aluminum anodyzed panels - on full x + y exterior to edge of Tenant's tenancy where area to be painted is covered, paint allowance credited to Tenant in full.

4.  Appropriate Ramp for truck entry plus truck door (16' door) on Commercial Street side.

5.  Relocation of water and sewer pipes for new bathroom

6.  Landscaping adjacent to front of building

7.  Three phase power to building

[SCHEDULE OF LESSEE'S WORK - AT LESSEE'S EXPENSE]

1.  Building of offices and showrooms pursuant to plans to be approved by lessor, approval not to be unreasonably withheld.

[ALL WORK TO BE DONE USING FIRST CLASS MATERIALS AND WORKMANSHIP, PURSUANT TO THE BUILDING CODE.]

0000386





# Commercial/Industrial Warehouse Space for
### 378 Commercial Street, Malden, MA 02148







0000388

# EXHIBIT C

ENVIRONMENTAL SITE ASSESSMENT
MALDEN, MASSACHUSETTS

PREPARED FOR:
NORWOOD ENGINEERING CO., INC.
NORWOOD, MASSACHUSETTS



TRC Environmental Consultants, Inc.

TRC Project No. 3021-N81-22

November 15, 1985

**800 Connecticut Blvd.
East Hartford, CT 06108
(203) 289-8631**

0001305

TABLE OF CONTENTS

SECTION                                                              PAGE

            EXECUTIVE SUMMARY . . . . . . . . . . . . . . . . .      ii

1.0         INTRODUCTION  . . . . . . . . . . . . . . . . . . .      1

2.0         SITE SETTING AND SITE HISTORY . . . . . . . . . . .      3
    2.1         Site Setting . . . . . . . . . . . . . . . . .       3
    2.2         Site History . . . . . . . . . . . . . . . . .       3

3.0         SITE GEOLOGY . . . . . . . . . . . . . . . . . . .       12

4.0         NATURE AND EXTENT OF SOIL AND WATER CONTAMINATION . .    19
    4.1         Field Investigation Techniques . . . . . . . . .     19
        4.1.1       Field Sampling Program . . . . . . . . . . .     19
    4.2         Site Contaminants . . . . . . . . . . . . . . . .    21
        4.2.1       Wellington Property . . . . . . . . . . . . .    21
        4.2.2       Malden Department of Public Works - MPDW. . . .  30
        4.2.3       Lombard Property and Adjacent Areas . . . . . .  32
        4.2.4       Off-Site Contamination . . . . . . . . . . .     32
        4.2.5       OVA Results . . . . . . . . . . . . . . . . .    33

5.0         RISK ASSESSMENT . . . . . . . . . . . . . . . . . .      36
    5.1         Hazard Identification . . . . . . . . . . . . . .    37
    5.2         Exposure Assessment . . . . . . . . . . . . . . .    45
        5.2.1       Inhalation. . . . . . . . . . . . . . . . . .    45
        5.2.2       Ingestion . . . . . . . . . . . . . . . . . .    48
        5.2.3       Dermal Exposure . . . . . . . . . . . . . .      48
    5.3         Health Risk Evaluation. . . . . . . . . . . . .      49

6.0         CONCLUSION . . . . . . . . . . . . . . . . . . . .       51

            REFERENCES . . . . . . . . . . . . . . . . . . . .       54

APPENDICES

A       SITE EVALUATION FOR POTENTIAL OF HAZARDOUS MATERIALS AND OIL,
        NORWOOD ENGINEERING

B       BORING LOGS

C       ANALYTICAL DATA
        C-1  FIRST ROUND SOIL SAMPLES
        C-2  FIRST ROUND WATER SAMPLES
        C-3  SECOND ROUND SOIL SAMPLES
        C-4  SECOND ROUND WATER AND FIRST ROUND SEDIMENT SAMPLES

D       MASTER LIST OF SAMPLES ANALYZED

E       CORPORATE RECORDS FROM SECRETARY OF STATES OFFICE

F       TECHNICAL REPORTS RE: WATER QUALITY MALDEN RIVER IN MALDEN,
        MASSACHUSETTS, COMPILED BY FAY, SPOFFORD & THORNDIKE, INC.

0001306

EXECUTIVE SUMMARY

A geohydrologic investigation was conducted at three properties along Commercial Street in Malden Massachusetts pursuant to the requirements of Massachusetts General Law Chapter 21E. The investigation began in March 1985 with the submittal of a field work plan to the Department of Environmental Quality Engineering (DEQE) for their review and approval. Shortly after the submittal to DEQE and the incorporation of their comments into the work plan, the site studies were begun.

The subject properties are identified as the Lombard Trucking terminal, the Malden DPW garage and the Wellington Realty property. The field studies included a terrain conductivity survey (geophysics), test pit excavations, exploratory bore holes, and monitoring wells, along with the environmental sampling and analysis of site soils, ground water, river and creek water, river sediments and organic vapor testing. The analytical program was structured to determine the presence of hazardous materials and/or oils associated with past and present site activities. A title and records search of the area indicated certain manufacturing industries existed which most likely involved the use of hazardous materials and the storage of petroleum products.

The topography of the site is relatively flat and much of the land surface is covered with asphalt pavement or occupied by single story buildings. Ground water is shallow, usually less than 10 feet, and generally flows west to east toward the Malden River. Ground water contours in the vicinity of Little Creek follow the channel meander and have localized flow directions to the south into the creek.

0001307

A terrain conductivity survey was performed and anomalies detected were excavated as test pits. No buried tanks nor drums were found. A major portion of the site has a substantial amount of fill overlying natural unconsolidated sand, silt, peat and clay layers. The clay was found anywhere between 6 and 46 feet below the surface near Commercial Street, to between 15 and 30 feet at the river. It is the major impermeable layer in the area.

Waste products found at the site can be grouped into four general categories: 1.) coal tar by-products, chemically identified as polynuclear aromatic hydrocarbons (PAH's); 2.) fuel oil components, chemically identified as purgeable aromatic hydrocarbons; 3.) solvents, primarily dichlorobenzenes and 4.) and several inorganic compounds.

On the Wellington property, the major environmental concerns are: the coal tar by-products found in the site soils and the sediments of the Little Creek; and arsenic bearing wastes identified in one of the test pits. PAH contaminated soil was generally located to the west and south of the existing building. PAH's in ground water were found in parts of the Wellington property.

Arsenic-bearing materials were identified in the fill west of the Wellington buildings. The material appears to be of limited lateral extent and no significant concentrations of arsenic were detected in the ground water. This suggests isolated deposition of the material which may be remediated by removal.

On the DPW property the major contaminants are fuel oils and fuel oil related compounds, and coal tar by-products. Slightly elevated metals concentrations were noted in soil samples from some of the borings (MM-2, MM-3). The fuel oils and fuel oil related compounds may be the result of leakage from past or present underground storage, past disposal of lubricating oils or dredge spoil disposed of on site. The elevated metal concentrations

0001308

are most probably associated with the dredge spoil. Coal tar by-products are found along the southern and northern property lines. The coal tar contamination along the southern property line appears to be part of the coal tar by-products found on the Wellington property. The coal tar contamination along the northern property line appears to be very localized. The existing underground fuel storage tanks are currently being tested to help determine the precise source of the fuel oil related contamination.

The principal contaminants on the Lombard property are chlorinated benzenes which are apparently from an off site source to the west and small area of coal tar and fuel oil contamination along the southern property line. Chlorinated benzenes were first detected on the Lombard property as reported by Norwood Engineering for Carabetta Enterprises in September 1984. Boring B-8 and test pit TP-15 encountered strong solvent odors associated with soils recovered from these areas. The maximum level of chlorinated benzenes in on-site ground water was found in well ML-3 at 0.17 ppm on the Lombard property. The maximum level of chlorinated benzenes in off-site ground water was found in a well of unknown construction (shown on Figure 2-5 as UNK-1) at 44 ppm.

Soils recovered from test pit TP-15 were analyzed and the total chlorinated benzene level was found at 3.17 ppm. The coal tar contamination appears to be in a small narrow band which straddles the Lombard and DPW property. There is fuel oil related contamination in the same general area as the coal tar.

Organic vapor levels measured during well and test pit excavations were significantly above ambient background levels. It is uncertain to what degree that natural organic decomposition (especially associated with peat layers) contributed methane to these vapor levels since the OVA was calibrated to benzene.

0001309

The data suggest that the greatest potential risks posed by materials on site may occur during construction activities associated with future development in certain contaminated areas on the properties. Exposures to certain chemicals may result in adverse health effects, if no special precautions are taken. Skin contact with virtually all of the contaminants in the soil and ground water is to be avoided. Inhalation protection would be required for site construction workers near and in the more highly contaminated coal tar and solvent areas. While these may pose potential risk to site workers, they may be easily mitigated with appropriate respiratory and direct contact protection. Development of the site would have very limited risk potential to surrounding residents or occupants of the new buildings.

The following is a summary of TRC's conclusions regarding the Commercial Street properties based on the data collected to date.

0001310

Conclusions:

- There is contamination of the Lombard property from apparent off-site sources. The potential of an active source of solvents warrants further investigation to the extent it impacts the site project.

- To a minor extent there are pockets of fuel oil related contamination on all three sites. Only that found on the northside of the DPW property appears to be recoverable.

- Most of the PAH's are coal tar related compounds tied up in fill or natural materials. Limited areas of potentially recoverable tars occur to the west of the Wellington building. Dissolved PAHS are encountered in low concentrations throughout the site.

- Inorganic compounds are found in the soil on both the DPW and Wellington properties. The isolated pocket of arsenic bearing materials on the Wellington site warrants consideration for removal.

- The greatest potential risk related to specific on-site contamination is to workers during future construction activities. However, these risks can be minimized with proper respiratory and contact protection.

0001311

TABLE OF CONTENTS
(Continued)

LIST OF FIGURES

| FIGURE | | PAGE |
|---|---|---|
| 2-1 | Site Location Map | 4 |
| 2-2 | Property Ownership Map | 6 |
| 2-3 | Historic Land Use Map | 8 |
| 2-4 | Aerial View (1960) | 10 |
| 2-5 | Sampling Location Map | 11 |
| 3-1 | Depth to Clay | 13 |
| 3-2 | Profile A-A[1] | 14 |
| 3-3 | Profile B-B[1] | 15 |
| 3-4 | Profile C-C[1] | 16 |
| 3-5 | Ground Water Contour Map | 18 |
| 4-1 | Contaminated Areas of Concern | 26 |
| 4-2 | Summary of Average OVA Readings | 35 |

LIST OF TABLES

| TABLE | | PAGE |
|---|---|---|
| 2-1 | Historic Land Use | 5 |
| 4-1 | Soil Analytical Data | 22 |
| 4-2 | Ground Water Analytical Data | 24 |
| 4-3 | Sediment and Surface Analytical Data | 25 |
| 4-4 | Summary of Analytical Chemistry Findings from NURP Priority Pollutant Samples (Includes Information Received Through July 31, 1985) | 28 |
| 5-1 | Ranges of Concentrations of Contaminants in Soils (mg/kg), and Ground Water (mg/l) at the Commercial Street Site | 38 |
| 5-2 | List of Contaminants of Concern | 43 |
| 5-3 | Summary of Information on Water Quality and Drinking Water Criteria for Selected High-Priority Chemical Contaminants | 46 |

0001312

1.0 <u>INTRODUCTION</u>

An environmental site evaluation was performed on three adjacent commercial properties in the City of Malden, Massachusetts to determine the possible presence of oil and/or hazardous materials relative to Massachusetts General Law Chapter 21E. The site includes three parcels totaling approximately 21.6 acres along Commercial Street immediately to the north of the Malden-Medford line. In 1984, Norwood Engineering conducted a preliminary site investigation of 326 Commercial Street (Lombard Trucking terminal) for possible oil and hazardous wastes on the property (Appendix A). The Norwood preliminary investigation indicated the presence of some hazardous materials under the applicable criteria of Chapter 21E. In January, 1985, the Massachusetts Department of Environmental Quality Engineering (DEQE), after reviewing Norwood's report, requested that any further site studies include portions of the Lombard property closer to Commercial Street.

In March, 1985, at the direction of Norwood Engineering Inc., TRC Environmental Consultants, Inc. initiated a further investigation of the properties including the Lombard property, the Malden Department of Public Works (DPW), and the Wellington Realty property to the south to assess potential environmental and public health risks associated with contaminants found to be present.

To evaluate the these sites, TRC developed a program including a field sampling, laboratory analysis and risk assessment. TRC collected historical information, some of which was provided by the Malden Redevelopment Authority (MRA) and Norwood. Norwood also provided survey and technical support. A copy of TRC's field work plan which included all sampling and analytical protocols was submitted to and approved by the DEQE prior to the initial field investigation. This report summarizes TRC's field sampling methods, laboratory results and discusses the health risks associated with the sites.

0001313

-1-

This report is divided into five sections including this Introduction. Section 2 describes the site setting and site history, Section 3 depicts the geology of the site, Section 4 discusses the nature and extent of soil and water contamination and Section 5 assesses the risks associated with the site.

0001314

## 2.0 SITE SETTING AND SITE HISTORY

### 2.1 Site Setting

The site is situated along the east side of Commercial Street along the Malden River (Figure 2-1). The site is bordered on the north by an office building on property which had been a sports stadium and on the south by a stream, Little Creek, which marks the Malden-Medford town boundary.

The land in the immediate vicinity of the site is developed and is used for warehousing, commercial, and light industrial purposes. Within one quarter of a mile of the site to the northwest, east, and southeast are single and multiple family residential units.

Although originally a tidal wetlands area, the site was filled and converted to industrial use during the early 1900s (Table 2-1). The development of flood control structures on the Mystic River eliminated the tidal nature of the Malden River and the inflow of brackish water.

The Malden River has no water supply use and limited, if any, recreational use. Drinking and industrial water in the area is provided by the MDC and there are no known private wells in the vicinity of the site.

The site is underlain by fill material of various thicknesses. This fill is, in turn, underlain by an organic silt or peat layer reminiscent of the wetlands which once existed there. A thick accumulation of silts and clays underlays the peat. A more detailed discussion of site geology can be found in Section 3.

### 2.2 Site History

Current ownership and land use of the site is depicted in Figure 2-2. As indicated on the map, the current owners are Lombard Management Co., Inc., Malden Redevelopment Authority (MRA), and Wellington Realty Company.

0001315



PROJECT SITE

Figure 2-1.  Site Location Map

0001316

TABLE 2-1

HISTORIC LAND USE

---

Lombard

| | |
|---|---|
| 1967 – present | Lombard Trucking – terminal and warehousing |
| 1943 – 1967 | Joseph McGuire and H.H. McGuire Co., Inc. Contractors Asphalt |
| 1926 – 1939 | Blue Diamond Materials Co., Mortar and Plaster Manufacturer |
| 1914 – 1921 | Bell Rock Leather and Tanning Co. |
| 1908 – 1922 | Eastern Metals and Refining Co. |

Malden Redevelopment Authority

| | |
|---|---|
| 1979 – 1985 | Malden Public Works Yard Equipment Fueling and Maintenance |
| 1977 – 1979 | Dredge Spoil Disposal Basin |
| 1974 – 1977 | Unoccupied |
| 1929 – 1974 | Richard Co. – Non-ferrous metals refining |
| 1917 – 1922 | Eastern Metals and Refining Co. |

Wellington Realty

| | |
|---|---|
| 1969 – present | Various manufacturing distributors and trucking companies (swimming pool distribution, two trucking companies, hero coating and adhesives) |
| 1965 – 1969 | Unoccupied |
| 1922 – 1965 | The Barret Co. (Allied Chemical and Dye) Coal Tar Products |
| 1917 – 1922 | Eastern Metals and Refining Co. |
| 1908 – 1917 | Bell Rock Leather and Tanning Co. |

---

0001317

Figure 2-2. Property Ownership Map

0001318

Historic land uses associated with the site are provided in Table 2-1 and Figure 2-3. Insurance maps made by the Sanborn Map Company in the early 1930s show Mansfield Paint and Varnish Company immediately to the west of the Lombard property. The Barret Co. (part of Allied Chemical and Dye) was located on the Wellington property. Sanborn maps from 1956 show that Hopwood Refining Corporation and Consolidated Iron Works replaced the Mansfield Company. The U.S. Government property, north of the Lombard property was replaced by an athletic field which in turn was replaced by the Riverview Office Park. Also, west of the Lombard property was Solvent Chemical Company. Corporate records obtained from the Secretary of State's Office show possible discrepancies in reference to company locations. For instance, the Bell Rock Leather and Tanning Co. (1914-1921), and the Eastern Metals and Refining Co. (1908-1922), show dates which overlap. Since no map location of these businesses could be found, it is most probable that both existed at the designated times in different buildings, not consecutively owned at the same building location (see Appendix E). Commercial Street which runs along the western side of the site was linked to that portion running south of Little Creek in the early 1970's. Prior to that Commercial Street was a dead end at the southern end of the Richards Co. which is currently the DPW yard.

The Sanborn maps also show a earlier pathway in which the Malden River once flowed. Apparently there was two islands, one at the southern end of the Wellington property and the second at the middle of the eastern property line of Lombard and Malden Redevelopment Authority (MRA). Also, information provided by a Norwood Engineering plan dated May 5, 1978 and four technical reports compiled by Fay, Spofford, & Thorndike, Inc. (Appendix F) shows a dredge disposal basin existed at the MRA property. The area covered by this basin was approximately 300 feet along north-south boundaries and 550 feet along east-west boundaries.

0001319

-7-



NOTE: Building locations taken from historic photos and Sanborn Insurance Maps. Therefore, locations are approximate.

SCALE   0 ___ 100 FT

LEGEND

- - - - - - PROPERTY LINE BOUNDARIES

APPROXIMATE BOUNDARIES OF ORIGINAL RIVER CANAL (Sanborn Maps, 1904)

TEST PIT

WELL OR BORING

SEDIMENT SAMPLE

HISTORIC LAND USE

APPROX. EDGE OF WATER (1977-Present)

OLD MIDDLE LINE OF LITTLE CREEK (1932)

DREDGE DISPOSAL AREA (1978)

Figure 2-3.  Historic Land Use Map

0001320

A 1960 aerial view of the site is shown in Figure 2-4. Notable features include: random fill and asphalt pile placement on the McGuire (Lombard) property, possible drum storage at the back of Richards Co. (Malden Public Works), and random fill and barrel storage at the southern end of the Barret Company (Wellington). Figure 2-5 is a Sample Location Map showing sampling locations and existing buildings.

0001321



Figure 2-4.  Aerial View (1960)

0001322



Figure 2-5.  Sample Location Map

0001323

LEGEND

—————— PROPERTY LINE BOUNDARIES

⬭ APPROXIMATE BOUNDARIES OF
  ORIGINAL RIVER CANAL (Sanborn Maps,
  1904)

▭ TEST PIT

⊙ WELL OR BORING

● SEDIMENT SAMPLE

~~~~ APPROX. EDGE OF WATER (1977-Present)

▲ SURFACE WATER SAMPLE

3.0 <u>SITE GEOLOGY</u>

The Commercial Street properties are part of what was originally tidal wetlands.  Flood control structures on the Mystic River and artificial fill have changed the tidal nature of the Malden River to its present non-tidal character.

The specific site stratigraphy at the Malden site is derived from test borings and test pits completed in the past ten years.  The upper eight feet of material at the site is artificial fill (i.e., brick fragments, asphalt, woodchips, etc.).  Rubble from several buildings and clean clays from excavation or dredging are also present.  Additionally, there was a dredge disposal basin which occupied the area of the Malden DPW in the late 1970s as shown in Figure 2-3.  Spoils from the basin are believed to have been used as along the banks of the Malden River.  Normally underlying the fill is a layer of black organic silty peat which accumulated during the time the area was a tidal wetland.  A sand and gravel unit underlies the peat.  This unit is brown to gray in color and is composed of fine to coarse sand and gravel.  In places, the sand and gravel may include a fair amount of organic material.  The typical thickness of the sand and gravel is 6 to 10 feet, but locally it ranges up to 30 feet.

Underlying the sand and gravel layer is a light yellow to bluish gray clay unit, typically referred to as the Boston Blue Clay.  The unit commonly exhibits alternating bands of silt and fine sand within the clay matrix.  In general, the material overlying the clay forms a wedge which is thicker at the Malden River and thins toward Commercial Street.  As shown in Figure 3-1, the upper surface of the clay is quite uneven.

Figures 3-2, 3-3, and 3-4 are stratigraphic profiles for selected borings and test pits along W-E lines running from Commercial Street to the Malden River.  The lines chosen for these profiles are shown on the site location map

0001324

-12-



Figure 3-1. Depth to clay, in feet, based on 44 test borings made by Carr-Dee Test Borings in the past 10 years. Contour interval is

0001325



Figure 3-2.
PROFILE A-A'

0001326



Figure 3-3.7
PROFILE B-B'

0001327



COMMERCIAL STREET

DEPTH (FEET)

ORGANIC VAPOR ANALYSIS ON
SAMPLES FROM SPECIFIC DEPTHS

NO DETECTABLE ODOR

OVA < 100 PPM BUT NOTICEABLE ODOR

OVA 100-500 PPM

OVA 500-1000 PPM

OVA > 1000 PPM

0001328

   APPROXIMATE POS 1

   SOIL SAMPLE TAKE
FROM DEPTH SHOWN

(Figure 2-1).    The profiles demonstrate that site geology is often more complex than the simple four-layer stratigraphy outlined above.    The peat, which generally directly underlies the fill, may be separated from the fill by a layer of sand and gravel and is commonly interlayered and mixed with the sand and gravel.

Similarly, in the zone above the blue clay, the sand and gravel unit is commonly mixed and interlayered with the clay.    Figures 3-2 through 3-4 also contain OVA data.    These data are discussed in Section 4.2.5.

Water levels in site borings were used to prepare a water table (Figure 3-5).    Flow is generally toward the Malden River and Little Creek.

The hydraulic conductivity of the various units at the Malden site varies over several orders of magnitude.    Ground water (and entrained or dissolved contaminants) can be expected to move most rapidly through the fill and sand/gravel units.    Movement of ground water through the peat and clay should be considerably slower.    The clay unit, which underlies the other materials, has a hydraulic conductivity which is low enough to serve as an impermeable boundary to the downward movement of contaminants.

Constant head permeability tests were performed in the fill and peat on monitoring wells MM-3 and MM-4 on the Malden DPW property and on monitoring wells MW-1 on the Wellington Realty property.    The resulting soil permeabilities ranged from $7.12 \times 10^{-4}$ cm/sec on the DPW property to $2.6 \times 10^{-3}$ cm/sec. on the Wellington Realty property.    The resulting Darcien flow velocities were 0.10 feet/day toward the Malden River and 0.28 feet/day toward the Little Creek.

**0001329**



SCALE  0      100 FT

0001330

LEGEND

———————— PROPERTY LINE BOUNDARIES

◯ APPROXIMATE BOUNDARIES OF
   ORIGINAL RIVER CANAL (Sanborn Maps,
   1904)

▱ TEST PIT

⊙ WELL OR BORING

● SEDIMENT SAMPLE

≈≈≈≈ APPROX. EDGE OF WATER (1977-Present)

Figure 3-5.  Ground Water Contours
             Malden River Site

4.0 <u>NATURE AND EXTENT OF SOIL AND WATER CONTAMINATION</u>

4.1 <u>Field Investigation Techniques</u>

    TRC conducted a field investigation of the site to determine the extent of contamination present and the potential risk posed by any contamination and to provide a basis for appropriate remedial responses that may be required. To achieve these goals, TRC developed a detailed work plan to define site geohydrology, the nature of the contaminants, and the controls on their movement.

    The field work plan provides specific information about the site investigation procedures. The program included a limited geophysical survey, test pit excavations, installation of monitoring wells, organic vapor analysis, and ground water, soil, and sediment sampling and analysis. Quality assurance and site safety plans are integrated into the work plan.

    4.1.1 <u>Field Sampling Program</u>

    TRC mobilized a team of hydrogeologists and engineers to conduct field sampling on March 26, 1985. During the following two weeks, an extensive ground conductivity survey was performed on a 25 foot center grid over all the properties. Conductivity anomalies (conductive and resistive) from this survey were used to locate 15 test pits that were excavated for detailed contaminant and geologic identifications. Nine test borings finished as monitoring wells were installed: five on the Wellington property (MW-1 through MW-5) and four on the DPW property (MM-1 through MM-4). All test borings were completed to the blue clay (depths from 16' - 30' from the ground surface).

    All soil samples from the test pits and borings were screened using an organic vapor analyzer (OVA) calibrated daily to 19.1 ppm (parts per million) of benzene and zeroed using 0.00 ppm organic free air . Readings were

0001331

recorded on the test pit and boring logs and used in the selection of soil samples submitted for chemical analysis. Ground water sampling was conducted at each of the monitoring wells two weeks after the drilling to allow stabilization.

In the last week of June and first week in July, a second drilling program was initiated to obtain in formation on off-site contributions to site conditions on the west side of Commercial Street. Exploratory borings 1 through 11 were drilled and well 5 was installed. Drilling was terminated, that is not drilled to the clay layer, when solvent odor and organic vapor readings indicated high levels of contamination. Borings 2 and 6 were selected for soil analysis to provide an indication of the extent of contamination to the west of the property boundary.

In early August, a third round of field work was conducted. Additional ground water samples from the previous monitoring wells were collected to fill certain data gaps. Sediment and surface water samples from the Malden River and Little Creek were collected to determine the potential for impact of the site on these water bodies.

In September a one and one-half inch O.D. observation well (UNK-1) between borings B-3 and B-4 was discovered and sampled by Norwood Engineering. Construction details of the wells or the original purpose are not known.

In October four additional stream samples and one upstream sediment sample was collected and submitted for analysis. A well (W-15) was also installed east of the Wellington building to assess effects of the former stream channel on contaminant migration.

Boring logs from the field sampling are provided in Appendix B. Soil, ground water, and sediment analytical data are provided in Appendix C. A Master List of Samples analyzed is located in Appendix D.

0001332

The results of the soil, ground water, and sediment analysis are summarized in Tables 4-1, 4-2, and 4-3 by media and by site. The tables list concentrations in parts per million (ppm) detected at each sample site. Figure 4-1 shows the approximate areas of contamination.

## 4.2 Site Contaminants

The distribution of contaminants at the site can be broken down roughly along the property lines. For the purposes of description each property along with adjacent areas having similar compounds present are discussed as a unit.

### 4.2.1 Wellington Property

### 4.2.2.1 Organics

Most of the organic compounds observed on the Wellington property are typically found in coal tars. These compounds include hydrocarbons such as benzene, ethylbenzene, and and polynuclear aromatic hydrocarbons such as naphthalene, acenaphthene, anthracene, benzo(a)anthracene, benzo(a)pyrene, benzofluoranthene, chrysene, fluoranthene, fluorene, phenanthrene, and pyrene. Coal tar wastes were detected at depths from five to ten feet across parts of the Wellington property and on the southern perimeter of the Malden DPW property. Most of the tars which underlay the Wellington site were not free flowing but were bound up either in sediment, fill or peat. The exception to this was in the area immediately to the west of the trucking terminal section of the Wellington building. There, a distinct floating fraction was noted on the ground water. A dissolved fraction of typical coal tar compounds was noted in monitoring wells MW-3, MW-4, and MW-5. A trace dichlorobenzene, not typically associated with coal tar wastes was noted in a

0001333

TABLE 4-1
SOIL ANALYTICAL DATA --COMMERCIAL STREET SITE
(ALL CONCENTRATIONS IN PPM)

|  | SOUTHERN PORTION | | | | | | | NORTHERN PORTION | | | | CENTRAL PORTION | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| SAMPLE NUMBER: | MW-1 | MW-3 | MW-5 | TP-3 | TP-4 | TP-6 | TP-7 | B-6 | Z-2 | TP-15 | TF-13 | MM-1 | MM-2 | MM-5 | MM-4 |
| SAMPLE DEPTH (FT): | 4-6 | 4-6 | 10-12 | 4.8-6.2 | .25-5 | 2.7-4.3 | 10 | 8-10 | 6-8 | 4-8 | 4-7 | 4-6 | 2-4 | 4-6 | 8-10 |
| **CONSTITUENTS** | | | | | | | | | | | | | | | |
| PESTICIDES AND PCB'S | | | | | | | | | | | | | | | |
| PCB-1016 | NA | NA | NA | NA | NA | NA | NA | NA | NA | 8.5 | -- | -- | NA | NA | NA |
| **PRIORITY POLLUTANT VOLATILE ORGANIC COMPOUNDS** | | | | | | | | | | | | | | | |
| BENZENE | 0.04 | 0.73 | -- | NA | 2.5 | NA | 0.4 | NA | NA | -- | NA | NA | NA | NA | NA |
| TOLUENE | 0.074 | 0.07 | -- | NA | 1 | NA | -- | NA | NA | -- | NA | NA | NA | NA | NA |
| ETHYL BENZENE | 0.088 | -- | -- | NA | 15 | NA | -- | NA | NA | -- | NA | NA | NA | NA | NA |
| TOTAL XYLENES | 0.1 | 0.072 | -- | NA | 37 | NA | -- | NA | NA | -- | NA | NA | NA | NA | NA |
| **PRIORITY POLLUTANT ACID EXTRACTABLES** | | | | | | | | | | | | | | | |
| 2,4 DICHLOROPHENOL | -- | -- | NA | NA | -- | NA | NA | -- | TR(0.6)0) | -- | -- | NA | NA | NA | NA |
| **PRIORITY POLLUTANT BASE/NEUTRAL EXTRACTABLES** | | | | | | | | | | | | | | | |
| 1,3 DICHLOROBENZENE | -- | -- | NA | NA | -- | NA | NA | -- | TR(1.8) | 1.70 | NA | NA | NA | NA | NA |
| 1,4 DICHLOROBENZENE | -- | -- | NA | NA | -- | NA | NA | TR(11) | 3.5 | 1.49 | NA | NA | NA | NA | NA |
| 1,2 DICHLOROBENZENE | -- | -- | NA | NA | -- | NA | NA | TR(11) | 21 | 0.37 | NA | NA | NA | NA | NA |
| 1,2,4 TRICHLOROBENZENE | -- | -- | NA | NA | -- | NA | NA | TR(11) | -- | -- | NA | NA | NA | NA | NA |
| NAPHTHALENE | 7000 | TR(1.2) | NA | NA | 12000 | NA | NA | -- | TR(0.3500) | -- | NA | NA | NA | NA | NA |
| ACENAPHTHYLENE | TR(52) | -- | NA | NA | TR(88) | NA | NA | TR(34) | TR(5.210) | -- | NA | NA | NA | NA | NA |
| ACENAPHTHENE | TR(110) | TR(1.2) | NA | NA | 3300 | NA | NA | 93 | -- | -- | NA | NA | NA | NA | NA |
| FLUORENE | 370 | TR(0.8) | NA | NA | 3500 | NA | NA | TR(11) | TR(0.220) | -- | NA | NA | NA | NA | NA |
| PHENANTHRENE | 1400 | 7.4 | NA | NA | 8300 | NA | NA | 490 | 2.6 | -- | NA | NA | NA | NA | NA |
| ANTHRACENE | 230 | TR(2.0) | NA | NA | 2500 | NA | NA | 160 | TR(0.8400) | -- | NA | NA | NA | NA | NA |
| FLUORANTHENE | 610 | 13 | NA | NA | 4600 | NA | NA | 250 | 6 | -- | NA | NA | NA | NA | NA |
| PYRENE | 780 | 8.1 | NA | NA | 4100 | NA | NA | 160 | 4.7 | -- | NA | NA | NA | NA | NA |
| BENZ(A)ANTHRACENE | 340 | 6.7 | NA | NA | 1100 | NA | NA | 103 | 3.6 | -- | NA | NA | NA | NA | NA |
| BIS(2 ETHYL-HEXYL)PHTHALATE | -- | -- | NA | NA | -- | NA | NA | 786 | -- | -- | NA | NA | NA | NA | NA |
| CHRYSENE | 440 | 8.5 | NA | NA | 1200 | NA | NA | 120 | 3.6 | -- | NA | NA | NA | NA | NA |
| BENZO(B)FLUORANTHENE | 290 | 10 | NA | NA | 1000 | NA | NA | TR(45) | 3.1 | -- | NA | NA | NA | NA | NA |
| BENZO(K)FLUORANTHENE | -- | -- | NA | NA | -- | NA | NA | TR(51) | 2.7 | -- | NA | NA | NA | NA | NA |
| BENZO(A)PYRENE | 320 | 4.9 | NA | NA | 800 | NA | NA | 93 | 5.2 | -- | NA | NA | NA | NA | NA |
| INDENO(1,2,3-CD)PYRENE | -- | -- | NA | NA | 220 | NA | NA | TR(25) | TR(2) | -- | NA | NA | NA | NA | NA |
| BENZO(GHI)PERYLENE | -- | -- | NA | NA | 420 | NA | NA | TR(23) | 2.0 | -- | NA | NA | NA | NA | NA |

0001334

-22-

TABLE 4-8 (CONT'D)
SOIL ANALYTICAL DATA -- COMMERCIAL STREET SITE
(ALL CONCENTRATIONS IN PPM)

| | -----SOUTHERN PORTION----- | | | | | | -----NORTHERN PORTION----- | | | | -----CENTRAL PORTION----- | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| SAMPLE NUMBER: | MW-1 | MW-3 | MW-5 | TP-3 | TP-4 | TP-6 | TP-7 | B-6 | B-2 | TP-15 | TP-17 | MW-1 | MW-2 | MW-3 | MW-4 |
| SAMPLE DEPTH (FT): | 4-6 | 4-6 | 10-12 | 4.8-6.2 | 1.5-5 | 2.7-6.3 | 10 | 6-10 | 4-6 | 4-6 | 4-7 | 4-6 | 2-4 | 4-6 | 8-10 |
| NON-PRIORITY POLLUTANT | | | | | | | | | | | | | | | |
| BASE/NEUTRAL EXTRACTABLES | | | | | | | | | | | | | | | |
| 2-METHYL NAPTHALENE | 1500 | TR(0.61) | NA | NA | 4500 | NA | NA | -- | -- | -- | NA | NA | NA | NA | NA |
| DIBENZOFURAN | TR(11) | -- | NA | NA | 1500 | NA | NA | TR(181) | TR | -- | NA | NA | NA | NA | NA |
| METALS, CYANIDE, PHENOL, AND pH | | | | | | | | | | | | | | | |
| ANTIMONY | <0.386 | NA | NA | <0.374 | NA | <0.388 | NA | NA | NA | NA | NA | NA | -- | -- | -- |
| ARSENIC | 16.3 | NA | NA | 2730 | NA | 21.1 | NA | NA | NA | NA | NA | NA | 10.1 | 40.2 | 4.65 |
| BERYLLIUM | 1.93 | NA | NA | <0.985 | NA | <1.02 | NA | NA | NA | NA | NA | NA | -- | -- | -- |
| CADMIUM | 0.165 | NA | NA | 0.667 | NA | 0.262 | NA | NA | NA | NA | NA | NA | 1.33 | 1.37 | 0.07 |
| CHROMIUM | 13.7 | NA | NA | 13.3 | NA | 33.7 | NA | NA | NA | NA | NA | NA | 17.7 | 22.5 | 16.3 |
| COPPER | 26.3 | NA | NA | 4.47 | NA | 21.9 | NA | NA | NA | NA | NA | NA | 261 | 1460 | 35.4 |
| LEAD | 88.7 | NA | NA | 31.5 | NA | 28.1 | NA | NA | NA | NA | NA | NA | 325 | 1280 | 34.8 |
| MERCURY | 6.50 | NA | NA | 0.54 | NA | NA | NA | NA | NA | NA | NA | -- | 0.45 | 0.81 | 0.32 |
| NICKEL | 15.6 | NA | NA | <1.40 | NA | 15.8 | NA | NA | NA | NA | NA | NA | 13.8 | 14.2 | 11.2 |
| SELENIUM | <0.730 | NA | NA | <0.704 | NA | <0.730 | NA | NA | NA | NA | NA | NA | -- | -- | -- |
| SILVER | <3.06 | NA | NA | 2.98 | NA | <3.06 | NA | NA | NA | NA | NA | NA | -- | -- | -- |
| THALLIUM | 0.163 | NA | NA | 0.921 | NA | 0.205 | NA | NA | NA | NA | NA | NA | -- | -- | -- |
| ZINC | 88.7 | NA | NA | 80.6 | NA | 67.9 | NA | NA | NA | NA | NA | NA | 254 | 594 | 22.9 |
| CYANIDE | 6.29 | NA | NA | 1.07 | NA | NA | NA | NA | NA | NA | NA | -- | 5.15 | -- | -- |
| PHENOL | -- | NA | NA | NA | NA | NA | NA | NA | NA | NA | -- | NA | NA | NA | NA |
| LABORATORY pH | NA | 5.0 | 7.8 | NA | NA | 7.4 | 8.6 | NA | NA | NA | 5.5 | NA | 8.1 | 6.9 | 7.9 |

NA = NOT ANALYZED
-- = LESS THAN THE DETECTION LIMIT
TR= CONCENTRATIONS BETWEEN 1 AND 10 TIMES THE DETECTION LIMIT

0001335

-23-

TABLE 4-2
GROUND WATER ANALYTICAL DATA - COMMERCIAL STREET SITE
(ALL CONCENTRATIONS IN PPM)

| | | SOUTHERN PORTION | | | | | NORTHERN PORTION | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| SAMPLE NUMBER: | MW-1 | MW-2 | MW-3 | MW-4 | MW-5 | WELL-5 | ML-3 | ML-4 | MW-1 | MW-2 | MW-3 | MW-4 |
| **CONSTITUENTS** | | | | | | | | | | | | |
| **PRIORITY POLLUTANT VOLATILE ORGANIC COMPOUNDS** | | | | | | | | | | | | |
| CHLOROBENZENE | — | — | — | — | TR(0.010) | — | 0.3 | — | — | — | — | — |
| BENZENE | TR(0.030) | — | — | TR(0.030) | TR(0.050) | — | — | — | — | — | — | — |
| TOLUENE | TR(0.020) | — | — | TR(0.020) | TR(0.010) | — | — | — | TR(0.050) | — | — | — |
| ETHYLBENZENE | — | — | — | — | 0.14 | — | — | — | 0.12 | — | — | — |
| TOTAL XYLENES | TR(0.050) | — | — | 0.22 | 0.13 | — | — | — | 0.22 | — | — | — |
| PESTICIDES AND PCB'S | NA | NA | — | — | NA | NA | — | — | NA | NA | NA | NA |
| **PRIORITY POLLUTANT BASE/NEUTRAL EXTRACTABLES** | | | | | | | | | | | | |
| 1,3 DICHLOROBENZENE | NA | NA | — | — | — | — | TR(0.004) | NA | NA | NA | — | — |
| 1,4 DICHLOROBENZENE | NA | NA | — | — | TR(0.008) | TR(0.011) | 0.08 | NA | NA | NA | — | TR(0.002) |
| 1,2 DICHLOROBENZENE | NA | NA | — | — | — | TR(0.007) | 0.03 | NA | NA | NA | — | — |
| 1,2,4 DICHLOROBENZENE | NA | NA | — | — | — | — | — | NA | NA | NA | — | — |
| NAPHTHALENE | NA | NA | — | 0.28 | 0.880 | TR(0.005) | TR(0.011) | NA | NA | NA | TR(0.017) | TR(0.004) |
| ACENAPHTHYLENE | NA | NA | — | TR(0.007) | TR(0.003) | — | — | NA | NA | NA | — | — |
| ACENAPHTHENE | NA | NA | TR(0.008) | 0.043 | 0.097 | TR(0.003) | TR(0.003) | NA | NA | NA | TR(0.018) | TR(0.012) |
| FLUORENE | NA | NA | — | 0.024 | 0.049 | — | — | NA | NA | NA | — | TR(0.015) |
| PHENANTHRENE | NA | NA | TR(0.016) | 0.068 | 0.078 | TR(0.013) | TR(0.006) | NA | NA | NA | TR(0.010) | 0.045 |
| ANTHRACENE | NA | NA | TR(0.006) | TR(0.015) | 0.023 | TR(0.004) | — | NA | NA | NA | TR(0.006) | TR(0.010) |
| FLUORANTHENE | NA | NA | TR(0.017) | 0.035 | 0.023 | TR(0.011) | TR(0.002) | NA | NA | NA | TR(0.015) | 0.043 |
| PYRENE | NA | NA | TR(0.009) | 0.029 | 0.023 | 0.026 | — | NA | NA | NA | 0.021 | 0.047 |
| BENZO(A)ANTHRACENE | NA | NA | TR(0.002) | TR(0.012) | TR(0.006) | TR(0.012) | — | NA | NA | NA | TR(0.007) | 0.025 |
| BIS(2-ETHYL HEXYL) PHTHALATE | NA | NA | — | 0.31 | TR(0.005) | — | — | NA | NA | NA | — | 0.23 |
| CHRYSENE | NA | NA | TR(0.002) | TR(0.012) | TR(0.007) | TR(0.019) | — | NA | NA | NA | TR(0.010) | 0.025 |
| BENZO(B)FLUORANTHENE | NA | NA | — | TR(0.017) | TR(0.007) | TR(0.017) | — | NA | NA | NA | TR(0.009) | 0.037 |
| BENZO(K)FLUORANTHENE | NA | NA | — | — | — | — | — | NA | NA | NA | — | — |
| BENZO(A)PYRENE | NA | NA | — | TR(0.019) | TR(0.007) | 0.021 | — | NA | NA | NA | TR(0.011) | 0.03 |
| INDENO(1,2,3,-C,D)PYRENE | NA | NA | — | TR(0.007) | — | TR(0.009) | — | NA | NA | NA | — | 0.025 |
| BENZO(GHI)PERYLENE | NA | NA | — | — | — | — | — | NA | NA | NA | — | 0.026 |
| **NON-PRIORITY POLLUTANT BASE/NEUTRAL EXTRACTABLES** | | | | | | | | | | | | |
| 2-METHYL NAPHTHALENE | NA | NA | — | 0.037 | 0.250 | — | TR(0.005) | NA | NA | NA | TR(0.004) | TR(0.012) |
| DIBENZOFURAN | NA | NA | TR(0.007) | TR(0.011) | 0.020 | — | — | NA | NA | NA | TR(0.004) | — |
| **METALS, CYANIDE, PHENOL, AND pH** | | | | | | | | | | | | |
| ANTIMONY | (0.005 | (0.005 | (0.005 | (0.005 | (0.005 | 0.009 | (0.005 | (0.005 | (0.005 | (0.005 | (0.005 | (0.005 |
| ARSENIC | (0.005 | (0.005 | 0.006 | 0.039 | 0.009 | (0.005 | 0.006 | (0.005 | (0.005 | (0.005 | 0.005 | 0.005 |
| BERYLLIUM | (0.010 | (0.010 | (0.010 | (0.010 | (0.010 | (0.010 | (0.010 | (0.010 | (0.010 | (0.010 | (0.010 | (0.010 |
| CADMIUM | (0.001 | (0.001 | 0.001 | (0.001 | (0.001 | 0.007 | (0.001 | (0.001 | 0.03 | (0.001 | (0.001 | (0.001 |
| CHROMIUM | (0.025 | 0.040 | (0.025 | 0.102 | (0.025 | (0.025 | (0.025 | (0.025 | (0.025 | (0.025 | (0.025 | (0.025 |
| COPPER | (0.025 | 0.025 | (0.025 | 0.035 | (0.025 | (0.025 | (0.025 | 0.025 | 0.53 | (0.025 | (0.025 | (0.025 |
| LEAD | (0.005 | (0.005 | (0.005 | (0.005 | (0.005 | (0.005 | (0.005 | (0.005 | (0.005 | (0.005 | (0.005 | 0.006 |
| MERCURY | (0.0002 | (0.0002 | (0.0002 | 0.0016 | (0.0002 | (0.0002 | 0.0005 | 0.0005 | (0.0002 | (0.0002 | 0.0019 | (0.0002 |
| NICKEL | (0.050 | 0.106 | (0.050 | 0.282 | (0.050 | 0.110 | (0.050 | (0.050 | 0.137 | (0.050 | (0.050 | (0.050 |
| SELENIUM | (0.005 | 0.071 | 0.067 | (0.005 | (0.005 | (0.005 | (0.005 | 0.012 | (0.025 | (0.005 | (0.005 | (0.005 |
| SILVER | (0.010 | (0.010 | (0.010 | (0.010 | (0.010 | (0.010 | (0.010 | (0.010 | (0.010 | (0.010 | (0.010 | (0.010 |
| THALLIUM | (0.005 | (0.005 | 0.006 | 0.007 | (0.005 | (0.005 | (0.005 | 0.012 | (0.025 | (0.005 | (0.005 | 0.012 |
| ZINC | 0.013 | 0.037 | 0.032 | 0.145 | 0.028 | 140 | 0.011 | 0.014 | 2.13 | 0.011 | 0.024 | (0.010 |
| CYANIDE | NA | 14 | 0.17 | 8.6 | 0.078 | 0.23 | 0.015 | NA | 0.01 | 0.68 | 0.01 | (0.046 |
| PHENOL | NA | 0.093 | 1.1 | 0.53 | 0.051 | (0.10 | 0.07 | NA | 0.51 | 0.62 | 0.35 | 0.022 |
| FIELD pH | 7.20 | 6.40 | 6.40 | 6.25 | 7.20 | NA | 6.50 | 7.10 | 3.50 | 11.00 | 6.70 | 7.60 |
| **TEMPERATURE AND SPECIFIC CONDUCTIVITY MEASURED IN THE FIELD** | | | | | | | | | | | | |
| TEMPERATURE (CELSIUS) | 16 | 16 | 18.5 | 19 | 19 | NA | 14 | 15 | 17 | 15.5 | 14 | 13 |
| SPECIFIC CONDUCTIVITY* | 1300 | 5100 | 5000 | 3030 | 1680 | NA | 1010 | 1300 | 4900 | 7100 | 750 | 520 |

* NOT ANALYZED
( LESS THAN DETECTION LIMIT

0001336

TABLE 4-5
SEDIMENT AND SURFACE WATER ANALYSIS - COMMERCIAL STREET SITE
(ALL CONCENTRATIONS IN PPM)

| SAMPLE NUMBER: | SD-1 | SD-2 | SD-3 | SD-4A | SW-1 | SW-2 | SW-3 | SW-4 |
|---|---|---|---|---|---|---|---|---|
| **CONSTITUENTS** | | | | | | | | |
| **PRIORITY POLLUTANT VOLATILE ORGANIC COMPOUNDS** | | | | | | | | |
| CHLOROBENZENE | — | 1.15 | .475 | NA | NA | NA | NA | NA |
| BENZENE | TR(0.025) | — | TR(0.025) | NA | NA | NA | NA | NA |
| TOLUENE | TR(0.075) | — | TR(0.025) | NA | NA | NA | NA | NA |
| ETHYLBENZENE | 1.75 | — | — | NA | NA | NA | NA | NA |
| TOTAL XYLENES | — | — | — | NA | NA | NA | NA | NA |
| **PRIORITY POLLUTANT BASE/NEUTRAL EXTRACTABLES** | | | | | | | | |
| 1,3 DICHLOROBENZENE | — | — | — | — | — | — | — | — |
| 1,4 DICHLOROBENZENE | — | — | — | — | — | TR(.017) | TR(.009) | — |
| 1,2 DICHLOROBENZENE | — | — | — | — | — | — | — | — |
| 1,2,4 TRICHLOROBENZENE | — | — | — | — | — | TR(.006) | TR(.007) | — |
| NAPHTHALENE | 28 | TR(46) | TR(12) | — | — | — | — | — |
| ACENAPHTHYLENE | TR(3.30) | TR(14) | TR(7.4) | — | — | — | — | — |
| ACENAPHTHENE | 17 | TR(50) | TR(8) | — | — | — | — | — |
| FLUORENE | 22 | 60 | TR(10) | — | — | — | — | — |
| PHENANTHRENE | 57 | 220 | TR(42) | TR(24) | — | — | — | — |
| ANTHRACENE | 66 | 68 | TR(21) | TR(9.8) | — | — | — | — |
| FLUORANTHENE | 42 | 250 | 130 | TR(54) | — | — | — | — |
| PYRENE | 36 | 110 | TR(62) | TR(31) | — | — | — | — |
| BENZO(A)ANTHRACENE | 21 | 70 | TR(40) | TR(21) | — | — | — | — |
| BIS(2-EHTYL HEXYL)PHTHALATE | — | 230 | 3,500 | 420 | — | — | — | — |
| CHRYSENE | 23 | 87 | TR(53) | TR(17) | — | — | — | — |
| BENZO(B)FLUORANTHENE | 24 | 110 | TR(76) | TR(26) | — | — | — | — |
| BENZO(K)FLUORANTHENE | — | — | — | — | — | — | — | — |
| BENZO(A)PYRENE | 29 | 84 | TR(66) | TR(13) | — | — | — | — |
| INDENO(1,2,3,-C,D)PYRENE | 12 | — | — | — | — | — | — | — |
| BENZO(GHI)PERYLENE | 11 | — | — | — | — | — | — | — |
| **PRIORITY POLLUTANT BASE/NEUTRAL EXTRACTABLES** | | | | | | | | |
| 2-METHYL NAPHTHALENE | TR(4.9) | TR(15) | TR(15) | — | — | — | — | — |
| DIBENZOFURAN | 13 | TR(37) | TR(37) | — | — | — | — | — |
| **METALS, CYANIDE, AND PHENOL** | | | | | | | | |
| ANTIMONY | <0.25 | 2.2 | <0.25 | NA | NA | NA | NA | NA |
| ARSENIC | 10 | 18 | 2.8 | NA | NA | NA | NA | NA |
| BERYLLIUM | <0.50 | 1.0 | 1.10 | NA | NA | NA | NA | NA |
| CADMIUM | 2.5 | 6.6 | 9.3 | NA | NA | NA | NA | NA |
| CHROMIUM | 19 | 80 | 99 | NA | NA | NA | NA | NA |
| COPPER | 56 | 250 | 240 | NA | NA | NA | NA | NA |
| LEAD | 150 | 1,500 | 1,100 | NA | NA | NA | NA | NA |
| MERCURY | 0.54 | 1.5 | 1.4 | NA | NA | NA | NA | NA |
| NICKEL | 11 | 41 | 44 | NA | NA | NA | NA | NA |
| SELENIUM | 0.45 | 1.0 | 1.0 | NA | NA | NA | NA | NA |
| SILVER | <0.100 | <0.100 | <0.100 | NA | NA | NA | NA | NA |
| THALLIUM | <0.25 | <0.25 | <0.25 | NA | NA | NA | NA | NA |
| ZINC | 580 | 800 | 1,500 | NA | NA | NA | NA | NA |
| CYANIDE | 46 | 1.4 | 1.3 | NA | 0.011 | 0.01 | <0.01 | <0.01 |
| PHENOL | 0.840 | 4.4 | 3 | NA | <10 | <50 | <50 | <10 |

LESS THAN DETECTION LIMIT
CONCENTRATIONS BETWEEN 1 AND 10 TIMES THE DETECTION LIMIT
NOT ANALYZED

-25-

0001337



0001338

NOTE:
Contaminated areas of concern were
identified using field observations,
i.e. odors and visual observations,
and analytical results summarized
in Tables 4-1 and 4-2.

SCALE    0    100 FT

LEGEND

| | | LEGEND | |
|---|---|---|---|
| ▨ | COAL TAR CONTAMINATED SOILS | ------- | PROPERTY LINE BOUNDARIES |
| ▥ | FREE FRACTION COAL TAR | ⌒ | APPROXIMATE BOUNDARIES OF ORIGINAL RIVER CANAL (Sanborn Maps, 1904) |
| ◩ | DISSOLVED COAL TAR FRACTIONS | | |
| ▦ | ARSENIC | ⌷ | TEST PIT |
| ▨ | FREE FRACTION OIL | ⊕ | WELL OR BORING |
| ▨ | DICHLOROBENZENE | ⊛ | SEDIMENT SAMPLE |
| ▩ | HEAVILY CONTAMINATED DICHLOROBENZENE | ⇒ | APPROX. EDGE OF WATER (1977-Present) |
| | | ▲ | SURFACE WATER SAMPLE |

ground water sample from the east side of the property (MW-5). Soils and ground water to the north and west of the property (B-6, Well-5) showed higher concentrations.

OVA readings across the site typically gave higher values at the water table. This would appear to indicate the presence of light coal tar fractions (i.e., benzene and toluene) at the water table. Higher readings encountered at depth may possibly be associated with methane generated by the in situ peat. Sediment samples collected in Little Creek adjacent to the site (SD-1) show elevated concentration of coal tar related PAHs. They are lower than the first upstream sample (SD-2) and about the same as the second upstream sample (SD-2A). Chemical characteristics of urban runoff sediment are presented in Table 4-4. Most of the PAH values in the sediment samples are no more than one order of magnitude more than typical values found within other urban areas of the United States.

### 4.2.1.2  Inorganic Compounds

Several metals are found in the soils on the Wellington property which generally exceed background levels. Of particulate note are the arsenic levels in TP-3 and the generally elevated levels of lead and nickel in MW-1. The arsenic in TP-3 is associated with a distinctive material encountered in the test pit and, as it was a single occurrence, it is most probably the result of an isolated disposal of material during plant demolition. Ground water values for lead and nickel do not exceed any federal drinking water standards indicating the metals are not very mobile in the ground water. Selenium levels in the soil are below the detection limit, yet ground water concentrations from monitoring wells MW-2 and MW-3 exceed the federal drinking water standards.

0001339

TABLE 4-4

SUMMARY OF ANALYTICAL CHEMISTRY FINDINGS FROM
NURP PRIORITY POLLUTANT SAMPLES
(Includes Information Received Through July 31, 1985)

| Pollutant | Cities Where Detected | Frequency of Detection (%) | Range of Detection (micro-g/l) |
|---|---|---|---|
| **Metals and Inorganics** | | | |
| Antimony | 7, 24 | 14 | 2, 6-23 |
| Arsenic | 2, 3, 7, 12, 19, 20, 22, 27 | 58 | .1-50.5 |
| Beryllium | 7, 12, 20, | 17 | 1-49 |
| Copper | 1, 2, 3, 7, 12, 17, 19, 20, 21, 22, 23, 27, 28, | 96 | 1-100 |
| Cyanides | 4, 19, 22, 27 | 16 | 2-33 |
| Lead | 1, 2, 3, 7, 12, 17, 19, 20, 21, 22, 28 | 96 | 6-460 |
| Zinc | 1, 2, 3, 7, 12, 17, 19, 20, 21, 22, 23, 27, 28 | 95 | 10-2400 |
| **Monocyclic Aromatics** (excluding phenols, creosols, phthalates) | | | |
| Benzene 1,2-dichloro- | | Not detected | |
| Benzene 1,3-dichloro- | | Not detected | |
| Benzene 1,4-dichloro- | | Not detected | |
| Benzene 1,2,4-dichloro- | | Not detected | |
| **Phthalate Ester** | | | |
| Phthalate, bis (2-ethylhexyl) | 4, 12, 19, 22 | 13 | 7-39 |

| | | | |
|---|---|---|---|
| 1. | Durham, N.H. | 20. | Little Rock, Ark. |
| 2. | Lake Quinsigamond, Mass. | 21. | Kansas City, Mo. |
| 3. | Mystic River, Mass. | 22. | Denver, Col. |
| 4. | Long Island, N.Y. | 23. | Salt Lake City, Utah |
| 7. | Washington, D.C. | 24. | Rapid City, So. Dak. |
| 12. | Knoxville, Tenn. | 27. | Bellevue, Wash. |
| 17. | Glen Ellyn, Ill. | 28. | Eugene, Oreg. |
| 19. | Austin, Tex. | | |

0001340

-28-

TABLE 4-4
(Continued)

SUMMARY OF ANALYTICAL CHEMISTRY FINDINGS FROM
NURP PRIORITY POLLUTANT SAMPLES
(Includes Information Received Through July 31, 1985)

| Pollutant | Cities Where Detected | Frequency of Detection (%) | Range of Detection (micro-g/l) |
|---|---|---|---|
| Polycyclic Aromatic Hydrocarbons | | | |
| Acenaphthene | | Not detected | |
| Acenaphthylene | | Not detected | |
| Anthracene | 2, 17, 20, 28 | 8 | 1-10 |
| Benzo(a)anthracene | 2, 27 | 4 | 1-10 |
| Benzo(b)fluoranthene | 27 | 1 | 2 |
| Benzo(k)fluoranthene | 2,27 | 2 | 4-10 |
| Benzo(g,h,i)perylene | | Not detected | |
| Benzo(a)pyrene | 2, 27 | 4 | 1-10 |
| Chrysene | 2, 7, 17, 27 | 7 | 0.6-10 |
| Dibenzo(a,h)anthracene | | Not detected | |
| Fluoranthene | 2, 12, 17, 27, 28 | 10 | 0.3-12 |
| Fluorene | 28 | 1 | 1 |
| Indeno(1,2,3,-c,d) pyrene | | Not detected | |
| Naphthalene | 4, 24, 28 | 11 | 0.8-2.3 |
| Phenanthrene | 2, 17, 20, 27, 28 | 12 | 0.3-10 |
| Pyrene | 2, 3, 12, 17, 27, 28 | 11 | 0.3-10 |

| | | | |
|---|---|---|---|
| 1.  Durham, N.H. | | 20.  Little Rock, Ark. | |
| 2.  Lake Quinsigamond, Mass. | | 21.  Kansas City, Mo. | |
| 3.  Mystic River, Mass. | | 22.  Denver, Col. | |
| 4.  Long Island, N.Y. | | 23.  Salt Lake City, Utah | |
| 7.  Washington, D.C. | | 24.  Rapid City, So. Dak. | |
| 12.  Knoxville, Tenn. | | 27.  Bellevue, Wash. | |
| 17.  Glen Ellyn, Ill. | | 28.  Eugene, Oreg. | |
| 19.  Austin, Tex. | | | |

0001341

Cyanides and phenols are typically associated with coal tars and are detected in both soil and water samples on the Wellington property. Elevated concentrations of cyanide were found in ground water samples from monitoring wells MW-2 and MW-4, both at the south end of the property. There are no nearby analyses to indicate whether there may be elevated cyanide levels in the soil.

### 4.2.1.3  Mode of Deposition

A review of the site history and boring and test pit logs suggest that the coal tar related materials were deposited on the Wellington property. Surface contamination was not noted on the property. However, considering the volume of fill on the property, past surface spillage may have been buried. The arsenic bearing material does appear to have been dumped on site, as it is an isolated lens associated with fill. It should be noted that because tars are heavier than water, they migrate along structural or stratigraphic contaminated paths rather than along the ground water table.

### 4.2.2  Malden Department of Public Works - MDPW

The primary contaminants associated with the MDPW yard are two separate areas of fuel oils located near MM-1 and MM-4. Trace levels of dissolved coal tar related PAHs are present in the ground water and coal tars were noted adjacent to the Wellington property and and in boring MM-4 on the north side.

High values for lead and copper and zinc were noted in soils in MM-2 and MM-3 while cyanide was high in MM-2. The high metal concentrations in the soils are probably due to the dredge spoil basin once located on the property. The ground water pH in MM-1 was 3.5 which probably resulted in the slightly elevated levels of copper and zinc that were found. The ground water

0001342

# EXHIBIT D

2B.



**CARABETTA**

December 20, 1985

Stanton Black
8 Riverview Business Park
300 Commercial Street
Malden, Massachusetts 02148

Dear Stan:

Please find site recommendations which we spoke about.

Very truly yours,
CARABETTA ENTERPRISES, INC.

JOSEPH F. CARABETTA

Enclosure:

JFC:jdm

0001588

**DEVELOPERS □ GENERAL CONTRACTORS □ DESIGNERS □ REAL ESTATE MANAGEMENT**
200 Pratt Street, Meriden, Connecticut 06450, 1-800-243-6858 & 203-237-7400

(               (

## Total Costs Site Remediation

1.   Lombard Site

     Localized Remediation:           $210,000

     Annual Operating Cost:            28,000

     Optional Liner Cost:             117,100

     TOTAL COST:                   $355,100

2.   DPW - Wellington Site

     Localized Remediation:          $ 90,000

     Annual Operating Cost:            24,000

     Surface Cap Requirements:      1,902,000

     Lightweight Sheet Pile:         150,000

     TOTAL COST:                  $2,166,000

3.   Foundation Costs Total Site:     $2,120,000

     Total Remediation Costs:       4,641,100

     Adjusted for continency, health and safety, engineering
        @ 25%

TOTAL COST ESTIMATE:   $5,802,000

0001589

Environmental Site Assessment:  Lombard Trucking Terminal

Re:    Remedial Actions

Item 1:    Recovery of Petroleum Product
Lombard - DPW Property Line

Recommended Alternative;   Installation of Passive/Active
Trench Recovery System

Estimated Installation Cost;        $75,000.

Projected Annual Operating Costs;      $12,000.


Item 2:    Off-Site Solvent Recovery

Recommended Alternative;   Air Stripping of Groundwater
followed by treatment of
effluent air stream by carbon
adsorption.

Estimated Installation Cost;  $125,000 - $135,000

Projected Operating Costs;      Reference Appendix A


Item 3:    Foundation Requirements;

Estimated Costs;  $127/linear foot per casing
required.  (See Appendix B)


NOTE:  Surface area should be asphalt covered, or lined to
restrict infiltration to adjacent parcels, if liner
required by regulatory agency, include the following
costs;

234,176 sq. ft. (site surface area) x $0.50/sq. ft. = $117,088

**0001590**

Environmental Site Assessment; MMDPW - Wellington Property

Re:       Remedial Actions

Item 1:   Recovery of Floating Coal Tar Products

Recommended Alternatives:

Installation of two surface mounted scavenger and
recovery wells.

Installation Costs:  $40,000/each = Total $80,000

Projected Operating Costs:  $24,000./year

Item 2:   Removal of Arsenic bearing soils

Recommended Alternatives:

Excavation of contaminated material and disposal to
authorize hazardous waste facility.

Estimated Cost:  $10,000

Item 3:   Surface Cap (See Appendix C)

Estimated Cost:
615,464 sq. ft. x $3.09 sq. ft. = $1,901,784

Item 4:   Lightweight Sheet Pile Groundwater Barrier

Estimated Cost:
500 ft. x 20 ft. x $12/sq. ft. = $120,000
     x 1.2* = $150,000
*(cutting, mobilization and demobilization)

Item 5:   Foundation Costs:  $127/linear foot per pile (See
                              Appendix B)

0001591

APPENDIX A

Solvent Recovery

Principle O & M costs are a function of operating parameters and the extent of contamination which is undefined at this time.  Excavation and disposal of highly contaminated soils and isolation of contaminant zones will be encouraged to mitigate environmental impacts.  Bulk recovery and distillation, as well as groundwater treatment may be feasible.  Total costs of 3 - 4 times the installation cost are feasible under present constraints.

   Typical carbon system monthly costs of operation are $9,000 - $10,000, while those for air stripping equipment are between $4,000 - $6,000.

0001592

APPENDIX B

Foundation Costs


Cost Parameters:    Estimate is based upon requirment of 221 H-
                    piles with the following constraints:

    a.    36 inch diameter

    b.    75 foot average depth

    c.    Wet conditions with pumping

    d.    Pulled casings

    e.    H-pile core


| | |
|---|---|
| Bare Cost: | $71/foot |
| H-pile core | $48/foot |
| 7% add on for 50 - 100' length | $ 8/foot |


221 caissons x 75 feet x $127/foot  =  $2,105,000
Mobilization charge                 =      15,000


TOTAL FOUNDATION COSTS:             =  $2,120,000


Note:  Piles must go to refusal (i.e., bedrock) existing soils
       have little bearing strength, hence belling of caissons
       not necessary; if desired add $150,000 to total.


0001593

APPENDIX C

Surface Cap Costs

Surface cap is a multilayer design consisting of gravels, crushed stone, filter fabric, impermeable membrane and final cover. The unit cost of $3.09/square foot accounts for venting of contaminated soil regions to enhance microbial degradation and waste stabilization and loading requirements for parking and vehicle traffic.

Placement of a thick clay layer over the site may be susceptible to loading failures during normal operation of the site. Utilities servicing the site will require special handling and installation procedures.

The original scope of site remediation involved the removal of 6,750 tons of material from Little Creek at an approximated cost of $337,500. This material may be suitable for placement across the Wellington Site as a base for the surface cap.

0001594

# EXHIBIT E

```
WELCLOS
12/22/86
12/24/86
12/26/86
12/29/86
```

## CLOSING AGREEMENT

This Closing Agreement made this $29^{th}$ day of December, 1986 by and between the following parties:

(a)  Wellington Realty Company, a general partnership, and Wellington Realty Company Limited Partnership, a Massachusetts limited partnership (collectively referred to as "Seller", the obligations of the entities herein referred to as Seller being joint and several), and

(b)  the entities executing this instrument as "Grantee", hereinafter collectively referred to as "Grantee", (the obligations of such entities named as Grantee being joint and several).

## W I T N E S S E T H

Reference is hereby made to a certain Purchase and Sale Agreement dated November 8, 1984 between Wellington Realty Company, as Seller, and Carabetta Enterprises, Inc., as Buyer, relating to certain premises in Malden, Massachusetts.  The within agreement constitutes an integral part of the transaction pursuant to said Purchase and Sale Agreement as a result of which title to said premises is being conveyed to Grantee herein.

Now therefore the parties hereto covenant and agree as follows:

1.  The parties have made adjustments pursuant to Clause 17 of the Purchase and Sale Agreement on the basis of the Adjustment Schedule hereto attached, and payments received by a party which, according to such Adjustment Schedule, belong to the other party, shall be promptly be paid over to the appropriate party.

2.  Seller represents that the attached Rent Adjustment Schedule correctly states the identity of the various lessees and occupants and the areas occupied and/or leased by each of them.  Seller represents that it has received a letter terminating the tenancy at will covering Area 9 effective as of December 31, 1986 and that J.A. Miara Transportation, Inc. has not exercised its extension right but the parties agree that J.A. Miara Transportation, Inc. may be permitted an additional two month extension so that its term ends March 31, 1987.

0000389

3.  Pursuant to the provisions of said Purchase and Sale
    Agreement (paragraph (K) of the Rider thereto) the purchase
    price has been reduced by $200,000 to $3,600,000 because the
    Nelson and Small lease dated November 3, 1983 therein
    referred to has not been terminated on or prior to the
    closing.  The parties hereto confirm the understanding set
    forth in said paragraph (K) as follows:  if subsequent to
    the closing said Nelson and Small lease is modified so as to
    terminate or if the lease is surrendered by mutual agreement
    prior to its specified expiration date and if the Grantee is
    required, to obtain such modification, to expend a sum less
    than $400,000, then Grantee shall, upon such modification
    and vacating by Nelson and Small, pay to Seller the amount
    by which $200,000 exceeds fifty (50%) percent of such
    payment.  By way of example, if the amount of such payment
    is $300,000, then Seller shall be entitled to receive
    $50,000, being the amount by which $200,000 exceeds fifty
    (50%) percent of $300,000 (or $150,000).  The within
    obligation under this paragraph is jointly and severally
    guaranteed by Carabetta Enterprises, Inc. and Combined
    Properties, Inc. who have executed this agreement solely for
    that purpose.

4.  Seller represents to Grantee that Wellington Realty Corp.,
    (formerly a Massachusetts corporation) which is the record
    holder of a portion of the premises subject to Grantee's
    right of first refusal (which premises are described in
    Certificate of Title No. 80700) has heretofore been li-
    quidated into Wellington Realty Company, the Massachusetts
    General Partnership, but that the property described in said
    Certificate of Title has not been conveyed to Wellington
    Realty Company.  Seller covenants with Grantee that such
    conveyance to Wellington Realty Company (and subsequent
    conveyance to Wellington Realty Company Limited Partnership)
    shall be effected and appropriate Certificates of Title (and
    additional documentation if necessary) shall be furnished by
    Seller to enable Buyer to have noted on the then current
    Certificate of Title Grantee's right of first refusal.

5.  The parties agree that there is to be included in the
    conveyance to Grantee certain unregistered land southerly of
    the premises described in the Deed being delivered to
    Grantee to the middle of the line of the relocated Little
    Creek existing as of the date hereof.  Grantee shall arrange
    to have prepared a current survey substantially in the form
    of said Exhibit A, showing Little Creek as it presently
    exists and Seller shall execute and deliver to Grantee a
    Deed conveying the following interest: all of the right,
    title and interest of (both entities named as Seller) if
    any, in and to all land southerly of the premises described
    in Certificate of Title No. 169205 to the middle line of the
    relocated Little Creek as shown on the survey dated _____
    _____ and entitled "_____" and of even
    record herewith.

0000390

6.   Post-closing, Seller will receive an opinion of Connecticut counsel with respect to authorization, validity and enforceability of the guaranty by Carabetta Enterprises, Inc.

This Agreement shall take effect as a sealed instrument and shall be be binding upon and enure to the benefit of parties hereto and their respective successors and assigns.

WELLINGTON REALTY COMPANY

By _____
   General Partner

WELLINGTON REALTY COMPANY
      LIMITED PARTNERSHIP

By _____
   General Partner

   ("Grantee")

WELL-COM, INC.

By _____

WELL-COM ASSOCIATES, INC.

By _____

COMMERCIAL STREET PROPERTIES,
INC.

By _____

CARABETTA ENTERPRISES, INC.

By _____

COMBINED PROPERTIES, INC.

By _____

0000391

3

AIR.RENT.SCH
12/22/86

PURCHASE OF 378 COMMERCIAL STREET, MALDEN, MASSACHUSETTS
RENT ADJUSTMENT SCHEDULE AS OF DECEMBER , 1986

| Tenant | Date of Lease | Leased Premises (Area Numbers refer to attached plan) | December Rent Paid | Adjustment Due Buyer | Security Deposit | Real Estate Tax Escalation Base | Base Fiscal Year | Base Amount Paid Thru |
|---|---|---|---|---|---|---|---|---|
| Nelson & Small | 11-3-83 | 25,000 s.f. of warehouse space (Area 1) | $ 7,488.33 | | | 22.12 | 1984 | |
| Coastal, Inc. | 6-8-84, amended 10-1-85 | 15,600 s.f. of garage space; 1,700 s.f. of office space (Area 2) | $ 7,583.30 | | $4,800.00 | 15.18 | 1977 | |
| Wellington Trading Corp. | 10-1-85 | 28,647 s.f. of warehouse space (Area 3) | $10,026.45* | | $2,604.17 | 25.2 | 1983 | |
| J.A. Miara Transportion, Inc. | 8-26-86 | 10,000 s.f. (Area 4) | $ 2,500.00 | | $1,250.00 | 6-2/3 | 1986 | |
| Oftech, Inc. | Tenancy-at-Will Agreement dated 2-28-86 | 2,000 s.f. (Area 5) | $ 541.67 | | $ 541.67 | | | |

* Wellington Trading Corp. has currently been paying $15,632.70 per month as rent for Area 3 (leased to Wellington Trading Corp.), Area 9 (leased to Watership), and Area 10 (leased to Mini Warehouse). The monthly rent for Area 3 as stated in the lease is $10,026.45. The monthly rent for Area 3 the ...

0000392

| Tenant | Date of Lease | Leased Premises (Area Numbers refer to attached plan) | December Rent Paid | Adjustment Due Buyer | Security Deposit | Real Estate Tax Escalation Base Fiscal Year | Base Amount | Paid Thru |
|---|---|---|---|---|---|---|---|---|
| Nelson, Small & White | Tenancy-at-Will Letter dated 10-6-86 | 2,000 s.f. of warehouse space (Area 6) | $ 333.33 | | | | | |
| Nelson, Small & White | Tenancy-at-Will (Area 7) dated 12-12-86 | 3,000 s.f. | $ 0 *option pay* | $ 0 | | | | |
| Markline Co., Inc. | Tenancy-at-Will Agreement dated 1/3/83 | 2,160 s.f. of warehouse space (Area 8) | $ 833.00 | | | | | |
| | Tenancy-at-Will Agreement dated | 20,000 s.f. (Area 9) | $5,06.15 * | | | | $ | |

*(handwritten: Wellington Trading, Wellington Trading Corp)*

* Wellington Trading Corp. has currently been paying $15,632.70 per month as rent for Area 3 (leased to Wellington Trading Corp.), and Area 10 (leased to Hird Warehouse). The monthly rent for Area 3 as stated in the lease to Wellington Trading Corp. is $10,026.45. The monthly rent for Area 10 is $ . The monthly rent for Area 11 is $ . The

| Tenant | Date of Lease | Leased Premises (Area Numbers refer to attached plan) | December Rent Paid | Adjustment Due Buyer | Security Deposit | Real Estate Tax Escalation — Base Fiscal Year | Base Amount | Paid Thru |
|---|---|---|---|---|---|---|---|---|
| COASTAL ~~Mini Warehouse~~ | | Tenancy-at-Will Agreement dated ___ of outside storage space (Area 10) ___ s.f. | '600 * | | | $ | | |
| ~~Anheuser~~ COSTAC | | Tenancy-at-Will Agreement dated ___ of outside storage space (Area 11) ___ s.f. | ~~$1,000.00~~ 850 | | | | | |

Total Rents Paid $ 36,362.33    $ 2345.96 due Buyer

per diem $ 1172.98

* Wellington Trading Corp. has currently been paying $15,632.70 per month as rent for Area 3 (leased to Wellington Trading Corp., Area 9 (leased to Watership), and ___ leased to Mini Warehouse). The monthly rent ___ for Area 3 ___ $25.25. The monthly rent ___ for Area 3 ___ monthly rent for Area 11 is ___ The

0000394

Property located aT
378 Commercial Street
Malden, Massachusetts

0000395



CITY TREASURER
AND
COLLECTOR OF TAXES

December 16, 1986

Sherin & Lodgen, Attys.
100 Summer St.
Boston, MA 02110

85-86-87

In accordance with Chapter 490 Acts 1909, I hereby certify that the Taxes for the year 19 Fiscal      and

19      on the property  Lot C2   378 Commercial St.                    Street assessed in the name of

Wellington Realty Co.                   are as follows:

431,252  feet valued $  610,100.                    Buildings valued $  1,556,700.
          (1st 6 months)                                      85 Fiscal  $55,089.38 Paid
Tax of 19 87 Fiscal  $30,604.39 not paid        Tax of 1986 Fiscal  $55,352.35 Paid
          Due by 12-17-86

Sewers  None                                        Sewers

Sidewalks  None                                     Sidewalks

Betterments  None                                   Betterments

                                                    Water Used from 4-8-86 to 10-8-86 $661.10 not
                                                                                            paid

Other Liens

$15.00 received

                                                    Very truly,

                                                    Jean B Carroll

                                                    Collector of Taxes

Key # 105969

# CITY OF MALDEN

Office of

## COLLECTOR OF TAXES

_December 29_  19 _86_

TO WHOM IT MAY CONCERN:

This is to certify that the Real Estate Tax on the following property was paid in full:

Assessed to:

_Wellington Realty_

Year _1987 1st half_

No. _373_    Street _Commercial St_

Lot No. _____    Street _____

Date of Payment _December 11, 1986_

Real Estate Tax _33,624.39_

Sewer Apportionment _____

Sidewalk Apportionment _____

Street Apportionment _____

Committed Interest _____

Water Lien _____

Interest _____

Demand _____

Respectfully,

_[signature]_

Collector of Taxes

0000397

```
RO43 23000 001                  POSTED PAYMENTS  NXT                    105969

TYPE REAS/CNCL  PAID     POSTED  -RECEIPT--  AMOUNT PAID  INT/DISC  APPLIED
     TAX YEAR =1987   BILLING GROUP =1    ROLL NO. =   3363  LAST ACTION =
     TOTAL TAXES DUE =  61,248.77   OUTSTANDING BALANCE =  30,624.38

  P X          12/11/86 12/22/86 33     3363  30,624.39       .00   30,624.39
     TAX YEAR =1986   BILLING GROUP =1    ROLL NO. =   3309  LAST ACTION =
     TOTAL TAXES DUE =  55,352.35   OUTSTANDING BALANCE =        .00

  P X          06/04/86 06/06/86 01     3309  27,807.41       .00   27,807.41
  F X          11/08/85 11/12/85 33        1   6,783.29       .00    6,783.29
  P X          11/01/85 11/07/85 33        1  20,761.65       .00   20,761.65
     TAX YEAR =1985   BILLING GROUP =1    ROLL NO. =   3276  LAST ACTION =
     TOTAL TAXES DUE =  55,089.88   OUTSTANDING BALANCE =        .00

  C R          08/07/85 08/13/85 33      737     149.00-      .00     149.00-
               REFUND
  P L          09/14/84 07/02/85 1      3276     149.00       .00     149.00
               WATER LIEN
  S X          06/18/85 06/25/85 33     3276  25,366.30       .00   25,366.30
  S X          06/18/85 06/25/85 33     3276   3,840.10     49.28    3,790.82
  P X          12/31/84 01/04/85 01     3276  25,932.76       .00   25,932.76
* * * C O N T I N U E D
```

0000398

Baybanks Mortgage Corp.
858 Washington Street
Dedham, MA  02026
(617) 329-3700

Baybank:  Middlesex

Loan #:  600335

Mortgagor and Property Address:

Wellington Realty
378 Commercial St.
Malden

As per your request, please find the payoff figures for the above mentioned

mortgage loan as of:___December 19,1986_____

principal balance  :_____109,002.58_____

interest due       :_____1,062.62_____

escrow             :_____4,612.70_____

late fees due      :_____

TOTAL PAYOFF       :_____105,452.50_____

Per diem of ___22.71_____ should be added for each day after the above

payoff date.

If you have any questions regarding this payoff figure please feel free to

call the payoff department at (617) 329-3700 ext. 2490 or 2491.

Very truly yours,

Mary Alice Boraski
461-2789

0000399

6.   <u>CLOSING AGREEMENT</u> re:

   (a)   Adjustments

   (b)   $200,000 re Nelson & Small

   (c)   Lease and tenancy status

   (d)   Former corporate property to be included in first refusal right

   (e)   21E study

   (f)   Subsequent deed

7.   <u>ADDITIONAL DOCUMENTATION</u>

8.   <u>INSURANCE</u> - name Seller as mortgagee

9.   <u>21E NOTICE</u> - problems

10.  BUSINESS CERTIFICATE

11.  <u>ADJUSTMENT SCHEDULE</u>

|  | DUE SELLER | DUE BUYER |
|---|---|---|
| Purchase Price | $3,600,000.00 | |
| Deposit | | $ 200,000.00 |
| Promissory Note and Mortgage | | 2,800,000.00 |
| Rent Adjustment (1.5 days) | | 1,759.47 |
| Real Estate Tax Adjustment (see attached)(1.5 days) | 227.48 | |
| Security Deposits | | 9,195.84 |
| Sewer Use and Water   (subject to verification) | | 0 |
| Documentary Stamps | | 8,208.00 |
| Pay-off of Existing Mortgage (see attached) | _____ | 105,725.02 |
| Totals | 3,600,227.48 | 3,124,888.33 |
| Due Seller | 475,339.15 | |

4

0000400

# EXHIBIT F

SNWD187CC
12/10/86

DEED

WELLINGTON REALTY COMPANY LIMITED PARTNERSHIP, a Massachusetts limited partnership, (the "Grantor") whose address is 40 Canal Street, P.O. Box 122, Medford, MA 02155, for consideration paid of Three Million Six Hundred Thousand ($3,600,000.00), grants to Commercial Street Properties, Inc., a Massachusetts coporation, an undivided fifty percent (50%) interest; Well-Com, Inc., a Massachusetts corporation, an undivided one percent (1%) interest; and Well-Com Associates, Inc., a Massachusetts corporation, an undivided forty-nine (49%) interest, all as tenants in common, and whose address is at 300 Commercial Street, Malden, MA 02148 (the "Grantee"), with QUITCLAIM COVENANTS, the following:

The land with the improvements thereon in Malden, Middlesex County, Massachusetts, bounded and described as follows:

EASTERLY          by the westerly line of Malden Canal, about five hundred fifty-seven and 28/100 feet;

SOUTHERLY         Westerly and Southerly by the middle line of Malden River and Little Creek;

WESTERLY          by land now or formerly of the Boston and Maine Railroad, about two hundred twenty-seven and 76/100 feet;

NORTHWESTERLY     by lot $C^1$ as shown on plan hereinafter mentioned, by a curving line, three hundred forty-three and 70/100 feet; and

NORTHERLY         by said lot $C^1$, six hundred seven and 26/100 feet.

Said land is shown as lot C2 on Land Court Plan No. 6178C.

All of said boundaries, except the lines in said River and Creek are determined by the Land Court to be located as shown on a subdivision plan, as approved by the Court, filed in the Land Registration Office, a copy of which is filed in the Registry of Deeds for the South Registry District of Middlesex County in Registration Book 220, Page 457, with Certificate of Title No. 34735.

Subject to and together with those matters set forth in Certificate of Title No. 169205.

Meaning and intending to convey all of Grantor's property on Commercial Street, Malden, Middlesex County, Massachusetts.

For Grantor's title see deed of even date and registration herewith from Wellington Realty Company to Grantor herein, and said premises are conveyed together with the benefit of all of

SNWD18/CC
12/10/86

Grantor's right, title and interest in and to all rights with respect to bona fide offers set forth in said deed, all of which are hereby assigned to Grantee.

As consideration for Grantee's purchase of the aforesaid premises, Grantor agrees that if, during the period beginning with the date of this deed and continuing for a period of ten (10) years thereafter, Grantor or an affiliate or affiliates of Grantor receives an acceptable bona fide offer to buy all or any part of premises ("Premises") in Medford, Massachusetts on Corporation Way, extending easterly to the Malden River, being bounded northerly by the property of the Seller which is the subject of this deed, and southerly by land now or formerly of Wellington Realty Co., which area is shown on Exhibit "A" hereto attached and including without limitation the property described in Exhibit B hereto attached, Grantor or such affiliate or affiliates shall furnish Grantee with a complete copy of the purchase and sale agreement ("P&S") acceptable to Grantor or its affiliate or affiliates, which shall constitute an offer to sell to Grantee all or such portion of such Premises on the terms of the P&S. The P&S shall be accompanied by a list of all existing leases, with details thereof, and with other pertinent information reasonably required by Grantee to review the P&S. Grantee shall have a period of ninety (90) days after receipt of the P&S to accept the P&S or reject it; failure to accept within such period of time shall be deemed a rejection. If Grantee accepts the P&S, then the parties shall comply with the terms of the P&S. If Grantee rejects the P&S, Grantor shall have a period of forty-five (45) days to sign the P&S, and shall have the period of time stated in the P&S to consummate the sale under the P&S; otherwise the terms of this paragraph shall remain in effect. If the P&S applies to only a part of the Premises, the remainder of the Premises shall continue to be subject to this Section. This Section shall apply not only to offers to purchase all or part of the Premises but shall also apply to so-called groundleases or similar long term leasing arrangements (i.e., leases for terms, including options, of more than five years) of all or part of the premises, and shall be applicable to the Grantor, its affiliates, nominees, heirs, executors or assigns and to property now owned or hereafter purchased or assembled. Grantor shall have the right to develop all of the Premises in its own name or its affiliate's name, but shall not, directly or indirectly, enter into a joint venture or similar arrangement relating to the Premises without offering Grantee the same right, upon all the same terms and conditions (including submission of a copy of the proposed joint venture or other arrangements) as set forth above. In the event Grantee rejects (either by affirmative action or passing of time) an offer made pursuant to this paragraph, Grantee shall promptly (but not later than 15 days after expiration of the

0000137

ninety (90) day period) deliver to Grantor, or its affiliate, an Affidavit in recordable form evidencing such rejection.

Pursuant to the provisions of Massachusetts General Laws Chapter 21C Section 7, the Grantor hereby notifies Grantee, its successors and assigns, that a release of hazardous materials has occurred at the premises conveyed herein.

Executed as a sealed instrument as of the 22ND day of December, 1986.

WELLINGTON REALTY COMPANY LIMITED
PARTNERSHIP, a Massachusetts limited
partnership

By: John Kazanjian
    John Kazanjian
    Its Managing General Partner

~~COMMONWEALTH OF MASSACHUSETTS~~
STATE OF FLORIDA

~~Suffolk~~, ss.                           December 22 , 1986
BROWARD,

Then personally appeared the above-named John Kazanjian, Managing General Partner of Wellington Realty Company Limited Partnership, a Massachusetts limited partnership, and acknowledged the foregoing instrument to be his free act and deed and the free act and deed of Wellington Realty Company Limited Partnership, before me,

0000138



Michael R. Shetr

Notary Public
My commission expires: _____  Notary Public, State of Florida at Large
                                My Commission Expires Jan. 7, 1990





APPROVED FOR REGISTRATION
BY THE COURT as to ... partnership only

CHIEF TITLE EXAMINER





**EXHIBIT B**

| Record Owner<br>(now or formerly) | Title Reference |
|---|---|
| 1. Wellington Realty Co.<br>a Massachusetts general<br>partnership | Certificate of Title<br>No. ~~169203~~ *169204* |
| 2. Wellington Realty Corp.<br>a Massachusetts corporation | Certificate of Title<br>No. 80700 |
| 3. Wellington Realty Co.<br>a Massachusetts general<br>partnership | Recorded at Book 15758<br>Page 273 |
| 4. Wellington Realty Co.<br>a Massachusetts general<br>partnership | Recorded at Book 15229,<br>Page 07 |
| 5. Richard B. Kurtzman, Trustee<br>of Highkurtz Realty Trust | Certificate of Title No.<br>recorded at Book<br>Page; see Deed<br>registered as Document<br>No. 666173 |
| 6. John R. Swansburg, Trustee<br>Crescent Avenue Realty Trust | Recorded at Book 14190,<br>Page 159 |
| 7. Leonard E. Walk | Recorded at Book 11547,<br>Page 542 |
| 8. Michael Delvechion | Certificate of Title No.<br>137249 |
| 9. John J. Paonessa | Recorded at Book 15051,<br>Page 296 |



DOCUMENT NO. _231923_

LOT C2 #78668

SO. MIDDLESEX LAND COURT
REGISTRY DISTRICT
RECEIVED FOR REGISTRATION

AT  3 H  35 M  P M

DEC 30 1986

NOTED ON CERT. NO. _6022_
REG. BK. _6022_    PAGE _128948_
CLERK
JOHN F. ZAMPARELLI
ASSISTANT RECORDER

TRANSFER CERTIFICATE OF TITLE ISSUED
AND TRANSCRIBED INTO REGISTRATION
BOOK _6022_    PAGE _128948_
BEING CERTIFICATE NO. _172_
IN MIDDLESEX SOUTH REGISTRY DISTRICT

CERT. TO:
Martin Bunn
40 Summer St., Boston
Boston, Ma 02210

0000141

EXHIBIT G

# DONNELLY & REED REAL ESTATE AGENCY

62 SUMMER STREET

P. O. BOX 185,

TELEPHONE 322-1893

MALDEN, MASSACHUSETTS 02148

March 6, 1987

Mr. Daniel Steinmetz, V.P.
Bank of Boston/Connecticut
85 East Main Street
Plainville, Conn. 06062

Re: Wellington Associates
    378 Commercial Street
    Malden, Massachusetts

Dear Mr. Steinmetz;

　　Enclosed please find my appraisal report for the property located at 378 Commercial Street, Malden, Massachusetts. This report was ordered by Mr. Stanton Black of Wellington Associates. The report was made to be used in conjunction with the application for mortgage made by Wellington Associates to Bank of Boston/Connecticut.

Respectfully submitted,

Robert Donnelly, R.A.



0000517

APPRAISAL REPORT
=================


378 COMMERCIAL STREET
MALDEN, MASSACHUSETTS


PREPARED FOR:

DANIEL J. STEINMETZ, V.P.
BANK OF BOSTON/CONNECTICUT
85 EAST MAIN STREET
PLAINVILLE, CONN. 06062


PREPARED BY:

ROBERT DONNELLY, R.A.
DONNELLY & REED REAL ESTATE
64 SUMMER STREET
MALDEN, MASSACHUSETTS 02148


1

0000518

# DONNELLY & REED REAL ESTATE AGENCY

62 SUMMER STREET

P. O. BOX 185

TELEPHONE 322-1893

MALDEN, MASSACHUSETTS 02148

March 6, 1987

Mr. Daniel J. Steinmetz, V.P.
Bank of Boston/Connecticut
85 East Main Street
Plainville, Connecticut 06062

Dear Mr. Steinmetz;

    In accordance with the request of Mr. Stanton Black for a
Market Data Appraisal of the property located at 378 Commercial
Street, Malden and legally described in Book 720 Page 179
Certificate 118189 of the Middlesex South District Registry of
Deeds, my report is enclosed.

    This report describes the methodology used in arriving at an
opinion of value, and lists the data considered in the various
analyses.

    As a result of my analysis of the information contained in
this report, I estimate the Market Value of the Subject Property,
as of February 20, 1987, for the purpose of a possible sale, to
be:

                    TEN MILLION DOLLARS
                    ($10,000,000.00)


                    Respectfully submitted,

                    Robert Donnelly, R.A.

                                                    0000519



# TABLE OF CONTENTS

| | |
|---|---|
| TITLE PAGE | 1 |
| LETTER OF TRANSMITTAL | 2 |
| TABLE OF CONTENTS | 3 |
| SUMMARY OF IMPORTANT FACTS | 4 |
| CONTINGENT & LIMITING CONDITIONS | 5 |
| DEFINITION OF MARKET VALUE | 7 |
| SUBJECT PROPERTY | 8 |
| BUILDING SKETCH | 9 |
| PHOTOGRAPHS OF SUBJECT | 10 |
| SITE MAP | 12 |
| NEIGHBORHOOD MAP | 13 |
| REGIONAL MAP | 14 |
| AREA MAP | 15 |
| THE COST APPROACH | 16 |
| THE MARKET DATA APPROACH | 18 |
| THE INCOME APPROACH | 25 |
| CORRELATION | 28 |
| TAX DATA | 29 |
| PURPOSE OF THE APPRAISAL | 30 |
| PROPERTY RIGHTS APPRAISED | 30 |
| DATE OF VALUATION | 30 |
| HIGHEST AND BEST USE | 30 |
| CITY DATA (MASS. DEPT. OF COMM.) | 31 |
| QUALIFICATIONS OF APPRAISER | 36 |
| CERTIFICATION | 37 |
| ADDENDUM | |

0000520

SUMMARY OF IMPORTANT FACTS AND CONCLUSIONS
==========================================

LOCATION:                        378 COMMERCIAL STREET, MALDEN IS LOCATED
                                 IN THE MALDEN INDUSTRIAL PARK, AT THE
                                 MALDEN/MEDFORD BORDER.

SITE/ZONING:                     THE TOPOGRAPHY IS RELATIVELY LEVEL. THE
                                 LOT IS ZONED FOR INSDUSTRIAL USE. THERE
                                 HAS BEEN AN ENVIRONMENTAL SITE ASSESS-
                                 MENT PERFORMED BY NORWOOD ENGINEERING
                                 WHICH IDENTIFIED THE PRESENCE OF HAZ-
                                 ARDOUS MATERIALS, AS DEFINED UNDER MGL
                                 CHAPTER 21E. A COPY OF THIS REPORT IS
                                 INCLUDED IN THE ADDENDUM.

PURPOSE OF APPRAISAL:            ESTIMATE THE MARKET VALUE OF THE SUBJECT
                                 PROPERTY IN FEE SIMPLE INTEREST.

EFFECTIVE DATE OF                FEBRUARY 20, 1987.
THE APPRAISAL:

AREA HIGHLIGHTS:                 MALDEN IS LOCATED IN THE SOUTHEAST SEC-
                                 TION OF MIDDLESEX COUNTY. IT IS APPROX-
                                 IMATELY 5 MILES NORTH OF BOSTON.

LOCATION HIGHLIGHTS:             THE SUBJECT PROPERTY IS LOCATED IN THE
                                 MALDEN INDUSTRIAL PARK AT THE MEDFORD
                                 BORDER.

4

0000521

CONTINGENT AND LIMITING CONDITIONS
====================================

THIS APPRAISAL REPORT AND THE CERTIFICATION ARE MADE EXPRESSLY
SUBJECT TO THE FOLLOWING ASSUMPTIONS AND LIMITING CONDITIONS:

1. THE TITLE OF THE PROPERTY IS GOOD AND MARKETABLE.

2. THE LEGAL DESCRIPTION FURNISHED IS CORRECT.

3. NO RESPONSIBILITY IS ASSUMED BY THE APPRAISER FOR LEGAL
   MATTERS, ESPECIALLY THOSE AFFECTING TITLE TO THE PROPERTY.

4. THE PROPERTY APPRAISED IS FREE AND CLEAR OF ALL LIENS AND
   ENCUMBRANCES.

5. THE INFORMATION AND OPINIONS OF OTHERS USED IN THIS REPORT
   ARE CONSIDERED TO BE ACCURATE AND RELIABLE BUT THE APPRAISER
   ASSUMES NO RESPONSIBILITY FOR THEIR ACCURACY.

6. THE APPRAISER IS NOT REQUIRED TO GIVE TESTIMONY OR ATTENDANCE
   IN COURT BY REASON OF THIS REPORT, UNLESS PREVIOUSLY AGREED
   UPON.

7. THE EXHIBITS INCLUDED IN THIS REPORT ARE PROVIDED SOLELY FOR
   THE PURPOSE OF ASSISTING THE READER IN VISUALIZING THE
   PROPERTY AND UNDERSTANDING THE INFORMATION PRESENTED, AND THE
   APPRAISER ASSUMES NO RESPONSIBILITY IN CONNECTION WITH THE
   EXHIBITS.

8. POSSESSION OF THIS REPORT, OR A COPY THEREOF, DOES NOT CARRY
   WITH IT THE RIGHT OF PUBLICATION, NOR MAY IT BE USED FOR ANY
   PURPOSE BUT FOR THE PURPOSE NAMED IN THIS REPORT, WITHOUT THE
   PREVIOUS, WRITTEN CONSENT OF THE APPRAISER.

9. THE DISTRIBUTION OF THE TOTAL VALUATION IN THIS REPORT
   BETWEEN LAND AND IMPROVEMENTS APPLIES ONLY UNDER THE EXISTING
   PROGRAM OF UTILIZATION. THE SEPARATE VALUATIONS FOR LAND AND
   IMPROVEMENTS MUST NOT BE USED IN CONJUNCTION WITH ANY OTHER
   APPRAISAL AND ARE INVALID IF SO USED.

10. THE LAND, AND PARTICULARLY THE SOIL, OF THE AREA UNDER
    APPRAISAL APPEARS FIRM AND SOLID, BUT THE APPRAISER DOES NOT
    WARRENT AGAINST SETTLING OR OTHER POSSIBLE CONDITIONS.

11. SUBSURFACE RIGHTS (MINERALS, OIL, ETC...) WERE NOT CONSIDERED
    IN MAKING THIS APPRAISAL.

0000522

CONTINGENT AND LIMITING CONDITIONS CON'T.
===========================================

12. COMPARABLE SALES AND RENTAL DATA RELIED UPON IN THIS REPORT
IS BELIEVED TO BE FROM RELIABLE SOURCES. THE APPRAISER HAS
CHECKED THE DATA TO THE BEST OF HIS ABILITY BUT ASSUMES NO
RESPONSIBILITY FOR ITS CORRECTNESS.

13. THE APPRAISER HAS INSPECTED, AS FAR AS POSSIBLE, BY
OBSERVATION, THE LAND AND THE IMPROVEMENTS THEREON, HOWEVER,
IT WAS NOT POSSIBLE TO PERSONALLY OBSERVE CONDITIONS BENEATH
THE SOIL OR HIDDEN STRUCTURAL COMPONENTS WITHIN THE IMPROVE-
MENTS; THEREFORE, NO REPRESENTATIONS ARE MADE HEREIN AS TO
THESE MATTERS AND UNLESS SPECFICALLY CONSIDERED IN THE REPORT
THE VALUE ESTIMATE IS SUBJECT TO ANY SUCH CONDITION THAT
COULD CAUSE A LOSS IN VALUE. CONDITION OF HEATING, COOLING,
VENTILATING, ELECTRICAL AND PLUMBING EQUIPMENT IS CONSIDERED
TO BE COMMENSURATE WITH THE CONDITION OF THE BALANCE OF THE
IMPROVEMENTS UNLESS OTHERWISE STATED.

14. NEITHER ALL NOR PART OF THE CONTENTS OF THIS REPORT SHALL BE
DISSEMINATED TO THE PUBLIC THROUGH ADVERTISING MEDIA, PUBLIC
RELATIONS MEDIA, SALES MEDIA, OR ANY OTHER PUBLIC MEANS OF
COMMUNICATION WITHOUT THE PRIOR WRITTEN CONSENT AND APPROVAL
OF THE APPRAISER.

16. IT IS ASSUMED, FOR APPRAISAL PURPOSES, THAT NO INSULATION OR
OTHER PRODUCT BANNED BY THE CONSUMER PRODUCT SAFETY COMMISION
HAS BEEN INTRODUCED INTO THE APPRAISED PREMISES, UNLESS
OTHERWISE NOTED IN THIS REPORT.

0000523

DEFINITION OF MARKET VALUE
===========================

THE MOST PROBABLE PRICE IN TERMS OF MONEY WHICH A PROPERTY
SHOULD BRING IN A COMPETITIVE AND OPEN MARKET, UNDER ALL
CONDITIONS REQUISITE TO A FAIR SALE, THE BUYER AND SELLER
EACH ACTING PRUDENTLY, KNOWLEDGEABLY AND ASSUMING THE PRICE
IS NOT AFFECTED BY UNDUE STIMULUS. IMPLICIT IN THIS
DEFINITION IS THE CONSUMATION OF A SALE AS OF A SPECIFIED
DATE AND THE PASSING OF TITLE FROM SELLER TO BUYER UNDER
CONDITIONS WHEREBY:

A. BUYER AND SELLER ARE TYPICALLY MOTIVATED;

B. BOTH PARTIES ARE WELL INFORMED OR WELL ADVISED, EACH
   ACTING IN WHAT HE CONSIDERS HIS OWN BEST INTEREST;

C. A REASONABLE TIME IS ALLOWED FOR EXPOSURE IN THE OPEN
   MARKET;

D. PAYMENT IS MADE IN TERMS OF CASH IN U.S. DOLLARS OR IN
   TERMS OF FINANCIAL ARRANGEMENTS COMPARABLE THERETO; AND

E. THE PRICE REPRESENTS THE NORMAL CONSIDERATION FOR THE
   PROPERTY SOLD UNAFFECTED BY SPECIAL OR CREATIVE
   FINANCING OR SALES CONCESSIONS GRANTED BY ANYONE
   ASSOCIATED WITH THE SALE.

0000524

## SUBJECT PROPERTY

The subject property consists of approximately 431,752 square feet or approximately 9.91 acres of land and the improvements situated thereon. The land is relatively level and is zoned for Industrial Use. The Norwood Engineering Co., Inc. did an Environmental Site Assessment of the land, a copy of their report is included in the addenda. Their report identified the presence of coal tar byproducts, inorganic compounds and petroleum products. The cost of correcting these problems is estimated to be between three hundred thousand dollars ($300,000.00) and four hundred thousand dollars ($400,000.00). One of the previous owners, Allied Chemical, may be responsible for at least part of the cleanup costs.

There is approximately 113,903 square feet of masonry buildings on the subject lot. The buildings are basically warehouse space with incidental office area. A building sketch is included in the following page because an Income Approach was considered to value the property under its existing utilization; however, the Highest and Best Use of the property would call for the existing buildings to be demolished and removed, to prepare the land for new development of office, office condominiums or research and development space.

A copy of the Malden Assessor's filed card, completed in 1982, can be found in the addendum.

0000525

BUILDING SKETCH
=================



9

0000526

PHOTOGRAPHS OF SUBJECT PROPERTY



VIEW FROM COMMERCIAL STREET



VIEW FROM REAR OF PROPERTY

10

0000527

PHOTOGRAPHS OF SUBJECT PROPERTY



STREET SCENE FACING SOUTH



STREET SCENE FACING NORTH

11

0000528



NEIGHBORHOOD MAP
=================



0000530

## REGIONAL MAP



M A L D E N
R E G I O N A L
A R E A

DECEMBER 1983

14

0000531



AREA MAP

THE COMMONWEALTH OF MASSACHUSETTS
DEPARTMENT OF COMMERCE
DIVISION OF PLANNING
MIDDLESEX COUNTY

SCALE IN MILES

15

0000532

THE COST APPROACH
==================

THE COST APPROACH TO VALUE INVOLVES A TECHNIQUE OF (A) DEVELOPING
THE ESTIMATED REPLACEMENT COST NEW OF THE BUILDING AND OTHER
IMPROVEMENTS, (B) ESTIMATING THE AMOUNT OF ACCRUED DEPRECIATION
WHICH IS DEDUCTED FROM THE COST NEW, AND (C) ESTIMATING THE VALUE
OF THE LAND AND ADDING IT TO THE RESULTS OF (A) AND (B).

THIS APPROACH IS BASED ON THE "THEORY OF SUBSTITUTION", AN
ECONOMIC PRINCIPLE THAT STATES A THING CAN NOT BE WORTH MORE THAN
THE COST TO REPLACE IT. AS A RESULT, ASSUMING MARKET CONDITIONS
OF ECONOMIC EQUILIBRIUM, THE REPLACEMENT COST REPRESENTS THE
UPPER LIMIT OF VALUE BECAUSE A PURCHASER WOULD NORMALLY NOT PAY
MORE FOR A PROPERTY THAN THE COST TO REPLACE IT.

THE REPLACEMENT COST IS ESTIMATED BY VARIOUS METHODS:

1. THE QUANTITY SURVEY METHOD - A DETAILED INVENTORY OF ALL THE
MATERIALS AND LABOR THAT GO INTO THE BUILDING. THIS METHOD IS
COMMONLY USED BY ARCHITECTS, BUILDERS AND CONTRACTORS. THE
QUANTITY OF EACH CLASS OF MATERIAL AND EQUIPMENT IS LISTED FROM
PLANS AND SPECIFICATIONS AND THE COST COMPUTED. TO THIS IS ADDED
THE COST OF LABOR FOR EACH OF THE BUILDING TRADES NECESSARY TO
PROCESS THESE MATERIALS INTO THE BUILDING. THE CONTRACTORS
PROFIT AND OVERHEAD IS ADDED AND THE RESULT IS THE ESTIMATED COST
OF THE BUILDING.

2. THE UNIT IN PLACE METHOD - A MATHEMATICAL COMPRESSION OF THE
QUANTITY SURVEY. THE ORIGINAL ESTIMATE DERIVED FROM THE QUANTITY
SURVEY, AND DEVIATIONS FROM THE BASE SPECIFICATIONS ARE COMPUTED
BY APPLYING THE DIFFERENTIAL COST REPRESENTED BY THOSE ITEMS THAT
DIFFER FROM THE BASE SPECIFICATIONS.

3. THE COST PER CUBIC FOOT METHOD - A PRODUCT OF THE QUANTITY
SURVEY AND UNIT IN PLACE METHODS, IT ESTABLISHES A COST PER CUBIC
FOOT OF THE SUBJECT BUILDING AND MULTIPLIES THAT UNIT COST BY THE
NUMBER OF CUBIC FEET WITHIN THE SUBJECT BUILDING TO ARRIVE AT A
FIGURE OF COST.

4. THE SQUARE FOOT METHOD - SIMILAR TO THE CUBIC FOOT METHOD
EXCEPT THAT IT IS BASED ON THE USABLE NUMBER OF SQUARE FEET
WITHIN THE BUILDING, MEANING THE USABLE AREA.  IT IS AN
ESTIMATION OF THE TOTAL COST BY COMPARISON WITH OTHER BUILDINGS
WHOSE COSTS ARE ACCURATELY KNOWN AND REDUCED TO SQUARE FOOT
UNITS.

THE SQUARE FOOT UNIT IS THE ONE MOST FREQUENTLY USED BY
APPRAISERS.  THE SUBJECT BUILDING IS PHYSICALLY MEASURED AND THE
TOTAL SQUARE FEET OF USABLE AREA IS CALCULATED.

0000533

THE COST APPROACH CON'T
=========================

DEPRECIATION IS THE LOSS OF VALUE DUE TO PHYSICAL DETERIORATION,
FUNCTIONAL OBSOLESCENCE AND ECONOMIC OBSOLESCENCE. PHYSICAL
DETERIORATION IS THE ACTUAL WEARING AWAY OF THE BUILDING. SOME
PARTS WEAR MORE RADIPLY THAN OTHERS AND THEREFORE DEPRECIATE AT A
MORE RAPID RATE. SOME PROPERTIES DETERIORATE AT A SLOWER RATE
THAN OTHERS BECAUSE OF PROPER MAINTENENCE. FUNCTIONAL
OBSOLESCENCE IS A DEPRECIATION DUE TO OUTMODED FEATURES OF A
PROPERTY AFFECTING ITS USEFULNESS AND ATTRACTIVENESS. IT MAY BE
IN ARCHITECTURAL DESIGN, OVERSIZED OR TOO SMALL ROOMS, OLD
FASHIONED PLUMBING FIXTURES, LACK OF CLOSET OR STORAGE SPACE OR
ANY OTHER FEATURES THAT ARE NOT ACCEPTABLE TO POTENTIAL BUYERS.
ECONOMIC OBSOLESCENCE IS A DEPRECIATION IN VALUE DUE TO CAUSES
FROM OUTSIDE INFLUENCES WHICH AFFECT THE VALUE OF THE SUBJECT
PROPERTY. FOR INSTANCE, A SERVICE STATION NEXT DOOR WOULD HAVE AN
ADVERSE AFFECT ON THE VALUE OF A RESIDENTIAL PROPERTY, OR A
COMMERCIAL PROPERTY COULD BE AFFECTED BY A CHANGE IN TRAFFIC
PATTERNS. THE TOTAL AMOUNT OF ACCRUED DEPRECIATION MUST BE
ESTIMATED, WHICH SUM, WHEN DEDUCTED FROM THE REPLACEMENT COST
NEW, EQUALS THE DEPRECIATED COST OF THE BUILDING. ACCRUED
DEPRECIATION IS THE DIFFERENCE BETWEEN THE REPLACEMENT COST NEW
AND THE AMOUNT OF MONEY BY WHICH IT ENHANCES THE FAIR MARKET
VALUE OF THE LAND UPON WHICH IT IS SITUATED.

THE COST APPROACH HAS BEEN DISCOUNTED FOR THE PURPOSE OF THIS
APPRAISAL REPORT BECAUSE THE HIGHEST AND BEST USE OF THE SUBJECT
PROPERTY WOULD BE DEVELOPABLE, VACANT LAND, WHICH WOULD
NECESSITATE THE DEMOLITION AND REMOVAL OF THE EXISTING BUILDINGS.

0000534

## MARKET DATA APPROACH
====================

THE MARKET DATA APPROACH TO VALUE IS A METHOD OF DETERMINING THE VALUE OF A PARTICULAR PROPERTY BY ANALYZING DATA FROM SALES OF SIMILAR PROPERTIES. TYPICAL ELEMENTS ARE ANALYZED AND ADJUSTMENTS ARE MADE TO THE SALES PRICES FOR DIFFERENCES TO ARRIVE AT AN INDICATION OF WHAT THE SUBJECT PROPERTY WOULD SELL FOR IF OFFERED FOR SALE ON THE OPEN MARKET.

THE FIVE SALES LISTED ON THE FOLLOWING PAGES WERE CONSIDERED TO BE COMPARABLE TO THE SUBJECT PROPERTY AND WERE ADJUSTED TO GIVE AN INDICATION OF VALUE ON A "PER ACRE" BASIS. THE ADJUSTMENTS THAT WERE MADE ARE SHOWN ON THE MARKET DATA ANALYSIS WORKSHEET.

THE ADJUSTED SALES PRICES, ON A PER ACRE BASIS, GIVE AN INDICATED VALUE RANGE FOR THE SUBJECT OF $10,000,000.00 TO $14,000,000.00. COMPARABLE SALE #5 IS CLOSEST TO THE SUBJECT GEOGRAPHICALLY AND A STUDY OF THE SALES INDICATES THAT NO SIZE ADJUSTMENT IS NECESSARY HOWEVER; THIS PARCEL IS CONSIDERED TO BE AN IMPORTANT PART OF THE ASSEMBLAGE FOR THE BUYER AND THEREFORE A SIZE ADJUSTMENT MAY BE APPROPRIATE FOR THIS SALE ONLY. COMPARABLE SALES 1 & 3 BOTH INDICATE A VALUE FOR THE SUBJECT OF $10,000,000.00. COMPARABLE SALE #1, BECAUSE OF SIZE AND LOCATION IS CONSIDERED TO BE THE BEST MEASURE OF VALUE FOR THE SUBJECT WITHIN THE MARKET DATA APPROACH.

THEREFORE, THE INDICATED VALUE OF THE SUBJECT PROPERTY, AS INDICATED BY THE MARKET DATA APPROACH IS:

TEN MILLION DOLLARS
($10,000,000.00)

18

0000535

COMPARABLE SALE # 1
===================

| | |
|---|---|
| Location: | 451 Fellsway, Medford |
| Grantor: | Benes Realty Trust |
| Grantee: | Cabot, Cabot & Forbes |
| Land Area: | 4.48 acres |
| Date of Sale: | September 24, 1986 |
| Sale Price: | $5,250,000.00 |
| Comments: | Cabot, Cabot & Forbes is putting together an assemblage of land for a condo / office development. |



19

0000536

COMPARABLE SALE # 2
===================

Location:                          83-87 Locust Street, Medford

Grantor:                           Locust Street Realty Corp.

Grantee:                           Locust Street Nominee R.T.

Land Area:                         1.94 acres

Date of Sale:                      June 6, 1986

Selling Price:                     $2,250,000.00

Comments:                          This is part of an assemblage
                                   across from the Meadow Glen
                                   Mall to be developed into
                                   residential condominiums.



20

0000537

```
                          COMPARABLE SALE # 3
                          ===================
```

Location:                    25 Revere Beach Boulevard
                             Medford

Grantor:                     Simon Realty Trust

Grantee:                     Cabot, Cabot & Forbes

Land Area:                   35,763 s.f. / 0.82 acres

Date of Sale:                June 2, 1986

Selling Price:               $900,000.00

Comments:                    Bought  as part of assemblage
                             for office / condominium
                             development.



21

0000538

COMPARABLE SALE # 4
====================

Location:                    3920 Mystic Valley Parkway
                             Medford.

Grantor:                     S.R.P. Realty Trust

Grantee:                     Mystic River Park R.T.

Land Area:                   3.58 acres

Date of Sale:                June 16, 1986

Selling Price:               $5,500,000.00

Comments:                    Property is expected to be
                             developed for residential
                             condominiums.



22

0000539

COMPARABLE SALE # 5
====================

| | |
|---|---|
| Location: | 109 Corporation Way, Medford |
| Grantor: | Wellington Realty |
| Grantee: | Colloredo F. Mansfield |
| Land Area: | 32,940 square feet |
| Date of Sale: | March 14, 1986 |
| Selling Price: | $1,127,799.00 |
| Comments: | Part of assemblage for office / condominium development. |



23

0000540

DATE OF SALE

LAND AREA

SELLING PRICE

PRICE PER ACR

ADJUSTMENTS
===========

TIME

LOCATION

TOPOGRAPHY

ACCESS

DEMOLITION &
REMOVAL COSTS

=============

ADJUSTED VALU
PER ACRE

INDICATED VAL
OF SUBJECT

LESS D.E.Q.E.
REMEDY COSTS

VALUE BY THE
MARKET DATA
APPROACH

ROUNDED

0000541

## THE INCOME APPROACH
====================

THE INCOME APPROACH TO VALUE IS A METHOD OF CONVERTING FUTURE
MONETARY BENEFITS OF A PROPERTY INTO AN INDICATION OF PRESENT
VALUE. AN INVESTOR IS SEEKING TO TRADE PRESENT DOLLARS FOR THE
RIGHT TO RECIEVE FUTURE PAYMENTS PLUS A RETURN ON HIS INVESTMENT.
THE FIRST STEP IN THE PROCESS IS TO ESTIMATE THE POTENTIAL GROSS
INCOME FOR THE PROPERTY; SECONDLY, TO ALLOW FOR VACANCY AND
COLLECTION LOSS; THIRD, TO SUBTRACT THE OPERATING EXPENSES
ATTRIBUTABLE TO THE PROPERTY; AND FINALLY, TO CAPITALIZE THE NET
OPERATING INCOME BY AN OVERALL RATE THAT INCLUDES TWO VARIABLES:
"RETURN OF" AND "RETURN ON" INVESTMENT.

WHEREAS THE HIGHEST AND BEST USE OF THE PROPERTY WOULD BE AS
DEVELOPABLE VACANT LAND, THE INCOME APPROACH IS NOT APPROPRIATE
FOR THIS REPORT; HOWEVER, MR. BLACK ASKED THAT IT BE INCLUDED TO
GIVE AN INDICATION OF VALUE UNDER THE EXISTING UTILIZATION.

THE PRESENT RENT ROLL, A COPY OF WHICH IS INCLUDED IN THE
ADDENDUM, WAS CONSIDERED IN THIS APPROACH BUT WAS SO FAR REMOVED
FROM "MARKET RENTS" THAT "MARKET RENTS" HAD TO BE USED AS A BASIS
FOR POTENTIAL GROSS ECONOMIC INCOME. IT SHOULD BE NOTED THAT THE
NEGOTIATIONS FOR THE PURCHASE OF THE SUBJECT PROPERTY HAVE BEEN
ONGOING FOR THE PAST THREE YEARS, AND THAT MOST TENANTS ARE ON AN
"AT WILL" BASIS AND ALL BUT ONE LEASE WILL EXPIRE ON OR BEFORE
SEPTEMBER 30, 1987. THAT ONE LEASE BEING THAT OF NELSON & SMALL,
AND EXPIRES ON DECEMBER 31, 1988. THERE IS AN OPTION FOR RENEWAL,
FOR A PERIOD OF FIVE YEARS, AT A RATE OF $5.00 PER SQUARE FOOT
FOR THE FIRST 30 MONTHS AND INCREASES TO $5.75 FOR THE FINAL 30
MONTHS. THIS LEASE WAS NEGOTIATED IN DECEMBER 1983.

THE AVERAGE ACTUAL RENT PER SQUARE FOOT OF BUILDING IS $4.10.
MARKET RENTS FOR SIMILAR PROPERTIES ARE $6.00 TO $7.00   PER
SQUARE FOOT ON A TRIPLE NET BASIS. COMPARABLE RENTAL DATA
CONSIDERED FOR THIS APPROACH IS LISTED STARTING ON PAGE 28.

AS A RESULT OF MY ANALYSIS OF THE DATA CONTAINED IN THIS
APPROACH, IT IS MY OPINION THAT THE ESTIMATED MARKET VALUE OF THE
SUBJECT PROPERTY, UNDER THE PRESENT UTILIZATION, AS OF FEBRUARY
20, 1987, IS:

FIVE MILLION SIX HUNDRED THIRTY THOUSAND DOLLARS
($5,630,000.00)

0000542

GROSS ECONOMIC INCOME
=====================

113,930 sq. ft. @ $6.00 (triple net basis)          $683,580.00

LESS VACANCY AND RENT LOSS
==========================

Estimated @ 5%                                      $ 34,179.00
                                                    -----------

GROSS INCOME AFTER VACANCY & R.L.                   $649,401.00

LESS EXPENSE ALLOWANCE
======================

Estimated @ 5%                                      $ 32,470.00
                                                    -----------


NET OPERATING INCOME                                $616,931.00


CAPITALIZATION RATE                                        9.8%
===================

        Interest 80% @ 9% = 7.2%
        Equity   20% @ 8% = 1.6%
        Recapture    @      1.0%
        ------------------------


CAPITALIZED VALUE                                   $6,295,214.00

ROUNDED                                             $6,295,000.00

LESS D.E.Q.E. CLEANUP                               $  240,000.00
(60% share of estimated maximum cost)               -------------

                                                    $6,055,000.00


LESS ADJUSTMENT FOR LEASES IN EFFECT                $  425,000.00
                                                    -------------


VALUE BY THE INCOME APPROACH                        $5,630,000.00

0000543

COMPARABLE RENTAL DATA
========================

1.) 21 Green Street, Malden. Malden Redevelopment Authority leases 55,200 square feet to American Banknote Company for $7.11 per square foot (triple net). Ten year lease written in 1982 with one ten year option (Market Review).

2.) 263 Commercial Street, Malden. Soep Companies leases 3,300 square feet to Levy Woodworking, Inc. for $9.00 per square foot (double net). Five year lease written in 1986.

3.) 407 Rear Mystic Avenue, Medford. J. Taschetto to AMI. Leasing 10,000 square feet of truck warehouse with 10% office space. Current lease is $9.00 per square foot (triple net).

4.) 76 Broadway, Malden. United Coach Body Shop leases 2,000 square feet for $1,800.00 monthly or $10.80 per square foot. Owner pays electric only. Two year lease.

5.) 47 South Street, Somerville. Mills Sandblasting Company rents an older building, part of two stories totaling 4,280 square feet for $2,000.00 per month or $7.60 per square foot (double net).

6.) 37 Medford Street, Somerville. Continental Craft Building leases areas from 7,500 to 20,000 square feet for an average of $8.00 per square foot, net.

7.) Access Road off Inner Belt Road, Somerville. Ames Realty leases 30,000 square feet to Combustion Engineering for $6.00 per square foot (triple net).

8.) 50 Inner Belt Road, Somerville. Travenol Genetech leases 40,000 square feet warehouse space for $5.50 per square foot (triple net).

9.) 63 Inner Belt Road, Somerville. Cobble Realty Trust leases warehouse space averaging 15,000 square feet for $6.50 per square foot (triple net).

10.) 312 Mystic Avenue, Medford. Ralph Pill Electric Supply Company leases 15,000 square feet for $9.50 per square foot (net).

11.) 91 Hicks Avenue, Medford. Federal Mogul leases 12,000 square feet and Downey Distribution Company leases 8,000 square feet at $7.00 per square foot (triple net). Building is four years old.

27

0000544

CORRELATION
===========

The three approaches to value were considered in the workings of this report. Due to the conclusion of the Highest and Best Use of the subject property, the Cost Approach to value is not considered to be an appropriate measure of value for the subject property.

The Income Approach is also not considered to be appropriate for the subject property due to the Highest and Best Use conclusion; however, it was included in this report to give an indication of value for the subject property under its existing utilization.

The Market Data Approach is considered to be the best measure of value for the subject property. The subject property is located in an area where there is considerable development and redevelopment going on. There have been ample sales of similar type properties to develop a basis of valuation.

It is my opinion, therefore, that the Market Value of the subject property, as of February 20, 1987, for the purpose of obtaining a mortgage is:

TEN MILLION DOLLARS
($10,000,000.00)

28

0000545

```
                          TAX DATA
                          ========


ASSESSMENTS
===========

Land                              $   619,100.00

Improvements                      $1,556,700.00
                                  ------------


TOTAL ASSESSMENTS
=================                 $2,175,800.00


Fiscal 1987 commercial tax rate        $28.15


FISCAL 1987 REAL ESTATE TAX        $61,248.77
```

0000546

## PURPOSE OF THE APPRAISAL

The purpose of this report is to estimate the Market Value of the Fee Simple Interest of the subject property. Market Value is defined elsewhere in this report. It is understood that this report and the conclusion of value herein is to be used for the purpose of obtaining a mortgage from the Bank of Boston/Connecticut.

## PROPERTY RIGHTS APPRAISED

The property rights being appraised are in Fee Simple. Fee Simple is defined in "Real Estate Terminology", published in 1975, as follows:

An absolute fee without limitation to a particular class of heirs or restrictions, but subject to the limitations of eminent domain, escheat, police powers and taxation.

## DATE OF VALUE

The Date of Value for this report is February 20, 1987, the date of my inspection of the subject property.

## HIGHEST AND BEST USE

Highest and Best Use, as defined in "Real Estate Terminology", published in 1975: is that reasonable and probable use that will support the highest present value, as defined, as of the effective date of the appraisal. It is that use from among reasonable, probable, and legal alternative uses; found to be physically possible, appropriately supported, financially feasible, and which results in the highest land value.

The Highest and Best Use of the subject property would be for development as an office complex or a residential condominium complex or possibly even an industrial research and development type complex. This area is on the M.B.T.A. rapid transit line and there is also M.B.T.A. bus service. Boston is less than five miles away and the network of roadways serving this area is considered adequate, although improvements in the immediate area are already being planned, including an underpass going from the Mystic Valley Parkway to the Revere Beach Parkway under Wellington Circle.

30

0000547

CITY DATA (MASS. DEPT. OF COMMERCE)
==========================================

Malden
October, 1984

### 1. GENERAL INFORMATION

1. City:                        Malden

2. County:                      Middlesex

3. Location:                    Eastern Massachusetts, bordered by Stoneham
                                and Melrose on the north, Revere on the
                                east, Everett on the south and Medford on
                                the west. It is 5 miles from Boston, 7
                                miles from Lynn, 20 miles from Lawrence,
                                and 225 miles from New York City.

4. Population:                  1980 – 53,386
   a. Sex Composition:          Female – 28,668 (53.7%), Male – 24,718
                                (46.3%)
   b. Projections:              1985-53,300; 1995-50,000; 2005-49,600
      (1980)                    1990-50,300; 2000-49,700; 2010-49,500

5. Area:(in sq. miles)          Land – 5.08 Water – 0.05 Total – 5.13

6. Density:                     1980 – 10,509 persons per square mile (land
                                area)

7. Climate:                     Normal temperature in January – 29.9$^{\circ}$ F.
                                Normal temperature in July –   73.7$^{\circ}$ F.
                                Normal annual precipitation –  42.77 in.

8. Elevation at
   City Hall:                   Approximately 30 feet above mean sea level

9. Topographical               Terrain is fairly level southerly of Route
   Characteristics:             60. Elevations ranging up to 280 feet
                                northerly of Route 60. Land is thickly
                                settled except for small areas in north and
                                southeast. Soil in the northern area is
                                rough and rocky while that in the southeast
                                is wet.

10. U.S.G.S. Topo-             Boston North
    graphical Plates:

11. Aerial Survey              Information on the availability of aerial
    Photos:                     survey photos for sections of the state may
                                be obtained from the Geodetic Survey
                                Division, Mass. Dept. of Public Works, 100
                                Nashua St., Boston, MA. 02114.

31

0000548

CITY DATA (MASS. DEPT. OF COMMERCE) CON'T
==============================================

---

Malden
October, 1984

GENERAL INFORMATION (cont.)

B. 1.  Established as
       a Town:              May 2, 1649

   2.  Incorporated as a
       City:                March 31, 1881

C. 1.  Type of Gov't:      Mayor and Council

   2.  Special Districts:   7th Massachusetts Congressional District
                            6th Councillor District
                            3rd Middlesex State Senatorial District
                            36th & 37th Middlesex and 21st Suffolk
                              State Representative Districts
                            Boston Standard Metropolitan Statistical
                              Area
                            Metropolitan Parks, Sewerage and Water
                              Districts
                            Massachusetts Bay Transportation Authority
                            Metropolitan Area Planning Council

0000549

CITY DATA (MASS. DEPT. OF COMMERCE) CON'T
================================================

VIII TRANSPORTATION

Malden
October, 1984

A. GENERAL

The city of Malden has railroad and bus facilities. Its proximity to Boston provides all types of modern transportation to all parts of the world. The public roads and highways meet the requirements of auto, truck and bus transportation and connect with major highways in the Area.

B. RAIL

The Boston and Maine Railroad provides freight service to the city and along with Conrail provides piggy-back service in Boston.

C. HIGHWAY

The network of numbered highways serving the city may best be understood by consulting the map accompanying this monograph. The principal highways serving Malden and the surrounding area are U.S. 1 and Interstate 93.

D. BUS

The city is a member of the Massachusetts Bay Transportation Authority which provides bus, rapid transit, trolley, trolley bus and train service in various combinations to 79 cities and towns in the area.

E. OTHER

Over 100 established trucking lines provide competitive service locally and to distant points. The railroad and bus terminals, the Boston docks and the Logan International Airport are easily accessible from Malden, thus providing land, ocean and air carrier service. The Malden River has a six-foot channel through the Mystic River to Boston Inner Harbor.

33

0000550

CITY DATA (MASS. DEPT. OF COMMERCE) CON'T
==========================================

Malden
October, 1984

### IX ECONOMIC DEVELOPMENT

#### A. ORGANIZATIONS

Malden Chamber of Commerce, 930 Eastern Ave., Malden, 02148
Malden Redevelopment Authority, 200 Pleasant St., Malden, 02148

#### B. LABOR SUPPLY

Current data on labor supply in the Malden employment area may be obtained from the local office of the Division of Employment Security, 200 Pleasant St., Malden, 02148

#### C. AVAILABLE BUILDINGS AND SITES

For specific data contact organizations above or Division of Economic Development, Massachusetts Department of Commerce and Development, 100 Cambridge Street, Boston, Mass. 02202.

### X. PLANNING

#### A. GENERAL

The city of Malden has a planning board, with a paid staff, which exercises sub-division control powers. A master plan has been completed with the use of federal funds and the city is a member of the Metropolitan Area Planning Council.

#### B. ZONING

The city's zoning ordinance amended in 1977, provides for 7 districts: 3 residential (A,B & C), Neighborhood Business, Central Business, Highway Business and Industrial. Dimensional requirements for the 9 districts do not lend themselves to chart form.

#### C. BUILDING CODE

The Commonwealth has adopted a state building code which supercedes all local regulations.

0000551

CITY DATA (MASS. DEPT. OF COMMERCE) CON'T
===========================================

<u>Malden</u>
<u>October, 1984</u>

XI <u>UTILITIES</u>

A. <u>ELECTRIC SERVICE</u>

   Massachusetts Electric Co., 25 Research Drive, Westborough, 01581

B. <u>GAS SERVICE</u>

   Boston Gas Company, 1 Beacon St., Boston, 02108

C. <u>WATER SERVICE</u>

   Water service is supplied by the Water Department of the city of Malden from the Metropolitan District Commission Supply. A chemical analysis made in 1981 by the Massachusetts Department of Environmental Quality Engineering showed the following results:

|                | <u>Milligrams per liter</u> <br> Tap in <br> <u>City Hall</u> |
|----------------|:----:|
| Turbidity      | 0.5  |
| Color          | 7.0  |
| pH             | 8.5  |
| Alkalinity     | 10.0 |
| Hardness       | 11.0 |
| Calcium        | 3.1  |
| Magnesium      | 0.7  |
| Sodium         | 8.5  |
| Potassium      | 0.5  |
| Iron           | 0.09 |
| Manganese      | 0.00 |
| Silica         | 1.0  |
| Sulfate        | 8.0  |
| Chloride       | 6.0  |
| Ammonia – N    | 0.11 |
| Nitrate – N    | 0.1  |
| Copper         | 0.02 |
| Spec. Cond.    | 66.0 |

0000552

QUALIFICATIONS OF APPRAISER
============================

Robert Donnelly
40 Goldcliff Road
Malden, Mass. 02148


GRADUATE, MALDEN CATHOLIC HIGH SCHOOL 1960
BUSINESS ACCOUNTING COURSES, BRYANT COLLEGE 1962
ASSOCIATE, DONNELLY & REED INSURANCE AGENCY 1968 TO PRESENT
PARTNER, DONNELLY & REED REAL ESTATE AGENCY 1968 THRU 1986
OWNER, DONNELLY & REED REAL ESTATE AGENCY JAN. 1987 TO PRESENT
MASSACHUSETTS REAL ESTATE BROKER'S LICENSE # 59511
MASSACHUSETTS INSURANCE BROKER'S LICENSE # 6752
FORMER ASSESSOR, CITY OF MALDEN 1974-1976 AND 1982-1985
FORMER CHAIRMAN, MALDEN BOARD OF ASSESSORS 1983-1985
FORMER MEMBER (CHAIRMAN) MALDEN BOARD OF APPEALS 1983-1985
FORMER MEMBER, EDUCATION COMMITTEE, MIDDLESEX COUNTY ASSESSORS
              ASSOCIATION
FORMER MEMBER, ASSOCIATION OF MASSACHUSETTS ASSESSORS
MEMBER, INTERNATIONAL ASSOCIATION OF REAL ESTATE APPRAISERS

NINETEEN YEARS EXPERIENCE IN REAL ESTATE AS A SALESMAN, BROKER
AND APPRAISER. EXPERIENCED IN APPRAISING APARTMENTS, RESIDENCES,
RETAIL STORES, OFFICE BUILDINGS, SERVICE STATIONS, SHOPPING
CENTERS, NURSING HOMES, INDUSTRIAL PROPERTIES AND VACANT LAND.

CONTINUING EDUCATION
====================

THE PRINCIPALS OF ASSESSING - ASSOC. OF MASS. ASSESSORS
ASSESSMENT APPRAISAL TECHNIQUES - ASSOC. OF MASS. ASSESSORS
NARRATIVE APPRAISAL COURSE - ASSOC. OF MASS. ASSESSORS
APPRAISAL COURSE 1 - BENTLEY COLLEGE/M.B.R.E.A.
APPRAISAL COURSE 1A - BENTLEY COLLEGE/M.B.R.E.A.
APPRAISAL OF SINGLE FAMILY RESIDENCE - M.B.R.E.A.
APPRAISAL OF SMALL RESIDENTIAL INCOME PROPERTIES - M.B.R.E.A.
APPRAISING THE CONDO UNIT - M.B.R.E.A.

DESIGNATION
===========

M.A.A.(#279) - ASSOCIATION OF MASSACHUSETTS ASSESSORS
I.R.C.A.(1529) - INTERNATIONAL ASSOCIATION OF R.E. APPRAISERS
R.A.(21-13259-38) - NATIONAL REGISTER OF REAL ESTATE APPRAISERS
                 REGISTERED APPRAISER, LEVEL III


0000553

CERTIFICATION
==============

The appraiser certifies and agrees that:

1. The appraiser has no present or contemplated future interest in the property appraised; and neither the employment to make the appraisal nor the compensation for it, is contingent upon the appraised value found in this report.

2. The appraiser has no personal interest in or bias with respect to the subject matter of the appraisal report. The "Estimate of Market Value" in the appraisal report is not based in whole or in part upon the race, color, or national origin of the owners or occupants of the property appraised, or upon the race, color, or national origin of the owners and occupants of the properties in the vicinity of the property appraised.

3. The appraiser has personally inspected the property, both inside and outside. To the best of the appraiser's knowledge and belief, all statements and information in the report are true and correct, and the appraiser has not knowingly withheld any significant information.

4. All contingent and limiting conditions are contained in this appraisal report.

5. This appraisal report has been made in conformity and is subject to the code of professional ethics and standards of professional conduct of the International Association of Real Estate Appraisers.

6. All conclusions and opinions concerning the real estate that are set forth in this appraisal report were prepared by the appraiser whose signature appears on the appraisal report. No change of any item in the appraisal report shall be made by anyone other than the appraiser, and the appraiser shall have no responsibility for any such unauthorized change.

___3/6/87___
date

Robert Donnelly, R.A.

37

0000554

Malden, Massachusetts

Malden DPW and Wellington Properties

An Environmental Site Assessment, relative to Massachusetts General Laws, Chapter 21E, was performed on two adjacent parcels, presently occupied by the Malden Department of Public Works (MDPW) and the Wellington Realty Corporation, in the City of Malden, Massachusetts.

The MDPW and Wellington properties constitute a project site of approximately 17.1 acres. This area is located immediately north of the Malden-Medford Town Line, between the western banks of the Malden River and Commercial Street.

The results of this investigation have identified the presence of hazardous materials above the applicable criteria under MGL Chapter 21E. The principle contaminants detected include: coal tars, petroleum products and inorganic compounds.

Summary of Results

I.   Coal Tar by Products

Coal tar related contamination is present on both the MDPW and Wellington properties. The majority of the coal tar fractions on each parcel are relatively immobile, retained by existing soil conditions. The presence of coal tars on the MDPW property appears to be related to the placement of river sediments upon the parcel. An isolated, remediable quantity of free floating coal tars has been detected upon the Wellington property. Source origin for these coal tars appears to be previous land use operations performed upon the Wellington site.

II.  Inorganic Compounds

A remediable deposit of Arsenic bearing material was detected in the central portion of the Wellington property. Field observations suggest that this material may have been improperly disposed of on-site. Elevated levels of zinc, copper and lead in the sediments of the MDPW parcel and cyanide in the groundwater of the Wellington site are apparently related to existing coal tar contamination.

III. Petroleum Products

Fuel oil products were noted along the property line between MDPW and the Lombard Management Company. Probable sources include mismanagement of petroleum products, leakage from underground storage tanks and/or previous land use applications upon the MDPW property.

*D.E.Q.E. REPORT*

0000555

ENVIRONMENTAL SITE ASSESSMENT

Malden DPW and Wellington Properties

Remedial Actions

I.   Coal Tar by Products

A groundwater recovery system should be implemented to collect floating coal tar fractions. As a part of this design, a delineation of the extent of the mobile plume(s) and a characterization of soluble fractions in the underlying groundwater must be performed.

The majority of coal tar contamination is relatively immobile, retained by existing soil conditions. Excavations within these areas should be minimized to reduce worker exposure and enhance overall site safety. The use of driven piles and the placement of utility services in one common accessway is encouraged in lieu of on-site excavations. Placement of suitable fill beneath an impermeable cap to achieve design grade should be incorporated into development alternatives. Upper fill regions, beneath the cap, must be vented for the release of accumulated vapors.

II.   Inorganic Compounds

Remediable quantities of Arsenic bearing materials exist in the central portion of the Wellington site. Field observations suggest that these may be excavated for removal off-site to an approved disposal facility. As an alternative, the encapsulation of the materials within a lined concrete vault for on-site disposal may be considered. Implementation of the second alternative requires additional regulatory control measures and, most likely, the application of a 21C deed notification.

III.  Petroleum Products

A pocket of fuel oil related compounds was detected along the southeasterly property line between the Lombard and MDPW parcels. Analysis of soil and groundwater samples from this area suggests that the fuel oil contamination emanates from the MDPW property. Probable sources include mismanagement of petroleum products, leakage from underground storage tanks and/or previous land use applications.

*D.E.Q.E. REPORT*



MALDEN DPW AND WELLINGTON PROPERTIES
SKETCH PLAN  MALDEN, MA

norwood engineering co. inc. · 1410 route 1 · norwood, ma.

figure
2

*D.E.Q.E. REPORT*

KENT KULL

04-Feb-97 , Page 8

Comercial Associates (Wellington)
578 Comercial Street, Malden

Escalation/Escalation Accounts

| Tenant | S.F. | Lease Begins | Lease Ends | Percent | Base | Receivable | Jan-97 | Feb-97 | Mar-97 | Apr-97 | May-97 | Jun-97 | Jul-97 | Aug-97 | Sep-97 | Oct-97 | Nov-97 | Dec-97 | Totals | P.S.F. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Nelson & Small | 25,000 | 15-Dec-83 | 31-Dec-88 | 22.12% | 49826 | 49826 | 8,288 | 8,288 | 8,288 | 8,288 | 8,288 | 8,288 | 8,288 | 8,288 | 8,288 | 8,288 | 8,288 | 8,288 | 99,456 | 53.98 |
| Base Rent | | | | | | | | | | | | | | | | | | | | |
| Real Estate Tax | | | | 0.00% | | | | | 1,243 | | | | | | | | 1,243 | | 2,527 | $0.10 |
| Operating Costs | | | | | | | | | | | | | | | | | | | | |
| N.& White | 2,000 | | 7/94 | 8.00% | 0 | 0 | 333 | 333 | 333 | 333 | 333 | 333 | 333 | 333 | 333 | 333 | 333 | 333 | 3,994 | 42.00 |
| Base Rent | | | | | | | | | | | | | | | | | | | | |
| Real Estate Tax | | | | 0.00% | | | | | | | | | | | | | | | | |
| Operating Costs | | | | | | | | | | | | | | | | | | | | |
| N.& White | 1,000 | | 7/94 | 6.00% | 0 | 0 | | 65 | 167 | 167 | 167 | 167 | 167 | 167 | 167 | 167 | 167 | 167 | 1,732 | 42.00 |
| Base Rent | | | | | | | | | | | | | | | | | | | | |
| Real Estate Tax | | | | 0.00% | | | | | | | | | | | | | | | | |
| Operating Costs (Guardship) | | | | | | | | | | | | | | | | | | | | |
| Wellington Tra | 20,000 | | 7/94 | 0.00% | 0 | 0 | 5,606 | 5,606 | 5,606 | 5,606 | 5,606 | 5,606 | 5,606 | 5,606 | 5,606 | 5,606 | 5,606 | 5,606 | 67,272 | 53.56 |
| Base Rent | | | | | | | | | | | | | | | | | | | | |
| Real Estate Tax | | | | 0.00% | | | | | | | | | | | | | | | | |
| Operating Costs | | | | | | | | | | | | | | | | | | | | |
| Wellington Tra | 28,647 | 15-Oct-85 | 30-Sep-97 | 25.23% | 49826 | 49826 | 10,027 | 10,027 | 10,027 | 10,027 | 10,027 | 10,027 | 10,027 | 10,027 | 10,027 | 10,027 | 10,027 | 10,027 | 120,324 | 44.20 |
| Base Rent | | | | | | | | | | | | | | | | | | | | |
| Real Estate Tax | | | | 0.00% | | | | | 1,439 | | | | | | | | 1,439 | | 2,678 | $0.10 |
| Operating Costs | | | | | | | | | | | | | | | | | | | | |
| Marilou | 3,000 | | 7/94 | 0.00% | 0 | 0 | 838 | 838 | 838 | 838 | 838 | 838 | 838 | 838 | 838 | 838 | 838 | 838 | 10,056 | 53.33 |
| Base Rent | | | | | | | | | | | | | | | | | | | | |
| Real Estate Tax | | | | 0.00% | | | | | | | | | | | | | | | | |
| Operating Costs | | | | | | | | | | | | | | | | | | | | |
| Coastal, Inc | 17,300 | 01-Jul-84 | 30-Sep-97 | 15.18% | 49826 | 49826 | 6,913 | 6,913 | 6,913 | 6,913 | 6,913 | 6,913 | 6,913 | 6,913 | 6,913 | 6,913 | 6,913 | 6,913 | 82,956 | 64.80 |
| Base Rent | | | | | | | | | | | | | | | | | | | | |
| Real Estate Tax | | | | 0.00% | | | | | 667 | | | | | | | | 667 | | 1,734 | $0.10 |
| Operating Costs (Guglquist) | | | | | | | | | | | | | | | | | | | | |
| Coastal, Inc  Outside Storage | | | 7/94 | 0.00% | 0 | 0 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 7,200 | |
| Base Rent | | | | | | | | | | | | | | | | | | | | |
| Real Estate Tax | | | | 0.00% | | | | | | | | | | | | | | | | |
| Operating Costs | | | | | | | | | | | | | | | | | | | | |
| Coastal, Inc  Outside Storage | | | 7/94 | 0.00% | 0 | 0 | 850 | 850 | 850 | 850 | 850 | 850 | 850 | 850 | 850 | 850 | 850 | 850 | 10,200 | |
| Base Rent | | | | | | | | | | | | | | | | | | | | |
| Real Estate Tax | | | | 0.00% | | | | | | | | | | | | | | | | |
| Operating Costs | | | | | | | | | | | | | | | | | | | | |
| J.A. Miara | 10,000 | 01-Aug-86 | 31-Mar-97 | 8.85% | 55070 | 55070 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 30,000 | 43.00 |
| Base Rent | | | | | | | | | | | | | | | | | | | | |
| Real Estate Tax | | | | 0.00% | | | | | 272 | | | | | | | | 272 | | 545 | 16.05 |
| Operating Costs | | | | | | | | | | | | | | | | | | | | |
| Ogitech, Inc. | 2,000 | | 7/94 | 0.00% | 0 | 0 | 542 | 542 | 542 | 542 | 542 | 542 | 542 | 542 | 542 | 542 | 542 | 542 | 6,504 | 43.25 |
| Base Rent | | | | | | | | | | | | | | | | | | | | |
| Real Estate Tax | | | | 0.00% | | | | | | | | | | | | | | | | |
| Operating Costs | | | | | | | | | | | | | | | | | | | | |

0000558

*RENT ROLL*

06-Feb-87 , Page 9

| | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Vacant | 5,000 | | | | | | | | | | | | | | |
| Base Rent | | | | | | | | | | | | | | | 93.8% |
| Real Estate Tax | | | | | | | | | | | | | | | 93.5% |
| Operating Costs | | | | | | | | | | | | | | | 93.5% |
| Subtotal | 113,747 | $0 | $36,477 | $34,562 | $34,664 | $34,664 | $34,664 | $36,664 | $34,664 | $40,506 | $34,664 | $34,664 | $447,330 | | 93.8% |
| Operating Costs | | | | | | | | | | | | | | 3,000 | | 93.5% |
| Real Estate Tax | | | | | | | | | | 30,424 | | | 61,240 | | | 93.5% |
| Subtotal | | | 3,000 | 3,000 | | | | | | 30,424 | | | 44,240 | | | |
| Net Rental Income | | 34,477 | 33,562 | 34,664 | 34,664 | 34,664 | 34,664 | 34,664 | 9,882 | 34,664 | 383,132 | | | | 93.34 |
| Debt Service | | | | | | | | | | | | | | | | |
| Wellington Realty | 2,000,000 | 5.50% | | 12,833 | 12,833 | 12,833 | 12,833 | 12,833 | 12,833 | 12,833 | 12,833 | 141,167 | | | | 41.24 |
| Bank Boston Connecticut | 750,000 | 8.50% | | 5,313 | 5,313 | 5,313 | 5,313 | 5,313 | 5,313 | 5,313 | 5,313 | 58,438 | | | | 94.5? |
| Subtotal | | | 0 | 18,146 | 18,146 | 18,146 | 18,146 | 18,146 | 18,146 | 18,146 | 18,146 | 179,604 | | | | |
| Net Cash Flow | | $34,477 | $15,417 | $16,518 | $16,518 | $16,518 | $16,518 | $16,518 | $(8,264) | $16,518 | $203,528 | | | | 91.41 |

0000559

SIDE | CARD

401

CODE
COUNT NO.

PROPERTY ADDRESS
MAILING ADDRESS (If Different)

PIN NOTE
KEY 10596PCA 401L WD/PCT 2-
LOC 378 COMMERCIAL STREET
WELLINGTON REALTY CO
40 CANAL STREET
MEDFORD         MA 02155
SZ 431752LND 394400BLD 1293600

**0000560**

## ASSESSMENT SUMMARY

| YEAR | 19 | 19 84 | 19 84 | 19 84 | 19 85 | 19 |
|---|---|---|---|---|---|---|
| Land | 361,100 | 371,200 | 379,200 | 379,400 | | |
| Buildings | 1,123,200 | 1,199,400 | 1,243,400 | 1,243,100 | | |
| Other Buildings | | | | | | |
| TOTAL | 1,484,300 | 1,558,600 | 1,622,600 | 1,687,500 | | |
| Land | | | | | | |
| Buildings | | | | | | |
| Other Buildings | | | | | | |
| TOTAL | | | | | | |
| Land | | | | | | |
| Buildings | | | | | | |
| Cost Approach | | | | | | |
| Market App. | | | | | | |
| Income App. | 1,406,200 | | | | | |

## TRANSFER RECORD

| DATE | VOL. | PAGE | SALE PRICE | VFY | GRANTEE |
|---|---|---|---|---|---|

Signature

## BUILDING PERMIT RECORD

| PERMIT | DATE | TP. | AMOUNT | DATE | % | DEM/NEW | DESCRIPTION |
|---|---|---|---|---|---|---|---|
| 473 | 4/15/83 | 04 | 25,000 | 3/9/85 | .25 | R6 5 | const. snow per. off |
| 543 | 12/6/84 | 04 | 165,000 | 3/9/85 | .35 | R6 5 | alt. to wthr to off. |
| | | y occ | | | | | |

REMARKS:

## LAND ATTRIBUTES

| Attribute | | | |
|---|---|---|---|
| Public Water | N | Y | X |
| Public Sewer | N | Y | X |
| Electric | N | Y | X |
| Natural Gas | N | Y | X |

| | P | F | A | G | E |
|---|---|---|---|---|---|
| Overall Location | | | X | | |
| Public Exposure | | X | | | |
| Landscaping | | | X | | |
| Arch. Attractiveness | | X | | | |
| Lot Usability | | | | X | |

## NEIGHBORHOOD ATTRIBUTES

| | Even | Above | Below |
|---|---|---|---|
| Grade | | | |
| Slope | Min. X | Mod. | Strong | Steep |

| | P | F | A | G | E |
|---|---|---|---|---|---|
| Concern | | | | | |
| Market Demand | | | | X | |
| Trend | Improving | Stable X | Declining | |

LAND NOTES:

## LAND VALUATION

| FRONT x DEPTH/AREA | RATE | ADJ. RATE | ADJ. VALUE | DEP. | MARKET VALUE |
|---|---|---|---|---|---|
| 20000 | 3.50 | | | | 70,000 |
| 148000 | 1.40 | | | | 196,000 |
| 271752 | .35 | | | | 95,100 |
| 431752 # TOTAL | | | | | |

ling
th
re Feet 431,752
ss
r Street Access | N | Y
ner
ng Conformity
est & Best Use
ess Problem
ment Burden
e to Public Trans.
Convenience
e to Service/Shops
Street Parking
oad Siding
ance Influence
fic Volume
er Street

0000561

0000562

This is a property assessment/appraisal listing card with numerous vertical category columns and handwritten entries. Key readable content:

**OCCUPANCY:** WAREHOUSE (TRANSIT)

**CONSTRUCTION CLASS:** A | B | C [X] D | S — C marked

**CONSTRUCTION QUALITY:** Excellent | Average | Very Good | Fair [X] | Good | Low Cost

**Categories (column headers):**
- ROOMS/AREA — No., Rooms/Area, Rent
- INCLUDED IN RENT — Heat, Elec., Appl., Other
- INTERIOR CONDITION / FUNCTIONAL PLAN / STRUCTURAL CONDITION: E | VG | G | A [X] | F | P
- PLUMBING — Bathrooms, Toilet Rooms, Fixture Baths, Sinks, Toilets, Urinals
- BATHS / Old Style — Modern
- KITCHENS / Old Style — Modern
- Total Fixtures: Cop. | Galv. | Brass | Plast.
- HEATING SYSTEM / Old Style — Modern
- ELECTRICAL — Quality: E | VG | G | A [X] | F | P
- 01 FOUNDATION: Pier, Slab [X], Continuous Wall, Cont. Bsmt. Wall
- Amps: 20; Volts: 240; Non-Metallic; Armored Cable [X] Race Way; Rigid Conduit; Flex. Conduit

| 01 FOUNDATION MTRL. | | 02 STRUCTURAL FRAME | | 03 EXTER. WALLS | | 04 ROOF SHAPE | | 05 ROOF STRUCTURE | | 06 ROOF COVER | | 07 FLOOR STRUCT. | | 08 FLOOR COVER | | 09 INTERIOR FINISH | | 10 HTG. & COOLING | | 11 FUEL SOURCE | | 10 H. & C. (Cont.) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

(Structural Frame: Steel Frame [X] = 02)

**LISTING DATA / lower handwritten section:**

| Occupancy | Sec. | Pg. | Ln. | No. of Sto. | Fac. | Sto. Hgt. | Fac. | Size Factor | Base Unit | Net S.F. Adj. ± | C.C./Loc. Factor | Final Unit | Area/Cube | RCN | | | Year Built | Eff. Age | Dep. (% Good) | Func. (% Good) | RCNLD |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| WAREHOUSE | 14 | 15 | 20 | 1/1.00 | | 24/1.231 | .898 | 24.03 | — | 1.13 | 30.42 | 51030 | 1,531,765 | | | H401 | | .65 | .50 | | |
| WAREHOUSE | 14 | 15 | 20 | 1/1.00 | | 24/1.231 | .967 | 24.03 | — | 1.13 | 30.32 | 47300 | 1,434,031 | | | | | | | | |
| GARAGE | 14 | 19 | 16 | 1/1.00 | | 18/1.00 | .957 | 18.95 | — | 1.13 | 22.26 | 15560 | 347,179 | | | | | .50 | | | |

Totals: Area/Cube 73,000 — RCN 3,313,975 — 93,000 — 1,076,700 — 46,500

FIRE PROTECTION — Sprinklers: NO; Alarm System: NO

BUILDING ELEVATORS — Type, Quan., Capacity, FPM, Floors: NO

| OCCUPANCY | | | | | ROOMS/AREA | | | | INCLUDED IN RENT | | | | 03 EXTERI | ILLS | 04 ROOF SHAPE | | 07 FLOOR STRUCT. | | 09 INTERIOR FINISH | | 9 H. & C. (Cont.) | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Rent | | No. | Rooms/Area | Appl. | Heat | Elec. | Appl. | | | None | 00 | Gable | 01 | None | 00 | None | 00 | Frost & Chilled Water | 1 |
| Office + Whse | | | | | | | | | | | | Wood Shingles | 01 | Hip | 02 | Wd. Dk./Wd. Joists | 01 | Plaster | 01 | Hot Water/Cool Air | 1. |
| | | | | | | | | | | | | Clapboard | 02 | Gambrel | 03 | Concrete Slab | 02 | Drywall | 02 | Package System | 1. |
| CONSTRUCTION CLASS | | | | | | | | | | | | Aluminum | 03 | Flat/Shed | 04 | Reinf. Conc. Slab | 04 | Wood Panel | 03 | H.V.A.C. | 1. |
| A | B | C | D | S | | | | | | | | Vinyl | 04 | Mansard | 05 | Steel Dk./Concrete | 05 | Wallboard | 04 | Separate Cooling | 05 |
| CONSTRUCTION QUALITY | | | | | | | | | | | | Asbestos | 05 | Sawtooth/Monitor | 06 | St. Dk./Pre-Cst. Pk. | 06 | Matched Bead | 06 | Suspended Heaters | 1 |
| Excellent | Average | | | | | | | | | | | Shakes | 06 | 05 ROOF STRUCTURE | | Pan or Waffle Conc. | 07 | Glazed Block | 07 | 11 FUEL SOURCE | |
| Very Good | Fair | | | | | | | | | | | Stucco | 07 | Wd. Dk./Wd. Rfts. | 01 | Precast Slab & Jts. | 08 | Ceramic/Qury. Tile | 08 | None | 0 |
| Good | W/Cost | | | | | 01 FOUNDATION MTRL. | | | | | | Textured Plywood | 08 | Wd. Dk./Wd. Truss | 02 | 08 FLOOR COVER | | 10 HTG. & COOLING | | Oil | 0 |
| INTERIOR CONDITION | | | | PLUMBING | | | Concrete | 05 | | | | Composition | 09 | Met. Dk./Rafters | 03 | None | 00 | None | 00 | Gas | 0 |
| VG | G | A | F | P | Bathrooms | | Concrete Block | 06 | | | | Vertical Board | 10 | St. Dk./St. Joists | 05 | Hardwood | 01 | Forced Air | 01 | Electric | 0 |
| FUNCTIONAL PLAN | | | | | Toilet Rooms | | Stone | 07 | | | | Single Siding | 11 | Steel Dk./St. Truss | 06 | Softwood | 02 | Hot Water | 02 | Coal | 0 |
| VG | G | A | F | P | Fixture Baths | | Brick | 08 | | | | Brick Veneer | 12 | Concrete Plank | 07 | W/W Carpet | 03 | Hot Water, Rad. | 03 | Wood | 0 |
| STRUCTURAL CONDITION | | | | | Sinks | | | | | | | Stone Veneer | 13 | Reinf. Concrete | 08 | Asphalt Tile | 04 | Steam | 04 | Solar | 0 |
| VG | G | A | F | P | Toilets | | | 09 | | | | Solid Brick | 14 | | | Vinyl Tile/Sheet | 05 | Electric | 05 | | |
| BATHS | | | | | Urinals | | 02 STRUCTURAL FRAME | | | | | Solid Stone | 15 | 06 ROOF COVER | | Ceramic/Quarry | 06 | Gravity | 06 | LISTING DATA | |
| Modern | Old Style | | | | | | Wood Frame | 01 | | | | Brick on Block | 16 | None | 00 | Terrazzo | 07 | Floor/Wall Furn. | 07 | Parcel No. | |
| KITCHENS | | | | | Total Fixtures | | Masonry Walls | 02 | | | | Concrete Block | 17 | Asphalt Shingles | 18 | Mill Flooring | 08 | Heat Pump | 08 | Side | of |
| Modern | Old Style | | | | | | Steel Frame | 03 | | | | Cinder Block | 19 | Wood Shingles | 19 | FIRE PROTECTION | | Warm/Cool Air | 09 | FIELD | DAT |
| HEATING SYSTEM | | | | Quality | | | Steel Frame Fireproof | 04 | | | | Reinf. Concrete | 20 | Asbestos Shingles | 03 | Sprinklers | | RENTABLE AREA | | Meas. | % |
| Modern | Old Style | | | | | | Reinf. Conc. Fireproof | 05 | | | | Metal Siding | 21 | Wood Shakes | 04 | Alarm System | | S.F. | | List | |
| ELECTRICAL | | | | | | | Pre-Cast. Conc. Firep. | 06 | | | | Metal Sand. Pan. | 22 | Slate | 05 | | | | S.F. | Rev. | |
| Amps | | | | | Pier | 01 | Mill Construction | | | | | Glass Panels | 23 | Tile | 06 | BUILDING ELEVATORS | | Use Code | | | |
| Volts | Rigid Conduit | | | | Slab | 02 | | 08 | | | | | | Roll Composition | 07 | Type | Quan. | Capacity | FPM | | | | |
| Non-Metallic | Flex. Conduit | | | | Continuous Wall | 03 | | | | | | | | Built-up T&G | 08 | Pass. | | | | | | | |
| Armored Cable | Race Way | | | | Cont. Bsmt. Wall | 04 | | | | | | | | | 09 | Freight | | | | | | | |

| Occupancy | Sec. | Pg. | Ln. | No. of Sto. | Fac. | Sta. Hgt. | Size Factor | Base Unit | Net S.F. Adj. ± | C.C./Loc. Factor | Final Unit | Area/Cube | RCN | Year Built | Type | Quan. | Eff. Age | Dep. (% Good) | Func. (% Good) | Floors | RCNLD |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Side "A" | | | | | | | 1.00 | | | | | | | 1940 | | | | | | | |
| OFFICES | 15 | 1F | 1 | 1 | 1400 | 12/400 | 1.00 | 32.04 | 41.64 | 1.07 | 29.64 | 4950 | 146,520 | | | | 63 | .50 | .91 complete | $ 6/ |
| WARE HOUSE | 14 | 1F | 2 | 1 | 34/311 | .916 | | 26.03 | | 1.13 | 30.62 | 42350 | 1,296,752 | | | | | | | | |
| SPRINKLERS | 15 | 3 | 1 | 1 | 1.20 | | 1 | 1.29 | | 1.21 | 1.56 | 4950 | 77.22 | | | | | | | | 502 600 |
| UNITS FITTING | 15 | 4 | 1 | 1 | 1.20 | | 1 | 5.90 | | 1.21 | 2.19 | 12,960 | 820,234 | | | | | | | | 805 3 20 |
| PUMP (R.J.) | | | | | | | 1 | 1.00 | | 1 | 1.11 | 830 | 1,593,525 | | | | | | | | |

0000563

REALTOR®

STANDARD FORM COMMERCIAL LEASE

Member Greater Boston Real Estate Board

**1. PARTIES**
*(fill in)*

WELLINGTON REALTY COMPANY, P.O. Box 122
40 Canal St., Medford, MA 02155

LESSOR, which expression shall include    its    heirs, successors, and assigns where the context so admits, does hereby lease to Nelson & Small, Inc., a Maine corporatic with principal offices at 212 Canco Rd., Portland, ME 04103

LESSEE, which expression shall include    its    successors, executors, administrators, and assigns where the context so admits, and the LESSEE hereby leases the following described premises:

**2. PREMISES**
*(fill in and include, if applicable, suite number, floor number, and square feet)*

20,000 square feet of warehouse space at 378 Commercial St., Malden, MA, which premises are outlined on the attached separate site and floor plans together with full access rights from Commercial St. and exclusive parking areas as outlined on said Plan. Subject to square footage adjustment as set forth in Rider.

together with the right to use in common, with others entitled thereto, the hallways, stairways, and elevators, necessary for access to said leased premises, and lavatories nearest thereto.

**3. TERM**
*(fill in)*

The term of this lease shall be for five (5) years plus fifteen (15) days commencing on December 15, 1983 and ending on December 31, 1988; subject to option set forth in Rider, attached hereto.

**4. RENT**
*(fill in)*

The LESSEE shall pay to the LESSOR rent at the rate of $4 per sq.ft. per year for ~~xxxxx~~ ~~xxxxxx~~ payable in advance in monthly installments of \ the first 3 years = 15 days a equal    thereafter as set forth in sa

**5. ~~XXXXXXX~~ ~~XXXXXXMONTH'S~~**
*(fill in)* **RENT**

Upon the execution of this lease, the LESSEE shall pay to the LESSOR the ~~xxxxxxx~~1st mo. rent id ~~xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx~~ ~~xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx~~

**RENT ADJUSTMENT**

**A. TAX ESCALATION**
*(fill in or delete)*

20,000 = 17.70%
113,000

If in any tax year commencing with the fiscal year 1985, the real estate taxes on the land and buildings, of which the leased premises are a part, are in excess of the amount of the real estate taxes thereon for the fiscal year 1984 (hereinafter called the "Base Year"), LESSEE will pay to LESSOR as additional rent hereunder, when and as designated by notice in writing by LESSOR, 17.69 per cent of such excess that may occur in each year of the term of this lease or any extension or renewal thereof and proportionately for any part of a fiscal year. If the LESSOR obtains an abatement of any such excess real estate tax, a proportionate share of such abatement, less the reasonable fees and costs incurred in obtaining the same, if any, shall be refunded to the LESSEE. The entire building contains 113,000 sq.ft. The percenta stated above will be adjusted upward or downward depending on**

**B. ~~OPERATING~~**
~~XXXXX~~
~~XXXXALATION~~
*(fill in or delete)*

~~XxxXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX~~
~~XxXX50XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX~~
~~XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX~~

B.    Deleted

~~XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX~~.

**C. ~~CONSUMER~~**
~~PRICE~~
~~ESCALATION~~
*(fill in or delete)*

~~XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX~~
~~XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX~~
~~XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX~~
~~index xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx~~
~~XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX~~
~~XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX~~

C.    Deleted

**the exact number of square feet which Lessee leases using the exact square feet as the numerator and 113,000 sq.ft. as the denominator.

COPYRIGHT ©1968
GREATER BOSTON REAL ESTATE BOARD
REVISED 1981

All rights reserved. This form may not be copied or reproduced in whole or in part in any manner whatsoever without the prior express written consent of the Greater Boston Real Estate Board.

[struck-through illegible text block]

[struck-through illegible text block]

**7. UTILITIES**

*delete "air conditioning" if not applicable*

The LESSEE shall pay, as they become due, all bills for electricity and other utilities (whether they are used for furnishing heat or other purposes) that are furnished to the leased premises and presently separately metered, and all bills for fuel furnished to a separate tank servicing the leased premises exclusively. ~~The LESSOR~~ [struck-through illegible text block]

LESSOR shall have no obligation to provide utilities or equipment other than the utilities and equipment within the premises as of the commencement date of this lease. In the event LESSEE requires additional utilities or equipment, the installation and maintenance thereof shall be the LESSEE's sole obligation, provided that such installation shall be subject to the written consent of the LESSOR.

**8. USE OF LEASED PREMISES**
*(fill in)*

The LESSEE shall use the leased premises only for the purpose of offices and/or ware-housing and/or distribution.

**0000565**

**9. COMPLIANCE WITH LAWS**

The LESSEE acknowledges that no trade or occupation shall be conducted in the leased premises or use made thereof which will be unlawful, improper, noisy or offensive, or contrary to any law or any municipal by-law or ordinance in force in the city or town in which the premises are situated, except Lessor acknowledges that offices & warehousing are permissible.

**10. FIRE INSURANCE**

The LESSEE shall not permit any use of the leased premises which will make voidable any insurance on the property of which the leased premises are a part, or on the contents of said property or which shall be contrary to any law or regulation from time to time established by the New England Fire Insurance Rating Association, or any similar body succeeding to its powers. The LESSEE shall on demand reimburse the LESSOR, and all other tenants, all extra insurance premiums caused by the LESSEE's use of the premises.

**11. MAINTENANCE**

**A. LESSEE'S OBLIGATIONS**

The LESSEE agrees to maintain the leased premises in good condition, damage by fire and other casualty only excepted, and whenever necessary, to replace plate glass and other glass therein, acknowledging that the leased premises are now in good order and the glass whole. The LESSEE shall not permit the leased premises to be over-loaded, damaged, stripped, or defaced, nor suffer any waste. LESSEE shall obtain written consent of LESSOR before erecting any sign on the premises. Lessee shall make routine maintenance repairs only. Lessor shall be responsible for capital repairs only.

**B. LESSOR'S OBLIGATIONS**

The LESSOR agrees to maintain the structure of the building* of which the leased premises are a part in the same condition as it is at the commencement of the term or as it may be put in during the term of this lease, reasonable wear and tear, damage by fire and other casualty only excepted, unless such maintenance is required because of the LESSEE or those for whose conduct the LESSEE is legally responsible.

**12. ALTERATIONS – ADDITIONS**

The LESSEE shall not make structural alterations or additions to the leased premises, but may make non-structural alterations provided the LESSOR consents thereto in writing, which consent shall not be unreasonably withheld or delayed. All such allowed alterations shall be at LESSEE's expense and shall be in quality at least equal to the present construction. LESSEE shall not permit any mechanics' liens, or similar liens, to remain upon the leased premises for labor and material furnished to LESSEE or claimed to have been furnished to LESSEE in connection with work of any character performed or claimed to have been performed at the direction of LESSEE and shall cause any such lien to be released of record forthwith without cost to LESSOR. Any alterations or improvements made by the LESSEE shall become the property of the LESSOR at the termination of occupancy as provided herein. See Rider attached.

[initials: WW EK]

**ASSIGNMENT – SUBLEASING**

The LESSEE shall not assign or sublet the whole or any part of the leased premises without LESSOR's prior written consent.** Notwithstanding such consent, LESSEE shall remain liable to LESSOR for the payment of all rent and for the full performance of the covenants and conditions of this lease.

*    including the foundation & the roof, weather & water tight
**   such consent not to be un~~necessarily~~ withheld or delayed.

nature of a mortgage, now or at any time hereafter, a lien or liens on the property of which the leased premises are a part and the LESSEE shall, when requested, promptly execute and deliver such written instruments as shall be necessary to show the subordination of this lease to said mortgages, deeds of trust or other such instruments in the nature of a mortgage. See Rider attached.

15. **LESSOR'S ACCESS**

The LESSOR or agents of the LESSOR may, at reasonable times, enter to view the leased premises and may remove placards and signs not approved and affixed as herein provided, and make repairs and alterations as LESSOR should elect to do and may show the leased premises to others, and at any time within three (3) months before the expiration of the term, may affix to any suitable part of the leased premises a notice for letting or selling the leased premises or property of which the leased premises are a part and keep the same so affixed without hindrance or molestation.

16. **INDEMNIFI-CATION AND LIABILITY** *(fill in)*

The LESSEE shall save the LESSOR harmless from all loss and damage occasioned by the use or escape of water or by the bursting of pipes, as well as from any claim or damage resulting from neglect in not removing snow and ice from the roof of the building or from the sidewalks bordering upon the premises so leased, or by any nuisance made or suffered on the leased premises, unless such loss is caused by the neglect of the LESSOR. The removal of snow and ice from the sidewalks bordering upon the leased premises shall be

    Lessee's          responsibility.

17. **LESSEE'S LIABILITY INSURANCE** *(fill in)*

The LESSEE shall maintain with respect to the leased premises and the property of which the leased premises are a part comprehensive public liability insurance in the amount of $500,000 with property damage insurance in limits of $100,000 in responsible companies qualified to do business in Massachusetts and in good standing therein insuring the LESSOR as well as LESSEE against injury to persons or damage to property as provided. The LESSEE shall deposit with the LESSOR certificates for such insurance at or prior to the commencement of the term, and thereafter within thirty (30) days prior to the expiration of any such policies. All such insurance certificates shall provide that such policies shall not be cancelled without at least ten (10) days prior written notice to each assured named therein.

18. **FIRE, CASUALTY – EMINENT DOMAIN**

Should a substantial portion of the leased premises, or of the property of which they are a part, be substantially damaged by fire or other casualty, or be taken by eminent domain, the LESSOR may elect to terminate this lease. When such fire, casualty, or taking renders the leased premises substantially unsuitable for their intended use, a just and proportionate abatement of rent shall be made, and the LESSEE may elect to terminate this lease if:

    (a) The LESSOR fails to give written notice within thirty (30) days of intention to restore leased premises, or

    (b) The LESSOR fails to restore the leased premises to a condition substantially suitable for their intended use within ninety (90) days of said fire, casualty or taking.

The LESSOR reserves, and the LESSEE grants to the LESSOR, all rights which the LESSEE may have for damages or injury to the leased premises for any taking by eminent domain, except for damage to the LESSEE's fixtures, property, or equipment.

19. **DEFAULT AND BANKRUPTCY** *(fill in)*

In the event that:

    (a) The LESSEE shall default in the payment of any installment of rent or other sum herein specified and such default shall continue for ten (10) days after written notice thereof; or

    (b) The LESSEE shall default in the observance or performance of any other of the LESSEE's covenants, agreements, or obligations hereunder and such default shall not be corrected within thirty (30) days after written notice thereof; or

    (c) The LESSEE shall be declared bankrupt or insolvent according to law, or, if any assignment shall be made of LESSEE's property for the benefit of creditors,

then the LESSOR shall have the right thereafter, while such default continues, to re-enter and take complete possession of the leased premises, to declare the term of this lease ended, and remove the LESSEE's effects, without prejudice to any remedies which might be otherwise used for arrears of rent or other default. The LESSEE shall indemnify the LESSOR against all loss of rent and other payments which the LESSOR may incur by reason of such termination during the residue of the term. If the LESSEE shall default, after reasonable notice thereof, in the observance or performance of any conditions or covenants on LESSEE's part to be observed or performed under or by virtue of any of the provisions in any article of this lease, the LESSOR, without being under any obligation to do so and without thereby waiving such default, may remedy such default for the account and at the expense of the LESSEE. If the LESSOR makes any expenditures or incurs any obligations for the payment of money in connection therewith, including but not limited to, reasonable attorney's fees in instituting, prosecuting or defending any action or proceeding, such sums paid or obligations insured, with interest at the rate of 12 per cent per annum and costs, shall be paid to the LESSOR by the LESSEE as additional rent. Lessor will pay Lessee's legal fees if Lessee prevails in dispute with Lessor.

). **NOTICE** *(fill in)*

Any notice from the LESSOR to the LESSEE relating to the leased premises or to the occupancy thereof, shall be deemed duly served, if left at the leased premises addressed to the LESSEE, or if mailed to the leased premises, registered or certified mail, return receipt requested, postage prepaid, addressed to the LESSEE.*Any notice from the LESSEE to the LESSOR relating to the leased premises or to the occupancy thereof, shall be deemed duly served, if mailed to the LESSOR by registered or certified mail, return receipt requested, postage prepaid, addressed to the LESSOR at such address as the LESSOR may from time to time advise in writing. All rent notices shall be paid and sent to the LESSOR at P.O. Box 122, Medford, MA 02155

  * At the address stated above, or that Lessee may advise from time to time in writing.

from the leased premises, (including, without hereby limiting the generality of the foregoing, all signs and lettering affixed or painted by the LESSEE, either inside or outside the leased premises). LESSEE shall deliver to the LESSOR the leased premises and all keys, locks thereto, and other fixtures connected therewith and all alterations and additions made to or upon the leased premises, in good condition, damage by fire or other casualty only excepted. In the event of the LESSEE's failure to remove any of LESSEE's property from the premises, LESSOR is hereby authorized, without liability to LESSEE for loss or damage thereto, and at the sole risk of LESSEE, to remove and store any of the property at LESSEE's expense, or to retain same under LESSOR's control or to sell at public or private sale, without notice any or all of the property not so removed and to apply the net proceeds of such sale to the payment of any sum due hereunder, or to destroy such property.

22. ~~BROKERAGE~~
(fill in or delete)

~~The LESSEE~~

~~warrants that it has no dealings with any broker or agent in connection with this lease other than the broker whose name is set forth below and the LESSEE agrees to indemnify~~

~~LESSOR against any claim of any other broker arising out of the execution and delivery of this lease or out of negotiations between the parties with respect to the lease of said premises.~~

~~Commission to be paid by Lessor to broker.~~

22.   Deleted

23.   OTHER
PROVISIONS

It is also understood and agreed that  Rider attached hereto is part of this Lease.

IN WITNESS WHEREOF, the said parties hereunto set their hands and seals this _____3rd_____ day of
_____November_____ . 19 83 .

NELSON & SMALL, INC.                    WELLINGTON REALTY

By _____                        By _____
LESSEE   Its   PRES                     LESSOR   Its
                                        Mng. Agt. / Partner

_____                     _____
LESSEE                                  LESSOR

_____
BROKER(S)

0000567

RIDER TO LEASE BETWEEN
WELLINGTON REALTY CO., LESSOR
AND
NELSON & SMALL, INC.
DATED: Nov. 3rd 1983

24.    Lessor will promptly undertake and complete at its expense the Schedule of work described as "Lessor's Work" attached hereto, to ready the Premises for Lessee's occupancy. Lessee and Lessor shall each pay for one-half the cost of the items of Lessor's Work designated "Shared Expense."

25.    The term of the Lease shall begin on December 15, 1983, so long as substantially all of Lessor's work shall be complete; otherwise to begin when so complete. Lessee can begin its improvements immediately.

26.    Lessor shall at all times keep the area (marked on the Plan "Open Area") fronting on Commercial Street free and clear of vehicles, trailers, equipment or other obstacles so that there is always clear unobstructed visibility of the Premises from Commercial Street.

27.    The Rent in the Lease year beginning January 1, 1987 shall be $4.30 per square foot, payable monthly, and $4.30 in Lease year beginning January 1, 1988 plus a one time supplemental rent payment of $3,000 on the first day of January, 1988.

28.    Provided Lessee is not then in default, Lessee shall have an option to extend the original term for an additional term of five (5) years on all the same terms and conditions as during the initial term except that the annual base rent shall be $5.00 per square foot payable in equal monthly installments during the first two and one-half (2 1/2) years of the extended term and $5.75 during each of the last two and one-half (2 1/2) years of the extended term, payable 1/12 monthly. Lessee shall exercise its option by written notice to Lessor not less than six (6) months prior to the end of the initial five (5) year term. Lessee can terminate the Lease during the optional renewal term by giving notice any time in the last six (6) months of the second year of said renewal term that it will terminate as of the last day of the thirtieth (30th) month of said renewal term.

Should Be ✓
# 14

29.    Notwithstanding any provision of paragraph 15, Lessee shall not subordinate this Lease to any future mortgagee unless the mortgagee gives Lessee a recognition agreement suitable to Lessee's counsel. Lessor warrants that the present mortgage on the leased premises is less than $310,000 principal balance.

30.    The Lessor warrants to the Lessee that the Premises are zoned for Lessee's intended use, that there are no restrictions prohibiting or restricting Lessee's right to use the premises for offices and warehousing and distribution purposes or the parking of trucks at the premises, and that construction described in the Schedule attached hereto are in substantial conformance with all applicable laws and regulations. It is

0000568

further understood that the Lessor's covenant to remove vehicles and all other obstacles from the area in front of adjacent premises as shown in the Plan and keep the area clear of obstructions during the term is a material inducement to Lessee's execution of this Lease and undertaking the improvement described herein.

31.   The Lessor is contemplating the construction of a new warehouse building on the land separately indicated on the site Plan.  The Lessor hereby grants to the Lessee a right of first negotiation to lease or purchase these premises prior to the commencement of construction.

32.   In the event truck access to or from Route 16 via Commercial Street is materially interfered with for over ten (10) consecutive business days, the rent shall abate by 50% until the interference terminates; if the interference continues for over sixty (60) consecutive calendar days, Lessee shall have the right to terminate this Lease as of the last day of any month.  If Lessee does not terminate within four months, the rent thereafter shall be equitably abated.

33.   Lessor will cooperate with Lessee and assist Lessee at all times in connection with the acquisition of necessary building permits.  Lessee's obligations hereunder are conditional upon the issuance within thirty (30) days of all building permits required to carry out the improvements described on the attached work schedule.  If said permits are not issued within thirty (30) days, lessee shall be free to terminate this lease without any further obligations and shall also be entitled to the return of all rent payments made.

34.   All Lessor's improvements and Lessee's improvements will comply with the building code of Malden.

35.   Lessee shall be entitled to remove its trade fixtures at any time.

36.   The attached floor plan describes Sections A, B and C of the building.  Lessee will occupy all of Section A.  Lessee can also add Sections B and C to the Lease at any time prior to December 31, 1983.  Lessee may use Sections B and C without charge until Lessor's work is completed. Section B will be at the same rent per square foot as Section A.  Section C shall be at a lower rate to Lessee to be determined by Lessor prior to November 15, 1983. $6666 of rent will be paid at Lease signing (to be applied to the rent due for the month of January 1984, with such additional amounts as shall be due if more than 20,000 square feet is ultimately leased) and one-half (1/2) a month's rent on December 15, 1983.  Regular rent will commence on January 1, 1984 and the correct monthly amount due will be ascertained and adjusted at that time dependent on how much space has actually been leased, and the rent as actually determined to the extent that Section C is utilized.

1201.001

0000569

[SCHEDULE OF LESSOR'S WORK - AT LESSOR'S EXPENSE]

1. Demising wall - as located.  Full ceiling height.  Fire rated board.

2. One load leveler at Tenant's designated location.

3. Dock bumpers for all loading docks.

4. Repair and/or replace all roll-up doors to first class condition and appearance, weather and water tight.

5. Clean and reseal entire floor.

6. Repair and grade all asphalt in parking lot, first class appearance.

7. Recement front steps and new door assembly, including lites; first class quality.

8. Exterior Mercury vapor lamps (no less than 3); building mount.

9. Paint all visible exteriors of building.

10. Repair and/or replace all existing strip lighting fixtures in warehouse area to Tenant's standard needs for Armstrong-type warehouse.

11. Obtain and pay for cost of outside building permits including window cuts.

12. Landscape triangle as per site plan.

[SCHEDULE OF LESSOR'S WORK - AT SHARED EXPENSE 50/50 WITH LESSEE]

1. Interior paint - white - all warehouse walls.

2. Cutouts for exterior windows/windows/installation.

3. Aluminum anodyzed panels - on full x + y exterior to edge of Tenant's tenancy where area to be painted is covered, paint allowance credited to Tenant in full.

4. Appropriate Ramp for truck entry plus truck door (16' door) on Commercial Street side.

5. Relocation of water and sewer pipes for new bathroom

6. Landscaping adjacent to front of building

7. Three phase power to building

[SCHEDULE OF LESSEE'S WORK - AT LESSEE'S EXPENSE]

1. Building of offices and showrooms pursuant to plans to be approved by lessor, approval not to be unreasonably withheld.

[ALL WORK TO BE DONE USING FIRST CLASS MATERIALS AND WORKMANSHIP, PURSUANT TO THE BUILDING CODE.]

0000570



# EXHIBIT H

# POSTERNAK, BLANKSTEIN & LUND

## ATTORNEYS AT LAW

ERIK LUND, P.C.
NOEL G. POSTERNAK, P.C.
RICHARD K. BLANKSTEIN, P.C.
DONALD H. SIEGEL, P.C.
GEORGE E. CHRISTODOULO
DAVID J. HATEM

STANLEY N. WALLERSTEIN
IRA J. DEITSCH
ROSANNA SATTLER
MICHAEL J. STONE
GEORGE A. BERMAN

LAWRENCE L. ATHAN, JR
MARK S. BODNER
STEVEN S. BROADLEY
RON N. DREBEN
RUSSELL K. DUNNING
JOHN EGAN
LAURENCE FIELD
JAMES D. FRIEDMAN
NANCY E. GLOWA
MARIA TILARO HIGGINS

MILES E. HOISINGTON
ROBERT M. L. KRAUS
CATHERINE J. LEFEBVRE
RICHARD G. MILLS
RICHARD M. ROSENTHAL
JAMES J. SCHEINKMAN
JANE E. SENDER
PETER J. SILBERSTEIN
NATALIE A. SIMON
MICHAEL J. WOLFSON

100 CHARLES RIVER PLAZA
BOSTON, MASSACHUSETTS 02114
617-367-9595

TELECOPIER 617-367-2315
CABLE PBL

March 12, 1987

Richard J. Chalpin
Deputy Regional Environmental Engineer
Commonwealth of Massachusetts
Department of Environmental Quality Engineering
Metropolitan Northeast Region
5 Commonwealth Avenue
Woburn, MA  01801

> Re: Wellington Realty Company, 378 Commercial Street,
>     Malden; DEQE Case No. 3-363

Dear Mr. Chalpin:

This letter is written on behalf of our client, Wellington Realty Company Limited Partnership, in response to your letter of December 17, 1986. You will recall that we wrote to you in response to your letter on December 19, 1986 and January 12, 1987 (copies enclosed).

While, on the date of your letter, December 17, our client owned property located at 378 Commercial Street in Malden (the "Property"), our client sold the Property at the end of December of 1986 as we advised you in our letter of January 12. Our client no longer owns the Property, and has no legal right of access to it. The principals of the entities that purchased the Property (Joseph F. Carabetta, Stanley Black, and the Lombard Management Company) have already received 21E Notice of Responsibility letters from you for the property known as the Lombard Trucking Terminal also located on Commercial Street. The purchase was part of a land assemblage for a proposed multi-million dollar project. Mr. Black and Carabetta are reported to have substantial net worths, and my client believes that they have full capacity to clean up the site without any requirement for investment of public funds. While we acknowledge that, as a matter of law, DEQE may have the right to proceed against our client as a former owner of the site, we believe that it is appropriate that the Department have some background information concerning the sale of the Property. That is because

0001165

POSTERNAK, BLANKSTEIN & LUND

Richard J. Chalpin
March 12, 1987
Page 2

some parties have intimated that they will ask DEQE to place a great deal of pressure on our client if it does not agree to up-front monetary payments prior to the full evaluation and clean-up of the site.

The purchase and sale agreement governing the sale of the Property was signed in November, 1984 at a price approximately $2,000,00 below 1986 fair market value. Under the terms of the purchase and sale agreement, Carabetta and Black (the "Buyers") represented to our client (the "Seller"), that environmental studies would be performed upon the property as part of its "development costs". The Buyers had the option of cancelling the agreement in the event they were not satisfied with the environmental condition of the property.

After receiving the environmental site assessment for the Property, the Buyers asked our client to lower the purchase price by $600,000 to compensate them for their anticipated clean-up costs. Our client offered to cancel the agreement and to return the deposit to the Buyers. However, the Buyers opted to go forward with the purchase at the original purchase price and waived cancellation of the transaction under the terms of the agreement. At the closing on December 30, 1986, our client placed an acknowledgement on the deed transferring the Property, pursuant to M.G.L. c.21C, and the deed was accepted by the Buyers' nominees.

As you know from DEQE's meetings with the Buyers' representatives and representatives of the Malden Redevelopment Authority, these parties plan to deal with the 21E problems on the Malden DPW property and the Lombard Trucking property, which parcels are adjacent to the Property. These parties also propose to develop the three sites as part of an urban development plan for Commercial Street. Our client takes the position that any environmental problems at the Property should be addressed by the present owner/developer (in connection with their joint development plans with the Malden Redevelopment Authority) and by the previous owner, Allied Corporation (the operator of the coal tar facility at the site). The current owner has control over the Property, and Allied has the necessary expertise to assist in the proposed studies and any clean up. It is not appropriate at this time for our client to perform additional site assessments or remediation at the Property, as it no longer owns or has legal access to the property, and because it did not contribute to nor cause any environmental problem at the site. Our client is willing to continue to cooperate with the other parties, and would like to receive additional information, concerning the site, as it is developed.

0001166

POSTERNAK, BLANKSTEIN & LUND

Richard J. Chalpin
March 12, 1987
Page 3


We are sure you are aware of the fact that our client and its consultant, Goldberg, Zoino Associates, have reviewed and participated in the initial site assessment process and report which was provided to DEQE. Our client and its consultant have continued to meet with the other parties and with DEQE in an effort to assist in the matter. In fact, we provided to DEQE and to all consultants the historical manufacturing process plans of the Barrett Oil Division of Allied which were left at the site. At the present time, however, it makes the most sense for our client to continue to review and comment upon the work of the present owners of the site, Allied, and the Malden Redevelopment Authority as they proceed with the next phases of study, remediation and urban development.

Sincerely,

Rosanna Sattler

RS/kmp

cc:  Mr. Edward Kazanjian
     Mr. Steven Johnson
     Ms. Elizabeth Callahan
     Morton Brown, Esquire
     Laurie Burt, Esquire
     David Cooke, Esquire
     Mr. Carl Eidam

RS75/30

0001167

# EXHIBIT I

## ATTENDANCE

### Meeting - Malden Redevelopment Authority - 6/21/88

| | | |
|---|---|---|
| Kenneth Reich | Malden Redevelopment Authority | 482-1390 |
| Kathleen Chojnowski | Malden Redevelopment Authority | 482-1390 |
| Edward J. Lonergen | Carabetta Enterprises | 494-8600 |
| Mike DiGianio | Combined Properties | 330-7600 |
| John M. Pereira | Combined Properties | 330-7600 |
| Lawrence m. Fischer | Allied Signal | 201-455-6556 |
| George Balch | Allied Signal | 428-0151 |
| Henry J. Mulhern | Malden Redevelopment Authority | 324-5720 |
| Steve Wishoski | Malden Redevelopment Authority | 324-5720 |
| Jeff Nangle | Norwood Engineering | 762-0143 |

0000977

# EXHIBIT J

MEMORANDUM

TO:     Stan Black
        Joe Carabetta

FROM:   Mike DiGiano   *F.M.D.*

RE:     Status of Wellington 21(e) Study

DATE:   July 13, 1988

_____

On June 21, representatives of the Malden Redevelopment Authority, Combined Properties, Carabetta Enterprises, and Allied Chemical met to discuss the draft of the final report of the interim data work plan as well as the next steps in this process.

To recap, the study's findings for the various Commercial Street properties are as follows:

DPW/LOMBARD

- No short term remediation is required.

- Long term remediation for the site involves capping (paving) piles and foundation venting.

- There is no evidence that the dichlorinated benzenes on this site are migrating.  The source of the DCB's are offsite (i.e. Rosebud Store which was the site of Solvent Chemical).  The groundwater study that was conducted by Fay Spofford and Thorndike concluded that a sheet pile wall would not be an effective means of sealing our site from the groundwater flow emanating from the solvent chemical site.  The fact that the DCB's are not migrating in the groundwater (because they are bound up in the clays) further eliminates the need for us to be concerned about the offsite DCB problem.

WELLINGTON

- No underground storage tanks remain on the site.

- Some underground piping (both water pipes and distribution pipes) from Allied remains.

- The coal tars are primarily tied-up in the soils and are concentrated mainly in the fill areas where the soils are more permeable.

- No interim remediation of coal tars was determined

0000985

-2-

necessary but there is a bulk fraction near the existing building which must be removed regardless of future land use.

- If there is a change in land use, long term remediation for coal tars would involve pile foundations, capping (paving, clay liners) special venting for the buildings and worker safety during construction.

- The arsenic deposits were limited in scope and related to the former tannery use of the property. Norwood's recommendation (DEQE site representatives concurred) is to leave the arsenic in place but identify known locations on the deed.

- The biggest problems on the Wellington parcel are the cyanides which are moving through the shallow groundwater into the sediments in Little Creek. Cyanide is a particularly devastating pollutant to aquatic systems (i.e. Little Creek). The cyanide is a by-product of the coal tars. Long term remediation would be to treat groundwater and remove creek sediments or isolate Little Creek from the shallow groundwater flowing through the coal tars on the Wellington parcel. This could be accomplished by culverting the creek.

NEXT STEPS AS DISCUSSED AT 6/21 MEETING

At the meeting we agreed that the appropriate next steps were to make final wording changes in the draft and define more clearly (with estimated costs) the long term remediation measures that we would propose. This latter task would require additional funding for Norwood. The advantage to this approach would be that we would provide DEQE with a total package that would enable us to move quickly through the approval process.

At the request of CPI/Carabetta, the participants in the meeting reviewed the remediation options and developed some very rough costs which were to be refined by Norwood if we were to proceed with the next step. Working off the January 1986 "Total Costs Site Remediation" estimates (see attached sheet) we determined long term remediation costs to be as follows:

1. LOMBARD

    a. Liner underneath new building     $ 120,000
    b. Asphalt paving                    normal construction
                                         cost

0000986

-3-

2.    DPW-WELLINGTON

    a. Localized remediation for coal          $  100,000
       tars on Wellington (passive
       recovery system)
    b. Annual operating cost                       24,000
    c. Sheet pile walls (if don't                 150,000
       isolate creek)
    d. Capping with geofabric, asphalt          1,900,000
    e. Foundation piles                         2,120,000
                      SUBTOTAL    $4,414,000

3.    Add 35% to subtotal for contingency,        5,958,900
    health and safety engineering

                        SAY         6,000,000

4.    Moving or culverting Little Creek          3,500,000

                    TOTAL       $ 9,500,000

It should be emphasized that this number was very crudely arrived at in the meeting. However, it is noteworthy because it points out that we theoretically eliminated an estimated $785,000 in off-site remediation cost (see January 1986 Total Costs Site Remediation from Norwood Report) for the DCB's but have identified another problem, the cyanides, which must be dealt with and may cost $3 million or more. CPI/Carabetta expressed surprise that the remediation costs were going up not down. It was agreed that both Allied and CPI/Carabetta needed some additional time to make final comments on the draft (approx. a week). There was some discussion of where the project stood in the terms of the existing budget. At that point, Norwood and Foley Hoag stated that some costs had gone over the original budget of $60,157. The overruns were reported as follows:

        $4,000 FST
        $8,000 Norwood of which $5,000 included additional
               borings required because wells were lost in
               the field due to trucking operations on the
               site.

Total costs for the existing study were now approximately $72,000 - $73,000.

Carabetta/CPI stated that the report at our last meeting in February was that the project was on budget and no one had contacted us since then to authorize work in excess of the original budget. We asked that Ken Reich provide us with a memo on these overruns.

-4-

The June 21 meeting ended with Foley Hoag/Norwood expecting our final comments within a week. We have since contacted them to request additional time. In addition, Foley Hoag/Norwood was going to provide us with an explanation of the overruns. Norwood was also going to prepare a budget to develop more fully an outline of remediation measures (in light of the findings of this study) and some better costs.

John, Ed Lonergan and myself met sometime after the meeting and decided that because of the very costly nature of the remediation program now being discussed, we need to:

1. Get an independent technical review of the draft Norwood report to insure the soundness of it's conclusion before we sign off on it.

2. Re-evaluate the viability of continuing with the MRA and Allied in a joint study process because of the chance that we may be in an adversarial position with Allied especially given the escalating nature of the clean-up costs.


FMD/bs
cc: Brian Dacey
    John Pereira

WELL713

0000988

# EXHIBIT K

# COMBINED PROPERTIES, INC.

40 ROWES WHARF
BOSTON, MASSACHUSETTS 02110

(617) 330-7600
FAX  330-7601

February 14, 1990

David Cooke, Esquire
Allied Corporation
Columbia Road and Park Avenue
Myer 4
Morristown, New Jersey  07960

Mr. Edward Kosangian
c/o Rosanna Satler, Esquire
Posternak, Blankstein & Lund
100 Charles River Plaza
Boston, Massachusetts  02114

Gentlemen:

     In order to expedite the further investigation of the
environmental conditions on the Wellington site as outlined in
the attached work scopes, (1/29/90 letter from Richard Hughto,
Rizzo Associates to F.M. DiGiano, Combined Properties), the
parties have entered into this letter agreement.

     Without admissions of any liability with respect to the
Wellington site, the parties agree that it is in their mutual
interest to pursue the studies described in the attached work
scopes.  It is agreed that the parties will share equally in the
cost of these studies up to a total of the presently estimated
cost of $60,000 but not in excess of the maximum share of each
without prior written consent.

     Combined Properties, Inc./Carabetta Enterprises, Inc. shall
act as coordinator for the implementation of these studies.  Any
determination or action taken in good faith by CPI as coordinator
in causing said studies to be completed and payments to be made
to consultants shall be final and conclusive on all parties
hereto and CPI, acting in good faith, shall not be liable for any
act or omission on its part or for any action on the part of any
consultant.  The parties further agree to pay their share of
consultants bills within 14 days of submission of such bills by
CPI.  Each party shall designate a representative to receive
bills and communications for it and to act as its principal
contact and authorized agent.

3

COMBINED PROPERTIES, INC.

David Cooke, Esqquire
Mr. Edward Kosangian
February 14, 1990
Page 2


Each party's representative will be provided with drafts of the study's findings and conclusions for review and comment prior to finalization and submission to DEQE.  The parties agree to contribute whatever technical expertise they may have in order to insure that the site investigations and remedial action which are the subjects of this agreement, are as complete as possible. It is expressly understood that the opportunity for review and comment does not confer final authority on any party other than CPI/Carabetta to control the work of the consultants.  However, it is also understood that any of the study reports or submissions made to DEQE or other governmental entity shall not be binding on any of the parties unless such party consents to and approves such report, submission, or plan in writing.

This letter agreement is made without prejudice to the position of any party that some or all of the costs which it has agreed to pay herein are properly the responsibility of any other entity other than a party hereto.  None of the parties hereto waive any rights it may have to recover such costs from such other entities other M.G.L.c.21E or other applicable authority.

Please indicate your acceptance of this letter agreement by signing all three originals in the space provided below and returning the duplicates to me.

Sincerely,


F. Michael DiGiano
Development Manager


AGREED AND ACKNOWLEDGED:

ALLIED CORPORATION


_____
By:


AGREED AND ACKNOWLEDGED:


_____
By:


4

January 29, 1990

Mr. Michael DiGiano
Combined Properties, Incorporated
40 Rowes Wharf, 6th Floor
Boston, MA  02110

Re:    Wellington Parcel
       Lower Commercial Street
       Malden, Massachusetts

Dear Mr. DiGiano:

Rizzo Associates (ENGINEER) is pleased to submit this Proposal/Agreement to
Combined Properties, Inc. (CLIENT) to conduct additional hazardous waste site
assessment services of property located at Lower Commercial Street in Malden,
Massachusetts (the Site), and known as the Wellington Parcel.  The objective of the
scope of work will be to implement Tasks 1 through 4 of the work scope dated
November 7, 1988 which was submitted to the Department of Environmental Quality
Engineering, now the Department of Environmental Protection (DEP).  Specific tasks to
be completed are described below.

SCOPE OF WORK

TASK 1:    Evaluate the inter-relationship between groundwater and Little Creek
           using existing data on groundwater elevations and groundwater quality, and
           using aerial photographs and physical observations.  Summarize the
           information available relative to the inter-relationship and determine
           whether a remedial action solution can be evaluated from the existing
           information.

TASK 2:    Perform a quantitative evaluation of the hydrologic relationship between
           the Site groundwater and the river.  We propose to install three 3-cluster
           mini-piezometer wells along the creek to satisfy DEP requirements
           specified in DEP's letter dated March 1, 1988.  An addendum to the
           approved workscope will be submitted for DEP approval prior to execution
           of this task.  Should the DEP requirements involve more labor or expenses
           than what is currently projected, the budget for this task will need to be
           modified.

TASK 3:    Conduct a Site visit to quantitatively assess Little Creek for evidence of
           discharges, and to collect five sediment samples for laboratory analyses.

TASK 4:    Laboratory analyze five sediment samples from Little Creek for total
           cyanide, phenols, and polynuclear aromatic hydrocarbons per request of
           DEP.

Page Two
Mr. Michael DiGiano
January 29, 1990

TASK 5:    Conduct a qualitative study of the macrobenthic communities in the Creek. Sediment samples will be collected from the Creek and aquatic organisms will be identified. A general evaluation of the stream environment will be made as indicated by the community composition observed in the sediment samples. Upon completion of this task, meet with the CLIENT to review the status of the project to date.

TASK 6:    Conduct a Disposal Site Risk Characterization of the Site. Specific tasks are described in Exhibit A.

TASK 7:    After completion of the hydrologic assessment and the Disposal Site Risk Characterization, evaluate potential remedial action alternatives for the Site and identify those alternatives which have the best potential for providing a permanent Site solution.

TASK 8:    Prepare a letter report describing the conduct and findings of the work, including a cost estimate for the proposed permanent solution or for additional studies to develop that cost estimate.

TASK 9:    Meet with CLIENT to discuss the results of our studies and the proposed permanent solutions.

COST AND SCHEDULE

The fee for the above work will be invoiced on a time and expense basis according to the current Hazardous Waste Fee Schedule. The budget that we suggest you establish for completion of the work as outlined is $60,000; of this $38,000 is targeted for Task 6. Additional tasks such as pilot studies, remedial design, and implementation of the selected remedy are not included in this Agreement. The budgets for individual tasks and the projected schedule for the work is provided in Appendix B.

A retainer of $20,000 will be required to initiate work, and charges will be deducted from the retainer as a percent of completion; that is, 30 percent of the retainer will be deducted from billings when 30 percent of the estimated final charges have been accrued. Charges will be invoiced monthly, and are payable within 30 days of billing. If a balance remains outstanding more than 30 days beyond the invoice date, work on the project will cease until payment is made. Invoices will indicate charges by task to keep you apprised of the financial progress of the project.

Assuming no delays caused by intermediate Client or regulatory reviews, Rizzo Associates anticipates completion of Tasks 1 through 9 within six months of initiation of work.

6

MLDN        000829

Page Three
Mr. Michael DiGiano
January 29, 1990

We are pleased to offer these services.  To execute this Agreement, please return one signed original copy of this letter along with the required retainer.  This Agreement is subject to the attached Statement of Terms and Conditions.

Please call Jane Carpenito if you have any questions.

Very truly yours,

Richard J. Hughto, Ph.D., P.E.
Vice President

Accepted by: _____          _____
                    Mr. Michael DiGiano                    Date
                    Combined Properties, Inc.

Attachments

HPA\959-02RA.ncr

EXHIBIT A

TASK 6:  DISPOSAL SITE RISK CHARACTERIZATION
SCOPE OF WORK

Wellington Parcel Proposal

The Massachusetts Department of Environmental Protection (DEP) has requested
additional studies of the Wellington Parcel in order to provide a full characterization of
the contamination and of the  potential risks.  This Exhibit A presents our proposal for
a Phase II Disposal Site Risk Characterization in conformity with the requirements of
the Massachusetts Contingency Plan.  This characterization is designed to fulfill DEP
requirements presented in Guidance for Disposal Site Risk Characterization and
Related Phase II Activities - in Support of the Massachusetts Contingency Plan (DEP,
May 17, 1989).  Tasks included in the characterization are presented below.

TASK 6.1:    SITE VISIT AND DEVELOPMENT OF DETAILED WORK PLAN

Rizzo Associates Risk Assessment personnel will visit the Site to assess site
conditions and will conduct a detailed review of available information on
the Site history.  Available sampling and analytical data will be critiqued
for applicability in conducting the Risk Characterization.  Data gaps where
modeling of exposures may be needed, will be identified.

Based on our preliminary review, we believe that the scope of work and
budget which we currently envision will be sufficient to evaluate the Site;
however, we reserve the right to submit an alternative work and cost
proposal if necessary following the preliminary evaluation.  A meeting with
the CLIENT will be scheduled at the completion of this task to discuss our
preliminary findings and to review any changes in the scope or cost
estimate that may be necessary.

TASK 6.2:    HAZARD IDENTIFICATION

The MCP requires that all contaminants identified at a Site be evaluated
during the Risk Characterization.  Prior to the publication of the May 17
guidance document, Massachusetts risk assessments were commonly
conducted according to U.S. EPA guidelines using "indicator compounds"
during the evaluation instead of evaluating all compounds found on a site.
This simplification significantly reduced the scope and cost of risk
characterizations.

From an initial inspection of the analytical data for the site, we have
determined that about 30 compounds have been identified to date.  In

A - 1

addition, DEP is requiring an analysis to determine if chlorinated phenols are present on the site. In scoping this proposal, we assume that 35 compounds of concern will be identified. Identification of additional contaminants will increase the scope and cost of the work.

During the Hazard Identification, we will collect and present physical, chemical, toxicological and other environmentally relevant information for each of the 35 substances. The concentrations and distribution of each of the substances will be specified and the affected environmental media identified. Data gaps which may require modeling of distribution data will also be identified.

Toxicological profiles will be prepared, either individually as public information documents, or from the U.S. EPA Integrated Risk Information System (IRIS) data base.

TASK 6.3:    IDENTIFICATION OF ARARs

In order to determine the risk assessment method required for the Site under the guidance document, and in order to assess additional criteria which must be met during cleanup, Rizzo Associates will review applicable or relevant and appropriate regulations, criteria and guidelines (ARARs) published by DEP and U.S. EPA.

TASK 6.4:    DOSE-RESPONSE ASSESSMENT

The dose-response assessment identifies the extent of an expected adverse health effect corresponding to specific doses of the contaminant of concern. This value is typically derived from experimental animal studies at high doses, and must be extrapolated to the low doses expected in environmental exposures. Relevant dose-response criteria for numerous chemical substances is provided by the U.S. EPA and others.

The dose of a contaminant below which no adverse noncarcinogenic effects are expected is expressed in the form of the "Reference Dose" (RfD) for that contaminant. The cancer risk associated with a specific dose of a contaminant is expressed in terms of the "Carcinogenic Potency Factor" (CPF) for that contaminant. The dose-response assessment will propose RfDs and CPFs as dose-response criteria. RfDs and CPFs are available for many, but not all of the contaminants at the Site. In cases where none exist, analogous dose-response criteria will be developed, where possible, from other appropriate health criteria. The criteria will be developed according to published USEPA methodologies which will be documented in the report, as such, the dose-response criteria should be acceptable to MADEP.

A - 2

TASK 6.5:    EXPOSURE ASSESSMENT

Exposure scenarios will be developed for individual receptors representing the populations judged to be "at risk" on and near the Site. Based on our preliminary evaluation, we have identified three groups potentially subject to exposure: workers at the Site during current operations, workers at the Site during planned construction or remedial activities, and transients visiting the wetland areas. Nearby residents exposed through air emissions are a fourth category which may need to be considered. Exposure of future office workers may be assumed to be no higher than that of current workers and, hence, will not need to be evaluated separately. Since the potential exists for exposure through all three environmental media (soil, air and water), exposure through each medium may need to be considered for each exposed group. Our budget has been constructed assuming consideration of a maximum of six exposure/receptor pathways. If consideration of additional pathways will be required, we will submit a revision of this proposal to accommodate the additional time requirements after completion of Task 6.1.

Rizzo Associates will estimate exposure point concentrations and average daily doses for contaminants for each receptor in each exposure scenario using recommended guidelines or data from literature references. Summary tables describing the exposure parameter values will be constructed and calculations will be presented on spreadsheets specifically adapted to Site conditions.

TASK 6.6:    RISK CHARACTERIZATION

The average daily dose to the receptor for each substance from all environmental pathways and by all routes of exposure assessed in Task 6.5 will be compared to the relevant noncarcinogenic dose-response value in order to estimate the noncarcinogenic health risk at the Site. The average daily dose will also be compared to the relevant carcinogenic dose-response value to estimate the cancer risk. The individual noncancer risks will be summed to calculate an overall Site Hazard Index for comparison with the DEP Hazard Index limit of 0.2. If the Site Hazard Index exceeds the limit, the noncancer risks will be recalculated by the individual adverse effects (such as liver toxicity, reproductive toxicity, anemia, etc.), where such data is available, to determine if the Hazard Index for any specific effect is exceeded.

The individual cancer risks will also be summed and compared with the appropriate DEP Total Site Cancer Risk limit ($1 \times 10^{-5}$ or $1 \times 10^{-6}$).

A - 3

TASK 6.7:    UNCERTAINTY ANALYSIS

Since the validity and usefulness of quantitative risk assessment data is related to the reliability of the data and assumptions used in the analysis, Rizzo Associates will evaluate the uncertainties associated with the exposure assumptions, dose-response values and other relevant parameter values and will discuss the limitations of the risk assessment process. This information is important so that the risk manager can appropriately interpret the results for use in decision-making and an uncertainty analysis is a required Risk Evaluation task under both MADEP and EPA guidelines.

TASK 6.8:    SAFETY, PUBLIC WELFARE AND ENVIRONMENTAL RISK
             CHARACTERIZATION

Rizzo Associates will qualitatively evaluate the environmental risk posed by conditions at the Site by comparing Site conditions with applicable or suitably analogous safety, public welfare and environmental standards, guidelines and policies of the MADEP. Rizzo Associates will assemble available MADEP approved risk assessments prepared for similar coal gasification sites at the commencement of the study.

TASK 6.9:    REPORT PREPARATION

Rizzo Associates will present the Risk Characterization either as a separate report or as a chapter in the Phase II report. Reference sources critical to the quantification of risks will be documented. The budget includes a maximum of 20 hours for report revisions based on Client or DEP requirements. Additional time will require a budget increase.

TASK 6.10: MEETINGS WITH CLIENT AND REGULATORY OFFICIALS

The budget includes a provision for up to two meetings with the Client, one prior to the initial scoping of the study, and one following completion of the technical review. Thirty-one man-hours are budgeted for meetings. In addition, we have included time for one meeting with representatives of MADEP to discuss our findings. Since we are participating in a MADEP Superfund Advisory Subcommittee which is proposing guidelines for evaluation of coal gasification sites, and meetings of this subcommittee are scheduled for early 1990, we will be able to obtain the most current information on MADEP proposed guidelines for use in this evaluation. As part of the evaluation for this project, we will also attempt to obtain current risk evaluations of similar sites which have been produced for or reviewed by MADEP.

A - 4                                      //

## HAZARDOUS WASTE FEE SCHEDULE

### Effective January 1, 1990 through December 31, 1990

| Rate Category | Hourly Rate |
|---|---|
| Principal/Project Director | $160.00 |
| Project Manager/Technical Specialist | $ 95.00 |
| Project Engineer | $ 70.00 |
| Project Environmental Scientist/Chemist/Planner | $ 70.00 |
| Project Surveyor/Party Chief | $ 55.00 |
| Civil/Environmental Engineer | $ 60.00 |
| Resident Representative | $ 60.00 |
| Environmental Scientist/Chemist | $ 55.00 |
| Planner | $ 55.00 |
| Technician/Surveyor | $ 50.00 |
| Draftsperson/Cartographer | $ 50.00 |
| Word Processor | $ 40.00 |
| Computer-Aided Design and Drafting CPU hour | $ 30.00 per |

**EXPENSES**
Direct expenses shall be billed at cost plus a service fee of
15 percent.  This charge covers the costs associated with the
cost of money, risks associated with our responsibility for
subcontractors, risks of doing business, etc.  Direct expenses
include transportation, (personal auto mileage at $0.25 per mile
and company field vehicles at $0.45 per mile), delivery, printing
costs, job supplies, long distance telephone calls, presentation
slides, soil borings, soil and water testing, expendable
supplies, special consultants and similar costs directly
applicable to the individual project.

**PAYMENT**
Invoices are issued monthly and/or upon completion and payable
upon receipt.  In the event payment is delayed 30 days beyond the
date of the invoice, interest shall be paid at 1.5 percent per
month on the unpaid balance.

HF\HWFEESCH   REV  12/19/89

/2

A - 5



WEEKLY LABOR PROJECTIONS
(DOLLARS IN THOUSANDS)

WEEK NUMBER

| TASKS | BUDGET | MAN HOUR | T DUR | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| TASK 1 | $1,270 | 12 | 1 | 1 | | | | | | | | | | | | | | | | | | | | | | | | |
| TASK 2 | $6,460 | 36 | 1 | 1 | | | | | | | | | | | | | | | | | | | | | | | | |
| TASK 3 & 4 | $2,200 | 16 | 1 | 1 | | | | | | | | | | | | | | | | | | | | | | | | |
| TASK 5 | $2,630 | 32 | 2 | 4 | 5 | | | | | | | | | | | | | | | | | | | | | | | | |
| TASK 6.1 | $1,800 | 25 | 1* | 3* 5* | | | | | | | | | | | | | | | | | | | | | | | | |
| TASK 6.2 | $5,020 | 78 | 1 | 6 6 | | | | | | | | | | | | | | | | | | | | | | | | |
| TASK 6.3 | $1,500 | 24 | 4 | 3 6 | | | | | | | | | | | | | | | | | | | | | | | | |
| TASK 6.4 | $3,350 | 50 | 4 | 4 8 | | | | | | | | | | | | | | | | | | | | | | | | |
| TASK 6.5 | $5,570 | 86 | 5 | 5 9 | | | | | | | | | | | | | | | | | | | | | | | | |
| TASK 6.6 | $6,360 | 96 | 7 | 3 9 | | | | | | | | | | | | | | | | | | | | | | | | |
| TASK 6.7 | $970 | 14 | 11 | 2 12 | | | | | | | | | | | | | | | | | | | | | | | | |
| TASK 6.8 | $1,440 | 20 | 8 | 3 10 | | | | | | | | | | | | | | | | | | | | | | | | |
| TASK 6.9 | $6,910 | 93 | 9 | 11 19 | | | | | | | | | | | | | | | | | | | | | | | | |
| TASK 6.10 | $2,920 | 31 | 1* | 8* 17* | | | | | | | | | | | | | | | | | | | | | | | | |
| TASK 7 | $2,920 | 28 | 19 | 3 21 | | | | | | | | | | | | | | | | | | | | | | | | |
| TASK 8 & 9 | $8,600 | 54 | 20 | 5 24 | | | | | | | | | | | | | | | | | | | | | | | | |

TOTAL $60,000   223

CUMM COST    5.8  1.5  2.6  2.8 10.4  3.3  4.1  4.5  4.3  1.1  1.1  0.6  0.6  0.6  0.6  1.5  0.6  0.6  1.6  3.4  2.7  1.7  1.7  1.7  0.0

MONTHLY INV.  5.8  7.3  9.8 12.7 23.1 26.4 30.4 34.9 39.2 40.3 41.5 42.2 43.8 44.5 45.9 46.6 47.2 48.8 52.1 54.8 56.6 58.3 60.0

                        12.7          22.2          7.7          3.4          8.3          5.2

* = PROJECTED MEETING DATES
HPA\V5902HP.WK1

MLDN

000836

EXHIBIT L

**POSTERNAK, BLANKSTEIN & LUND**
ATTORNEYS AT LAW

NOEL G. POSTERNAK, P.C.
RICHARD K. BLANKSTEIN, P.C.
DONALD H. SIEGEL, P.C.
GEORGE E. CHRISTODOULO
DAVID J. HATEM
DAVID M. SALTIEL
KENNETH A. KORB
IRA J. DEITSCH
ROSANNA SATTLER
MICHAEL J. STONE
GEORGE A. BERMAN
RUSSELL K. DUNNING
LAURENCE FIELD
GERALD J. BILLOW
JOHN EGAN
LAWRENCE L. ATHAN, JR.
ROBERT M. SCHLEIN

JEFFREY W. ARMSTRONG
DEBORAH DIVERDI CARLSON
CYNTHIA A. CLARK
DREW W. COLBY
SUSAN E. DRESENS
ROBERTA R. FITZPATRICK
MARIA J. FRAZIN
LEE ANN S. GALOWICH
ELLEN GLICKMAN SIMON
ROGER P. GLOVSKY
NANCY E. GLOWA
MAURA A. GREENE
JAY S. GREGORY
JOSEPH A. HEARST (CALIF. ONLY)
BARBARA HICKINGBOTTOM
PAUL A. IZZO
PETER D. JORDAN

DOROTHY A. LANGLEY
CATHERINE J. LEFEBVRE
E. LYNETTE LEMAIRE
CYNTHIA MEAD
JILL C. NORMAN
PATRICIA E. RATNER
RICHARD M. ROSENTHAL
VALERIE C. SAMUELS
JAMES J. SCHEINKMAN
PETER J. SILBERSTEIN
CYNTHIA C. SMITH
MICHAEL S. TRAISTER
JEFFREY J. UPTON
ANDREW B. WHITE
MICHAEL J. WOLFSON

OF COUNSEL
STANLEY N. WALLERSTEIN
(ALSO ADMITTED IN N.H.)

100 CHARLES RIVER PLAZA
BOSTON, MASSACHUSETTS 02114
617-367-9595

TELECOPIER 617-367-2315

March 13, 1990

F. Michael DiGiano
Development Manager
Combined Properties, Inc.
40 Rowes Wharf
Boston, Massachusetts  02110

Re:  Wellington Realty Co.
     Lower Commercial Street, Malden, Massachusetts

Dear Mr. DiGiano:

Pursuant to my letter to you of March 7, 1990 concerning the above matter, my client has considered your proposal, and is not prepared to go foward at this time.  You will recall that the purchase and sale agreement governing the sale of the Property was signed in November, 1984 at a price approximately $2 million below 1986 fair market value.  Under the terms of the purchase and sale agreement, Carabetta and Black (the "Buyers") repesented to our client (the "Seller") that environmental studies would be performed upon the Property as part of its "development costs". The Buyers had the option of cancelling the agreement in the event they were not satisfied with the environmental condition of the property.

After receiving the environmental site assessment for the Property, the Buyers asked our client to lower the purchase price by $600,000 to compensate them for their anticipated clean-up costs.  Our client offered to cancel the agreement and to return the deposit to the Buyers.  However, the Buyers opted to go forward with the purchase at the original purchase price and waived cancellation of the transaction under the terms of the agreement.  At the closing on December 30, 1986, our client placed an acknowledgement on the deed transferring the Property pursuant to M.G.L. c.21C, and the deed was accepted by the Buyers' nominees.

POSTERNAK, BLANKSTEIN & LUND

F. Michael DiGiano
Development Manager
Page 2
March 13, 1990

    Given the history of the transaction, and the assumption of the risk by the Buyers, and also given the role that Allied played in the past, we do not think it is appropriate for our client to share in the costs of the remaining Phase III studies, and our client declines to do so.

                Sincerely,

                Rosanna Sattler

RS/sd
cc:  Edward Kazanjian
     Noel G. Posternak, P.C.
     Stanley N. Wallerstein, Esquire
     David Cooke, Esquire

RS187-1

0000478

EXHIBIT M

GOULSTON & STORRS
A PROFESSIONAL CORPORATION
COUNSELLORS AT LAW
400 ATLANTIC AVENUE
BOSTON, MASSACHUSETTS 02110-3333
617/482-1776

TELECOPY/FAX 617-574-4112

CLOSING MEMORANDUM

TRANSFER OF INTERESTS BY JOSEPH F. CARABETTA AND COMMERCIAL
STREET PROPERTIES, INC. ("Assignors")
TO
WELL-COM ASSOCIATES, INC. AND COMBINED SPECIAL HOLDING LIMITED
PARTNERSHIP ("Assignees")

September 11, 1996

Counsel to Assignors:

Dominic Aprile, Esquire
Bathgate, Wegener & Wolf
One Airport Road, P.O. Box 2043
Lakewood, New Jersey 08701

Counsel to Assignees:

Marilyn L. Sticklor, Esquire
Paige A. Manning, Esquire
Goulston & Storrs, P.C.
400 Atlantic Avenue
Boston, Massachusetts 02110-3333

---

This memorandum relates to the transfer of interests by Joseph F. Carabetta and
Commercial Street Properties, Inc. to Well-Com Associates, Inc. and Combined Special
Holding Limited Partnership. The transfer documents were signed on July 16 and July
17, 1996 via mail. The documents were held in escrow by Justice Mollen of Graubard,
Mollen & Miller and were released on September 11, 1996. Documents for recording
were recorded and/or filed in the Middlesex South Registry of Deeds and the Middlesex
South Registry District of the Land Court.

Documents executed and delivered incident to closing or otherwise relevant to this
transaction are set forth below:

GENERAL DOCUMENTS

1.    Term Sheet by and between Carabetta Interests and Combined Interests.

2.    Transfer Agreement dated July 16, 1996, by and among the Assignors and
      Assignees.

0000676

3. Side letter relating to the Transfer Agreement by and among Combined Special Holding Limited Partnership, Well-Com Associates, Inc., Well-Com, Inc., and Joseph F. Carabetta.

4. Assignment Agreement dated July 16, 1996, by and between Patricia G. Black and Edward I. Rudman, Executors of the Estate of Stanton L. Black, and Combined Special Holding Limited Partnership with respect to Bankruptcy Proof of Claim No. 49 filed by Stanton L. Black in the Bankruptcy Case Number 95-51918, Joseph F. Carabetta, Debtor.

5. Assignment Agreement dated July 1, 1996, by and between Patricia G. Black and Edward I. Rudman, Executors of the Estate of Stanton L. Black, and Combined Special Holding Limited Partnership with respect to with respect to Bankruptcy Proof of Claim filed by Stanton L. Black in Bankruptcy Case Number 95-51918, Joseph F. Carabetta, Debtor.

6. Mutual General Release executed by John M. Pereira and Combined Special Holding Limited Partnership, Well-Com Associates, Inc. and Well-Com, Inc. and Joseph F. Carabetta and Commercial Street Properties, Inc.

7. Escrow Agreement until Court Approval by and among the Assignors, the Assignees and John Pereira, dated July 17, 1996.

8. Waiver of Certain Escrow Requirements by and among by and among the Assignors, the Assignees and John Pereira, dated July 17, 1996.

9. Secretary's Certificate dated July 15, 1996, executed by Joseph F. Carabetta, as Secretary of Commercial Street Properties, Inc., with attached Application for Revival of Commercial Street Properties, Inc. and Secretary's Certificate dated August 15, 1966, executed by Joseph F. Carabetta as Secretary of Commercial Street Properties, Inc., ratifying vote taken July 11, 1996.

### 326 COMMERCIAL STREET, MALDEN, MASSACHUSETTS

10. Assignment of Beneficial Interest by 326 Commercial Street Realty Trust to Combined Special Holding Limited Partnership, dated July 19, 1996.

11. Restated Schedule of Beneficiaries of 326 Commercial Street Realty Trust dated July 17, 1996.

12. Amendment No. 1 of 326 Commercial Street Realty Trust, dated July 17, 1996.

**0000677**

13. Certificate of Amendment No. 1 of 326 Commercial Street Realty Trust, dated July 19, 1996, recorded with the Middlesex South Registry of Deeds on September 25, 1996 as Document No. 737.

14. Resignation of Trustee executed by Joseph F. Carabetta, dated July 19, 1996, and recorded with the Middlesex South Registry of Deeds on September 25, 1996, as Document No. 738.

### 378 COMMERCIAL STREET, MALDEN, MASSACHUSETTS

15. Deed from Commercial Street Properties, Inc., to Well-Com Associates, Inc., conveying a 50% interest in property located at 378 Commercial Street, Malden, Massachusetts, and Secretary's Certificate executed by Joseph F. Carabetta as Secretary of Commercial Street Properties, Inc., dated August 15, 1996, relating to the transfer of a 50% interest, filed with the Middlesex South District of the Land Court as Document No. 1012978 on September 19, 1996.


Paige A. Manning
October 25, 1996

0000678

GS2- 94515-1
10/25/96 12:06 PM

4/18/96

## TERM SHEET

1.  All interests held by Joseph F. Carabetta or any affiliate or related entities (the "Carabetta Interests") in and to the properties commonly known as 326 Commercial Street and 378 Commercial Street (individually a "Property" and collectively the "Properties") respectively, shall be assigned to John Pereira or any affiliate or related entities holding interests in the Properties or nominees thereof (the "Combined Interests").

2.  In consideration for said assignment, the Carabetta Interests or nominees thereof shall receive the following:

    a.  The Combined Interests shall indemnify and hold the Carabetta Interests harmless from any and all liability with respect to the Properties, including, but not limited to, any liability under Mass. General Laws Chapter 21E and any other environmental laws and/or regulations, provided that recourse under the foregoing indemnification shall be limited to the interests of the Combined Interests in the Properties.

    b.  Upon any Disposition (as hereinafter defined) occurring within 10 years of the date of the agreement contemplated hereby, the Carabetta Interests shall be entitled to receive the following percentage of any Profit (as hereinafter defined):

        i.   In the event that aggregate Profit is between $0 and $5 million, the Carabetta Interests shall receive 10% of Profit;

        ii.  In the event that aggregate Profit exceeds $5 million, the Carabetta Interests shall receive an additional $250,000 on account of i above plus 15% of the Profit in excess of $5 million.

    c.  The proofs of claim filed by the Combined Interests or by any affiliated or related entities or persons, including Stanton Black, in the Carabetta bankruptcy cases, shall be withdrawn.

3.  The parties shall exchange mutual general releases of all claims against one another (and of all trustees, partners, shareholders, officers, directors, employees, agents and other representatives) except with respect to the rights created in the agreement contemplated by this Term Sheet.

4.  The agreement contemplated by this Term Sheet shall be and is contingent upon Bank of Boston and its affiliates (the "Bank") releasing the Carabetta Interests from certain guaranties and all other liability with respect to the Properties, and the Bank agreeing not to seek to collect any portion of the sums claimed due with respect to the Properties from the Carabetta Interests and any on-going obligations with respect to the Properties to be without recourse to the Carabetta Interests or any of their affiliates, employees, officers, agents, shareholders, directors and/or other representatives. The Combined Interests shall cooperate in obtaining the foregoing release.

0000679

5.   The agreement contemplated by this Term Sheet shall be contingent upon the Combined Interests obtaining the assignment and release of the proofs of claim filed by the Estate of Stanton L. Black, and obtaining any other consent or authority necessary to carry out the terms of the agreement.

6.   The parties will execute such documentation as may be necessary to effectuate the assignment to the Combined Interests contemplated herein, including, but not limited to, resignations as trustees, shareholders, officers or directors of any entity in whose name any Property is currently held, as well as such documentation as may be necessary to effectuate the other transactions contemplated hereby.

7.   The term "Profit" as used herein shall mean an amount equal to the gross proceeds of any Disposition (as defined hereinbelow) less the sum of;

   a.   reasonable and necessary costs of the Disposition; plus

   b.   the cost of all capital improvements to the Properties made after the date of the agreement contemplated hereby and prior to such Disposition; plus

   c.   an amount equal to (i) the then outstanding amount due to the Bank or any successor financer of the Properties with respect to all Properties (or such lesser amount as the Bank or such financer is willinng to accept); plus (ii) the amount of all principal payments made after the date of the agreement contemplated hereby to the Bank or to such successor financer; plus

   d.   all amounts paid after the date of the agreement contemplated hereby and prior to such Disposition on account of environmental remediation or other clean-up of any Property; provided, however, that the Carabetta Interests shall be entitled to be reimbursed pro rata from any amounts recovered by the Combined Interests from third parties on account of environmental liability with respect to any Property until any reductions from Profit pursuant to this paragraph 7d. have been restored. The foregoing proviso shall survive the ten year term set forth in paragraph 2.b. above.

8.   The definition of "Disposition" as used herein is to be agreed upon in the final documentation to be entered into by the parties; it being, however, the intention of the parties that a "Disposition" shall mean a sale of all or any part of a Property and/or any transfer of all or any part of a Property which is tantamount to the sale thereof.

9.   The parties agree to act in good faith in effectuating the agreement of the parties and shall not take any actions to intentionally circumvent the terms of said agreement.

0000680

10.  The parties shall work in good faith to consummate the transactions contemplate hereby not later than April 26, 1996.

Carabetta Interests

By _Joseph F. Carabetta_
Joseph F. Carabetta, as
their authorized representative

Combined Interests

By _John M. Pereira_
John M. Pereira, as
their authorized representative

0000681

## TRANSFER AGREEMENT

This TRANSFER AGREEMENT (this "Agreement") is made and entered into as of _July 16_, 1996, by and among (i) JOSEPH F. CARABETTA ("Carabetta") and COMMERCIAL STREET PROPERTIES, INC. (the "Carabetta Corporation"), a Massachusetts corporation duly organized and existing according to law, each with an address c/o Carabetta Enterprises, Inc., 200 Pratt Street, Meriden, CT, as Assignors (the "Assignors"), and (ii) COMBINED SPECIAL HOLDING LIMITED PARTNERSHIP ("CSHLP"), a Massachusetts limited partnership duly organized and existing according to law, and WELL-COM ASSOCIATES, INC. ("Well-Com"), a Massachusetts corporation duly organized and existing according to law, and WELL-COM, INC., a Massachusetts corporation duly organized and existing according to law, each with an address c/o Combined Properties Inc., 25 Riverview Business Park, 300 Commercial Street, Malden, MA, and any successors or assigns who are an affiliate, parent, beneficiary, shareholder or subsidiary of the foregoing, excepting a bona fide third party purchaser (as defined in Section 5.2 hereof), as Assignees (the "Assignees").

## RECITALS

Reference is made to the following facts which form the background to this Agreement:

A. Carabetta is the holder of 50% of the beneficial interest in 326 Commercial Street Realty Trust, which holds the fee interest in the property known and numbered as 326 Commercial Street, Malden, Massachusetts (the "326 Commercial Property"). The Carabetta Corporation is the owner of an undivided fifty percent (50%) interest as tenant in common in the property known and numbered as 378 Commercial Street, Malden, Massachusetts (the "378 Commercial Property"). The 326 Commercial Property and the 378 Commercial Property are referred to individually as a "Property" and collectively as the "Properties", as the context of this Agreement appropriately would admit or require.

B. The Assignees desire to induce the Assignors to transfer to Assignees the respective interests of the Assignors in the Properties, and the Assignors are willing to transfer their respective interests in the Properties in reliance on the consideration from Assignees set forth herein and on the terms and conditions set forth herein.

NOW, THEREFORE, FOR GOOD AND VALUABLE CONSIDERATION, the receipt, sufficiency and delivery of which are hereby acknowledged, the parties hereto hereby agree as follows:

1.   _Agreement to Transfer._ Simultaneously with the execution of this Agreement, the Assignors are transferring to the Assignees, and the Assignees are accepting the transfer from the Assignors, of the Assignors' interests in the Properties, in accordance with the terms and conditions of this Agreement. The transfer by Carabetta of the beneficial interest in the 326 Commercial Property is being made to CSHLP, and the transfer by the Carabetta Corporation of the undivided fifty percent (50%) interest as tenant in common in the 378 Commercial Property is being made to Well-Com.

GSS- 44486-8
7/11/96 3:21 PM

-1-

0000682

2. _Consideration._ The consideration for the transfer of Assignors' interests in the Properties is: (a) the Assignees' promise to pay to Assignors payment or payments following a Disposition (hereinafter defined) of the Properties pursuant to the terms provided in Section 5 of this Agreement below; and (b) the delivery to the Assignors of the Withdrawal (hereinafter defined) and a General Release (hereinafter defined); and (c) the indemnification obligations, as provided in Section 6 of this Agreement below.

3. _Covenants, Representations and Warranties of the Parties._

3.1    The Assignors make the following representations and warranties to the Assignees:

3.1.1    The Carabetta Corporation has full corporate power and authority to execute and deliver this Agreement and all documents to be executed and delivered by the Carabetta Corporation pursuant to this Agreement (collectively, the "378 Commercial Property Documents) and to perform all obligations of the Carabetta Corporation arising under the 378 Commercial Property Documents. The execution and delivery of the 378 Commercial Property Documents and the consummation by the Carabetta Corporation of the transactions contemplated by the 378 Commercial Property Documents have been duly authorized by all requisite corporate action (including by each of its shareholders and directors) and have been duly executed by an authorized officer on behalf of the Carabetta Corporation. The 378 Commercial Property Documents are the valid and binding obligations of the Carabetta Corporation and are enforceable according to their terms.

3.1.2    Carabetta has executed and delivered this Agreement and all documents to be executed and delivered pursuant to this Agreement (collectively the "326 Commercial Property Documents") The 326 Commercial Property Documents are the valid and binding obligations of Carabetta enforceable according to their terms.

3.1.3    The respective execution and delivery by the Carabetta Corporation and Carabetta of the 378 Commercial Property Documents and the 326 Commercial Property Documents do not in each case (i) violate any law applicable to any of the Assignors; (ii) violate or will violate any order, ruling, writ, judgment, injunction or decree of any governmental entity applicable to the Assignors; (iii) result or will result in a breach of or default under the certificate of incorporation or bylaws of the Carabetta Corporation or conflict or will conflict with or result or will result in any breach of any contractual obligation applicable to any of the Assignors; (iv) result or will result in the imposition of any lien on any of the Properties after the consummation of the transfers contemplated hereby; or (v) result or will result in or give rise to any claim or judgment against any of the Assignors or any of the Assignees.

3.1.4    Carabetta is the holder of 50% of the beneficial interest in the 326 Commercial Property, which interest is free from any lien, pledge or encumbrance. The Carabetta Corporation is holder of an undivided fifty percent (50%) interest as tenant in common in the 378 Commercial Property, which interest is free from any lien, pledge or encumbrance, except (i) the current outstanding indebtedness to Bank of Boston Connecticut (the "Bank") secured by a mortgage on the 378 Commercial Property, and (ii) those matters listed on Schedule B to Owner's Policy of Title Insurance issued by Commonwealth Land Title Insurance Company, December 30, 1986 as Policy Number 107-198905.

GS3- 44488-8
7/11/98 3:21 PM

-2-

0000683

3.1.5    Carabetta has no direct or indirect interest in the Assignees or in any entity controlled by John M. Pereira.

3.2    The Assignees make the following representations and warranties to Assignors:

3.2.1    CSHLP has the full power and authority to execute and deliver this Agreement and to perform all obligations of CSHLP arising under this Agreement. The execution and delivery of the this Agreement and the consummation by CSHLP of the transactions contemplated by this Agreement have been duly executed by an authorized general partner on behalf of CSHLP. This Agreement is the valid and binding obligation of CSHLP and is enforceable according to its terms.

3.2.2    Well-Com has the full corporate power and authority to execute and deliver this Agreement and to perform all obligations of Well-Com arising under this Agreement. The execution and delivery of the this Agreement and the consummation by Well-Com of the transactions contemplated by this Agreement have been authorized by all requisite corporate action and have been duly executed by an authorized officer on behalf of Well-Com. This Agreement is the valid and binding obligation of Well-Com and is enforceable according to its terms.

3.2.3    The respective execution and delivery by CSHLP and Well-Com of this Agreement does not in each case (i) violate any law applicable to any of the Assignees; (ii) violate or will violate any order, ruling, writ, judgment, injunction or decree of any governmental entity applicable to the Assignees; (iii) result or will result in a breach of or default under the limited partnership agreement of CSHLP or the certificate of incorporation or bylaws of Well-Com or conflict or will conflict with or result or will result in any breach of any contractual obligation applicable to any of the Assignees; (iv) result or will result in or give rise to any claim or judgment against any of the Assignees.

3.2.4    Prior to the consummation of the transfers contemplated hereby, CSHLP is the holder of 50% of the beneficial interest in the 326 Commercial Property, which interest is free from any lien, pledge or encumbrance. Prior to the consummation of the transfers contemplated hereby, Well-Com is holder of an undivided forty-nine percent (49%) interest as tenant in common in the 378 Commercial Property and Well-Com, Inc., a Massachusetts corporation of which John M. Pereira is the holder of a majority shareholder interest, is holder of a one percent (1%) interest as a tenant in common in the 378 Commercial Property, which interests are free from any lien, pledge or encumbrance, except (i) the current outstanding indebtedness to Bank of Boston Connecticut (the "Bank") secured by a mortgage on the 378 Commercial Property, and (ii) those matters listed on Schedule B to Owner's Policy of Title Insurance issued by Commonwealth Land Title Insurance Company, December 30, 1986 as Policy Number 107-198905.

3.3    The representation and warranties made herein shall survive the Closing hereunder.

CS3-44488-8
7/11/86 3:21 PM

-5-

0000684

4. Closing.

4.1    Simultaneously herewith, the Assignors are delivering to the Assignees the following documents executed by Assignors to transfer to Assignees the interests of the Assignors in the Properties:

4.1.1    Transfer of Beneficial Interests:  Documents necessary to transfer the beneficial interest of Carabetta in 326 Commercial Street Realty Trust, consisting of an Assignment of Beneficial Interests, Restated Schedule of Beneficial Interests, Resignation of Trustee, in forms attached hereto as Exhibits A, B, and C, and Amendment to Declaration of Trust, and Certificate of Amendment to Declaration of Trust, in form proposed by Assignees and reasonably satisfactory to Assignors.

4.1.2    Transfer of Tenancy in Common Interest:  Documents necessary to transfer the undivided one-half interest as tenant in common in the 378 Commercial Property from the Carabetta Corporation to Well-Com, consisting of a Deed in the form(s) attached hereto as Exhibit(s) D, and including (i) a Clerk's Certificate evidencing the vote of the stockholders and directors of Carabetta Corporation authorizing the transaction contemplated hereby and the authority of the signatory to execute the documents on behalf of the Carabetta Corporation and (ii) either (a) an excise tax lien waiver pursuant to the provisions of Massachusetts General Laws Chapter 62C, Sections 51 and 52 or (b) evidence satisfactory to Assignees that all taxes that could become a lien upon the Carabetta Corporation's interest in the 378 Commercial Property to be transferred hereunder have been paid satisfactory for the purpose of removing any exception to title relating to such lien to Assignees' title insurance company.

4.1.3    General Release:  A General Release by the Assignors of any and all claims against the Assignees and/or any other liability with respect to the Properties (the "General Release") in the form attached hereto as Exhibit E.

4.2    Simultaneously herewith, the Assignees are delivering to the Assignors the following documents executed by Assignees, to the extent applicable:

4.2.1    Withdrawal:  Original copies of withdrawal of bankruptcy proofs of claim in the Carabetta Bankruptcy Case Number 92-51918 by Assignors, as assignees of the Executors of the Estate of Stanton Black (the "Withdrawal").

4.2.2    General Release:  A General Release by the Assignees of any and all claims against the Assignors and/or any other liability with respect to the Properties (the "General Release") in the form attached hereto as Exhibit E. *and the Estate of Black and John Pereira*

5. Payments Upon Disposition.

5.1    In the event the Disposition (hereinafter defined) of either or both of the Properties by the Assignees occurs on or before ___July 16___, 2006 (the "Termination Date"), the Assignees, jointly and severally, shall pay to Carabetta (or his nominee as directed in writing by Carabetta) in the manner and in the amounts calculated as set forth below the following percentage of the Profit (hereinafter defined), if any, resulting from the Disposition of the Properties:

5.1.1  In the event that the Profit from the Disposition of the Properties, either individually or in the aggregate, is greater than $0 and not greater than $5,000,000.00, the Assignees shall pay to Assignors ten percent (10%) of the Profit simultaneously with the receipt by Assignees of cash proceeds of the Disposition resulting in such Profit;

5.1.2  In the event that the Profit from the Disposition of the Properties, either individually or in the aggregate, is greater than $5,000,000.00, the Assignees shall pay to Assignors fifteen percent (15%) of the Profit simultaneously with the receipt by Assignees of cash proceeds of the Disposition resulting in such Profit.

5.1.3.  Consistent therewith, if an amount has been paid to Assignors upon Disposition of one Property under clause 5.1.1, and, thereafter, a Disposition occurs of the remaining Property which would cause the aggregate amount of Profit with respect to both Properties to exceed $5,000,000, the amount payable hereunder shall be calculated under clause 5.1.2 with respect to the aggregate of both Properties at the time of Disposition of the second Property, and any additional amount due to Assignors based on such calculation shall be promptly paid by Assignees to Assignors.

5.1.4  The obligation of Assignees under this Section 5.1 shall terminate upon the earlier to occur of (i) with respect to each Property, the date of the Disposition by Assignee of such Property and the receipt by Assignors of any payment required under Sections 5.1.1, 5.1.2 and/or 5.1.3, and (ii) the Termination Date.

5.2      For the purposes hereof, the term "Disposition" shall mean the occurrence of any of the following events prior to the Termination Date:  (i) a sale of all or any part of a Property, or a transfer of all or any part of a Property which is tantamount to the sale thereof, to a bona fide third party purchaser, including, without limitation, sale of all of the (x) beneficial interest in any trust which is the holder of title to a Property, (y) economic interest in any partnership which is the holder of title to a Property, or (z) stock in any corporation which is the holder of title to a Property; (ii) a sale by foreclosure; (iii) a taking by condemnation of all or substantially all of a Property; (iv) a ground lease having a term of more than fifty years; and/or (v) a refinancing in excess of the amount due the Bank or any successor lender(s) providing mortgage financing for either or both of the Properties which results in any distribution of proceeds in any form and/or amount to the Assignees, and/or any affiliate, parent, beneficiary, shareholder, subsidiary, relative and/or related party or entity of any of the Assignees.  A bona fide third party purchaser shall not include (A) an affiliate, parent, beneficiary, shareholder or subsidiary of the Assignees, (B) John M. Pereira, (C) an entity in which John M. Pereira owns more than a fifty percent interest, or (D) a relative of John M. Pereira and/or Stanton L. Black.

In order to carry out the intention of the parties, and for purposes of determining the amount of proceeds which shall be due and payable to the Assignors pursuant to Section 5 of this Agreement, in the event of any purported "Disposition" to an entity which does not constitute a bona fide third-party purchaser, followed by a Disposition to a bona fide third-party purchaser, both such transactions shall be considered to constitute a single Disposition under the terms hereof.

5.3    The term "Profit" as used in this Section 5 means the gross proceeds (hereinafter defined) received from the Disposition of a Property or from both of the Properties less the sum of:

("Affiliates")

a) Reasonable and necessary costs and expenses incident to realizing such proceeds (any such costs and expenses paid to an affiliate, parent, beneficiary, shareholder or subsidiary of Assignees for services that could have been rendered by third parties shall not exceed the charges which customarily would have been charged by third parties for rendering of such services), including, without limitation, brokerage commissions, legal fees and expenses incurred with respect to third parties, repairs and adjustments, plus

b) The cost of all capital expenditures, including improvements made to either or both of the Properties after the date hereof; plus

c) An amount equal to (i) the then outstanding amounts due the Bank or any successor lender(s) providing mortgage financing for either or both of the Properties (or such lesser amount as the Bank or such successor lender is willing to accept); plus (ii) the amount of all principal payments made after the date hereof to the Bank or any successor lender and costs associated with any refinancing. For the purposes of this clause (c), payments of principal made to the Bank or successor lender shall include both payments under the current indebtedness to the Bank secured by mortgages on the Properties, and payments which may be due to the Bank or successor lender after restructuring of such indebtedness by agreement of Assignees and the Bank, which is anticipated to occur subsequent to the date hereof; provided, however that the amount to be subtracted from the gross proceeds under this Subsection 5.3(c) shall in no event exceed the amount due the Bank or successor lender after the restructuring of the existing indebtedness claimed by the Bank or successor lender (which restructuring is anticipated by John M. Pereira to occur, if at all, subsequent to the date hereof) plus the amount of all principal payments made to the Bank or any successor lender after the date hereof but prior to the date of such restructuring and any refinancing costs; plus

d) All amounts paid or incurred after the date hereof and prior to the date of Disposition on account of environmental remediation of either or both of the Properties; provided, any amounts recovered by either or both of the Assignees from third parties on account of environmental liability with respect to a Property shall be paid ninety percent (90%) to Assignees and ten percent (10%) to Assignors until any reductions from Profit made pursuant to this subparagraph (d) have been restored to Assignors, at which time said amounts shall be paid one hundred percent (100%) to Assignees. The foregoing proviso shall specifically exclude amounts entitled to be retained by the successors or assigns of such Assignees in the event of a Disposition, and shall survive the Termination Date.

0000687

The term "gross proceeds" used in this Section 5 means payments to Assignees of good and immediately available funds. In the event of a Disposition is made for consideration other than payment of good and immediately available funds, such as, without limitation, an obligation to repay purchase money indebtedness or an obligation to pay rent in the future, such Disposition shall not be considered to have resulted in receipt of gross proceeds until if, as and to the extent good and immediately available funds are received by Assignees in partial or full payment of such obligation.

* provided, however, that brokerage fees shall be limited to Affiliates
6% ~~in~~ the aggregate except in any sale to Telecom City
or the City of Malden or any of its agencies. The commission
shall be limited to the following : 3% on the first $5,000,000

GS3-44405-B
7/11/96 3:21 PM

of gross disposition proceeds, and
2% on the next $5,000,000 and 1½%
on the balance above $10,000,000.

0000688

5.4  Within thirty (30) days prior to a Disposition of a Property, the Assignees shall send notice to the Assignors of such intended Disposition which notice shall set forth the entire amount of gross proceeds anticipated to be received from the Disposition and the calculation of exclusions detailed in Section 5.3 (a) - (d) above. Payment of the percentage of Profit, if any, due under Section 5.1 shall be made to Assignors on the date of the receipt by Assignees of cash proceeds of the Disposition resulting in such Profit. In the event each Property is subject to a Disposition at different times, the notice of Assignees to Assignors with respect to the second Disposition shall calculate the amount of proceeds and the calculation of exclusions on the basis of the Disposition of both Properties in the aggregate, and shall include calculation of any adjustment payable under Section 5.1.3 above.

5.5  The Assignees shall have the sole, total discretion to determine all matters with respect to the Properties including, without limitation, matters relating to the financing (including without limitation the restructuring of financing with the Bank or any successor lender), operation, maintenance, leasing, environmental remediation, Disposition and any refinancing of the Properties. The Assignees shall have no fiduciary duty toward the Assignors with respect to such or any other matters, and the Assignees shall have the unfettered and sole discretion to, without limitation, (i) market, set prices and negotiate and execute agreements with respect to Disposition of the Properties; (ii) apply condemnation awards or casualty awards to the rebuilding of the Properties; (iii) conduct environmental remediation with respect to the Properties;  (iv) pursue recovery for environmental liability with respect to the Properties from third parties; (v) enter into agreements with the Bank or other lenders with respect to restructuring the current indebtedness secured by mortgages of the Properties;  (vi) enter into agreements with successor lenders for the refinancing of the Properties; (vii) make repairs or capital improvements to the Properties; and (viii) take any and all other actions with respect to the Properties. Nothing herein shall be construed as establishing a partnership or other relationship among the parties, except as parties to a contractual arrangement. The Assignors acknowledge and agree that (x) the rights created by this Agreement do not constitute an interest in real property, (y) the rights created by this Agreement are not secured by a security interest in real property, and (z) Assignors will not seek a lien, including without limitation, a lis pendens, on the real property subject to this Agreement. The Assignees collectively hereby acknowledge and agree that the Assignors shall be entitled to a lien upon the proceeds of any Disposition (as defined hereinabove), to the extent provided by law, in order to secure the payment and/or payments to be made to the Assignors pursuant to the terms of this Agreement.

6.  Indemnification.  Assignees shall indemnify and hold harmless the Assignors from and against any and all claims against and liabilities of Assignors with respect to the Properties, including, but not limited to, claims and liabilities under Massachusetts General Laws Chapter 21E and any other Massachusetts or federal laws and/or regulations relating to Hazardous Substances, except to the extent that such liabilities are the result of the intentional act or negligence of either of the Assignors, or any party acting by, through or under either of the Assignors. Assignors must provide Assignees with prompt notice of any claim, liabilities or other basis for indemnification hereunder, and shall provide Assignee with a reasonable opportunity to defend against such claim or liabilities. Notwithstanding the foregoing, any liability of Assignees under this Section 6 or otherwise to Assignors shall be limited to the remaining interests of Assignees in the Properties at the time a claim for indemnification is made and any unpaid payment required under Sections 5.1.1, 5.1.2 and/or 5.1.3, and no principal,

partner, trustee, beneficiary, director, officer, shareholder, employee or agent of the Assignees shall, in any case, have any personal liability to Assignors under this Section 6.

7. Condition Precedent. It is a condition precedent to this Agreement that the Assignors receive an unconditional release from Bank of Boston Connecticut with respect to any and all claims arising out of or which could arise in connection with the Properties, substantially in form attached hereto as Exhibit F.

8. General Provisions.

8.1    Notices. Any notice provided for or given hereunder shall be in writing and shall be given either (i) in hand, (ii) by certified or registered mail, return receipt requested, postage prepaid, or (iii) by a national overnight delivery service such as Federal Express and if intended for Assignors, addressed to Assignors at the following address:

> c/o Carabetta Enterprises, Inc.
> 200 Pratt Street
> Meriden, CT
> Attn: Joseph F. Carabetta

with a copy to:

> Bathgate, Wegener & Wolf
> One Airport Road
> Lakewood, NJ
> Attn: Dominic Aprile, Esq.

and if intended for any of the Assignees, addressed to such entity at the following address:

> c/o Combined Properties Inc.
> 25 Riverview Business Park
> 300 Commercial Street
> Malden, MA 02148
> Attn: John M. Pereira

with a copy to:

> Goulston & Storrs, P.C.
> 400 Atlantic Avenue
> Boston, MA 02110
> Attn: Marilyn L. Sticklor, Atty.

or to such other address(es) as either party may, from time to time, by notice as aforesaid designate. Notices shall be deemed given upon the earlier of actual receipt or two (2) days after being mailed, or one (1) day after being deposited with a national overnight delivery service.

GSS-44486-8
7/11/96 3:21 PM

-8-

8.2    Construction. The marginal notes used as headings for the various provisions of this Agreement are used only as a matter of convenience for reference, and are not to be considered a part of this Agreement or to be used in determining the intent of the parties to this Agreement.

8.3    Exhibits. The following Exhibits referred to herein and attached hereto are expressly made and constitute a part of this Agreement:

Exhibit A  Form of Assignment of Beneficial Interests
Exhibit B  Form of Restated Schedule of Beneficial Interests
Exhibit C  Form of Resignation of Trustee
Exhibit D  Form of Deed
Exhibit E  Form of General Release by Assignors and Assignees
Exhibit F  Bank of Boston Release

8.4    Entire Agreement. This Agreement represents the entire agreement of the parties, and all prior negotiations and agreements not herein expressly contained shall be of no force and effect.

8.5    Binding Effect. The terms and conditions hereof shall be binding upon, and inure to the benefit of the respective successors, assigns, heirs and legal representatives of the parties.

8.6    Actions and Other Documents. The parties hereto agree to execute any and all other documents reasonably required to implement the provisions of this Agreement. The parties hereto further agree to act in good faith in effectuating this Agreement and shall not take any actions to intentionally circumvent the terms of this Agreement. In the event a court of competent jurisdiction determines that a party to this Agreement has intentionally circumvented the terms of this Agreement, the aggrieved party shall be entitled to any payments the aggrieved party would have received pursuant to Section 5 in the absence of such intentional circumvention plus reasonable attorneys' fees and expenses. John M. Pereira hereby agrees to guarantee the payment of any amounts due from Assignee to the Assignors pursuant to this Section 8.6, and Carabetta agrees to guarantee the payment of any amounts due from Assignors to the Assignees pursuant to this Section 8.6.

This Agreement shall be governed and construed according to the laws of the Commonwealth of Massachusetts, may be executed in any number of counterparts, each of

-5-

0000691

which shall be deemed an original, and all of which together shall constitute one and the same contract.

WITNESS THE EXECUTION HEREOF, AS AN INSTRUMENT UNDER SEAL, AS OF THE DATE SET FORTH ABOVE.

ASSIGNORS:

_____
JOSEPH F. CARABETTA

ASSIGNEES:

COMBINED SPECIAL HOLDING LIMITED PARTNERSHIP

By: COMBINED SPECIAL HOLDING, INC.,
     its general partner

By _____
Its  President
Hereunto duly authorized

COMMERCIAL STREET
PROPERTIES, INC.

By: _____
Its: _____
Hereunto duly authorized

WELL-COM ASSOCIATES, INC.

By: _____
Its: President
Hereunto duly authorized

WELL-COM, INC.

By: _____
Its: President
Hereunto duly authorized

JOINDER

John M. Pereira joins in the foregoing agreement solely for purposes of acknowledging that he is bound by provisions of Section 8.6 of the foregoing agreement.

_____
JOHN M. PEREIRA

GS3-44488-8
7/11/96 3:21 PM

-10-

0000692

## ASSIGNMENT AGREEMENT

THIS AGREEMENT made as of the _1st_ day of _July_, 1996 by and between Patricia G. Black of Brookline, Norfolk County, Massachusetts and Edward I. Rudman, of Weston, Middlesex County, Massachusetts, Executors of the Estate of Stanton L. Black also known as Stanton Lawrence Black (Commonwealth of Massachusetts, Norfolk County Probate and Family Court, Docket No. 95-P0036EI), as Assignor (the "Assignor"), and COMBINED SPECIAL HOLDING LIMITED PARTNERSHIP, a Massachusetts limited partnership duly organized and existing according to law with a mailing address c/o Combined Properties, Inc. 25 Riverview Business Park, 300 Commercial Street, Malden, MA, as Assignee (the "Assignee").

FOR GOOD AND VALUABLE CONSIDERATION, the receipt and sufficiency of which is hereby acknowledged, the parties hereby agree as follows:

1.    -Assignment.

(a) The Assignor hereby conveys, transfers and assigns absolutely, without recourse or any warranties or representations whatsoever, whether as to validity, allowability, collectability or otherwise, to Assignee all of the Assignor's right, title and interest in and to the Bankruptcy Proof of Claim filed by Stanton L. Black in the Bankruptcy Case Number 95-51918, Joseph F. Carabetta, Debtor, (the "Bankruptcy Proof of Claim") attached hereto as Exhibit A, together with all right to receive any and all sums and proceeds arising out of said Bankruptcy Proof of Claim, from and after the date hereof.

2.    Acceptance.  The Assignee hereby accepts the assignment of the above-assigned rights and interests to the Bankruptcy Proof of Claim from Assignor and agrees to assume all the duties and obligations of Assignor arising thereunder accruing from and after the date hereof.

3.    Miscellaneous.

(a) Counterparts.  This Assignment Agreement may be signed in counterparts, with less than all parties signing a counterpart, but separate counterparts with, collectively, the signatures of both of the Assignor and the Assignee shall constitute an original Assignment Agreement.

(b) Governing Law.  This Agreement shall be governed by the laws of the Commonwealth of Massachusetts.

**0000705**

COMMONWEALTH OF MASSACHUSETTS

*Suffolk*, ss.                                    *man 29th*, 1996

Then personally appeared the above named Edward I. Rudman, Executor of the Estate, and acknowledged the foregoing instrument to be his free act and deed and the free act and deed of the Estate before me.

*M. Joan Kirby*
Notary Public
My Commission Expires *July 24 1998*

COMMONWEALTH OF MASSACHUSETTS

*Middlesex*, ss.                                  *July 1*, 1996

Then personally appeared the above named John M. Pereira, President of Combined Holding, Inc., a Massachusetts corporation, and acknowledged that the foregoing instrument was signed and sealed on behalf of said corporation by authority of its Board of Directors, and said John M. Pereira acknowledged the same to be his free act and deed and the free act and deed of Combined Holding, Inc., before me.

Notary Public
My Commission Expires   12/5/97

**0000706**

GS3- 44926-2
5/28/96 2:25 PM

(c) <u>Successors and Assigns</u>. .The provisions of this Agreement shall be binding upon and inure to the benefit of the respective successors, assigns, heirs, executors and administrators of the parties hereto.

IN WITNESS WHEREOF, the parties hereto have executed this instrument under seal as of the day and year first above written.

ASSIGNOR:                                    ASSIGNEE:

ESTATE OF STANTON L. BLACK          COMBINED SPECIAL HOLDING
                                     LIMITED PARTNERSHIP

By: _____        By:    COMBINED SPECIAL HOLDING,
    Patricia G. Black, as Executor of        INC., its general partner
    the Estate of Stanton L. Black,
    not individually.                        By: _____
                                                 Name:  John M. Pereira
                                                 Its:   President
By: _____                    Hereunto duly authorized
    Edward I. Rudman, as Executor of
    the Estate of Stanton L. Black,
    not individually.


                COMMONWEALTH OF MASSACHUSETTS

    Suffolk            , ss.                        June 7 , 1996

    Then personally appeared the above named Patricia G. Black, Executor of the Estate, and acknowledged the foregoing instrument to be her free act and deed and the free act and deed of the Estate before me.

                                     _____
                                     Notary Public
                                     My Commission Expires

                                          [See next page]


                                                              **0000707**

GS3- 44926-2
5/28/96 2:25 PM

FORM B10
(690)

# FORM 10. PROOF OF CLAIM

## United States Bankruptcy Court
### District of __Connecticut__

## PROOF OF CLAIM

In re (Name of Debtor)

Joseph F. Carabetta

NOTE: This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A "request" or payment of an administrative expense may be filed pursuant to 11 U.S.C § 503.

Case Number

92-51918

Name of Creditor
(The person or entity to whom the debtor owes money or property)

Name and Address Where Notices Should be Sent

Stanton L. Black
c/o Combined Properties, Inc.
25 Riverview Business Park
300 Commercial Street
Malden, MA 02148
Telephone No.    (617) 321-7800

ACCOUNT OR OTHER NUMBER BY WHICH CREDITOR IDENTIFIES DEBTOR

☐ Check box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.

☒ Check box if you have never received any notices from the bankruptcy court in this case.

☐ Check box if the address differs from the address on the envelope sent to you by the court.

THIS SPACE
COURT U

Check here if this claim    ☐ replaces
☐ amends    } a previously filed claim.

**1. BASIS FOR CLAIM**
- ☐ Goods sold
- ☐ Services performed
- ☐ Money loaned
- ☐ Personal injury/wrongful death
- ☐ Taxes
- ☒ Other (Describe briefly)    Amounts due on a personal guarantee and other alleged joint liability for environmental clean-up.

- ☐ Retiree benefits as defined in 11 U.S.C. § 1114(a)
- ☐ Wages, salaries, and compensations (Fill out below)
  Your social security number _____
  Unpaid compensations for services performed
  from _____ to _____

**2. DATE DEBT WAS INCURRED**
December 22, 1987

**3. IF COURT JUDGMENT, DATE OBTAINED:**

**4. CLASSIFICATION OF CLAIM.** Under the Bankruptcy Code all claims are classified as one or more of the following: (1) Unsecured nonpriority, (2) Secured. It is possible for part of a claim to be in one category and part in another. CK THE APPROPRIATE BOX OR BOXES that best describe your claim and STATE THE AMOUNT OF THE CLAIM.

☐ SECURED CLAIM $ _____
Attach evidence of perfection of security interest
Brief Description of Collateral:
☐ Real Estate    ☐ Motor Vehicle    ☐ Other (Describe briefly)

Amount of arrearage and other charges included in secured claim above,
if any $ _____

☒ UNSECURED NONPRIORITY CLAIM $ 933,153 (plus costs)**
A claim is unsecured if there is no collateral or lien on property of the debtor securing the claim or to the extent that the value of such property is less than the amount of the claim.

☐ UNSECURED PRIORITY CLAIM $ _____
Specify the priority of the claim.
- ☐ Wages, salaries, or commissions (up to $ 2000), earned not mo 90 days before filing of the bankruptcy petition or cessation business, whichever is earlier) - 11 U.S.C. § 507(a)(3)
- ☐ Contributions to an employee benefit plan - 11 U.S.C. § 507(a)(4)
- ☐ Up to $ 900 of deposits toward purchase, lease, or rental of services for personal, family, or household use - 11 U.S.C
- ☐ Taxes or penalties of governmental units - 11 U.S.C § 507
- ☐ Other - 11 U.S.C. §§ 507(a)(2), (a)(5) - (Describe briefly)

**5. TOTAL AMOUNT OF CLAIM AT TIME CASE FILED:**
$ 933,153 (plus costs) (Unsecured)    $ _____ (Secured)    $ _____ (Priority)    $ 933,153 (

☐ Check this box if claim includes prepetition charges in addition to the principal amount of the claim. Attach itemized statement of all additional

THIS SPACE
COURT USE

**6. CREDITS AND SETOFFS:** The amount of all payments on this claim has been credited and deducted for the purpose of making this proof of claim. In filing this claim, claimant has deducted all amounts that claimant owes to debtor.    ** See Rider I annexed hereto.

**7. SUPPORTING DOCUMENTS:** Attach copies of supporting documents, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, court judgments, or evidence of security interests. If the documents are not available, explain. If the documents are voluminous, attach a summary.    See attached.

**8. TIME-STAMPED COPY:** To receive an acknowledgment of the filing of your claim, enclose a stamped, self-addressed envelope and copy of this proof of claim.

Date

October 5, 1992

Sign and print the name and title, if any, of the creditor or other person authorized to file this claim (attach copy of power of attorney, if any)

By: _____
Its: _____

0000708

Penalty for presenting fraudulent claim: Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 357

LROK-6/91

RIDER 1
TO PROOF OF CLAIM OF
STANTON L. BLACK ("CLAIMANT")

In addition to the liability described in the Proof of Claim, the Debtor and Claimant may be required to remove certain hazardous materials and oil from 378 Commercial Street, Malden Massachusetts. Debtor is jointly liable with Claimant for the cost of such removal. The cost of such removal is currently unknown.

0000709

# EXHIBIT N

1 0 1 2 9 7 8

## DEED

COMMERCIAL STREET PROPERTIES, INC., a Massachusetts corporation (the "Grantor") whose address is 200 Pratt Street, Meriden CT , for consideration paid of TEN DOLLARS ($10.00) and other good and valuable consideration, grants to WELL-COM ASSOCIATES, INC., whose address is at 300 Commercial Street, Malden, Massachusetts 02148 (the "Grantee"), with QUITCLAIM COVENANTS, an undivided fifty one hundredths percent (50%) interest in the following parcel of land:

SEE EXHIBIT A ATTACHED HERETO AND INCORPORATED HEREIN.

Pursuant to the provisions of Massachusetts General Laws Chapter 21C, Section 7, the Grantor hereby notifies Grantee, its successors and assigns, that a release of hazardous materials has occurred at the premises conveyed herein.

The parcel of land described in Exhibit A is subject to outstanding indebtedness evidenced by a Promissory Note in the original principal amount of $4,500,000.00 to Bank of Boston Connecticut from Commercial Street Properties, Inc., Well-Com, Inc. and Well-Com Associates, Inc., dated December 22, 1987, as amended by Amendment dated March 29, 1990 and as further amended by Amendment dated July 1, 1990 secured by a Mortgage dated December 22, 1987 from Commercial Street Properties, Inc., Well-Com, Inc. and Well-Com Associates, Inc. to Bank of Boston Connecticut filed with Middlesex South Registry District of the Land Court as Document No. 763780, as amended by Amendment dated March 29, 1990 and filed with said District of the Land Court as Document No. 819756 and as further amended by Amendment dated July 1, 1990 and filed with said District of the Land Court as Document No. 827150, which amount exceeds the value of the parcel of land described in Exhibit A as of the date hereof, and, accordingly, no excise stamps need to be affixed to this document in connection with this transaction.

For Grantor's title see deed from Wellington Realty Company Limited Partnership to Commercial Street Properties, Inc., Well-Com, Inc. and Well-Com Associates, Inc. dated December 22, 1986, filed with the Middlesex County Registry District of the Land Court as Document No. 731921 and recorded with the Middlesex County Registry of Deeds in Book

CTF. 178949, Book 1044, PAGE 199

4 0 1 2 9 7 8

Executed as a sealed instrument as of the 19 day of JULY, 1996.

COMMERCIAL STREET PROPERTIES, INC.
a Massachusetts corporation

By: _____
Name: Ralph Carabetta
Its: President/Vice President
Hereunto duly authorized

By: _____
Name: Joseph F. Carabetta
Its: Treasurer/Assistant Treasurer
Hereunto duly authorized

STATE OF CONNECTICUT
COMMONWEALTH OF MASSACHUSETTS )
                                        ) ss.    MERIDEN
COUNTY OF    NEW HAVEN                   )
                                              July 19    , 1996

Then personally appeared the above-named __Ralph Carabetta__, President/Vice
President of COMMERCIAL STREET PROPERTIES, INC., a Massachusetts corporation, and
acknowledged that the foregoing instrument was signed and sealed on behalf of said corporation
by authority of its Board of Directors, and said __officer__, acknowledged said instrument
to be his free act and deed and the free act and deed of COMMERCIAL STREET PROPERTIES,
INC., before me.

_____
Notary Public
My Commission Expires: _____

(acknowledgments continued on next page)

NORMAN E. ISKO
NOTARY PUBLIC
STATE OF CONNECTICUT
MY COMMISSION EXPIRES MARCH 31, 1...
MAY

G82-74331-2
5/20/96 4:51 PM

-2-

5-10

0000150

SENT BY:PHILLIPS LYTLE;    7-21-98 ; 23:26 ;    BATHGATE WEGNER→    2032253146;# 8

1 0 1 2 9 7 5

STATE OF CONNECTICUT
COMMONWEALTH OF MASSACHUSETTS )
                                      ) ss.  MERIDEN
COUNTY OF NEW HAVEN                   )        JULY 19        , 1996

Then personally appeared the above-named  Joseph F. Carabetta
Treasurer/Assistant Treasurer of COMMERCIAL STREET PROPERTIES, INC., a
Massachusetts corporation, and acknowledged that the foregoing instrument was signed and
sealed on behalf of said corporation by authority of its Board of Directors, and said
officer        acknowledged said instrument to be his free act and deed and the free act and
deed of COMMERCIAL STREET PROPERTIES, INC., before me

Norman _____

Notary Public
My Commission Expires: _____

NORMAN E. ISKO
NOTARY PUBLIC
STATE OF CONNECTICUT
MY COMMISSION EXPIRES MARCH 31, 19___

GWB- 742911-2
8/20/96 4:01 PM

6-10

0000151

SENT BY: BATHGATE WEGNER     7-21-99  1:23:24     BATHGATE WEGNER→     2092959148:#  7

1 0 1 2 9 7 8

## EXHIBIT A

The land with the improvements thereon in Malden, Middlesex County, Massachusetts, bounded and described as follows:

| | |
|---|---|
| EASTERLY | by the westerly line of Malden Canal, about five hundred fifty-seven and 28/100 feet; |
| SOUTHERLY | Westerly and Southerly by the middle line of Malden River and Little Creek; |
| WESTERLY | by land now or formerly of the Boston and Maine Railroad, about two hundred twenty-seven and 76/100 feet; |
| NORTHWESTERLY | by lot C¹ as shown on plan hereinafter mentioned, by a curving line, three hundred forty-three and 70/100 feet; and |
| NORTHERLY | by said lot C¹, six hundred seven and 26/100 feet. |

Said land is shown as lot C2 on Land Court Plan No. 5178C.

All of said boundaries, except the lines in said River and Creek are determined by the Land Court to be located as shown on a subdivision plan, as approved by the Court, filed in the land Registration Office, a copy of which is filed in the Registry of Deeds for the South Registry District of Middlesex County in Registration Book 220, Page 457, with Certificate of Title No. 34735.

There is appurtenant to the above described land:

(1)   the right to use for the ordinary purposes of a way or street the whole of Commercial Street in common with others entitled thereto, and also as and for such purposes a strip of land in continuation Southerly of said Commercial Street to the Northerly line of lot B, all as shown on a plan, as modified and approved by the Court, filed in the Land Registration Office, a copy of a portion of which is filed in the Registry of Deeds for the South Registry District of Middlesex County in Registration Book 48, Page 265, with Certificate 7700.

(2)   the right to pass and repass for all usual purposes of a way on and over the thirty-five foot street shown on the last mentioned plan, and the rights to fill and to deposit waste products granted, and as limited and defined, in a certain deed given by the Bell Rock Leather & Tanning Company to the Eastern Metal & Refining Company, dated March 21, 1917, filed and registered as Document 21118.

(3)   the right to pass and repass for all usual purposes of a way on and over a strip of land in extension of said Commercial Street as granted, and as limited and defined, in a certain indenture by and between said Bell Rock Leather & Tanning Company and said Eastern Metal & Refining Company, dated May 29, 1917, filed and registered as Document 21598.

GB3-74291-2
8/30/98 4:51 PM

1 0 1 2 9 7 8

(4)    the right to pass and repass over the parcel of land and flats lying between the Easterly line of said Lots $C^1$ and $C^2$ and the Channel line established by the United States in accordance with the provisions of the United States River and Harbor Act, approved March 4, 1915, and shown on said plan filed with Certificate of Title 34735, and also the right to build docks and wharves on and over said parcel of land and flats, and to excavate the same so far as may be necessary in connection with the erection and maintenance of such docks and wharves, and also the right to lay vessels at such docks and wharves.

Said land and said easements are subject to any and all public rights legally existing in and over said land and in and over the said adjacent land and flats, below mean high water.

There is appurtenant to said land a right of way over the way 40 feet wide as shown on said plan in Registration Book 220, Page 457, as set forth in Document 120831 and subject to the provisions therein.

Part of the above described land is subject to a Grant of Easement from Wellington Realty Corporation to Mystic Valley Gas Company, Document No. 430422, and as acquired by Easement to Boston Gas Company, Document No. 518612.

Part of the above described land is subject to a Taking by the Commonwealth of Massachusetts (Metropolitan District Commission) for drainage purposes, Document No. 438134.

Part of the above described land is subject to an Order and Taking by the Massachusetts Electric Company, Document No. 442358.

The above described land is subject to a Grant of Easement from Wellington Realty Corp. to Massachusetts Electric Company, Document No. 443420.

Part of the above described land is subject to a Grant of Easement and Release of Damages from Wellington Realty Corp. to Massachusetts Electric Company, Document No. 453866.

The above described land is subject to a Taking by the Massachusetts Bay Transportation Authority for Transportation purposes, Document No. 483776.

Part of the above described land is subject to a Taking by the Malden Redevelopment Authority for Urban Renewal Area, Document No. 519982.

Part of the above described land is subject to a Grant of Easement from Wellington Realty Corporation to Massachusetts Electric Company for transmission lines, Document No. 520550.

The above described land is subject to a Taking by the City of Malden (Public Works Commission) of easement for drainage purposes, Document No. 531247.

The above described land is subject to a Taking by the City of Malden (Public Works Commission) for laying out Commercial Street, Document No. 531249.

G83-74381-2
5/22/96 4:01 PM

SENT BY:BATHGATE WEGENER    ; 7-21-98 ; 23:26 ;    BATHGATE, WEGENER    2032959145;# 9

1 0 1 2 9 7 8

The above described land is subject to a Grant of Easement from Malden Redevelopment Authority to Wellington Realty Corp., for perpetual right and easement over lot 38 on plan filed in Registration Book 720, Page 179 to use the Railroad Reservation Area for the benefit of lot 34, Document No. 614171.

Said premises are conveyed together with the benefit of all of Grantor's right, title and interest in and to all rights with respect to bona fide offers set forth in the deed dated December 22, 1986 from Wellington Realty Company Limited Partnership to Commercial Properties, Inc., Well-Com, Inc. and Well-Com Associates, Inc., and filed with the Middlesex County Registry District of the Land Court as Document No. 731923 and recorded with the Middlesex County Registry of Deeds in Book 17074, Page 614, all of which are hereby assigned and transferred.

0382-74391-3
5/20/96 4:01 PM

9-10

0000154

69

## SECRETARY'S CERTIFICATE

The undersigned Secretary of Commercial Street Properties, Inc., a corporation organized under the laws of the Commonwealth of Massachusetts, (the "Corporation"), hereby certifies that the following Resolution was duly adopted by all Directors and Shareholders thereof by Unanimous Written Consent on August 15, 1996 in lieu of a Special Meeting of Directors and Shareholders held for that purpose, as authorized by the laws of the Commonwealth of Massachusetts and the by-laws of the Corporation, and that said Resolution is and remains in full force and effect as of the date hereof:

> RESOLVED: That all Directors and Shareholders of the Corporation hereby ratify those certain Resolutions (copy annexed) duly adopted by unanimous written consent of said Directors and Shareholders on July 11, 1996 with the same force and effect as if duly adopted in such manner and with such formality on this date.

IN WITNESS WHEREOF, the undersigned has executed and delivered this Certificate this 15th day of August, 1996.

_____
Joseph F. Carabetta
Secretary

Misc\Resolutn

0-1-1

0000155

RESOLVED:  That the corporation transfer its undivided 50 percent interest as tenant-in-common in the property known as 378 Commercial Street, Malden, Massachusetts to Well-Com Associates, Inc., a Massachusetts corporation, pursuant to the terms and conditions of a certain written agreement entitled "Transfer Agreement" to be entered into by Joseph F. Carabetta, an individual; the Corporation; Combined Special Holding Limited Partnership, a Massachusetts limited partnership; Well-Com, Inc. , a Massachusetts corporation; and said Well-Com Associates, Inc., a copy of which agreement, duly executed by all such parties, shall be filed in the corporate records of the Corporation maintained at its offices in Meriden, Connecticut; and

RESOLVED:  That negotiations as to the foregoing transfer, the execution and delivery of any and all conveyances, assignments, agreements and other documents to effect the same, and the performance or observance of any and all other matters, causes or things necessary, proper, or appropriate to accomplish the foregoing purposes, be undertaken for and in the name of the Corporation by its Treasurer, Joseph F. Carabetta acting singly, upon such terms and conditions as he deems necessary, proper or appropriate in his sole discretion to effect the foregoing purposes.

RESOLVED: That the corporation transfer its undivided 50 percent interest as tenant-in-common in the property known as 378 Commercial Street, Malden, Massachusetts to Well-Com Associates, Inc., a Massachusetts corporation, pursuant to the terms and conditions of a certain written agreement entitled "Transfer Agreement" to be entered into by Joseph F. Carabetta, an individual; the Corporation; Combined Special Holding Limited Partnership, a Massachusetts limited partnership; Well-Com, Inc., a Massachusetts corporation; and said Well-Com Associates, Inc., a copy of which agreement, duly executed by all such parties, shall be filed in the corporate records of the Corporation maintained at its offices in Meriden, Connecticut; and

RESOLVED: That negotiations as to the foregoing transfer, the execution and delivery of any and all conveyances, assignments, agreements and other documents to effect the same, and the performance or observance of any and all other matters, causes or things necessary, proper, or appropriate to accomplish the foregoing purposes, be undertaken for and in the name of the Corporation by its Treasurer, Joseph F. Carabetta acting singly, upon such terms and conditions as he deems necessary, proper or appropriate in his sole discretion to effect the foregoing purposes.

# EXHIBIT O

## DEED

WELL-COM, INC., a Massachusetts corporation with an address c/o Combined Properties, Inc. at 25 Riverview Business Park, 300 Commercial Street, Malden, Middlesex County, Massachusetts (the "Grantor"), for consideration paid of TEN DOLLARS ($10.00) and other good and valuable consideration, grants to WELL-COM ASSOCIATES LIMITED PARTNERSHIP, a Massachusetts limited partnership with an address c/o Combined Properties, Inc. at 25 Riverview Business Park, 300 Commercial Street, Malden, Massachusetts 02148 (the "Grantee"), with QUITCLAIM COVENANTS, an undivided one one hundredths percent (1%) interest in the following parcel of land:

SEE EXHIBIT A ATTACHED HERETO AND INCORPORATED HEREIN.

Pursuant to the provisions of Massachusetts General Laws Chapter 21C, Section 7, the Grantor hereby notifies Grantee, its successors and assigns, that a release of hazardous materials has occurred at the premises conveyed herein.

The foregoing premises are being conveyed subject to a Mortgage and Security Agreement dated December 22, 1987 from Commercial Street Properties, Inc., Well-Com, Inc. and Well-Com Associates, Inc. to Bank of Boston Connecticut filed with Middlesex South Registry District of the Land Court as Document No. 763780, as amended by Amendment dated March 29, 1990 and filed with said District of the Land Court as Document No. 819756 and as further amended by Amendment dated July 1, 1990 and filed with said District of the Land Court as Document No. 827150, securing a Commercial Real Estate Promissory Note in the original principal amount of $4,500,000.00 to Bank of Boston Connecticut from Commercial Street Properties, Inc., Well-Com, Inc. and Well-Com Associates, Inc., dated December 22, 1987, as amended by Amendment dated March 29, 1990 and as further amended by Amendment dated July 1, 1990, which amount exceeds the value of the parcel of land described in Exhibit A as of the date hereof, and, accordingly, no excise stamps need to be affixed to this document in connection with this transaction.

For Grantor's title, see Certificate of Title No. 178949, in Registration Book 1024, Page 199.

Executed as a sealed instrument as of the 1st day of November, 1996.

WELL-COM, INC.
a Massachusetts corporation

By: _____
Name:
Its: President and Treasurer
Hereunto duly authorized

0000158

COMMONWEALTH OF MASSACHUSETTS    )
COUNTY OF _Suffolk_              )ss
                                )
                                        _November_ 1, 1996

    Then personally appeared the above-named John M. Pereira, President and Treasurer of
WELL-COM, INC., a Massachusetts corporation, and acknowledged that the foregoing
instrument was signed and sealed on behalf of said corporation by authority of its Board of
Directors, and said John M. Pereira acknowledged said instrument to be his free act and deed and
the free act and deed of WELL-COM, INC., before me

                            _Nancy M O'Leary_
                            Notary Public
                            My Commission Expires: _____

                    NANCY M. O'LEARY, Notary Public
                    My Commission Expires October 30, 1998

-2-

GS2- 87559-1
9/24/96 8:31 PM

0000159

## EXHIBIT A

The land with the improvements thereon in Malden, Middlesex County, Massachusetts, bounded and described as follows:

| | |
|---|---|
| EASTERLY | by the westerly line of Malden Canal, about five hundred fifty-seven and 28/100 feet; |
| SOUTHERLY | Westerly and Southerly by the middle line of Malden River and Little Creek; |
| WESTERLY | by land now or formerly of the Boston and Maine Railroad, about two hundred twenty-seven and 76/100 feet; |
| NORTHWESTERLY | by lot $C^1$ as shown on plan hereinafter mentioned, by a curving line, three hundred forty-three and 70/100 feet; and |
| NORTHERLY | by said lot $C^1$, six hundred seven and 26/100 feet. |

Said land is shown as lot C2 on Land Court Plan No. 6178C.

All of said boundaries, except the lines in said River and Creek are determined by the Land Court to be located as shown on a subdivision plan, as approved by the Court, filed in the land Registration Office, a copy of which is filed in the Registry of Deeds for the South Registry District of Middlesex County in Registration Book 220, Page 457, with Certificate of Title No. 34735.

There is appurtenant to the above described land:

(1)     the right to use for the ordinary purposes of a way or street the whole of Commercial Street in common with others entitled thereto, and also as and for such purposes a strip of land in continuation Southerly of said Commercial Street to the Northerly line of lot B, all as shown on a plan, as modified and approved by the Court, filed in the Land Registration Office, a copy of a portion of which is filed in the Registry of Deeds for the South Registry District of Middlesex County in Registration Book 48, Page 265, with Certificate 7700.

(2)     the right to pass and repass for all usual purposes of a way on and over the thirty-five foot street shown on the last mentioned plan, and the rights to fill and to deposit waste products granted, and as limited and defined, in a certain deed given by the Bell Rock Leather & Tanning Company to the Eastern Metal & Refining Company, dated March 21, 1917, filed and registered as Document 21118.

(3)     the right to pass and repass for all usual purposes of a way on and over a strip of land in extension of said Commercial Street as granted, and as limited and defined, in a certain indenture by and between said Bell Rock Leather & Tanning Company and said Eastern Metal & Refining Company, dated May 29, 1917, filed and registered as Document 21598.

-3-

GS2-87559-1
9/24/98 8:31 PM

(4)    the right to pass and repass over the parcel of land and flats lying between the Easterly line of said Lots $C^1$ and $C^2$ and the Channel line established by the United States in accordance with the provisions of the United States River and Harbor Act, approved March 4, 1915, and shown on said plan filed with Certificate of Title 34735, and also the right to build docks and wharves on and over said parcel of land and flats, and to excavate the same so far as may be necessary in connection with the erection and maintenance of such docks and wharves, and also the right to lay vessels at such docks and wharves.

Said land and said easements are subject to any and all public rights legally existing in and over said land and in and over the said adjacent land and flats, below mean high water.

There is appurtenant to said land a right of way over the way 40 feet wide as shown on said plan in Registration Book 220, Page 457, as set forth in Document 120831 and subject to the provisions therein.

Part of the above described land is subject to a Grant of Easement from Wellington Realty Corporation to Mystic Valley Gas Company, Document No. 430422, and as acquired by Easement to Boston Gas Company, Document No. 518612.

Part of the above described land is subject to a Taking by the Commonwealth of Massachusetts (Metropolitan District Commission) for drainage purposes, Document No. 438134.

Part of the above described land is subject to an Order and Taking by the Massachusetts Electric Company, Document No. 442358.

The above described land is subject to a Grant of Easement from Wellington Realty Corp. to Massachusetts Electric Company, Document No. 443420.

Part of the above described land is subject to a Grant of Easement and Release of Damages from Wellington Realty Corp. to Massachusetts Electric Company, Document No. 453866.

The above described land is subject to a Taking by the Massachusetts Bay Transportation Authority for Transportation purposes, Document No. 483776.

Part of the above described land is subject to a Taking by the Malden Redevelopment Authority for Urban Renewal Area, Document No. 519982.

Part of the above described land is subject to a Grant of Easement from Wellington Realty Corporation to Massachusetts Electric Company for transmission lines, Document No. 520550.

The above described land is subject to a Taking by the City of Malden (Public Works Commission) of easement for drainage purposes, Document No. 531247.

The above described land is subject to a Taking by the City of Malden (Public Works Commission) for laying out Commercial Street, Document No. 531249.

I 0 I 3 I 5 I

The above described land is subject to a Grant of Easement from Malden Redevelopment Authority to Wellington Realty Corp., for perpetual right and easement over lot 38 on plan filed in Registration Book 720, Page 179 to use the Railroad Reservation Area for the benefit of lot 34, Document No. 614171.

Said premises are conveyed together with the benefit of all of Grantor's right, title and interest in and to all rights with respect to bona fide offers set forth in the deed dated December 22, 1986 from Wellington Realty Company Limited Partnership to Commercial Street Properties, Inc., Well-Com, Inc. and Well-Com Associates, Inc., and filed with the Middlesex County Registry District of the Land Court as Document No. 731923.

GS2- 87559-1
9/24/98 8:31 PM

-5-

0000162

1 0 1 8 1 5 1

DOCUMENT 1018151

SO. MIDDLESEX LAND COURT
REGISTRY DISTRICT
RECEIVED FOR REGISTRATION

ON 11/25/96 AT 01:48:56  70.00 JEO
NOTED ON:
CERT 0178949   BK   1024 PG 199
NEW CERTIFICATE(S) CREATED:
CERT 0206878   BK   1164 PG 128

70

WELL-COM, INC.

CLERK'S CERTIFICATE

The undersigned hereby certifies on behalf of WELL-COM, INC., a Massachusetts corporation (the "Corporation"), and not individually, that he is the duly elected Clerk of the Corporation and that:

1.  Attached hereto as Exhibit A are true, complete and accurate votes adopted by the sole director and sole stockholder of the Corporation on November 1, 1996 1996 and said votes have not been revised, rescinded, amended or otherwise modified and, as of the date hereof, are in full force and effect.

2.  Each of the following persons is, as of the date hereof, a duly elected, qualified and acting officer of the Corporation holding the office set forth below opposite his name:

|  |  |
|---|---|
| John M. Pereira | President |
| John M. Pereira | Treasurer |
| John M. Pereira | Clerk |

IN WITNESS WHEREOF, the undersigned has on behalf of the Corporation executed this Certificate as a sealed instrument this _1st_ day of _November_, 1996.

John M. Pereira
Clerk

GS2-87823-1

## EXHIBIT A

RESOLVED: That the Corporation be, and it hereby is, authorized to convey to Well-Com Associates Limited Partnership the property commonly known as and numbered 378 Commercial Street, Malden, Massachusetts; that the officers of the Corporation be, and each of them acting singly hereby is, authorized and empowered in the name and on behalf of the Corporation to execute and deliver a deed and such other documents as such executing officer, acting singly, shall deem necessary or desirable on the Corporation's behalf, the execution and delivery of any such document by such officer to be conclusive evidence of such officer's authority to execute and deliver such document and of the executing officer's authority for all purposes and effects and that the same have been authorized, approved and adopted hereby.

RESOLVED: That the Corporation be, and it hereby is, authorized to transfer to 378 Commercial Street Associates, Inc. a 1% general partnership interest in the Well-Com Associates Limited Partnership; that the officers of the Corporation be, and each of them acting singly hereby is, authorized and empowered in the name and on behalf of the Corporation to execute such documents as such executing officer, acting singly, shall deem necessary or desirable on the Corporation's behalf to effect said transfer, the execution and delivery of any such document by such officer to be conclusive evidence of such officer's authority to execute and deliver such document and of the executing officer's authority for all purposes and effects and that the same have been authorized, approved and adopted hereby.

RESOLVED: That the officers of the Corporation be, and each of them acting singly hereby is, empowered, authorized and directed on behalf of the Corporation, to do or cause to be done such other acts and things, including but not limited to the execution and delivery of any document, certificate, agreement or instrument as such officer may deem necessary, proper or advisable in order to effectuate the purposes and carry out the intent of the foregoing resolutions, the doing of any such act or thing and the execution and delivery of any such writing to be conclusively evidenced by such officer's execution and delivery thereof, and that all actions previously taken and all writings previously executed and delivered in connection therewith be and hereby are ratified, confirmed and approved.

GS2-87823-1
9/25/96 10:22 AM

-2-

0000165

EXHIBIT P

1 0 8 1 5 2

71

## DEED

WELL-COM ASSOCIATES, INC., a Massachusetts corporation with an address c/o Combined Properties, Inc. at 25 Riverview Business Park, 300 Commercial Street, Malden, Middlesex County, Massachusetts (the "Grantor"), for consideration paid of TEN DOLLARS ($10.00) and other good and valuable consideration, grants to WELL-COM ASSOCIATES LIMITED PARTNERSHIP, a Massachusetts limited partnership with an address c/o Combined Properties, Inc. at 25 Riverview Business Park, 300 Commercial Street, Malden, Massachusetts 02148 (the "Grantee"), with QUITCLAIM COVENANTS, an undivided ninety-nine one hundredths percent (99%) interest in the following parcel of land:

SEE EXHIBIT A ATTACHED HERETO AND INCORPORATED HEREIN.

Pursuant to the provisions of Massachusetts General Laws Chapter 21C, Section 7, the Grantor hereby notifies Grantee, its successors and assigns, that a release of hazardous materials has occurred at the premises conveyed herein.

The foregoing premises are being conveyed subject to a Mortgage and Security Agreement dated December 22, 1987 from Commercial Street Properties, Inc., Well-Com, Inc. and Well-Com Associates, Inc. to Bank of Boston Connecticut filed with Middlesex South Registry District of the Land Court as Document No. 763780, as amended by Amendment dated March 29, 1990 and filed with said District of the Land Court as Document No. 819756 and as further amended by Amendment dated July 1, 1990 and filed with said District of the Land Court as Document No. 827150, securing a Commercial Real Estate Promissory Note in the original principal amount of $4,500,000.00 to Bank of Boston Connecticut from Commercial Street Properties, Inc., Well-Com, Inc. and Well-Com Associates, Inc., dated December 22, 1987, as amended by Amendment dated March 29, 1990 and as further amended by Amendment dated July 1, 1990, which amount exceeds the value of the parcel of land described in Exhibit A as of the date hereof, and, accordingly, no excise stamps need to be affixed to this document in connection with this transaction.

For Grantor's title, see Certificate of Title No. 178949 in Registration Book 1024, Page 199 and deed from Commercial Street Properties, Inc., registered as Document No. 1012978 and noted on Certificate of Title No. 178949, in Registration Book 1024, Page 199.

Executed as a sealed instrument as of the 1st day of November, 1996.

WELL-COM ASSOCIATES, INC.
a Massachusetts corporation

By: _____
Name:
Its: President and Treasurer
Hereunto duly authorized

-1-

GS2-87556-1
9/24/96 8:34 PM

0000166

1 0 1 8 1 5 2

COMMONWEALTH OF MASSACHUSETTS )
COUNTY OF _Suffolk_ )ss
 )
_November 1_, 1996

Then personally appeared the above-named John M. Pereira, President and Treasurer of
WELL-COM ASSOCIATES, INC., a Massachusetts corporation, and acknowledged that the
foregoing instrument was signed and sealed on behalf of said corporation by authority of its
Board of Directors, and said John M. Pereira acknowledged said instrument to be his free act and
deed and the free act and deed of WELL-COM ASSOCIATES, INC., before me

Notary Public
My Commission Expires: _____

NANCY M. O'LEARY, Notary Public
My Commission Expires October 30, 1998

GS2- 67558-1
9/24/96 8:34 PM

-2-

0000167

1 0 1 3 1 5 2

## EXHIBIT A

The land with the improvements thereon in Malden, Middlesex County, Massachusetts, bounded and described as follows:

| | |
|---|---|
| EASTERLY | by the westerly line of Malden Canal, about five hundred fifty-seven and 28/100 feet; |
| SOUTHERLY | Westerly and Southerly by the middle line of Malden River and Little Creek; |
| WESTERLY | by land now or formerly of the Boston and Maine Railroad, about two hundred twenty-seven and 76/100 feet; |
| NORTHWESTERLY | by lot $C^1$ as shown on plan hereinafter mentioned, by a curving line, three hundred forty-three and 70/100 feet; and |
| NORTHERLY | by said lot $C^1$, six hundred seven and 26/100 feet. |

Said land is shown as lot C2 on Land Court Plan No. 6178C.

All of said boundaries, except the lines in said River and Creek are determined by the Land Court to be located as shown on a subdivision plan, as approved by the Court, filed in the land Registration Office, a copy of which is filed in the Registry of Deeds for the South Registry District of Middlesex County in Registration Book 220, Page 457, with Certificate of Title No. 34735.

There is appurtenant to the above described land:

(1)     the right to use for the ordinary purposes of a way or street the whole of Commercial Street in common with others entitled thereto, and also as and for such purposes a strip of land in continuation Southerly of said Commercial Street to the Northerly line of lot B, all as shown on a plan, as modified and approved by the Court, filed in the Land Registration Office, a copy of a portion of which is filed in the Registry of Deeds for the South Registry District of Middlesex County in Registration Book 48, Page 265, with Certificate 7700.

(2)     the right to pass and repass for all usual purposes of a way on and over the thirty-five foot street shown on the last mentioned plan, and the rights to fill and to deposit waste products granted, and as limited and defined, in a certain deed given by the Bell Rock Leather & Tanning Company to the Eastern Metal & Refining Company, dated March 21, 1917, filed and registered as Document 21118.

(3)     the right to pass and repass for all usual purposes of a way on and over a strip of land in extension of said Commercial Street as granted, and as limited and defined, in a certain indenture by and between said Bell Rock Leather & Tanning Company and said Eastern Metal & Refining Company, dated May 29, 1917, filed and registered as Document 21598.

0000168

1 0 1 8 1 5 2

(4)    the right to pass and repass over the parcel of land and flats lying between the Easterly line of said Lots $C^1$ and $C^2$ and the Channel line established by the United States in accordance with the provisions of the United States River and Harbor Act, approved March 4, 1915, and shown on said plan filed with Certificate of Title 34735, and also the right to build docks and wharves on and over said parcel of land and flats, and to excavate the same so far as may be necessary in connection with the erection and maintenance of such docks and wharves, and also the right to lay vessels at such docks and wharves.

Said land and said easements are subject to any and all public rights legally existing in and over said land and in and over the said adjacent land and flats, below mean high water.

There is appurtenant to said land a right of way over the way 40 feet wide as shown on said plan in Registration Book 220, Page 457, as set forth in Document 120831 and subject to the provisions therein.

Part of the above described land is subject to a Grant of Easement from Wellington Realty Corporation to Mystic Valley Gas Company, Document No. 430422, and as acquired by Easement to Boston Gas Company, Document No. 518612.

Part of the above described land is subject to a Taking by the Commonwealth of Massachusetts (Metropolitan District Commission) for drainage purposes, Document No. 438134.

Part of the above described land is subject to an Order and Taking by the Massachusetts Electric Company, Document No. 442358.

The above described land is subject to a Grant of Easement from Wellington Realty Corp. to Massachusetts Electric Company, Document No. 443420.

Part of the above described land is subject to a Grant of Easement and Release of Damages from Wellington Realty Corp. to Massachusetts Electric Company, Document No. 453866.

The above described land is subject to a Taking by the Massachusetts Bay Transportation Authority for Transportation purposes, Document No. 483776.

Part of the above described land is subject to a Taking by the Malden Redevelopment Authority for Urban Renewal Area, Document No. 519982.

Part of the above described land is subject to a Grant of Easement from Wellington Realty Corporation to Massachusetts Electric Company for transmission lines, Document No. 520550.

The above described land is subject to a Taking by the City of Malden (Public Works Commission) of easement for drainage purposes, Document No. 531247.

The above described land is subject to a Taking by the City of Malden (Public Works Commission) for laying out Commercial Street, Document No. 531249.

GS2- 87558-1
9/24/96 8:34 PM

-4-

1 0 1 3 1 5 2

The above described land is subject to a Grant of Easement from Malden Redevelopment Authority to Wellington Realty Corp., for perpetual right and easement over lot 38 on plan filed in Registration Book 720, Page 179 to use the Railroad Reservation Area for the benefit of lot 34, Document No. 614171.

Said premises are conveyed together with the benefit of all of Grantor's right, title and interest in and to all rights with respect to bona fide offers set forth in the deed dated December 22, 1986 from Wellington Realty Company Limited Partnership to Commercial Street Properties, Inc., Well-Com, Inc. and Well-Com Associates, Inc., and filed with the Middlesex County Registry District of the Land Court as Document No. 731923.

GS2- 37558-1
9/24/96 8:34 PM

-5-

*71*

## WELL-COM ASSOCIATES, INC.

### CLERK'S CERTIFICATE

The undersigned hereby certifies on behalf of WELL-COM ASSOCIATES, INC., a Massachusetts corporation (the "Corporation"), and not individually, that he is the duly elected Clerk of the Corporation and that:

1. Attached hereto as Exhibit A are true, complete and accurate votes adopted by the sole director and sole stockholder of the Corporation on _November 1_, 1996 1996 and said votes have not been revised, rescinded, amended or otherwise modified and, as of the date hereof, are in full force and effect.

2. Each of the following persons is, as of the date hereof, a duly elected, qualified and acting officer of the Corporation holding the office set forth below opposite his name:

| John M. Pereira | President |
| John M. Pereira | Treasurer |
| John M. Pereira | Clerk |

IN WITNESS WHEREOF, the undersigned has on behalf of the Corporation executed this Certificate as a sealed instrument this _1st_ day of _November_, 1996.

_John M. Pereira_
John M. Pereira
Clerk

C 00171

EXHIBIT A

RESOLVED: That the Corporation be, and it hereby is, authorized to convey to Well-Com Associates Limited Partnership the property commonly known as and numbered 378 Commercial Street, Malden, Massachusetts; that the officers of the Corporation be, and each of them acting singly hereby is, authorized and empowered in the name and on behalf of the Corporation to execute and deliver a deed and such other documents as such executing officer, acting singly, shall deem necessary or desirable on the Corporation's behalf, the execution and delivery of any such document by such officer to be conclusive evidence of such officer's authority to execute and deliver such document and of the executing officer's authority for all purposes and effects and that the same have been authorized, approved and adopted hereby.

RESOLVED: That the officers of the Corporation be, and each of them acting singly hereby is, empowered, authorized and directed on behalf of the Corporation, to do or cause to be done such other acts and things, including but not limited to the execution and delivery of any document, certificate, agreement or instrument as such officer may deem necessary, proper or advisable in order to effectuate the purposes and carry out the intent of the foregoing resolutions, the doing of any such act or thing and the execution and delivery of any such writing to be conclusively evidenced by such officer's execution and delivery thereof, and that all actions previously taken and all writings previously executed and delivered in connection therewith be and hereby are ratified, confirmed and approved.

-2-

GS2- 91455-1
9/24/96 8:56 PM

172

# EXHIBIT Q

# BINGHAM, DANA & GOULD LLP

### 150 FEDERAL STREET
### BOSTON, MASSACHUSETTS 02110-1726

TEL: 617.951.8000
FAX: 617.951.8736

Jonathan G. Shapiro
Direct Dial: 617-951-8376

January 16, 1997

COMBINED PROPERTIES, INC.



R JAN 1 7 1997 D
ECEIVE

*VIA FEDERAL EXPRESS*

John M. Pereira
c/o Combined Properties, Inc.
25 Riverview Business Park
300 Commercial Street
Malden, MA 02148

> Re:    *Commercial Street Properties -- Original Documents*

Dear John:

      Reference is made to the Escrow Agreement dated as of December 31, 1996 among Bank of Boston Connecticut (the "Bank"), 326 Commercial Street Associates Limited Partnership ("326 Associates LP"), Well-Com Associates Limited Partnership ("Well-Com Associates LP") (together, the "Escrow Parties") and Bingham, Dana & Gould LLP, as Escrow Agent for the Escrow Parties ("BD&G"), as amended through January 13, 1997 (as amended, the "Escrow Agreement"). BD&G hereby certifies that all of the terms of Section 2 of the Escrow Agreement have been satisfied and releases all of the following documents to you pursuant to Section 3 of the Escrow Agreement (all of which are originals dated as of December 31, 1996, except where indicated):

## Negotiable Instruments/Documents Pertaining to Both Loans

1.    Commercial Real Estate Promissory Note, dated December 20, 1985, from Joseph Carabetta and Stanton Black to Colonial Bank for $1,400,000, with three amendments thereto.

2.    Lost Promissory Note Affidavit from the Bank of Boston Connecticut, dated January 9, 1997, relating to a certain Commercial Real Estate Promissory Note, dated December 22, 1987, from Commercial Street Properties, Inc., Well-Com, Inc., and Well-Com Associates, Inc. to Bank of Boston Connecticut for $4,500,000 (as amended to date).

3.    Release of Guaranties, dated as of January 9, 1997, from the Bank of Boston Connecticut, releasing obligations of Stanton Black (under two guaranties) of payment and performance of the two notes referenced above.

4.    $1,000,000 Limited Guaranty executed by John Pereira in favor of the Bank.

**0000747**

BOSTON          HARTFORD          WASHINGTON          LONDON

BOS-BUS:352954.1

BINGHAM, DANA & GOULD LLP

John M. Pereira, President
326 Associates GP
Well-Com Associates GP
January 16, 1997
Page 2

5.    $1,000,000 Joint and Several Limited Guaranty executed by Morton Ruderman in favor of the Bank.

6.    $1,000,000 Joint and Several Limited Guaranty executed by Arthur Epstein in favor of the Bank.

7.    Legal Opinion of Goulston & Storrs PC as to the validity and enforceability of the Loan Documents, the Limited Guaranty and the Joint and Several Limited Guaranties.

## 326 Commercial Street Documents

8.    Override Agreement among 326 Associates LP and the Bank.

9.    Copy of Tranche A Note executed by 326 Associates LP in favor of the Bank.

10.   Copy of Tranche B Note executed by 326 Associates LP in favor of the Bank.

11.   Amended and Restated Mortgage and Security Agreement between 326 Associates LP and the Bank.

12.   Amended and Restated Assignment of Rents and Leases between 326 Associates LP and the Bank.

13.   Unconditional Guaranty executed by 326 Associates LP in favor of the Bank.

14.   General Partner's Certificate as to power and authority of 326 Commercial Street Associates, Inc. ("326 Associates GP") to act on behalf of 326 Associates LP and accuracy of Partnership Certificate and Partnership Agreement of 326 Associates LP.

15.   Clerk's Certificate as to Incumbency, Directors Resolutions, Articles of Organization and Bylaws of 326 Associates GP.

16.   Copy of Good Standing Certificate of 326 Associates LP from the Massachusetts Secretary of the Commonwealth.

**0000748**

BINGHAM, DANA & GOULD LLP

John M. Pereira, President
326 Associates GP
Well-Com Associates GP
January 16, 1997
Page 3

17.  Copy of Good Standing Certificate of 326 Associates GP from the Massachusetts Secretary of the Commonwealth.

18.  Copy of Title Policy Amendment and Date-Down Endorsement by Commonwealth Land Title Insurance Co. on 326 Commercial Street, Malden, MA, dated as of January 16, 1997 (January 13, 1997 with respect to unregistered land).

19.  Copy of Perfection Certificate of 326 Associates LP.

20.  Copies of UCC Financing Statements for personal and fixture property, executed by 326 Associates LP and the Bank.

**378 Commercial Street Documents**

21.  Override Agreement among Well-Com Associates LP and the Bank.

22.  Copy of Tranche A Note executed by Well-Com Associates LP in favor of the Bank.

23.  Copy of Tranche B Note executed by Well-Com Associates LP in favor of the Bank.

24.  Amended and Restated Mortgage and Security Agreement between Well-Com Associates LP and the Bank.

25.  Amended and Restated Assignment of Rents and Leases between Well-Com Associates LP and the Bank.

26.  Unconditional Guaranty executed by Well-Com Associates LP in favor of the Bank.

27.  General Partner's Certificate as to power and authority of 378 Commercial Street Associates, Inc. ("Well-Com Associates GP") to act on behalf of Well-Com Associates LP and accuracy of Partnership Certificate and Partnership Agreement of Well-Com Associates LP.

28.  Clerk's Certificate as to Incumbency, Directors Resolutions, Articles of Organization and Bylaws of Well-Com Associates GP.

**0000749**

BINGHAM, DANA & GOULD LLP

John M. Pereira, President
326 Associates GP
Well-Com Associates GP
January 16, 1997
Page 4

29.    Copy of Good Standing Certificate of Well-Com Associates LP from the
       Massachusetts Secretary of the Commonwealth.

30.    Copy of Good Standing Certificate of Well-Com Associates GP from the
       Massachusetts Secretary of the Commonwealth.

31.    Copy of Title Policy Amendment and Date-Down Endorsement by
       Commonwealth Land Title Insurance Co. on 378 Commercial Street,
       Malden, MA, dated January 13, 1997 (January 16, 1997 with respect to the
       fixture filing).

32.    Copy of Perfection Certificate of Well-Com Associates LP.

33.    Copies of UCC Financing Statements for personal and fixture property,
       executed by Well-Com Associates LP and the Bank.

Please sign the enclosed copy of this letter acknowledging receipt of each of the
documents set forth above and return it in the enclosed self-addressed stamped envelope at
your earliest convenience. Please note that we will forward to you copies of the final title
policy amendments as soon as we receive them. If you have any questions, please do not
hesitate to give me a call.

Very truly yours,

Jonathan G. Shapiro

Enclosures
cc:    Jonathan K. Bernstein, Esq.
       (w/o enclosures)

RECEIPT ACKNOWLEDGED:

_____
John M. Pereira, President
326 Associates GP
Well-Com Associates GP

**0000750**

BOS-BUS:352954.1

OVERRIDE AGREEMENT

between

WELL-COM ASSOCIATES LIMITED PARTNERSHIP

and

BANK OF BOSTON CONNECTICUT

December 31, 1996

**0000751**

BOS-BUS:345366.7

## OVERRIDE AGREEMENT

**OVERRIDE AGREEMENT** (this "Agreement") made as of December 31, 1996 by and between **Well-Com Associates Limited Partnership**, a Massachusetts limited partnership with a principal place of business at 25 Riverview Business Park, 300 Commercial Street, Malden, Massachusetts 02148 (the "Borrower") and **Bank of Boston Connecticut**, a Connecticut state-chartered savings bank with its principal banking office at 100 Pearl Street, Hartford, Connecticut 06103 (the "Bank").

**WHEREAS,** the Borrower is the owner of certain real property or real properties in Malden, Massachusetts more particularly described on Exhibit A attached hereto (the "Property"), which Property is presently improved by a commercial building, off-street parking and other related structures and improvements (together with the Property, the "Project");

**WHEREAS,** the Bank made a certain commercial real estate loan (the "Loan") jointly and severally to (i) Commercial Street Property, Inc., a corporation organized and existing under the laws of the Commonwealth of Massachusetts ("Commercial Street"), (ii) Well-Com, Inc., a corporation organized and existing under the laws of the Commonwealth of Massachusetts ("Well-Com") and (iii) Well-Com Associates, Inc., a corporation organized and existing under the laws of the Commonwealth of Massachusetts ("Well-Com Associates" and together with Commercial Street and Well-Com, the "378 Group"), collectively the predecessors in interest to the Borrower, which loan is evidenced by that certain Commercial Real Estate Promissory Note dated December 22, 1987 in the original principal amount of Four Million Five Hundred Thousand and no/100 dollars ($4,500,000.00), as amended by (i) that certain Amendment to Commercial Real Estate Promissory Note dated March 29, 1990 and (ii) that certain Second Amendment to Commercial Real Estate Promissory Note dated July 1, 1990 (as amended and in effect, the "Original Note");

**WHEREAS,** the Original Note is secured by (i) that certain Mortgage and Security Agreement dated December 22, 1987 by and between the 378 Group and the Borrower filed with the Middlesex South Registry District of the Land Court (the "Land Court") as Document No. 763780 encumbering the Project, as amended by (a) that certain Amendment to Mortgage and Security Agreement and Collateral Assignment of Leases and Rents dated March 30, 1990 filed with the Land Court as Document No. 819756 and (b) that certain Second Amendment to Mortgage and Security Agreement and Collateral Assignment of Leases and Rents dated July 1, 1990 filed with the Land Court as Document No. 827150 (as amended and in effect, the "Original Mortgage and Security Agreement") and (ii) that certain Collateral Assignment of Leases and Rents dated December 22, 1987 by and between the 378

**0000752**

-2-

Group and the Bank filed with the Land Court as Document No. 7637981 as amended by (a) that certain Amendment to Mortgage and Security Agreement and Collateral Assignment of Leases and Rents dated March 30, 1990 filed with the Land Court as Document No. 819756 and (b) that certain Second Amendment to Mortgage and Security Agreement and Collateral Assignment of Leases and Rents dated July 1, 1990 filed with the Land Court as Document No. 827150 (as amended and in effect, the "Original Assignment", and together with the Original Mortgage and Security Agreement, (the "Original Security Documents" and, together with the Original Note, the "Original Loan Documents");

WHEREAS, the Original Note has matured as of December 31, 1990 and has become due and payable in full according to the terms thereof;

WHEREAS, the Borrower has requested that the Bank restructure the Loan, and the Bank is willing to restructure the Loan by splitting the total outstanding principal balance of the Original Note into two tranches, one of which the parties intend to be serviced by the net operating income presently generated by the Project, and the other of which the parties intend to be serviced by Project sales or refinancing proceeds, if any, received prior to December 31, 1999, subject to certain limitations as more fully set forth in this Agreement;

WHEREAS, as a condition precedent to the Bank agreeing to restructure the Loan, the Bank has required the Borrower to amend and restate the Original Note by separating the Original Note into a Tranche A Note (the "Tranche A Note") and a Tranche B Note (the "Tranche B Note", and together with the Tranche A Note, the "Restated Notes") to reflect the restructuring contemplated by this Agreement;

WHEREAS, as a further condition precedent to the Bank agreeing to restructure the Loan, the Bank has required the Borrower to amend and restate (i) the Original Mortgage and Security Agreement (as amended and restated, the "Restated Mortgage and Security Agreement") and (ii) the Original Assignment (as amended and restated, the "Restated Assignment" and, together with the Restated Mortgage and Security Agreement, the "Restated Security Documents" and collectively with the Restated Notes and this Agreement, the "Loan Documents"), to reflect the restructuring contemplated by this Agreement, the bifurcation of the Original Note into the Restated Notes and certain changes in ownership of the Property referred to therein;

WHEREAS, 326 Commercial Street Associates Limited Partnership, a limited partnership organized and existing under the laws of the Commonwealth of Massachusetts (the "Related Borrower") is party to an Override Agreement with the Bank dated concurrently herewith (the "Related Override Agreement"), pursuant to which the Related Borrower has agreed to restructure a certain commercial real estate loan (as described therein, the "Related Loan") which was made to finance a certain

0000753

-3-

Project (as defined therein, the "Related Project") and which is evidenced by a certain Tranche A Note (as defined in the Related Override Agreement, the "Related Tranche A Note"), a certain Tranche B Note (as defined in the Related Override Agreement, the "Related Tranche B Note", and together with the Related Tranche A Note, the "Related Notes") and secured by a certain Restated Mortgage and Security Agreement (as defined in the Related Override Agreement, the "Related Mortgage and Security Agreement") and a certain Restated Assignment of Leases and Rents (as defined in the Related Override Agreement, the "Related Assignment" and, together with the Related Mortgage and Security Agreement, the "Related Security Documents" and, collectively with the Related Notes and the Related Override Agreement, the "Related Loan Documents");

WHEREAS, as a further condition precedent to the Bank agreeing to restructure the Loan, the Bank has required the Borrower to enter into an Unconditional Guaranty (the "Unconditional Guaranty") with the Bank dated concurrently herewith, pursuant to which the Borrower will guaranty payment and performance of (a) all of the Related Borrower's Obligations under the Related Tranche A Note and (b) all of the Related Borrower's Obligations under the Related Tranche B Note, as provided herein and therein;

WHEREAS, as a further condition precedent to the Bank agreeing to restructure the Loan, the Bank has required each of Morton Ruderman, an individual and Arthur Epstein, an individual (each a "Joint and Several Guarantor" and, together, the "Joint and Several Guarantors") to enter into limited guaranties (each a "Joint and Several Limited Guaranty" and, together, the "Joint and Several Limited Guaranties"), pursuant to which they will jointly and severally guaranty payment and performance of up to one million dollars ($1,000,000) of (a) all of the Borrower's Obligations under the Tranche A Note and the Related Tranche A Note, and (b) against misapplication by the Borrower of any proceeds of a sale or refinance above a certain threshold required to be paid to the Bank under the Tranche B Note and the Related Tranche B Note, as provided in Section 2.2 of this Agreement and the Related Override Agreement;

WHEREAS, as a further condition precedent to the Bank agreeing to restructure the Loan, the Bank has required John Pereira, an individual (together with the Joint and Several Guarantors, the "Individual Guarantors"), to enter into a limited guaranty (the "Pereira Limited Guaranty", and, together with the Joint and Several Limited Guaranties and the Unconditional Guaranty, the "Guaranties"), pursuant to which he will guaranty payment and performance of up to one million dollars ($1,000,000) of (a) all of the Borrower's Obligations under the Tranche A Note and the Related Tranche A Note, and (b) against misapplication by the Borrower of any proceeds of a sale or refinance above a certain threshold required to be paid to the Bank under the Tranche B Note and the Related Tranche B Note, as provided in Section 2.2 of this Agreement and the Related Override Agreement; and

**0000754**

-4-

WHEREAS, as a further condition precedent to the Bank agreeing to restructure the Loan, the Bank has required the Borrower, concurrently herewith, to pay down one hundred eighty-eight thousand one hundred and twenty-nine dollars ($188,129) of the Outstanding Obligations (as defined below) of the Loan (the "Paydown");

NOW, THEREFORE, in consideration of the Paydown, the mutual covenants set forth herein, and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged by both parties, the Borrower and the Bank hereby agree as follows:

### ARTICLE I

1.1.    Ratification; Outstanding Obligations.  The Borrower and the Bank agree that all of the obligations of the Borrower evidenced by or otherwise arising under the Original Note and the Original Security Documents are ratified and confirmed and in full force and effect in all respects, as modified or amended by the terms of the Agreement, the Restated Notes or the Restated Security Documents. As of the date of this Agreement, the Borrower is indebted to the Bank, pursuant to the terms of the Original Note and the Original Security Documents, for three million nine hundred thousand and five and 53/100 dollars ($3,900,005.53) (the "Outstanding Obligations"):  The Borrower represents, warrants and acknowledges that, prior to giving effect to the transactions contemplated herein, all of the Outstanding Obligations are now due and payable in full, and that no counterclaim, right of off-set or defense exists with respect to such obligations. Contemporaneously herewith, the Bank is (i) executing and delivering written releases of the guaranty of Stanton L. Black (including, without limitation, his successors and assigns) of the obligations under the Original Loan Documents and (ii) returning the Original Note to the Borrower.

1.2.    Payment Terms.  Notwithstanding the terms and provisions contained in the Original Note with respect to the rate (or rates) of interest payable on outstanding principal or the amounts or times of any periodic payments of principal or interest, the Borrower shall pay to the Bank the amounts set forth in this Section 1.2.

(a)    Tranche A.    An amount equal to two million dollars ($2,000,000) of total Outstanding Obligations shall be referred to as "Tranche A". Tranche A shall bear interest ("Tranche A Interest") at an annual rate of two and three quarters (2 3/4%) percent over the five year Treasury Bond rate (the "Treasury Rate") as published in the Wall Street Journal on December 31, 1996 or the date next prior to December 31, 1996 on which such rate is published, such rate to change on December 31, 2001 to the rate which is two and three quarters (2 3/4%) over the Treasury Rate as published in the Wall Street Journal on December 31, 2001 or the

**0000755**

-5-

date next prior thereto on which such rate is published, or if the Wall Street Journal is not published on either date, then the Treasury Rate as published by a daily business journal of similar standing which meets the approval of the Borrower and the Bank, which approval in either case shall not be unreasonably withheld (the "Tranche A Rate"). For the first five years of the Loan, principal and interest on Tranche A Note shall be payable monthly for the calendar month based upon a twenty (20) year direct reduction amortization schedule consisting of equal consecutive monthly installments of seventeen thousand eight hundred and two and 03/100 dollars ($17,802.03) each, due in arrears on the first (1st) day of each and every calendar month (a "Monthly Payment Date") commencing on February 1, 1997 through and including January 1, 2002. On December 31, 2001, the Tranche A Rate shall be recalculated to adjust for the new Treasury Rate as set forth above and beginning on February 1, 2002 through and including December 1, 2006, principal and interest (at the recalculated Tranche A Rate) on the then-outstanding principal amount of the Tranche A Note shall be payable monthly for the calendar month based upon a fifteen (15) year direct reduction amortization schedule consisting of equal consecutive monthly installments, due in arrears on the Monthly Payment Date. All outstanding Tranche A principal and accrued interest shall be due and payable in full on December 31, 2006 (the "Tranche A Maturity Date"). Prepayments made on or prior to December 31, 1999 may be made without premium or penalty, and will be applied to principal. Prepayments made after December 31, 1999 must be accompanied by a prepayment premium calculated as set forth below:

| Year | Premium |
|------|---------|
| 2000 through 2002 | 3% of amount prepaid |
| 2003 through 2004 | 2% of amount prepaid |
| 2005 through December 30, 2006 | 1% of amount prepaid |

(b) Tranche B. The remaining portion of the total Outstanding Obligations (after subtracting the Paydown), equal to one million seven hundred and eleven thousand eight hundred and seventy-seven dollars ($1,711,877) shall be referred to as "Tranche B". Principal under Tranche B shall accrue interest ("Tranche B Interest") at the Tranche A Rate as of the date hereof (the "Tranche B Rate"), and, if the Tranche B Note has not yet been cancelled as provided in Section 1.2(e) hereof, upon the adjustment of the Tranche A Rate on the fifth anniversary of the date hereof, the Tranche B Rate shall be adjusted to equal the adjusted Tranche A Rate, and shall be payable (subject to the limitations of Section 1.2(d) hereof) at the Tranche B Maturity Date, as defined below. All outstanding Tranche B principal and interest shall be payable solely from Early Sale Proceeds (as defined in Section 2.2. hereof) on December 31, 1999 (the "Tranche B Maturity Date"), unless any of the following events occurs prior to such date (each a "Tranche B Event"):

0000756

-6-

(i)    commencement of any bankruptcy, debt consolidation, reorganization or similar insolvency proceedings by or against, or any proceeding for the appointment of a receiver for or trustee for the benefit of creditors of, the Borrower, the General Partner, or any individual, corporation, limited partnership or other entity owning or controlling fifty percent (50%) or more of the outstanding general partnership interest, or other equity ownership interest in the Borrower;

(ii)    if the Borrower, or any person or entity claiming by or through the Borrower ever commences, joins in, assists, cooperates or participates as an adverse party or adverse witness in any suit or other proceeding against the Bank questioning the validity of, or attempting to disavow, the Loan Documents or the Guaranties or alleging that the Loan Documents or the Guaranties or any of them are unauthorized or unenforceable; or

(iii)    any of the claims of the Bank under any provision of this Agreement or any of the other Loan Documents or the Guaranties as originally executed shall be subordinated to the claims of any other creditor of the Borrower, the General Partner, or any individual, corporation, limited partnership or other entity owning or controlling fifty percent (50%) or more of the outstanding general partnership interest, or other equity ownership interest in the Borrower to the extent that any such claims of the Bank are based upon, arising under, or as a result of the transactions contemplated by this Agreement or any of the other Loan Documents.

Upon a Tranche B Event, this Agreement and the Tranche B Note shall be immediately deemed amended and restated so that (i) the Tranche B Maturity Date is the same as the Tranche A Maturity Date, subject to acceleration of both the Tranche A Maturity Date and the Tranche B Maturity Date resulting from an Event of Default, and (ii) there shall be full recourse to the assets of the Borrower for payment of the full amount of the Tranche B Note and the accrued Tranche B Interest on the Tranche B Maturity Date (as it may be accelerated). Prepayments of Tranche B principal may be made voluntarily at any time without premium or penalty.

·(c)    <u>Default Interest Rate</u>; <u>Interest Computations</u>. If any Event of Default shall have occurred hereunder, the Tranche A Rate and Tranche B Rate shall be adjusted to add four percent (4.0%) to the Tranche A Rate and Tranche B Rate in effect immediately prior to such Event of Default and such adjusted Rates shall be known as the "<u>Tranche A Default Rate</u>" or "<u>Tranche B Default Rate</u>", as the case may

0000757

-7-

be. All computations of interest relating to the Loan, including the Tranche A Rate, the Tranche B Rate, the Tranche A Default Rate and the Tranche B Default Rate shall be based upon a 360 day year and paid for the actual number of days elapsed.

(d)    Restriction on Payments of Tranche B. Notwithstanding anything else to the contrary in this Agreement or any of the other Loan Documents, Tranche B Principal and Tranche B Interest shall be payable solely from Early Sale Proceeds (as defined in Section 2.2 hereof), except upon the occurrence of a Tranche B Event.

(e)    Cancellation of Tranche B Note. If, and only if, no payments are then due and owing in respect of the Tranche B Note pursuant to Section 2.2 hereof at the Tranche B Maturity Date and if no Tranche B Event shall have occurred on or before the Tranche B Maturity Date, then at the Tranche B Maturity Date the Tranche B Note shall be returned to the Borrower marked "Cancelled" and all obligations of the Borrowers with respect to Tranche B hereunder and in the other Loan Documents shall be released and forgiven and deemed satisfied in full, regardless of any Tranche B Principal or Tranche B Interest remaining unpaid on such Tranche B Note.

1.3.    Operating Accounts. The Borrower shall keep all of its general operating accounts (the "Operating Accounts") at The First National Bank of Boston until such time as the Bank is able to receive deposits from the Borrower in Boston and credit them to the Borrower's account at the Bank on the same Business Day, at which time the Borrower shall transfer the Operating Accounts to the Bank.

1.4.    Reserve Account. The Borrower, together with the Related Borrower, shall establish a blocked account with the Bank (the "Reserve Account"), and the Borrower hereby grants to the Bank a continuing security interest in, and pledges and assigns to the Bank, all monies in the Reserve Account and acknowledges that the Related Borrower has done the same pursuant to the Related Override Agreement. From and after the date hereof, until the Reserve Account has an aggregate balance of $300,000 and whenever the balance of such account, having previously reached $300,000, shall fall below such amount through expenditures made in accordance with this Section 1.4, and until such time as the balance of the Reserve Account shall again be at least $300,000, (i) the Borrower shall within ten (10) days after the end of each calendar quarter deposit all Excess Cash Flow (as defined below) into the Reserve Account until reaching its Percentage (as defined below) of the difference between the balance of the Reserve Account and $300,000 (the "Reserve Deficiency") and (ii) the Borrower shall not make any Distributions (as defined below). The Borrower acknowledges that the Related Borrower will, pursuant to the Related Override Agreement, contribute the remainder of the Reserve Deficiency, provided, however, that if the Related Borrower has insufficient cash flow to pay its Percentage (as defined below) of the Reserve Deficiency, then the Borrower shall pay such additional money from its Excess Cash Flow (to the extent such excess money exists) to make up the difference. For the purposes of this Agreement, "Percentage"

0000758

-8-

shall mean the amount of indebtedness of the Borrower pursuant to the Restated Notes divided by the same amount plus an amount equal to the indebtedness of the Related Borrower pursuant to the Related Notes. The Borrower's Percentage plus the Related Borrower's Percentage shall equal one hundred percent (100%).

For purposes of this Agreement, "Excess Cash Flow" shall mean the amount by which the gross cash receipts from operations of the Borrower from the Project (exclusive of refinancing proceeds) for any calendar month prior to the Tranche A Maturity Date exceed the aggregate of:

(a)     all amounts paid in cash by the Borrower on account of real estate, income and other taxes due from the Borrower or any of its partners during such calendar quarter in connection with the Project;

(b)     all ordinary and necessary operating costs and expenses consistent with past practices in the management of the Project (including management fees not to exceed five percent (5%) of gross rents ("Permitted Management Fees") paid in cash by the Borrower during such calendar quarter in the operation of the Project. Security deposits from tenants returned to tenants in cash shall be treated as an operating expense to the extent the same were included as part of the gross cash receipts of the Borrower from the Project;

(c)     any deposits into the Reserve Account during such calendar quarter pursuant to the terms of this Agreement;

(d)     capital expenses on the Project made during such calendar quarter;

(e)     payments with respect to Tranche A made during such calendar quarter; and

(f)     any fees, expenses or other amounts paid to the Bank during such calendar quarter pursuant to the terms hereof or the terms of any of the other Loan Documents.

For purposes of this Agreement, "Distribution" or "Distributions" shall mean any payment or payments by the Borrower to any person, including, without limitation, the General Partner, the Guarantors and any limited partner of the Borrower, of any dividend, salary, bonus, partnership interest or other payment on or in respect of any equity ownership interest in the Project or in the Borrower or any repurchase of any such interest, but excluding the payment of any (i) Permitted Management Fees and (ii) distributions to partners of the Borrower in order to pay taxes on the Borrower's profits.

**0000759**

-9-

So long as the Reserve Account shall have a balance equal to or greater than $300,000, the Borrower shall be entitled to retain all Excess Cash Flow and shall be permitted to make Distributions. The Bank may, in its discretion, require the Borrower to maintain appropriate additional reserve escrows with the Bank for payment of expenses due semi-annually or periodically, for taxes and utility assessments.

Funds from the Reserve Account may be used only for (a) a payment to the Bank required by the Loan Documents or the Related Loan Documents (a "Debt Service Payment") or (b) any improvement, replacement or expense (whether capital or non-capital) reasonably related to the Project or the Related Project required pursuant to an Approved Lease or in connection with the lease-up of a new tenant or the renewal of an existing lease (a "Tenant Improvement"). The Borrower or the Related Borrower shall submit a certificate to the Bank in each instance in which either desires to withdraw funds from the Reserve Account, specifying, in the case of a Debt Service Payment, that the Borrower or the Related Borrower, as the case may be, possesses insufficient cash to pay such Debt Service Payment without using funds from the Reserve Account, and in the case of a Tenant Improvement, (a) that such Tenant Improvement is required by an Approved Lease or required in connection with the lease-up of a new tenant or the renewal of an existing lease and (b) that the requested funds shall be used solely for such Tenant Improvement. Upon receipt of a certificate requesting funds for a Debt Service Payment and provided that no Event of Default has occurred, the Bank shall, by the end of the following Business Day, apply the appropriate funds against amounts owing pursuant to this Agreement or the other Loan Documents as requested by the Borrower or the Related Borrower in such certificate. Upon receipt of a certificate requesting funds for a Tenant Improvement and provided that no Event of Default has occurred, the Bank shall disburse such funds to the Borrower or the Related Borrower by the end of the following Business Day.

1.5. Leases. The Borrower shall promptly notify the Bank of the identity of any proposed tenant, together with the proposed terms of any lease contemplated to be entered into with such proposed tenant. The Borrower shall not lease any space in the Project except to creditworthy tenants approved by the Bank pursuant to leases ("Approved Leases") the economic and other material terms of which are acceptable in form and substance to the Bank; provided, however, that approval by the Bank with respect to both leases and tenants (including the creditworthiness of such tenants) shall not be unreasonably withheld. The Borrower will provide the Bank with true, accurate, complete and legible copies of any leases or other agreements relating to occupancy or other use of space in the Project in effect at the time of the execution and delivery of this Agreement upon such execution and delivery, and thereafter promptly upon request. The Bank shall have the right, from time to time, upon reasonable notice to the Borrower to inspect and copy all ledgers, books of

**0000760**

-10-

account or other records of the Borrower with respect to the operation and expenses of the Project.

## ARTICLE II

2.1.  Financial Statements.

At the request of the Bank, the Borrower shall provide such unaudited financial statements as the Bank may reasonably request, but in any event monthly financial statements within ten (10) days after the end of each calendar month for the preceding calendar month.  All of such financial statements shall be in form, substance and scope satisfactory to the Bank.

2.2.  Net Proceeds From Sale or Refinancing.

The net proceeds realized from the sale or refinancing of all or any part of the Project and/or the Related Project which occurs on or prior to December 31, 1999 ("Early Sale Proceeds") up to an aggregate of three million two hundred thousand dollars ($3,200,000) shall be applied in the following order of priority:

(i)     first, to the Bank in payment of the Tranche A Principal and Tranche A Interest due under the Tranche A Note and any fees or expenses due the Bank under Section 3.5 hereof or the Restated Security Documents and any fees, expenses or other amounts due under the Tranche A Note; and

(ii)    second, to the Bank in payment of the Tranche A Principal and Tranche A Interest due under the Related Tranche A Note and any fees or expenses due the Bank under Section 3.5 of the Related Override Agreement or the Related Security Documents and any fees, expenses or other amounts due under the Related Tranche A Note.

(iii)   third, if the total of such sums due to the Bank under clauses (i) and (ii) above is less than $3,200,000, the difference between such total and $3,200,000 may be retained by the Borrower.

If Early Sale Proceeds are greater than $3,200,000 and the total of the sums due to the Bank under clauses (i) and (ii) above is greater than $3,200,000, then Early Sale Proceeds in excess of $3,200,000 shall be applied in the same order as set forth above in clauses (i) and (ii) until the Tranche A Note and the Related Tranche A Note are satisfied in cash in full.

**0000761**

-11-

Once the Tranche A Note and the Related Tranche A Note have been satisfied pursuant to the terms of the preceding paragraph or if the Tranche A Note and the Related Tranche A Note were satisfied by application of the first $3,200,000 of Early Sale Proceeds, then any remaining Early Sale Proceeds in excess of $3,200,000 shall be applied as follows.  One half of such remaining Early Sale Proceeds shall be retained by the Borrower and the remaining half shall be applied in the following order of priority:

(iv)  first, to payment of the Tranche B Principal and Tranche B Interest due under the Tranche B Note and any fees or expenses due the Bank under Section 3.5 hereof or the Restated Security Documents and any fees, expenses or other amounts due under the Tranche B Note; and

(v)  second, to payment of the Tranche B Principal and Tranche B Interest due under the Related Tranche B Note and any fees or expenses due the Bank under Section 3.5 of the Related Override Agreement or the Related Security Documents and any fees, expenses or other amounts due under the Related Tranche B Note.

(vi)  third, once the Tranche B Note and the Related Tranche B Note are fully satisfied pursuant to the terms of clauses (iv) and (v) hereof, then all (100%) of the remaining Early Sale Proceeds, if any, and any other proceeds and amounts with respect to the Project or the Related Project, shall be retained by the Borrower.

For the purposes hereof, the taking by condemnation of all or substantially all of the Project or a Total Casualty Loss (as defined below) shall be treated as a sale and net proceeds thereof (including condemnation payments and insurance proceeds) shall be treated as net proceeds of a sale. The Borrower agrees promptly to liquidate, on the best terms reasonably available, any part of the Project remaining after such a taking or Total Casualty Loss.  For purposes of this Agreement, "Total Casualty Loss" shall mean an insured casualty loss for which available insurance proceeds equal or exceed the outstanding aggregate sum owed by the Borrower to the Bank under the Tranche A Note and the Related Tranche A Note.

For purposes of this Agreement, the term "net proceeds" shall mean the entire proceeds received from a sale, financing or refinancing including, without limitation, a sale by foreclosure pursuant to the Security Documents, less the reasonable costs and expenses incident to realizing such proceeds, including, without limitation, reasonable brokerage commissions, retirement of debt secured by any liens prior to the lien of the Security Documents, necessary repairs, adjustments, legal fees and expenses.

**0000762**

BOS-BUS:345366.7

-12-

The net proceeds realized from the sale or refinancing of all or any part of the Project and/or the Related Project which occurs after December 31, 1999 ("Late Sale Proceeds") shall be applied in the order specified in clauses (i) through (iii) hereof, provided, however, that if the Tranche A Note and the Related Tranche A Note become satisfied, then all (100%) of the remaining Late Sale Proceeds, if any, shall be retained by the Borrower; provided further, that if a Tranche B Event shall have occurred on or prior to December 31, 1999, then, in addition, any remaining Late Sale Proceeds in excess of $3,200,000 shall be applied as set forth in clauses (iv) through (vi) above.

The Borrower shall not sell any portion of the Project without the prior written permission of the Bank, unless such sale is to a third party buyer in an arms-length transaction, which transaction shall have commercially reasonable provisions with respect to price and terms. In the event of a refinancing, the Bank shall not be required to release the liens on the Project and on the Related Project nor shall it be required to release its lien on any other collateral under the Restated Security Documents or the Related Security Documents unless the Buyer shall first satisfy in full the indebtedness evidenced by the Restated Notes and the Related Notes. Nothing in this Agreement or in any of the other Loan Documents shall be construed to require the Borrower or the Related Borrower to effectuate any sale or refinancing of the Project or the Related Project prior to December 31, 1999 or otherwise.

## ARTICLE III

3.1.    Events of Default; Agreements Cross-Defaulted. If, for any reason, (a) the Borrower shall fail to pay on the stated due date thereof any amount owed under this Agreement, the Restated Notes or the Unconditional Guaranty with respect to Tranche A Principal, Tranche A Interest, Tranche B Principal, Tranche B Interest or any expense or fee incurred hereunder or under any of the other Loan Documents or the Unconditional Guaranty, which failure shall continue for ten (10) days after written notice thereof is given to the Borrower; provided, however, that such notice need not be given by the Bank more than twice in any calendar year, so that on the third such failure in any calendar year an Event of Default shall occur immediately upon the failure by the Borrower to pay the amount due within ten (10) days after the stated due date thereof without notice (a "Monetary Default"), (b) the Borrower shall fail to perform its obligations under this Agreement in accordance with the terms hereof, or the other Loan Documents or the Unconditional Guaranty, in accordance with the terms thereof, which failure shall continue for thirty (30) days after written notice thereof is given to the Borrower (a "Non-Monetary Default"), or (c) an Event of Default shall occur under any of the Related Loan Documents (a "Cross-Default"), then such Monetary Default, Non-Monetary Default or Cross-Default shall constitute an Event of Default (an "Event of Default") hereunder and as defined in each of the other Loan Documents and the Unconditional Guaranty, and the Bank shall have all the rights and remedies on account thereof as specified herein and under the other

0000763

-13-

Loan Documents and the Unconditional Guaranty as if this Agreement had been incorporated in and made a part of such instruments and agreements as of the closing of the Loan, and shall have all the rights and remedies specified in such instruments and agreements on account thereof.

In addition to the foregoing, the following shall constitute additional Events of Default under this Agreement (each an "Early Termination Event"):

(i)     any of the Individual Guarantors shall die, or the Borrower or any agent thereof shall seek to dissolve the General Partner or the Borrower , or the General Partner or the Borrower shall be dissolved by the Commonwealth of Massachusetts or any instrumentality thereof and not be reinstated within the applicable period under the agreement of limited partnership of the Borrower or under applicable law, or the Related Borrower or any agent thereof shall seek to dissolve the Related Borrower or the general partner thereof, or the Related Borrower or the general partner thereof shall be dissolved by the Commonwealth of Massachusetts or any instrumentality thereof and not be reinstated within the applicable period under the relevant agreement of limited partnership of the Related Borrower or under applicable law;

(ii)     the General Partner or the Borrower or any of the Individual Guarantors shall make an assignment for the benefit of creditors, or admit in writing its inability to pay or generally fail to pay its debts as they mature or become due excluding obligations reflecting Debt Service Payments or Tenant Improvements to be satisfied from the Reserve Fund pursuant to Section 1.4 hereof or Section 1.4 of the Related Override Agreement, or shall petition or apply for the appointment of a trustee or other custodian, liquidator or receiver of the General Partner or the Borrower or of any of the Individual Guarantors of any substantial part of the assets of the General Partner or the Borrower or such Individual Guarantor or shall commence any case or other proceeding relating to the General Partner or the Borrower or any of the Individual Guarantors under any bankruptcy, reorganization, arrangement, insolvency, readjustment of debt, dissolution or liquidation or similar law of any jurisdiction, now or hereafter in effect, or shall take any action to authorize any of the foregoing, or if any such petition or application shall be filed or any such case or other proceeding shall be commenced against the General Partner or the Borrower or any of the Individual Guarantors and the General Partner or the Borrower or such Individual Guarantor shall indicate its approval thereof, consent thereto or acquiescence therein or such petition or application shall not have been dismissed within ninety (90) days following the filing thereof;

0000764

-14-

(iii) a decree or order is entered appointing any such trustee, custodian, liquidator or receiver or adjudicating the General Partner or the Borrower or any of the Individual Guarantors bankrupt or insolvent, or approving a petition in any such case or other proceeding, or a decree or order for relief is entered in respect of the General Partner or the Borrower or any of the Individual Guarantors in an involuntary case under federal bankruptcy laws as now or hereafter constituted;

3.2.    Further Assurances. The Borrower shall at any time and from time to time as requested by the Bank execute and deliver such further instruments and security documents and take such further action (prior to an Event of Default, at no expense to the Borrower) as may reasonably be requested by the Bank, in each case further and more perfectly to effect the transactions contemplated by this Agreement and the other Loan Documents, including without limitation the execution, delivery and/or recordation of one or more amended notes, mortgages, deeds of trust or related documents as the Bank may request in order to evidence on a separate basis one or more of the obligations provided for herein, or to transfer its interest in the Tranche A or Tranche B indebtedness or in order to ensure that the liens upon the Project created by the Security Documents secure the Borrower's obligations under this Agreement. Any additional security documents executed pursuant to this Section 3.2 shall be deemed Security Documents for all purposes of this Agreement. The Borrower shall at any reasonable times permit the Bank, its agents, employees and consultants to inspect and examine the Project and/or any books and records concerning operation of the Project.

3.3.    Release. The Borrower, on behalf of itself and its successors and assigns, hereby waives, releases and discharges the Bank, and all directors, officers, employees and agents of the Bank, from any and all claims, demands, actions or causes of action arising on or before the date hereof and arising out of or in any way relating to the Loan, and any documents, agreements, dealings or other matters connected with the Loan, including without limitation all known and unknown matters, claims, transactions or things occurring prior to the date of this Agreement related to the Loan.

3.4.    Expenses. From and after the occurrence of any Event of Default hereunder, the Borrower agrees to pay to the Bank upon demand, each month until paid in full, any and all out-of-pocket costs or expenses (including reasonable attorneys' fees and disbursements, accounting, appraisal, inspection, investment banking and similar professional fees and charges) thereafter incurred or sustained by the Bank in connection with the preservation or enforcement of the Bank's rights under this Agreement, the other Loan Documents or the Unlimited Guaranty.

**0000765**

-15-

3.5.    Relationship of the Borrower to the Bank. The Borrower and not the Bank has the sole responsibility for the operation, control and management of the Project, and the Bank's rights in respect of the Project are only those of a secured creditor as set forth in the Restated Notes, the Restated Security Documents and this Agreement. The relationship created between the Bank, on the one hand, and the Borrower, on the other, is that of creditor and debtor, and the Bank is not, nor shall it be deemed to be or treated as, a partner, joint-venturer or co-venturer, with the Borrower.

3.6.    Good Standing and Authorization of the Borrower. The Borrower (a) is a limited partnership duly organized, validly existing and in good standing under the laws of the Commonwealth of Massachusetts; and (b) has all requisite power to own its properties and conduct its business as now conducted and as presently contemplated. The execution, delivery and performance of this Agreement by the Borrower (a) are within the authority of the Borrower; (b) have been duly authorized by all necessary proceedings; (c) do not conflict with or result in any breach or contravention of any law, statute, rule, regulation or ordinance to which the Borrower or the Project is subject, or any judgment, order, writ, injunction, license, permit or approval applicable to the Borrower or the Project; and (d) do not conflict with or contravene any provision of the Borrower's certificate and agreement of limited partnership, or any other agreement or instrument binding upon the Borrower or the Project.

3.7.    Accuracy of Information. The Borrower represents and warrants that it has previously delivered to the Bank a current statement of operations for the Project and a financial statement for the Project, which the Borrower represents and warrants were prepared in accordance with accounting principles used by the Borrower in the past in financial statements submitted to the Bank in connection with the Loan and fairly and accurately reflect the financial condition of the Project. The Borrower represents and warrants that it has previously delivered to the Bank accurate and complete rent roll for the Project. The Borrower represents and warrants that there are no material obligations, contingent or otherwise, not disclosed on such financial statements previously delivered to the Bank. The Borrower further represents and warrants that all information provided to the Bank by the Borrower with respect to the Project or the Borrower, is true, accurate, complete and not misleading, that none of such information contains an untrue statement of any material fact, and that there is no material fact concerning the Project or the Borrower which the Borrower has failed to disclose to the Bank in writing.

3.8.    Current Ownership of the Borrower: Transfer of Partnership Interest. The general partner of the Borrower (the "General Partner") as of the date hereof is 326 Commercial Street Associates, Inc., a corporation organized and existing under the laws of the Commonwealth of Massachusetts. The sole limited partner of the Borrower as of the date hereof is Well-Com Associates, Inc., a

-16-

corporation organized and existing under the laws of the Commonwealth of Massachusetts. As of the date of this Agreement, John Pereira is the holder of 100% of the general and limited partnership interests of the Borrower. Any transfer on or after the date hereof of the voting equity interests in the general or limited partnership interest of the Borrower which results in John Pereira owning less than 51% in the aggregate of such voting equity interests without the prior written consent of the Bank while this Agreement remains in effect or the Restated Notes remain unsatisfied shall be an Event of Default hereunder. The Borrower shall give the Bank prompt notice of any change in voting control of the general or limited partnership interest of the Borrower.

3.9.   Transferees; Cooperation. The Borrower agrees to permit the Bank to disclose information concerning the Project and the Borrower to potential transferees of the obligations of the Borrower hereunder and under the Notes and Security Documents or any one or more of such obligations or Notes, and further agrees on request of the Bank, to permit any such potential transferee to examine the Project and the books and records of the Borrower.

3.10.   Governing Law. This Agreement shall take effect as a sealed instrument to be governed by and construed in accordance with the laws of the Commonwealth of Massachusetts.

3.11.   Notices. All notices and other communications made or required to be given pursuant to this Agreement shall be in writing and delivered in hand, or by courier providing delivery receipt, or mailed by United States first-class mail, postage prepaid, addressed as follows:

(a)     If to the Borrower:

John M. Pereira, President
378 Commercial Street Associates, Inc.
c/o Combined Properties, Inc.
25 Riverview Business Park
300 Commercial Street
Malden, MA 02148

with a copy to:

Kitt Sawitsky, Esq.
Goulston & Storrs PC
400 Atlantic Avenue
Boston, MA 02026

**0000767**

-17-

<u>and a copy to:</u>

Steven P. Rosenthal, Esq.
Mintz, Levin, Cohn, Ferris,
    Glovsky & Popeo, PC
One Financial Center, 41st Floor
Boston, MA 02111

(b)    If to the Bank:

Anthony E. Varone, Vice President
Bank of Boston Connecticut
100 Pearl Street
Hartford, CT 06103

<u>with a copy to:</u>

Jonathan K. Bernstein, Esq.
Bingham, Dana & Gould LLP
150 Federal Street
Boston, MA 02110

3.12.  <u>Amendments</u>.  This Agreement may not be modified or amended except by a written agreement singed by the Bank and the Borrower.

3.13.  <u>Successors and Assigns</u>.  The provisions of this Agreement shall be binding upon and shall inure to the benefit of the successors and assigns of the Borrower and the Bank.

3.14.  <u>Captions</u>.  Titles or captions of articles and sections are for convenience of reference only and do not constitute part of this Agreement or describe the intent or scope of any provisions of this Agreement.

3.15.  <u>Index of Defined Terms</u>.

"Agreement".  See Preamble.

"Approved Leases".  See Section 1.5.

"Approved Operating Budget".  See Section 1.4 and Section 2.2.

"Bank".  See Preamble.

BOS-BUS:345366.7

0000768

-18-

"Borrower".  See Preamble.

"Business Day".  See Section 1.3.

"Debt Service Payment".  See Section 1.4.

"Distribution".  See Section 1.4.

"Early Sale Proceeds".  See Section 2.1.

"Early Termination Event".  See Section 3.1.

"Estate Planning Event'.  See Section 3.8.

"Excess Cash Flow".  See Section 1.4.

"Event of Default".  See Section 3.1.

"General Partner".  See Section 3.8.

"Guaranties".  See Preamble.

"Individual Guarantors".  See Preamble.

"Joint and Several Guarantor".  See Preamble.

"Joint and Several Guaranty".  See Preamble.

"Land Court".  See Preamble.

"Late Sale Proceeds".  See Section 1.4.

"Loan".  See Preamble.

"Loan Documents".  See Preamble.

"Monetary Default".  See Section 3.1.

"Monthly Payment Date".  See Section 1.2(a).

"net proceeds".  See Section 2.2.

"Non-Monetary Default".  See Section 3.1.

**0000769**

-19-

"Operating Accounts". See Section 1.3.

"Original Assignment". See Preamble.

"Original Loan Documents". See Preamble.

"Original Mortgage and Security Agreement". See Preamble.

"Original Note". See Preamble.

"Original Security Documents". See Preamble.

"Outstanding Obligations". See Section 1.1.

"Paydown". See Preamble.

"Percentage". See Section 1.4.

"Pereira Limited Guaranty". See Preamble.

"Permitted Management Fees". See Section 1.4.

"Project". See Preamble.

"Property". See Preamble.

"Registry". See Preamble.

"Related Borrower". See Preamble.

"Related Loan Documents". See Preamble.

"Related Notes". See Preamble.

"Related Override Agreement". See Preamble.

"Related Project". See Preamble.

"Related Security Documents". See Preamble.

"Related Tranche A Note". See Preamble.

"Related Tranche B Note". See Preamble.

**0000770**

-20-

"Reserve Account".  See Section 1.4.

"Reserve Deficiency".  See Section 1.4.

"Restated Assignment".  See Preamble.

"Restated Mortgage and Security Agreement'".  See Preamble.

"Restated Notes".  See Preamble.

"Restated Security Documents".  See Preamble.

"Security Documents".  See Preamble.

"378 Group".  See Preamble.

"Tenant Improvement".  See Section 1.4.

"Total Casualty Loss".  See Section 2.2.

"Tranche A".  See Section 1.2(a).

"Tranche A Default Rate".  See Section 1.2(c).

"Tranche A Interest".  See Section 1.2(a).

"Tranche A Maturity Date".  See Section 1.2(a).

"Tranche A Note".  See Preamble.

"Tranche A Rate".  See Section 1.2(a).

"Tranche B".  See Section 1.2(b).

"Tranche B Default Rate".  See Section 1.2(c).

"Tranche B Event".  See Section 1.2(b).

"Tranche B Interest".  See Section 1.2(b).

"Tranche B Maturity Date".  See Section 1.2(b).

"Tranche B Note".  See Preamble.

**0000771**

-21-

"Tranche B Rate".  See Section 1.2(b).

"Unconditional Guaranty".  See Preamble.

3.16.  <u>Counterparts</u>.  This Agreement may be executed separately by the parties hereto in multiple counterparts, and the counterparts shall be taken together as a single composite Agreement, and each composite counterpart shall constitute an original Agreement.

3.17.  <u>Severability</u>.  If any provision contained in this Agreement shall be invalid or unenforceable under any applicable law, said provision shall be ineffective to the extent of such invalidity only, without in any way affecting the remaining portions and provisions of this Agreement.

[Signature Page Follows]

**0000772**

IN WITNESS WHEREOF, the parties have caused this Override Agreement to be executed as a sealed instrument by their duly authorized representatives as of the date first above written.

BORROWER:

WELL-COM ASSOCIATES
LIMITED PARTNERSHIP

By:    378 Commercial Street Associates, Inc.,
       its General Partner

By: _____
    John M. Pereira
    President

BANK:

BANK OF BOSTON CONNECTICUT

By: _____
    Anthony E. Varone
    Vice President

0000773

Exhibit A

## Legal Description of Property

The land with the improvements thereon in Malden, Middlesex County, Massachusetts, bounded and described as follows:

| | |
|---|---|
| **EASTERLY** | by the westerly line of Malden Canal, about five hundred fifty-seven and 28/100 feet; |
| **SOUTHERLY** | Westerly and Southerly by the middle line of Malden River and Little Creek; |
| WESTERLY | by land now or formerly of the Boston and Maine Railroad, about two hundred twenty-seven and 76/100 feet; |
| **NORTHWESTERLY** | by lot $C^1$ as shown on plan hereinafter mentioned, by a curving line, three hundred forty-three and 70/100 feet; and |
| **NORTHERLY** | by said lot $C^1$, six hundred seven and 26/100 feet. |

Said land is shown as lot $C^2$ on Land Court Plan 6178C.

All of said boundaries, except the lines in said River and Creek are determined by the Land Court to be located as shown on a subdivision plan, as approved by the Court, filed in the Land Registration Office, a copy of which is filed in the Registry of Deeds for the South Registry District of Middlesex County in Registration Book 220, Page 457, with Certificate of Title No. 34735.

Subject to and together with those matters set forth in Certificate of Title No. 178949.

**0000774**



COPY

## AMENDED AND RESTATED
## TRANCHE A NOTE

$2,000,000                                            December 31, 1996

     **WHEREAS,** Bank of Boston Connecticut, a Connecticut state-chartered savings bank having an address at 100 Pearl Street, Hartford, Connecticut 06103 (the "Bank") made a certain commercial real estate loan (the "Loan") jointly and severally to (i) Commercial Street Properties, Inc., a corporation organized and existing under the laws of the Commonwealth of Massachusetts ("Commercial Street"), (ii) Well-Com, Inc., a corporation organized and existing under the laws of the Commonwealth of Massachusetts ("Well-Com") and (iii) Well-Com Associates, Inc., a corporation organized and existing under the laws of the Commonwealth of Massachusetts ("Well-Com Associates" and together with Commercial Street and Well-Com, the "378 Group"), collectively the predecessors in interest to Well-Com Associates Limited Partnership, a limited partnership organized and existing under the laws of the Commonwealth of Massachusetts having an address at c/o Combined Properties, Inc., 25 Riverview Business Park, 300 Commercial Street, Malden, Massachusetts 02148 (the "Borrower"), which Loan is evidenced by that certain Commercial Real Estate Promissory Note dated December 22, 1987 in the original principal amount of Four Million Five Hundred Thousand and no/100 dollars ($4,500,000.00), as amended by (i) that certain Amendment to Commercial Real Estate Promissory Note dated March 29, 1990 and (ii) that certain Second Amendment to Commercial Real Estate Promissory Note dated July 1, 1990 (as amended and in effect, the "Original Note");

     **WHEREAS,** the Original Note is secured by (i) that certain Mortgage and Security Agreement dated December 22, 1987 by and between the 378 Group and the Borrower filed with the Middlesex South Registry District of the Land Court (the "Land Court") as Document No. 763780 encumbering the Project, as amended by (a) that certain Amendment to Mortgage and Security Agreement and Collateral Assignment of Leases and Rents dated March 30, 1990 filed with the Land Court as Document No. 819756 and (b) that certain Second Amendment to Mortgage and Security Agreement and Collateral Assignment of Leases and Rents dated July 1, 1990 filed with the Land Court as Document No. 827150 (as amended and in effect, the "Original Mortgage and Security Agreement") and (ii) that certain Collateral Assignment of Leases and Rents dated December 22, 1987 by and between the 378 Group and the Bank filed with the Land Court as Document No. 7637981 as amended by (a) that certain Amendment to Mortgage and Security Agreement and Collateral Assignment of Leases and Rents dated March 30, 1990 filed with the Land Court as Document No. 819756 and (b) that certain Second Amendment to Mortgage and Security Agreement and Collateral Assignment of Leases and Rents dated July 1,

-2-

1990 filed with the Land Court as Document No. 827150 (as amended and in effect, the "Original Assignment", and together with the Original Mortgage and Security Agreement, (the "Original Security Documents");

**WHEREAS,** the Original Note has matured as of December 31, 1990 and has become due and payable in full according to the terms thereof;

**WHEREAS,** the Borrower has requested that the Bank restructure the Loans and the Bank is willing to restructure the Loans under the terms set forth in that certain Override Agreement dated concurrently herewith among the Bank and the Borrower (the "Override Agreement");

**WHEREAS,** the Override Agreement contemplates that the Bank will split the outstanding principal balance of the Original Note into two tranches, each of which will be evidenced by a separate note, one of which ("Tranche A") will be structured as a full recourse note and other of which ("Tranche B") will be a non-recourse note payable only upon a sale or refinance of certain properties occurring under certain conditions, as set forth in Section 2.2 of the Override Agreement;

**WHEREAS,** the Borrower and the Bank desire that the Original Note be amended and restated by separating the Original Note into a Tranche A Note and a Tranche B Note to reflect the restructuring contemplated by the Override Agreement while preserving the priority of the Original Security Documents and that this Amended and Restated Tranche A Note (this "Tranche A Note") continue to evidence the amounts outstanding under the Loan in the manner and to the extent stated herein;

**NOW, THEREFORE,** the Borrower and the Bank agree as follows:

**FOR VALUE RECEIVED,** the Borrower hereby promises to pay to the order of the Bank at the Bank's head office:

> (a) prior to or on December 31, 2006 the principal amount of two million dollars ($2,000,000) evidencing the Tranche A Loan made by the Bank to the Borrower pursuant to the Override Agreement; and

> (b) interest from the date hereof on the principal amount from time to time outstanding to and including the maturity hereof at the rates and terms and in all cases in accordance with the terms of the Override Agreement as applicable to the Tranche A Loan.

This Tranche A Note evidences borrowings under and has been issued by the Borrower in accordance with the terms of the Override Agreement as applicable to the Tranche A Loan. The Bank and any holder hereof is entitled to the benefits of the Override Agreement, the Security Documents and the other Loan Documents, and may enforce the agreements of the Borrower contained therein, and any holder hereof

0000776

-3-

may exercise the respective remedies provided for thereby or otherwise available in respect thereof, all in accordance with the respective terms thereof. All capitalized terms used in this Tranche A Note and not otherwise defined herein shall have the same meanings herein as in the Override Agreement.

The Borrower irrevocably authorizes the Bank to make or cause to be made, at the time of receipt of any payment of principal of this Tranche A Note, an appropriate notation on the grid attached to this Tranche A Note, or the continuation of such grid, or any other similar record, including computer records, reflecting the receipt of such payment. The outstanding amount of the Tranche A Loan set forth on the grid attached to this Tranche A Note, or the continuation of such grid, or any other similar record, including computer records, maintained by the Bank with respect to the Tranche A Loan shall be prima facie evidence of the principal amount of the Tranche A Loan owing and unpaid to the Bank, but the failure to record, or any error in so recording, any such amount on any such grid, continuation or other record shall not limit or otherwise affect the obligation of the Borrower hereunder or under the Override Agreement to make payments of principal of and interest on this Tranche A Note when due.

The Borrower has the right in certain circumstances and the obligation under certain other circumstances to prepay the whole or part of the principal of this Tranche A Note on the terms and conditions and subject to the prepayment penalties specified in the Override Agreement.

Upon the occurrence of any Event of Default, (i) the entire unpaid principal amount of this Tranche A Note and all of the unpaid interest accrued thereon may become or be declared due and payable in the manner and with the effect provided in the Override Agreement and (ii) any amount then owing hereunder shall bear interest at the Tranche A Default Rate from the time of such Event of Default until this Tranche A Note is paid in full. Upon the occurrence of any Early Termination Event, this Tranche A Note shall become immediately due and payable without further action by the Bank or the Borrower.

No delay or omission on the part of the Bank or any holder hereof in exercising any right hereunder shall operate as a waiver of such right or of any other rights of the Bank or such holder, nor shall any delay, omission or waiver on any one occasion be deemed a bar or waiver of the same or any other right on any future occasion.

The Borrower and every endorser and guarantor of this Tranche A Note or the obligation represented hereby waives presentment, demand, notice, protest and all other demands and notices in connection with the delivery, acceptance, performance, default or enforcement of this Tranche A Note, and assents to any extension or postponement of the time of payment or any other indulgence, to any substitution, exchange or release of collateral and to the addition or release of any other party or

0000777

-4-

person primarily or secondarily liable, except as expressly provided in the Override Agreement.

THIS NOTE AND THE OBLIGATIONS OF THE BORROWER HEREUNDER SHALL FOR ALL PURPOSES BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAW OF THE COMMONWEALTH OF MASSACHUSETTS (EXCLUDING THE LAWS APPLICABLE TO CONFLICTS OR CHOICE OF LAW). THE BORROWER AGREES THAT ANY SUIT FOR THE ENFORCEMENT OF THIS NOTE MAY BE BROUGHT IN THE COURTS OF THE COMMONWEALTH OF MASSACHUSETTS OR ANY FEDERAL COURT SITTING THEREIN AND THE CONSENT TO THE NONEXCLUSIVE JURISDICTION OF SUCH COURT AND THE SERVICE OF PROCESS IN ANY SUCH SUIT BEING MADE UPON THE BORROWER BY MAIL AT THE ADDRESS SPECIFIED IN §3.11 OF THE OVERRIDE AGREEMENT. THE BORROWER HEREBY WAIVES ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE VENUE OF ANY SUCH SUIT OR ANY SUCH COURT OR THAT SUCH SUIT IS BROUGHT IN AN INCONVENIENT COURT.

This Tranche A Note, together with the Tranche B Note dated concurrently herewith from the Borrower, are in substitution for, and supersede the Original Note.

This Tranche A Note is secured by (i) that certain Amended and Restated Mortgage and Security Agreement dated concurrently herewith by and between the Bank and the Borrower and (ii) that certain Amended and Restated Assignment of Rents and Leases dated concurrently herewith by and between the Bank and the Borrower (together, the "Restated Security Documents"). This Tranche A Note is also secured by (iii) those certain $1,000,000 Joint and Several Limited Guaranties dated concurrently herewith from Morton E. Ruderman and Arthur J. Epstein, each an individual, (iv) that certain $1,000,000 Limited Guaranty dated concurrently herewith from John M. Pereira, an individual and (v) that certain Unconditional Guaranty dated concurrently herewith from the Related Borrower (collectively, the "Guaranties"). The Restated Security Documents and the Guaranties guaranty payment and performance of all of the obligations evidenced hereby subject to any maximum dollar limit contained therein.

This Tranche A Note shall be deemed to take effect as a sealed instrument under the laws of the Commonwealth of Massachusetts.

[Signature Page Follows]

0000778

-5-

IN WITNESS WHEREOF, the Borrower has caused this Tranche A Note to be signed in its partnership name as of the day and year first above written.

WELL-COM ASSOCIATES
LIMITED PARTNERSHIP

By: 378 Commercial Street Associates, Inc.,
its general partner

By: _____
John M. Pereira
President

The undersigned holder of the Original Note, hereby consents to the foregoing amendments.

BANK OF BOSTON CONNECTICUT

By: _____
Anthony E. Varone
Vice President

0000779

BOS-BUS:344798.4

EXHIBIT R



# COMMONWEALTH OF MASSACHUSETTS
## EXECUTIVE OFFICE OF ENVIRONMENTAL AFFAIRS
### DEPARTMENT OF ENVIRONMENTAL PROTECTION
#### NORTHEAST REGION
ONE WINTER STREET, BOSTON, MA 02108  617-292-5500

**MITT ROMNEY**
Governor

**KERRY HEALEY**
Lieutenant Governor

**RECEIVED**
OCT 9 5 2005
COMBINED PROPERTIES, INC.

**STEPHEN R. PRITCHARD**
Secretary

**ROBERT W. GOLLEDGE, J**
Commissioner

October 21, 2005

John Periera, President
378 Commercial Street Associates, Inc.
Well-Com Associates
300 Commercial Street, Suite 25
Malden, MA 02148

RE:     In the Matter of Well-Com Associates, LP
        Malden, 378 Commercial Street, RTN 3-590
        ACO-NE-05-3A003

Dear Mr. Periera:

Attached for signature are two copies of an Administrative Consent Order ("ACO"). Please sign both copies and return them to this office *within ten (10) days* of your receipt of this letter. Both copies will be signed here and one fully executed copy returned to you. The ACO will become effective as of the date of the MassDEP's signature.

Please note that, if you do not agree to sign the ACO, you must notify MassDEP in writing *within 10 days* of receipt of this letter. If you do not respond in any fashion within this time period, MassDEP will assume that you do not intend to sign the ACO. If you do not sign the ACO, MassDEP will schedule an enforcement conference to discuss the ACO and any penalty.

If you have any questions, please contact Paegan Deering at (617) 654-6660.

Yours truly,

Stephen M. Johnson
Acting Deputy Regional Director
Bureau of Waste Site Cleanup

cc      Robert Ankstitis, LSP, by electronic mail

This information is available in alternate format. Call Donald M. Gomes, ADA Coordinator at 617-556-1057. TDD Service - 1-800-298-2307.

DEP on the World Wide Web: http://www.mass.gov/dep
Printed on Recycled Paper

COMMONWEALTH OF MASSACHUSETTS
EXECUTIVE OFFICE OF ENVIRONMENTAL AFFAIRS
DEPARTMENT OF ENVIRONMENTAL PROTECTION

|  |  |  |
|---|---|---|
| IN THE MATTER OF: | ) | RE: Malden, 378 Commercial Street |
|  | ) |  |
| Well-Com Associates, LP | ) | RTN 3-0590 |
|  | ) |  |
|  | ) | ADMINISTRATIVE CONSENT ORDER |
|  | ) | AND NOTICE OF NONCOMPLIANCE |
|  | ) |  |
|  | ) | ACO-NE-05-3A003 |

## I. THE PARTIES

1.  The Department of Environmental Protection (the "Department" or "DEP") is a duly constituted agency of the Commonwealth of Massachusetts. Its principal office is located at One Winter Street in Boston, Massachusetts 02108.

2.  Well-Com Associates, LP ("Respondent") is the owner of the property located at 378 Commercial Street, Malden, MA. The Respondent's mailing address is 300 Commercial Street, Suite 25, Malden, MA 03862.

3.  378 Commercial Street Associates, Inc., is the General Partner of Well-Com Associates Limited Partnership.

4.  Respondent's Federal Employee Identification Number is _____.

## II. STATEMENT OF PURPOSE

5.  This Administrative Consent Order ("Consent Order") is voluntarily entered into by and between Respondent and the Department because they have mutually agreed that it is in the public interest, and in their own interests, to proceed promptly with the actions called for herein. Respondent and the Department hereby agree to comply with and be bound by the terms of this Consent Order.

## III. DEFINITIONS

6.  Unless otherwise indicated, the terms used herein shall have the meaning given to them by the Massachusetts Oil and Hazardous Material Release Prevention and Response Act, M.G.L. c. 21E ("M.G.L. c. 21E"), and the regulations promulgated thereunder as the Massachusetts Contingency Plan ("MCP"), 310 CMR 40.0000 et seq. When used herein to describe past or future submittals, actions or deadlines, such terms shall have the meaning ascribed to them in the versions of such laws and regulations in effect at the time of such submittals, actions or deadlines. In addition, the following term(s) shall have the meaning defined herein:

> Site shall mean the property located at 378 Commercial Street in Malden, MA or any other place or area where the release(s) of oil or hazardous material(s) at and/or from said property has come to be located.

In the Matter of Well-Com Associates, LP
ACO-NE-05-3A003

## IV. STATEMENT OF LAW

The parties agree to the following statement of applicable law and to the jurisdiction and authority of the Department to issue this Consent Order:

7.     The Department is charged with the implementation and enforcement of M.G.L. c. 21E and the MCP. The Department has the authority to issue this Consent Order pursuant to M.G.L. c. 21E, § 9.

8.     The Department is authorized to issue Notices of Noncompliance and to assess civil administrative penalties pursuant to M.G.L. c. 21A, § 16, and the regulations promulgated thereunder at 310 CMR 5.00, et seq.

9.     M.G.L. c. 21E, § 9 and 310 CMR 40.0170(9) authorize the Department to enter into a consent order with a responsible party ("RP"), potentially responsible party ("PRP"), or other person ('OP"), which sets forth necessary response actions, time periods, deadlines for the performance thereof, and requirements for submittals to the Department.

10.    310 CMR 40.0024(1) states that, with limited exceptions, each person who is undertaking response actions shall perform each response action by the deadline imposed by M.G.L. c. 21E, the MCP, or any order or determination of the Department.

11.    310 CMR 40.0170(5)(a) states, in part, that RPs, PRPs and OPs shall perform each and every response action properly and promptly within deadlines prescribed by or pursuant to M.G.L. c. 21E and/or the MCP, including any Interim Deadlines.

12.    310 CMR 40.0405(3) states that Release Abatement Measures (RAMs) are remedial actions that may be voluntarily undertaken at disposal sites, for the purpose of remediating releases until such time as more comprehensive remedial actions can be performed.

13.    310 CMR 40.0560(2)(d) states, in part, that any person undertaking response actions at a Tier II disposal site shall submit a Response Action Outcome Statement ("RAO") within five years of the effective date of such permit.

## V. STATEMENT OF FACTS

Respondent agrees to the following Statement of Facts in this section, solely for the purposes of this Consent Order and for no other purpose:

14.    Respondent is the owner and operator of the 9.5 acre parcel located at 378 Commercial Street in Malden, Massachusetts ("Property").

15.    On April 15, 1987, the Department was notified of the presence of coal tar on the Property. The release was observed during a subsurface investigation of the property in 1985. Investigation of the Property revealed soil contaminated with coal tar and cyanide, evidence that a release of oil and/or hazardous materials as defined by M.G.L. c. 21E section 5 occurred at the Property. The Department assigned Release Tracking Number ("RTN") 3-0590 to the Site

2

In the Matter of Well-Com Associates, LP
ACO-NE-05-3A003

16.    On August 31, 2000, Respondent submitted a Phase I Report and Tier Classification to the Department.

17.    On November 26, 2003, the Department issued a Notice of Noncompliance ("NON") to the Respondent for failure to submit a Phase II Comprehensive Site Assessment ("Phase II Report"), a Phase III Remedial Action Plan ("Phase III Report") and a Phase IV Remedy Implementation Plan ("Phase IV Report").

18.    On June 30, 2004, the Department issued an Amended Notice of Noncompliance to the Respondent granting Respondent's request for extension of the Phase IV deadline.

19.    On August 6, 2004, Respondent submitted a Phase II Report to the Department.

20.    On August 27, 2004, Respondent submitted a Phase III Report to the Department.

21.    On April 29, 2005, Respondent submitted a Phase IV Report to the Department.

22.    On May 24, 2005, Respondent submitted a RAM Plan to the Department.

23.    On August 31, 2005, Respondent was overdue for the filing of an RAO and a Tier II Extension to the Department.

24.    On September 1, 2005, Respondent Submitted a Tier II Extension to DEP. The submittal indicates that Respondent requires more than a year to achieve a permanent or temporary solution for the Site.

25.    As of the date this Consent Order, Respondent has not implemented the Phase IV Plan nor has the Respondent submitted an RAO to the Department.

## VI. STATEMENT OF DETERMINATIONS

Based upon the Statement of Facts set forth above in Section V, the Department has determined the following:

26.    The Site is a disposal site as defined by M.G.L. c. 21E and the MCP.

27.    Respondent is an RP or PRP for the Site at which there is or has been a release and/or threat of release of oil and/or hazardous material pursuant to M.G.L. c. 21E and the MCP.

28.    Conditions at the Site constitute a release or threat of release to the environment of oil and/or hazardous material pursuant to M.G.L. c. 21E and the MCP.

29.    Respondent failed to submit a RAO to the Department within five years of Tier Classification, in violation of 310 CMR 40.0560(1) and 310 CMR 40.0560(2)(d).

## VII. DISPOSITION AND ORDER

30.    Based on the foregoing Statement of Law, Facts and Determinations, the Department issues and Respondent consents to the terms of this Consent Order and agrees to perform the actions as set forth herein.

In the Matter of Well-Com Associates, LP
ACO-NE-05-3A003

31. The Department's authority to issue this order is conferred by M.G.L. c. 21E and the regulations promulgated thereunder at 310 CMR 40.0000, and M.G.L. c. 21A, § 16 and the regulations promulgated thereunder at 310 CMR 5.00. Respondent admits to the jurisdiction and authority of the Department to issue and enter into this Consent Order.

32. This Consent Order shall be binding upon: Respondent, its officers, employees, and agents, in their official, not individual capacity; corporate successors and any assignees. Respondent shall not violate this Consent Order and shall not allow or suffer his officers, employees, agents, successors, contractors, consultants or persons acting for or at the direction of Respondent to violate this Consent Order.

33. Unless otherwise indicated herein, the actions performed pursuant to this Consent Order shall be performed in accordance with M.G.L. c. 21E, the MCP and any other applicable federal, state or local laws, regulations and approvals.

34. Unless Respondent first submits an RAO Statement in accordance with 310 CMR 40.1000 or achieves and maintains Remedy Operation Status (ROS) in accordance with 310 CMR 40.0800, Respondent shall submit the following reports within the following deadlines:

    a. A RAM Status or Completion Statement for the Site by March 28, 2006 and a RAM Status or Completion Statement every six months until the RAM is complete;
    b. Implementation of the Phase IV on or before August 30, 2006
    c. A Phase IV Completion Statement on or before May 30, 2008;
    d. An RAO on or before July 1, 2008.

35. If, during response actions at the Site, any condition is discovered which requires notification to the Department pursuant to 310 CMR 40.0300, Respondent shall comply with the MCP in addressing such condition.

36. All submittals required pursuant to 310 CMR 40.0000 et seq. or this Consent Order shall be in compliance with the MCP, including without limitation any other applicable timelines and Performance Standards. Failure to provide a submittal in compliance with this Consent Order, the MCP, applicable timelines and/or Performance Standards, shall constitute a violation of this Consent Order and shall be subject to Stipulated Penalties as provided in Section IX below.

## IX. STIPULATED PENALTIES

37. If Respondent fails to meet any of the terms or requirements of this Consent Order, Respondent shall pay the Commonwealth a stipulated penalty in the amount of One Thousand Dollars ($1,000.00) per violation for each day, or any portion thereof, each such violation continues. Stipulated penalties shall begin to accrue the day the performance is due or the day a violation occurs and shall continue to accrue through the final day of the correction of the violation or completion of the activity.

38. Even if violations are simultaneous, separate penalties shall accrue for separate violations of this Consent Order. Stipulated penalties shall accrue regardless of whether the Department has notified Respondent of the violation. The payment of stipulated penalties shall not alter in any way Respondent's obligation to complete performance as required by this Consent Order.

39. All stipulated penalties accruing under this Consent Order shall be paid within thirty (30) days of the date the Department sends a written demand therefore. Payment of such penalties shall be

In the Matter of Well-Com Associates, LP
ACO-NE-05-3A003

made by certified check, cashiers check or money order, payable to the "Commonwealth of Massachusetts." Respondent's federal employer identification number and the words, "In the Matter of Well-Com Associates, LP, ACO-NE-05-3A003" must be clearly written on the face of the check or money order. The Commonwealth will not accept any other form of payment. The payment must be directed to:

> Commonwealth of Massachusetts
> Department of Environmental Protection
> Commonwealth Master Lockbox
> P.O. Box 3982
> Boston, MA 02241-3982

In addition, photocopies of the check or money order shall be sent to the Department at the Notice address herein, ATTN: Stephen M. Johnson.

36.     The stipulated penalties set forth herein shall not preclude the Department from electing to pursue alternative remedies or alternative civil, administrative or criminal penalties which may be available by reason of Respondent's failure to comply with the requirements of this Consent Order. In the event that the Department collects alternate civil or administrative penalties, Respondent shall not be required to pay such stipulated penalties pursuant to this Consent Order for the same violation, and the Department shall reduce such alternative civil or administrative penalties by the amount of any stipulated penalties already paid by Respondent for the violation for which the alternate civil or administrative penalties are to be collected.

## X. NOTICES AND SUBMITTALS

37.     All notices, payments, certifications, submissions or other communications required to be made hereunder shall, unless otherwise indicated in this Consent Order, be made in writing and shall, unless otherwise indicated in this Consent Order, be sent by certified mail, return receipt requested, by hand delivery or by recognized overnight courier, as follows:

If to the Department, to:

> Stephen M. Johnson, Acting Deputy Regional Director
> Department of Environmental Protection
> One Winter Street, 7th Floor
> Boston, MA 02108

If to Respondent, to:

> Well-Com Associates, LP
> 300 Commercial Street, Suite 25
> Malden, MA 12148
> ATTN: John M. Pereira

Submittals will be considered delivered upon receipt by the Department.

## XI. WAIVER OF HEARING

38.     Respondent understands and hereby waives his right to an adjudicatory hearing before the Department on, and judicial review by the courts of, the issuance or terms of this Consent Order and to notice of any such rights of review. This waiver does not extend to any other order issued by the Department.

In the Matter of Well-Com Associates, LP
ACO-NE-05-3A003

## XII. RESERVATION OF RIGHTS

39. Except as may be set forth in this Consent Order, the Department expressly reserves, and this Consent Order is without prejudice to, the Department's legal or equitable right and authority to issue any additional order and to bring any other claim, demand, suit, or other action against Respondent with respect to the subject matter of this Consent Order including, but not limited to, the: (1) recovery of costs incurred by the Department in connection with response actions conducted at the Site, or enforcement of the terms of this Consent Order; (2) recovery of damages to natural resources pursuant to M.G.L. c. 21E, § 5; (3) recovery of damages to the Commonwealth's real or personal property pursuant to M.G.L. c. 21E, § 5; (4) enforcement of the terms of this Consent Order in any administrative or judicial proceeding; and (5) enforcement of past or future noncompliance with any statute or regulation except those past violations cited in Section VI above. Notwithstanding the foregoing, the Department agrees not to assess civil administrative penalties beyond those described in this Consent Order for the violations identified in Section VI above, provided Respondent fully complies with all the terms and requirements of this Consent Order.

40. Nothing in this Consent Order shall be construed or operate to bar, diminish, waive or in any way affect the Department's authority to require Respondent to conduct response actions or take other actions beyond those required by this Consent Order in order to comply with all applicable laws and regulations including, without limitation, M.G.L. c. 21E and the MCP or to perform response actions and recover response costs in the event of Respondent's failure to perform such actions.

41. This Consent Order shall not be construed or operate to bar, diminish, waive or in any way affect the legal or equitable right of the Department with respect to any subject matter not covered by this Consent Order.

## XIII. ACCESS

42. Respondent agrees to provide the Department and the Department's employees, representatives and contractors access to the Site at all reasonable times, upon one business day's notice, for purposes of conducting any activity related to its oversight of this Consent Order. Notwithstanding any provision of this Consent Order, the Department retains all its access authorities and rights under applicable state and federal law.

## XIV. CONSEQUENCES OF VIOLATION OF THE CONSENT ORDER

43. This Consent Order is also a Notice of Noncompliance issued under M.G.L. c. 21A, § 16 and 310 CMR 5.00 for Respondent's noncompliance with M.G.L. c. 21E and 310 CMR 40.0000, as set forth in Paragraph 23 above. Future violations of these requirements as specified herein or of this Consent Order may result, without limitation, in the assessment of additional civil administrative penalties for each day or portion thereof that each violation occurs or continues.

## XV. MODIFICATION

44. This Consent Order may be modified only upon the written agreement of the Department and Respondent.

6

In the Matter of Well-Com Associates, LP
ACO-NE-05-3A003

## XVI. SEVERABILITY

45.    If any term or provision of this Consent Order or the application thereof to any person or circumstance shall, to any extent, be invalid or unenforceable, the remainder of this Consent Order, or the application thereof, shall be valid and enforceable to the fullest extent permitted by law.

## XVII. EFFECTIVE DATE

46.    This Consent Order shall become effective and shall be deemed to be consented to as of the date of the Parties signatures set forth below.

47.    Each undersigned hereby certifies that s/he is fully authorized to enter into the terms and conditions of this Consent Order and to legally bind himself/herself and/or the party on whose behalf such representative is signing.

ORDERED:

For the DEPARTMENT OF ENVIRONMENTAL PROTECTION,


By: _____    Date: _____
         Richard J. Chalpin, Regional Director
         Department of Environmental Protection
         Northeast Regional Office
         One Winter Street
         Boston, MA 02108

CONSENTED TO:

For Well Com Associates, LP

By: _____    Date: _____

Printed Name: ___ John Periera    Title:    President _____

Address: _____ 300 Commercial Street _____

Address: _____ Malden _____

FEIN: _____

COMMONWEALTH OF MASSACHUSETTS
EXECUTIVE OFFICE OF ENVIRONMENTAL AFFAIRS
DEPARTMENT OF ENVIRONMENTAL PROTECTION

|  |  |  |
|---|---|---|
| IN THE MATTER OF: | ) | RE: Malden, 378 Commercial Street |
|  | ) |  |
| Well-Com Associates, LP | ) | RTN 3-0590 |
|  | ) |  |
|  | ) | ADMINISTRATIVE CONSENT ORDER |
|  | ) | AND NOTICE OF NONCOMPLIANCE |
|  | ) |  |
|  | ) | ACO-NE-05-3A003 |

## I. THE PARTIES

1. The Department of Environmental Protection (the "Department" or "DEP") is a duly constituted agency of the Commonwealth of Massachusetts. Its principal office is located at One Winter Street in Boston, Massachusetts 02108.

2. Well-Com Associates, LP ("Respondent") is the owner of the property located at 378 Commercial Street, Malden, MA. The Respondent's mailing address is 300 Commercial Street, Suite 25, Malden, MA 03862.

3. 378 Commercial Street Associates, Inc., is the General Partner of Well-Com Associates Limited Partnership.

4. Respondent's Federal Employee Identification Number is _____.

## II. STATEMENT OF PURPOSE

5. This Administrative Consent Order ("Consent Order") is voluntarily entered into by and between Respondent and the Department because they have mutually agreed that it is in the public interest, and in their own interests, to proceed promptly with the actions called for herein. Respondent and the Department hereby agree to comply with and be bound by the terms of this Consent Order.

## III. DEFINITIONS

6. Unless otherwise indicated, the terms used herein shall have the meaning given to them by the Massachusetts Oil and Hazardous Material Release Prevention and Response Act, M.G.L. c. 21E ("M.G.L. c. 21E"), and the regulations promulgated thereunder as the Massachusetts Contingency Plan ("MCP"), 310 CMR 40.0000 et seq. When used herein to describe past or future submittals, actions or deadlines, such terms shall have the meaning ascribed to them in the versions of such laws and regulations in effect at the time of such submittals, actions or deadlines. In addition, the following term(s) shall have the meaning defined herein:

> Site shall mean the property located at 378 Commercial Street in Malden, MA or any other place or area where the release(s) of oil or hazardous material(s) at and/or from said property has come to be located.

In the Matter of Well-Com Associates, LP
ACO-NE-05-3A003

## IV. STATEMENT OF LAW

The parties agree to the following statement of applicable law and to the jurisdiction and authority of the Department to issue this Consent Order:

7.    The Department is charged with the implementation and enforcement of M.G.L. c. 21E and the MCP. The Department has the authority to issue this Consent Order pursuant to M.G.L. c. 21E, § 9.

8.    The Department is authorized to issue Notices of Noncompliance and to assess civil administrative penalties pursuant to M.G.L. c. 21A, § 16, and the regulations promulgated thereunder at 310 CMR 5.00, et seq.

9.    M.G.L. c. 21E, § 9 and 310 CMR 40.0170(9) authorize the Department to enter into a consent order with a responsible party ("RP"), potentially responsible party ("PRP"), or other person ("OP"), which sets forth necessary response actions, time periods, deadlines for the performance thereof, and requirements for submittals to the Department.

10.    310 CMR 40.0024(1) states that, with limited exceptions, each person who is undertaking response actions shall perform each response action by the deadline imposed by M.G.L. c. 21E, the MCP, or any order or determination of the Department.

11.    310 CMR 40.0170(5)(a) states, in part, that RPs, PRPs and OPs shall perform each and every response action properly and promptly within deadlines prescribed by or pursuant to M.G.L. c. 21E and/or the MCP, including any Interim Deadlines.

12.    310 CMR 40.0405(3) states that Release Abatement Measures (RAMs) are remedial actions that may be voluntarily undertaken at disposal sites, for the purpose of remediating releases until such time as more comprehensive remedial actions can be performed.

13.    310 CMR 40.0560(2)(d) states, in part, that any person undertaking response actions at a Tier II disposal site shall submit a Response Action Outcome Statement ("RAO") within five years of the effective date of such permit.

## V. STATEMENT OF FACTS

Respondent agrees to the following Statement of Facts in this section, solely for the purposes of this Consent Order and for no other purpose:

14.    Respondent is the owner and operator of the 9.5 acre parcel located at 378 Commercial Street in Malden, Massachusetts ("Property").

15.    On April 15, 1987, the Department was notified of the presence of coal tar on the Property. The release was observed during a subsurface investigation of the property in 1985. Investigation of the Property revealed soil contaminated with coal tar and cyanide, evidence that a release of oil and/or hazardous materials as defined by M.G.L. c. 21E section 5 occurred at the Property. The Department assigned Release Tracking Number ("RTN") 3-0590 to the Site

2

In the Matter of Well-Com Associates, LP
ACO-NE-05-3A003

16. On August 31, 2000, Respondent submitted a Phase I Report and Tier Classification to the Department.

17. On November 26, 2003, the Department issued a Notice of Noncompliance ("NON") to the Respondent for failure to submit a Phase II Comprehensive Site Assessment ("Phase II Report"), a Phase III Remedial Action Plan ("Phase III Report") and a Phase IV Remedy Implementation Plan ("Phase IV Report").

18. On June 30, 2004, the Department issued an Amended Notice of Noncompliance to the Respondent granting Respondent's request for extension of the Phase IV deadline.

19. On August 6, 2004, Respondent submitted a Phase II Report to the Department.

20. On August 27, 2004, Respondent submitted a Phase III Report to the Department.

21. On April 29, 2005, Respondent submitted a Phase IV Report to the Department.

22. On May 24, 2005, Respondent submitted a RAM Plan to the Department.

23. On August 31, 2005, Respondent was overdue for the filing of an RAO and a Tier II Extension to the Department.

24. On September 1, 2005, Respondent Submitted a Tier II Extension to DEP. The submittal indicates that Respondent requires more than a year to achieve a permanent or temporary solution for the Site.

25. As of the date this Consent Order, Respondent has not implemented the Phase IV Plan nor has the Respondent submitted an RAO to the Department.

## VI. STATEMENT OF DETERMINATIONS

Based upon the Statement of Facts set forth above in Section V, the Department has determined the following:

26. The Site is a disposal site as defined by M.G.L. c. 21E and the MCP.

27. Respondent is an RP or PRP for the Site at which there is or has been a release and/or threat of release of oil and/or hazardous material pursuant to M.G.L. c. 21E and the MCP.

28. Conditions at the Site constitute a release or threat of release to the environment of oil and/or hazardous material pursuant to M.G.L. c. 21E and the MCP.

29. Respondent failed to submit a RAO to the Department within five years of Tier Classification, in violation of 310 CMR 40.0560(1) and 310 CMR 40.0560(2)(d).

## VII. DISPOSITION AND ORDER

30. Based on the foregoing Statement of Law, Facts and Determinations, the Department issues and Respondent consents to the terms of this Consent Order and agrees to perform the actions as set forth herein.

3

In the Matter of Well-Com Associates, LP
ACO-NE-05-3A003

31. The Department's authority to issue this order is conferred by M.G.L. c. 21E and the regulations promulgated thereunder at 310 CMR 40.0000, and M.G.L. c. 21A, § 16 and the regulations promulgated thereunder at 310 CMR 5.00. Respondent admits to the jurisdiction and authority of the Department to issue and enter into this Consent Order.

32. This Consent Order shall be binding upon: Respondent, its officers, employees, and agents, in their official, not individual capacity; corporate successors and any assignees. Respondent shall not violate this Consent Order and shall not allow or suffer his officers, employees, agents, successors, contractors, consultants or persons acting for or at the direction of Respondent to violate this Consent Order.

33. Unless otherwise indicated herein, the actions performed pursuant to this Consent Order shall be performed in accordance with M.G.L. c. 21E, the MCP and any other applicable federal, state or local laws, regulations and approvals.

34. Unless Respondent first submits an RAO Statement in accordance with 310 CMR 40.1000 or achieves and maintains Remedy Operation Status (ROS) in accordance with 310 CMR 40.0800, Respondent shall submit the following reports within the following deadlines:

   a. A RAM Status or Completion Statement for the Site by March 28, 2006 and a RAM Status or Completion Statement every six months until the RAM is complete;
   b. Implementation of the Phase IV on or before August 30, 2006
   c. A Phase IV Completion Statement on or before May 30, 2008;
   d. An RAO on or before July 1, 2008.

35. If, during response actions at the Site, any condition is discovered which requires notification to the Department pursuant to 310 CMR 40.0300, Respondent shall comply with the MCP in addressing such condition.

36. All submittals required pursuant to 310 CMR 40.0000 et seq. or this Consent Order shall be in compliance with the MCP, including without limitation any other applicable timelines and Performance Standards. Failure to provide a submittal in compliance with this Consent Order, the MCP, applicable timelines and/or Performance Standards, shall constitute a violation of this Consent Order and shall be subject to Stipulated Penalties as provided in Section IX below.

## IX. STIPULATED PENALTIES

37. If Respondent fails to meet any of the terms or requirements of this Consent Order, Respondent shall pay the Commonwealth a stipulated penalty in the amount of One Thousand Dollars ($1,000.00) per violation for each day, or any portion thereof, each such violation continues. Stipulated penalties shall begin to accrue the day the performance is due or the day a violation occurs and shall continue to accrue through the final day of the correction of the violation or completion of the activity.

38. Even if violations are simultaneous, separate penalties shall accrue for separate violations of this Consent Order. Stipulated penalties shall accrue regardless of whether the Department has notified Respondent of the violation. The payment of stipulated penalties shall not alter in any way Respondent's obligation to complete performance as required by this Consent Order.

39. All stipulated penalties accruing under this Consent Order shall be paid within thirty (30) days of the date the Department sends a written demand therefore. Payment of such penalties shall be

In the Matter of Well-Com Associates, LP
ACO-NE-05-3A003

made by certified check, cashiers check or money order payable to the "Commonwealth of Massachusetts." Respondent's federal employer identification number and the words, "In the Matter of Well-Com Associates, LP, ACO-NE-05-3A003" must be clearly written on the face of the check or money order. The Commonwealth will not accept any other form of payment. The payment must be directed to:

> Commonwealth of Massachusetts
> Department of Environmental Protection
> Commonwealth Master Lockbox
> P.O. Box 3982
> Boston, MA 02241-3982

In addition, photocopies of the check or money order shall be sent to the Department at the Notice address herein, ATTN: Stephen M. Johnson.

36.    The stipulated penalties set forth herein shall not preclude the Department from electing to pursue alternative remedies or alternative civil, administrative or criminal penalties which may be available by reason of Respondent's failure to comply with the requirements of this Consent Order. In the event that the Department collects alternate civil or administrative penalties, Respondent shall not be required to pay such stipulated penalties pursuant to this Consent Order for the same violation, and the Department shall reduce such alternative civil or administrative penalties by the amount of any stipulated penalties already paid by Respondent for the violation for which the alternate civil or administrative penalties are to be collected.

## X. NOTICES AND SUBMITTALS

37.    All notices, payments, certifications, submissions or other communications required to be made hereunder shall, unless otherwise indicated in this Consent Order, be made in writing and shall, unless otherwise indicated in this Consent Order, be sent by certified mail, return receipt requested, by hand delivery or by recognized overnight courier, as follows:

If to the Department, to:

> Stephen M. Johnson, Acting Deputy Regional Director
> Department of Environmental Protection
> One Winter Street, 7th Floor
> Boston, MA 02108

If to Respondent, to:

> Well-Com Associates, LP
> 300 Commercial Street, Suite 25
> Malden, MA 12148
> ATTN: John M. Pereira

Submittals will be considered delivered upon receipt by the Department.

## XI. WAIVER OF HEARING

38.    Respondent understands and hereby waives his right to an adjudicatory hearing before the Department on, and judicial review by the courts of, the issuance or terms of this Consent Order and to notice of any such rights of review. This waiver does not extend to any other order issued by the Department.

In the Matter of Well-Com Associates, LP
ACO-NE-05-3A003

## XII. RESERVATION OF RIGHTS

39.  Except as may be set forth in this Consent Order, the Department expressly reserves, and this Consent Order is without prejudice to, the Department's legal or equitable right and authority to issue any additional order and to bring any other claim, demand, suit, or other action against Respondent with respect to the subject matter of this Consent Order including, but not limited to, the: (1) recovery of costs incurred by the Department in connection with response actions conducted at the Site, or enforcement of the terms of this Consent Order; (2) recovery of damages to natural resources pursuant to M.G.L. c. 21E, § 5; (3) recovery of damages to the Commonwealth's real or personal property pursuant to M.G.L. c. 21E, § 5; (4) enforcement of the terms of this Consent Order in any administrative or judicial proceeding; and (5) enforcement of past or future noncompliance with any statute or regulation except those past violations cited in Section VI above.  Notwithstanding the foregoing, the Department agrees not to assess civil administrative penalties beyond those described in this Consent Order for the violations identified in Section VI above, provided Respondent fully complies with all the terms and requirements of this Consent Order.

40.  Nothing in this Consent Order shall be construed or operate to bar, diminish, waive or in any way affect the Department's authority to require Respondent to conduct response actions or take other actions beyond those required by this Consent Order in order to comply with all applicable laws and regulations including, without limitation, M.G.L. c. 21E and the MCP or to perform response actions and recover response costs in the event of Respondent's failure to perform such actions.

41.  This Consent Order shall not be construed or operate to bar, diminish, waive or in any way affect the legal or equitable right of the Department with respect to any subject matter not covered by this Consent Order.

## XIII. ACCESS

42.  Respondent agrees to provide the Department and the Department's employees, representatives and contractors access to the Site at all reasonable times, upon one business day's notice, for purposes of conducting any activity related to its oversight of this Consent Order. Notwithstanding any provision of this Consent Order, the Department retains all its access authorities and rights under applicable state and federal law.

## XIV. CONSEQUENCES OF VIOLATION OF THE CONSENT ORDER

43.  This Consent Order is also a Notice of Noncompliance issued under M.G.L. c. 21A, § 16 and 310 CMR 5.00 for Respondent's noncompliance with M.G.L. c. 21E and 310 CMR 40.0000, as set forth in Paragraph 23 above.  Future violations of these requirements as specified herein or of this Consent Order may result, without limitation, in the assessment of additional civil administrative penalties for each day or portion thereof that each violation occurs or continues.

## XV. MODIFICATION

44.  This Consent Order may be modified only upon the written agreement of the Department and Respondent.

In the Matter of Well-Com Associates, LP
ACO-NE-05-3A003

## XVI. SEVERABILITY.

45.    If any term or provision of this Consent Order or the application thereof to any person or circumstance shall, to any extent, be invalid or unenforceable, the remainder of this Consent Order, or the application thereof, shall be valid and enforceable to the fullest extent permitted by law.

## XVII. EFFECTIVE DATE

46.    This Consent Order shall become effective and shall be deemed to be consented to as of the date of the Parties signatures set forth below.

47.    Each undersigned hereby certifies that s/he is fully authorized to enter into the terms and conditions of this Consent Order and to legally bind himself/herself and/or the party on whose behalf such representative is signing.

ORDERED:

For the DEPARTMENT OF ENVIRONMENTAL PROTECTION,

By: _____    Date: _____
            Richard J. Chalpin, Regional Director
            Department of Environmental Protection
            Northeast Regional Office
            One Winter Street
            Boston, MA 02108

CONSENTED TO:

For Well Com Associates, LP

By: _____    Date: _____

Printed Name: ___John Periera___ Title: ___President___

Address: _____300 Commercial Street_____

Address: _____Malden_____

FEIN: _____

7

# EXHIBIT S

# *Transcript of the Testimony of John M. Pereira*

*Taken: October 12, 2005*

*Volume: 1*

*In the Matter of:*
*Well-Com Associates, LP,*
*Plaintiff,*

*v.*

*Honeywell International, Inc.,*
*Defendant.*

*Reported By*

*O'CONNOR POLLARD REPORTING, INC.*
*Phone: 508-528-2950*
*Fax: 508-528-3927*

Page 1

1                UNITED STATES DISTRICT COURT

2                   DISTRICT OF MASSACHUSETTS

3                          Case No. 05-10056-JLT

4      ********************************

5    WELL-COM ASSOCIATES, LP,

6                    Plaintiff,

7        v.

8    HONEYWELL INTERNATIONAL, INC.,

9                    Defendant.

10     ********************************

11                    DEPOSITION OF JOHN M. PEREIRA, a

12   witness called on behalf of the Defendant, taken

13   pursuant to the Federal Rules of Civil

14   Procedure, before Maureen O'Connor Pollard, RPR

15   and Notary Public within and for the

16   Commonwealth of Massachusetts, at the offices of

17   Hare & Chaffin, 160 Federal Street, Boston,

18   Massachusetts, on the 12th of October, 2005,

19   commencing at 11:05 o'clock a.m.

20

21

22

23

24

JOHN M. PEREIRA
10-12-05

Page 6

         I N D E X
1
2
            FOR
3  EXHIBITS:   DESCRIPTION         ID
4  100 9-12-01 letter to Brian Cafferty
        from Gregory Bibler          7
5  101 Notice of Non-Compliance with MCP    7
   102 3-25-04 letter to John Pereira
6      from Rizzo Associates        7
   103 3-26-04 letter to Kenneth Stroup
7      from Brian Cafferty with attachments   7
   104 Memorandum of Agreement and Tolling
8      Agreement                    7
   105 First Amendment and Extension of
9      Memorandum of Agreement and Tolling
        Agreement of June 1, 2004   7
10 106 1-19-05 letter to Michael Keiselbach
        from Rizzo Associates        7
11 107 1-19-05 letter to Michael Keiselbach
        from Rizzo Associates        7
12 108 2-7-05 letter to Brian Israel
        from Brian Cafferty          7
13
14
15
16
17
18
19
20
21
22
23
24

Page 7

1    P R O C E E D I N G S

2

3        (Whereupon, Pereira Exhibits 33 to 108

4        were marked for identification.)

5

6        JOHN M. PEREIRA,

7    having been identified by Massachusetts driver's

8    license, being first duly sworn, was examined

9    and testified as follows:

10       MR. HARTZELL:  Same stipulations?

11       MR. CHRISTO:  Yes.  Do you want to

12   state them?

13       MR. HARTZELL:  I'll state them for the

14   record.

15       All objections except as to form and

16   all motions to strike reserved to the time of

17   trial.  The witness may read and sign the

18   transcript under the pains and penalties of

19   perjury, and does not need to be notarized.

20       MR. CHRISTO:  That's fine.

21       BY MR. CHRISTO:

22   Q.   Okay.  Could you state your name for

23   the record, please?

24   A.   John Pereira.

Page 8

1    Q.   Mr. Pereira, by whom are you employed?

2    A.   I'm self-employed.

3    Q.   What is the nature of your

4    self-employment?

5    A.   I have a company called Combined

6    Properties.

7    Q.   Okay.  And are you the sole owner of

8    Combined Properties?

9    A.   Yes.

10   Q.   And could you briefly state the

11   business of Combined Properties?

12   A.   Combined is a management/development

13   company of real estate.

14   Q.   And could you explain what you mean by

15   management and development of real estate?

16   A.   We own commercial properties, real

17   estate in Chelsea, Medford, Malden, Lynnfield

18   and Peabody that we have developed.

19   Q.   Approximately how many different

20   properties just in order of magnitude?

21   A.   About 30.

22   Q.   And are you the founder of Combined

23   Properties?

24   A.   No.

Page 9

1    Q.   When did you come to own Combined

2    Properties?

3    A.   I believe it was January of '96.

4    Q.   From what person or persons did you

5    buy Combined Properties?

6    A.   I bought it from the estate of Stanton

7    L. Black.

8    Q.   And the estate was the sole proprietor

9    at that time of Combined Properties?

10   A.   I think that Stan's wife Pat also had

11   an interest in the company.

12   Q.   All right.  As of the time you

13   purchased Combined Properties, approximately how

14   many properties was it then managing?

15   A.   Probably for -- less than we manage

16   today, so probably 26, 25.

17   Q.   Somewhere in the mid twenties?

18   A.   Yes.

19   Q.   Is there a particular theme to all the

20   properties you manage, or is it diverse?  By

21   that I mean is there a particular kind of use,

22   residential, commercial, that kind of thing?

23   A.   No.  We have industrial, warehouse,

24   office, retail, and we're building apartments

O'CONNOR POLLARD REPORTING, INC.
Mycourtreporter@comcast.net       508-528-2950 * MA: 800-528-2951       Fax:  508-528-3927

Page 10

1  now.
2      Q.  Okay.  So a fairly wide range of
3  various real estate uses?
4      A.  Yes.
5      Q.  Okay.  Let's take a minute and explore
6  your background.
7          Could you please summarize for me your
8  post-high school education?
9      A.  I have a bachelors of science in civil
10  engineering from the University of Massachusetts
11  at Dartmouth, graduated in '78; I have a JD from
12  Boston College in '81.
13      Q.  Okay.  And after you got your JD from
14  Boston College, did you practice law?
15      A.  I practiced law here in the City of
16  Boston.
17      Q.  When did you pass the Bar?
18      A.  '81.
19      Q.  Okay.  Mass Bar?
20      A.  Yes.
21      Q.  Are you a member of any other Bars, or
22  were you a member of any other Bars besides the
23  Mass Bar?
24      A.  I think I'm a member of Federal

Page 11

1  District Court, the Federal Court of Appeals,
2  and the Supreme Court.
3      Q.  Okay.  No other state Bars?
4      A.  No.
5      Q.  All right.  And do you maintain your
6  membership in the Mass Bar to the current time?
7      A.  Yes.
8      Q.  Not on an active status?
9      A.  Not at all.
10      Q.  Do you still practice law at all?
11      A.  No.
12      Q.  Where did you first practice law after
13  graduating from BC?
14      A.  Reimer & Braunstein.
15      Q.  And that was in Boston?
16      A.  Yes.
17      Q.  What was the nature of your specialty,
18  if any?
19      A.  I represented commercial banks, mostly
20  in workouts.
21      Q.  Workouts?
22      A.  Workouts.
23      Q.  Okay.  And for how long did you stay
24  with Reimer & Braunstein, approximately?

Page 12

1      A.  Through '83, I believe.
2      Q.  In '83, how did your employment
3  change?
4      A.  Sherin & Lodgen.
5      Q.  And did you join as an associate?
6      A.  Associate.
7      Q.  And what was the nature of your
8  specialization at that firm, if any?
9      A.  Representing banks and real estate
10  developers, Stop & Shop.
11      Q.  With regard to your real estate
12  developer representation, what types of legal
13  work did you do; closings, that kind of thing?
14      A.  What I meant by that was really
15  representing real estate developers, people who
16  were buying and selling real estate versus
17  representing a bank at a closing.
18      Q.  Okay.  And what kinds of activities
19  did you engage in representing real estate
20  developers while at Sherin & Lodgen?
21      A.  Could you ask the question again?
22      Q.  Yes.  What types of activities were
23  you engaged in representing real estate
24  developers?

Page 13

1      A.  General real estate practice.
2      Q.  Okay.  How long did you stay at Sherin
3  & Lodgen?
4      A.  I believe I left in November of '87.
5      Q.  What was your next employment?
6      A.  I was vice-president and general
7  counsel at Combined Properties.
8      Q.  So you were in-house at Combined
9  Properties?
10      A.  Yes.
11      Q.  And you worked for Mr. Black?
12      A.  Yes.
13      Q.  He was at that time the owner together
14  with his wife of the company?
15      A.  Yes.
16      Q.  And was this a corporation?
17      A.  Combined is a Sub S Corp.
18      Q.  And was it at the time you went to
19  work for them?
20      A.  I believe so.
21      Q.  Okay.  What were your duties in
22  general terms as vice-president and general
23  counsel at Combined?
24      A.  Advising the company as to legal

O'CONNOR POLLARD REPORTING, INC.
Mycourtreporter@comcast.net    508-528-2950  *  MA: 800-528-2951    Fax: 508-528-3927

Page 14

1  matters.
2      Q.  So your activities remained legal in
3  nature as opposed to any other type of work?
4      A.  Not totally.  I was part of the senior
5  management team, and managed outside legal
6  counsel as opposed to providing just legal
7  services.  It was more of a management position.
8      Q.  Okay.  Did you have anything to do
9  with non-legal parts of the business, real
10  estate evaluations, acquisitions, that kind of
11  thing?
12      A.  Eventually.  Not in the early stages
13  or the early days that I was there.
14      Q.  Okay.  Now, when you joined did you
15  have any equity in the company, or were you
16  strictly an employee?
17      A.  I had equity.
18      Q.  What was the nature percentage-wise of
19  your equity?
20      A.  It was minor.  I don't even remember.
21      Q.  A small percentage?
22      A.  Small percentage.
23      Q.  Okay.  How did you come to join
24  Combined and leave Sherin & Lodgen?  How did

Page 15

1  that come about?
2      A.  Sherin & Lodgen representing Combined
3  Properties, and I was doing work for Combined
4  while at Sherin & Lodgen.
5      Q.  That's how you got to know Mr. Black?
6      A.  Right.
7      Q.  All right.  And you mentioned you were
8  part of the senior management.  Who else was
9  part of the senior management besides Mr. Black
10  and yourself?
11      A.  When I first got there?
12      Q.  Yes.
13      A.  Ron Collins.
14      Q.  What was his role?
15      A.  He was on the management side.
16      Q.  Do you recall if he had a title?
17      A.  No, I don't recall.
18      Q.  Anyone else?
19      A.  Brian Dacey.
20      Q.  How do you spell Mr. Dacey's name?
21      A.  D-A-C-E-Y.
22      Q.  Okay.  Do you recall what his title
23  was?
24      A.  I believe it was executive

Page 16

1  vice-president when I got there.
2      Q.  Okay.  Anyone else?
3      A.  On a senior management?
4      Q.  Right.
5      A.  I think Bob Degaeta.
6      Q.  Could you spell Mr. Degaeta's name?
7      A.  D-E-G-A-E-T-A.  He was the chief
8  financial officer.
9      Q.  Is that it?
10      A.  That was it, I think.
11      Q.  Okay.  And you remained continuously
12  employed as VP and general counsel at Combined
13  until you purchased the company from the estate
14  in '96?
15      A.  I remained employed with them in the
16  capacity as general counsel.
17      Q.  How did that change and when?
18      A.  How did that change and when?
19      Q.  Yes.
20      A.  I became executive vice-president, and
21  then president.
22      Q.  Approximately when did those two
23  events occur?
24      A.  I think I became executive

Page 17

1  vice-president either in '89 or '90.
2      Q.  Okay.
3      A.  And I think I became president around
4  '91.
5      Q.  How did your job change functionally
6  when you became EVP?
7      A.  As executive vice-president, I was
8  second in command.
9      Q.  Did Mr. Dacey leave?
10      A.  Yes.
11      Q.  And did you maintain or continue your
12  general counsel duties as well, or did you
13  replace yourself from that role?
14      A.  No, I did not -- we did not hire
15  another general counsel, but I phased out of
16  doing day to day legal work.
17      Q.  Did you hire a lawyer in-house, or
18  just farm it out?
19      A.  What period are we talking about?
20      Q.  When you became EVP and phased out of
21  legal work.
22      A.  I was still doing some and farming out
23  some.
24      Q.  And then in '91 you became president,

5 (Pages 14 to 17)

Page 22

1  partnership was 50 percent Stanton Black and 50
2  percent a group called CRES, C-R-E-S, Cooper,
3  Rudimen, Epstein and Stone.  Mr. Black owned 50
4  percent, CRES owned 50 percent.  Combined
5  operated and managed the property on behalf of
6  the partnership.
7      Q.  So Combined had, in essence, a
8  management contract with the partnership?
9      A.  That's right.
10     Q.  Okay.  And as in-house general counsel
11 for Combined, you managed the lawyers who
12 pursued the litigation against Coastal of New
13 England?
14     A.  Yes.
15     Q.  And could you just summarize the
16 nature of that environmental litigation?
17     A.  Suffolk Square 3 is a 60,000 square
18 foot piece of property that had been redeveloped
19 by the Malden Redevelopment Authority.  Prior to
20 its redevelopment it had been used as an oil
21 depot.  And in refinancing the property the
22 first 21E study was done probably about '87, and
23 it was determined that the property had oil
24 contamination, and we brought a lawsuit against

Page 23

1  the operator of the oil depot to clean up the
2  site.
3      Q.  And how did that lawsuit turn out?
4      A.  We were successful in proving that
5  Coastal was liable for the contamination.
6      Q.  Did you get a judgment?
7      A.  We did.
8      Q.  What court was that in?
9      A.  The Massachusetts Superior Court.
10     Q.  And do you recall the year of the
11 judgment?
12     A.  No, I don't.
13     Q.  Do you recall generally the time frame
14 when this lawsuit transpired?
15     A.  It was in the early eighties -- let me
16 see, the early nineties, not early eighties.
17     Q.  What was the size of the judgment?
18     A.  Judgment was for 2.2 million, I think,
19 or 2.2, 2.4.
20     Q.  Okay.  And did the Plaintiff
21 ultimately collect on that judgment?
22     A.  No.
23     Q.  What happened?
24     A.  The case was reversed in part on

Page 24

1  appeal.
2      Q.  Was it remanded for further
3  proceedings, or did you resolve it at that
4  point?
5      A.  It was -- I don't know.  I don't
6  remember.
7      Q.  How did it end up, if you remember?
8      A.  We were entitled to -- there was a
9  determination that Coastal was liable for the
10 pollution.  The Court awarded us costs in the
11 litigation, and that we were to receive the
12 costs of clean-up, but not a claim for damages.
13     Q.  Okay.  Did you collect on the
14 attorney's fees and costs of clean-up?
15     A.  Yes.
16     Q.  And approximately how much did that
17 amount to?
18     A.  A few hundred thousand dollars.
19     Q.  Okay.  Turning your attention to the
20 property that is at issue in this case, how
21 would you describe the property at issue in this
22 case?  What would you call it?
23     A.  378 Commercial Street.
24     Q.  378 Commercial.  And could you

Page 25

1  describe for us the nature of the ownership of
2  378 Commercial Street?
3      A.  Today?
4      Q.  Yes.
5      A.  I believe it's held in a limited
6  partnership of the corporate general partner.
7      Q.  And what is the name of that limited
8  partnership?
9      A.  I don't recall.
10     Q.  Who is the corporate general partner?
11     A.  I don't recall.
12     Q.  What is the relationship, if any,
13 between Combined Properties and 378 Commercial
14 Street?
15     A.  It's as we described earlier; we
16 manage the property, Combined manages the
17 property for the ownership entity.
18     Q.  And could you just describe in the
19 case of 378 Commercial what that means?
20     A.  We collect the rents, we pay the
21 bills, we contract for snowplowing and
22 landscaping services, we rent out to tenants, we
23 manage the tenants, it's commercial management.
24     Q.  Approximately how many tenants do you

7 (Pages 22 to 25)

JOHN M. PEREIRA
10-12-05

Page 26

1  have there?
2      A.  Today?
3      Q.  Yes.
4      A.  Two.
5      Q.  Who are the tenants?
6      A.  UPS and Vocell's Bus.
7      Q.  Could you spell that for her?
8      A.  V-O-C-E-L-L apostrophe S, I think.
9      Q.  What's the nature of the UPS
10  occupancy?
11      A.  They occupy 50,000 feet of warehouse
12  space.
13      Q.  So they store packages there and have
14  trucks coming and going?
15      A.  Yes.  It's not a typical UPS
16  operation, it's a fulfillment operation.
17      Q.  What do you mean by that?
18      A.  They store goods for third parties and
19  deliver them when called upon.
20      Q.  Okay.  And Vocell's Bus, what's the
21  nature of their occupancy?
22      A.  It's basically a school bus operator.
23      Q.  So they park their buses there?
24      A.  They park and --

Page 27

1      Q.  Is there a maintenance facility?
2      A.  There's maintenance, they have
3  headquarters, offices.
4      Q.  By "maintenance" we mean repair of the
5  buses as needed, that kind of thing?
6      A.  I believe so.
7      Q.  Approximately what's the size of their
8  occupancy?
9      A.  They occupy 15,000 feet of building
10  and a couple acres, I think, of land.
11      Q.  Is there any remaining availability
12  for tenancy on that site, or is it --
13      A.  Yes.
14      Q.  What is the remaining?
15      A.  There's 50,000 feet available.
16      Q.  50,000 available?
17      A.  Mm-hmm.
18      Q.  Are you marketing that at this time?
19      A.  Yes.
20      Q.  What are you trying to market it as?
21      A.  What are we marketing it as?  You mean
22  the use?
23      Q.  Yes.
24      A.  It's an industrial use.  We're

Page 28

1  marketing it for uses consistent with the zoning
2  that exists.
3      Q.  So uses similar to the existing uses?
4      A.  Yes, warehouse.
5      Q.  For how long has that space been
6  available, approximately?
7      A.  Oh, I don't know, three to five years
8  maybe.
9      Q.  Okay.  Do you advertise it?
10      A.  Yes.
11      Q.  Do you have a broker?
12      A.  We do that in-house.
13      Q.  "We" meaning Combined Properties?
14      A.  Combined does it in-house.
15      Q.  Do you have any ownership interest in
16  378 Commercial?
17      A.  Yes.
18      Q.  What's the nature of your ownership
19  interest?
20      A.  I own 100 percent of the limited
21  partnership interest, and 100 percent of the
22  stock, I think, of the general partner.
23      Q.  Okay.  So you are the owner through a
24  limited partnership?

Page 29

1      A.  That's right.
2      Q.  And the corporate owner you also own,
3  but you just don't remember the names of those
4  entities?
5      A.  That's right.  There have been so many
6  names, I don't remember if it's Well-Com, Inc.
7  or 378 Associates, Inc..
8      Q.  Join the club.  We're going to try to
9  parcel through that as we go through these
10  documents today.
11          For how long have you been the owner
12  through whatever entities exist of 378
13  Commercial?
14      A.  When I acquired the company from the
15  estate, I took an ownership interest in 378.
16      Q.  That would be in 1996?
17      A.  That's right.
18      Q.  Prior to '96, did you have any
19  ownership interest in 378?
20      A.  I believe so.
21      Q.  And what was the nature of that
22  ownership interest?
23      A.  It was a minority partnership
24  interest.

8 (Pages 26 to 29)

JOHN M. PEREIRA
10-12-05

Page 30

1    Q.  With Mr. Black having the lead?
2    A.  That's right.
3    Q.  Okay.  And for how long did you have a
4  minority partnership interest?
5    A.  Since I joined the company.
6    Q.  That would be --
7    A.  '87.
8    Q.  -- '87?  Okay.
9        (Off the record discussion.)
10       BY MR. CHRISTO:
11   Q.  Now, is it the case -- well, is it
12  your understanding that 378 Commercial is
13  contaminated in some way?
14   A.  Yes.
15   Q.  To your understanding, what's the
16  nature of the contamination?
17   A.  Say that again?
18   Q.  To your understanding, what's the
19  nature of the contamination?
20   A.  I believe the site is contaminated
21  with coal tars and metals.
22   Q.  Okay.  Anything else?
23   A.  Not that I can recall at the moment.
24   Q.  Okay.  And how did you gain an

Page 31

1  understanding that the site has this
2  contamination?
3    A.  It was a long process.
4    Q.  Could you summarize the process?
5    A.  How did I gain the knowledge that it
6  was contaminated?
7    Q.  Yes.
8    A.  Prior to the acquisition of the
9  property, studies were done on this and other
10  properties on Commercial Street.  I believe
11  those studies were originally done by TRC.  And
12  the studies have continued since then until the
13  present with other studies being done by Norwood
14  Engineering, Faye, Spofford & Thorndike, FST.
15   Q.  And others perhaps?
16   A.  And others, yes.
17   Q.  When you said "prior to the
18  acquisition of the property," prior to the
19  acquisition of the property by whom?
20   A.  Prior to the acquisition of the
21  property.  The original owner of the property
22  was a joint venture between Stan Black and Joe
23  Carabetta.
24   Q.  Okay.  And so do you mean prior to the

Page 32

1  acquisition by them?
2    A.  Yes.
3    Q.  All right.  And how do you know
4  studies were done prior to the acquisition by
5  them?
6    A.  They weren't done by them.
7    Q.  Maybe I misphrased the question.
8        How do you know that prior to the
9  acquisition by them studies were done?
10   A.  I believe I reviewed them.
11   Q.  And when and how did you have occasion
12  to review them?
13   A.  I don't remember when we closed on the
14  property when the property was acquired, I
15  believe it was late '87.  So prior to that I was
16  at Sherin & Lodgen, so I would have reviewed
17  them in my capacity as an attorney for Black and
18  Carabetta.
19   Q.  So Black and Carabetta, if I
20  understand you correctly, were going to be in
21  some sort of a partnership to purchase this
22  property, and Combined Properties was going to
23  manage it, am I straight so far?
24   A.  Yes.

Page 33

1    Q.  All right.  And in connection with
2  that, some studies were done that you reviewed
3  on behalf of Black and Carabetta?
4    A.  Yes.
5    Q.  And do you recall which of the various
6  consulting firms did those studies?
7    A.  I believe the original studies were
8  done by TRC.
9    Q.  TRC?
10   A.  Right.
11   Q.  Okay.  And as a result of reviewing
12  those studies, you gleaned information that the
13  site was contaminated in '87?
14   A.  As well as discussions with the
15  engineer or engineers.
16   Q.  The engineers from TRC?
17   A.  And others.
18   Q.  Do you remember any of them?
19   A.  Jeff Nangle from Norwood Engineering
20  began to play a role early on in the studies.
21   Q.  What was your purpose or purposes in
22  reviewing these studies at the time?
23   A.  I was helping with the acquisition of
24  a property as an attorney.

9 (Pages 30 to 33)

JOHN M. PEREIRA
10-12-05

Page 34

1    Q.  Is it fair to say that before Black
2  and Carabetta purchased the property they wanted
3  to glean some understanding of the nature of the
4  contamination of the property?
5    A.  You've got to say that again.
6    Q.  Is it fair to say that before Black
7  and Carabetta purchased the property they wanted
8  to gain some understanding of the nature of the
9  contamination on that property?
10    A.  Yes.
11    Q.  And you assisted them in that regard?
12    A.  In gathering an understanding of the
13  contamination?  I'm not sure I'd say I assisted.
14    Q.  Well, what did you do in that regard,
15  if anything?
16    A.  Well, they had engineers that were
17  helping them understand the contamination on the
18  site.
19    Q.  And you as their lawyer also attempted
20  to understand the contamination?
21    A.  Yes.
22    Q.  Okay.  Were any of these studies done
23  at the behest of Black and Carabetta, or were
24  they done by third parties?

Page 35

1    A.  My memory is that they were done by
2  the Malden Redevelopment Authority, the earliest
3  of the studies.
4    Q.  Do you recall why the MRA had been
5  doing these studies?
6    A.  They were interested in redevelopment
7  of what was called Lower Commercial Street, and
8  therefore took a pretty active role in that
9  regard.
10    Q.  Doing studies of the various
11  properties and so forth?
12    A.  And other things, yes.
13    Q.  I gather that Black and Carabetta
14  decided to go forward with the purchase
15  notwithstanding the contamination?
16    A.  Yes.
17    Q.  And do you know why that is?
18    MR. HARTZELL:  I'd caution you to be
19  mindful of any privileges, any information you
20  learned as a result of communications with your
21  then client.
22    A.  What was the question again?
23    BY MR. CHRISTO:
24    Q.  The question was; why did the purchase

Page 36

1  go forward notwithstanding the contamination?
2    A.  You've got to ask the question again.
3  Sorry.
4    Q.  All right.  I think we're at the point
5  where Black and Carabetta were planning to buy
6  the property?
7    A.  Right.
8    Q.  There were studies done --
9    A.  Right.
10    Q.  -- that you reviewed and others
11  reviewed concerning contamination that
12  established there was contamination?
13    A.  Right.
14    Q.  Notwithstanding that, the purchase
15  went forward?
16    A.  That's right.
17    Q.  And the question is; why did the
18  purchase go forward given that the property was
19  contaminated?
20    A.  I think they had -- I think they
21  believed that they had understood the cost of
22  remediation and the rights they had against
23  predecessors in helping clean up those, or
24  dealing with the costs of clean-up.

Page 37

1    Q.  So a decision, is it fair to say a
2  decision was made that notwithstanding the
3  contamination the property was worth buying?
4    A.  Yes.
5    Q.  Okay.  At the time, the time being
6  late '87 when this purchase came about, you had
7  some, I gather, understanding of the extent of
8  the contamination, correct?
9    MR. HARTZELL:  Objection.
10    A.  What's the question?
11    BY MR. CHRISTO:
12    Q.  At the time, the time being late '87
13  when this purchase was consummated, did you feel
14  you had some understanding of the nature of the
15  contamination?
16    A.  I had some knowledge of the
17  contamination.
18    Q.  Okay.  From that time to today, has
19  your understanding in that regard changed?
20    A.  I have more knowledge today than I did
21  then.  I know more facts, yes.
22    Q.  All right.  From that time to today,
23  has your understanding of the extent of the
24  contamination changed?

10 (Pages 34 to 37)

JOHN M. PEREIRA
10-12-05

Page 38

1    A.   Yes.
2    Q.   All right.  How has it changed?
3    A.   I believe there's more today.  I
4  believe the studies reveal that there are more
5  contamination -- there is more contamination.
6    Q.   Than you originally thought?
7    A.   Than we originally believed.
8    Q.   When you say "more," can you
9  characterize that at all?  Different places,
10  larger amount, what?
11    A.   All of that.
12    Q.   All of the above?
13    A.   Yes.
14    Q.   Okay.
15    A.   Larger amounts, different places, more
16  prevalent.
17    Q.   Different types of contamination, or
18  same type?
19    A.   No, I think it's basically the same
20  types of contamination.
21    Q.   Now, certainly when you purchased the
22  property you were aware it was contaminated?
23        MR. HARTZELL:  Objection.
24        BY MR. CHRISTO:

Page 39

1    Q.   Correct?
2        MR. HARTZELL:  When you say -- I don't
3  know what you're talking about when you say
4  "you."
5        BY MR. CHRISTO:
6    Q.   I think earlier in your testimony you
7  indicated you purchased the property through
8  various entities, correct?
9    A.   Right.
10    Q.   When that happened, you were aware of
11  the contamination?
12    A.   Yes.
13    Q.   Okay.
14    A.   I was aware of the contamination that
15  we knew about at the time that I acquired it.
16    Q.   What were you aware of with regard to
17  the contamination when you purchased the
18  property?
19    A.   Probably wasn't much different than
20  when the original acquisition took place in '87.
21    Q.   Can you just summarize what that was?
22  What kind of contamination?
23    A.   It was coal tars and metals.
24    Q.   Coal tars and metals.

Page 40

1        And today it's the same contamination,
2  coal tars and metals?
3    A.   I believe so.
4    Q.   Okay.  Why don't we turn to some
5  documents, and maybe that will help us remember
6  the names of the various entities to piece this
7  together.
8        Let me show you what's been previously
9  marked -- at any time you want to break or you
10  want to stretch or do anything --
11    A.   No, I'm fine.
12    Q.   Let me show you what's been marked as
13  Deposition Exhibit 33, a letter dated November
14  9th, '84 to Mr. Edward Kazanjian at Wellington
15  Realty Company from Steven Buchbinder (handing),
16  with a copy to Mr. Carabetta.
17        At this time, the time being '84, did
18  you have any involvement with Combined
19  Properties and/or 378 Commercial Street?
20    A.   I was involved with Combined
21  Properties beginning in 1984.
22    Q.   Now, were you aware of this ongoing
23  transaction at that time?
24    A.   I don't recall.

Page 41

1    Q.   Okay.  Do you recall who Mr. Kazanjian
2  was?
3    A.   I know who he is.
4    Q.   All right.  And who is he with
5  relation to 378 Commercial?
6    A.   Which Kazanjian?
7    Q.   Edward.
8    A.   Edward was John's son.  Ed was
9  managing his father's real estate.
10    Q.   And at the time, the time being around
11  '84, did Wellington Realty Company have some
12  connection with 378 Commercial Street?
13    A.   There were various Wellington entities
14  that the Kazanjians owned.  From this letter I
15  wonder if -- or I believe Wellington Realty
16  Company owned 378.
17    Q.   Okay.  But essentially it was the
18  Kazanjians, that was their company they were
19  using?
20    A.   Yes.
21    Q.   Okay.  And was that one of the
22  entities from which Carabetta and Black were
23  going to purchase the property, if you recall?
24    A.   I believe so, yes.

11 (Pages 38 to 41)

JOHN M. PEREIRA
10-12-05

Page 66

1  fully determined.  Discussions were more about
2  the source of the contamination.
3      Q.  What do you recall about discussions
4  concerning the source?
5      A.  When the first studies were done we
6  didn't know what the operation was then, so
7  there was speculation about sources, and as
8  Allied got involved there was greater
9  understanding of the processes, things of that
10  nature.
11      Q.  What other sources do you recall being
12  speculated about, if any?
13      A.  Well, they found, I believe, hide.
14      Q.  Hides?
15      A.  Hide.
16      Q.  As in animal hides?
17      A.  Animal hides, and people were
18  wondering why those animal hides were there; was
19  there a tannery that operated there.  So there
20  were questions about the contaminants that were
21  on the site.
22      Q.  Do you recall at any of those meetings
23  it being determined that there was, in fact, a
24  tannery there at one time?

Page 67

1      A.  No, it was never determined that there
2  was a tannery there.
3      Q.  Okay.  Turning your attention to
4  Exhibit 48, this is a Donnelly & Reed Real
5  Estate Agency appraisal report for the property.
6  Do you recognize this to be an appraisal report
7  dated March 6th, '87 for the 378 Commercial
8  Street property?
9      A.  What was the question again, please?
10      Q.  Do you recall this to be an appraisal
11  report dated March 6th, 1987 for the 378
12  Commercial Street property?
13      A.  Yes.
14      Q.  And is it correct that in or about
15  that time the appraisal was at $10,000,000?
16      A.  The appraisal says $10,000,000, yes.
17      Q.  Does that conform to your
18  understanding?
19      A.  My understanding of what?
20      Q.  What the appraisal was for the
21  property, what its appraised value was?
22      A.  I don't recall.
23      Q.  You don't recall.  Could be, could not
24  be?

Page 68

1      A.  Yes.
2      Q.  Okay.  Is it correct that, to your
3  understanding, Messrs. Black and Carabetta
4  bought the property for substantially less than
5  its appraised value?
6          MR. HARTZELL:  Objection.
7      A.  What was the question?
8          BY MR. CHRISTO:
9      Q.  Is it correct, to your understanding,
10  that Messrs. Black and Carabetta bought the
11  property for substantially less than its
12  appraised value?
13      A.  Substantially less than this appraised
14  value.  Yes.
15      Q.  Separate from this appraised value, to
16  your understanding did they buy the property
17  cheap, for lack of a better word?
18      A.  No, I never believed that.
19      Q.  You didn't believe that?
20      A.  No.
21      Q.  Did you believe they overpaid for it?
22      A.  No.
23      Q.  You thought it was a fair price?
24      A.  Right.

Page 69

1      Q.  Okay.  I take it you disagree with
2  this appraised value?
3      A.  You have to understand the terms and
4  conditions of an appraisal, and I really don't
5  recall how this appraisal was done, so I don't
6  have an opinion.
7      Q.  Okay.  Fair enough.
8          MR. HARTZELL:  Just so the record is
9  clear, I don't believe this is a complete copy
10  of that appraisal in any event.
11          THE WITNESS:  All it is is the title
12  page.
13          MR. CHRISTO:  517 through 519 Bates
14  stamped.
15          MR. HARTZELL:  But what you've marked
16  as Exhibit 48 is only three pages of a longer
17  document.
18          MR. CHRISTO:  Fine.  I don't know if
19  we have a longer document or what the deal is.
20          MR. CAFFERTY:  You do.
21          MR. CHRISTO:  If you want me to
22  conform and put the whole thing in, I'll be
23  happy to do it.
24          MR. HARTZELL:  It's your deposition.

18 (Pages 66 to 69)

JOHN M. PEREIRA
10-12-05

Page 74

1    AFTERNOON SESSION
2        1:02 P.M.
3
4        A.   There was a question you had asked me
5    earlier which if I recall was did you know that
6    Carabetta and Black formed an intent to buy the
7    property knowing it was contaminated.
8            When I answered that I assumed you
9    meant when they bought the property in '86.
10           BY MR. CHRISTO:
11       Q.   Yes.
12       A.   Okay.
13       Q.   As opposed to what other time would it
14   be?
15       A.   Prior to buying the property.
16           MR. CAFFERTY:  '84?
17       A.   '84, '83.
18           BY MR. CHRISTO:
19       Q.   Well, they bought the property in '86?
20       A.   Right.
21       Q.   How could they have --
22       A.   That's how I interpreted the question.
23   The purchase and sale agreement was signed in
24   '84.

Page 75

1        Q.   Right.
2        A.   It was when they acquired the property
3    was your question, it was in '86.
4        Q.   Since we're exploring that, at the
5    time they signed the purchase and sale agreement
6    in '84, didn't they have like a two year window
7    to look at and review environmental studies?
8        A.   Right.
9        Q.   And didn't they have the ability to
10   back out of the deal?
11       A.   Yes.
12       Q.   Okay.  Anything else you want to talk
13   about?
14       A.   No.
15       Q.   Okay.  Turning our attention to
16   Exhibit 50, it's a letter dated June 8th, 1987
17   from you to Laurie Burt at Foley, Hoag & Eliot.
18           Are you the author of this letter?
19       A.   I believe so.
20       Q.   Now, at the time, the time being June
21   of '87, were you acting in your capacity as
22   outside counsel for Messrs. Black and Carabetta?
23       A.   Yes.
24       Q.   Okay.  Now, this concerns, among other

Page 76

1    things, the 387 Commercial Street property which
2    is the subject of this lawsuit, correct?
3        A.   I'm sorry, say that again?
4        Q.   This concerns, among other things, did
5    I say 387, the 378 Commercial Street property
6    that is the subject of this lawsuit, correct?
7        A.   I believe so, yes.
8        Q.   It also concerns the Lombard parcel we
9    referred to earlier?
10       A.   Yes.
11       Q.   Ms. Burt represented whom?
12       A.   The Malden Redevelopment Authority.
13       Q.   Okay.  Now, you write to Ms. Burt that
14   "the development of the Wellington and Lombard
15   parcels is falling seriously behind schedule."
16           Could you elaborate on that and tell
17   us what you meant?
18       A.   I don't know.
19       Q.   Was there some schedule at the time
20   that was --
21       A.   I don't recall.
22       Q.   Do you recall what the development was
23   for at the time?
24       A.   No, I don't.

Page 77

1        Q.   You refer to the "next phase of the
2    site assessment."  Could you tell us what that
3    refers to?
4        A.   No, I don't.
5        Q.   Okay.  In the beginning you talk about
6    "it's been over a month since Joe Carabetta and
7    Stan Black received a letter from Hank Mulhern
8    regarding DEQE's request for completion of the
9    site assessment work."
10           Mr. Mulhern worked at DEQE at the
11   time?
12       A.   Hank Mulhern was the executive
13   director of the Malden Redevelopment Authority.
14       Q.   Okay.  And what, if anything, do you
15   recall about DEQE requesting completion of the
16   site assessment work?
17       A.   I think there was some issues with the
18   studies, that I think it was called a data gap,
19   there was gaps in the data, and that in a
20   conference I thought with DEQE there was a
21   request to fill in those gaps in the data.  So
22   there was a data gap study, I think, that we
23   were talking about at this time.
24       Q.   And can you tell what you meant by

20 (Pages 74 to 77)

Page 130

1  significant fact that purchasers of property at
2  the time they purchase property are aware the
3  contamination?
4       MR. HARTZELL: Objection.
5    A.  I still don't know what the question
6  is. Do I believe it's a significant fact that
7  there's contamination before buying a property,
8  is that what you're asking me?
9       BY MR. CHRISTO:
10   Q.  That the knowledge on the part of the
11  purchasers of contamination is a significant
12  factor?
13      MR. HARTZELL: Objection.
14   A.  I don't understand the question.
15      MR. HARTZELL: Are you asking
16  hypothetically?
17      BY MR. CHRISTO:
18   Q.  From your knowledge of applicable
19  rules, regulations and law in this area, do you
20  believe it is of any moment that a purchaser of
21  contaminated property is aware of contamination
22  at the time he purchases it?
23      MR. HARTZELL: Objection.
24      Are you asking for his opinion?

Page 131

1       MR. CHRISTO: His understanding.
2       MR. HARTZELL: What's the difference?
3  I don't know that you can ask him his opinion.
4       MR. CHRISTO: I'm not asking his
5  opinion. I'm asking whether he has an
6  understanding that's of any moment.
7       MR. HARTZELL: Objection as to form.
8       Answer if you can.
9    A.  I'm sorry, I still don't understand
10  the question.
11      BY MR. CHRISTO:
12   Q.  Let me try it another way.
13      At the time you purchased this
14  property, 378 Commercial, fair to say you were
15  aware it was contaminated?
16      MR. HARTZELL: Objection.
17   A.  At the time I purchased the property
18  in '96, at the time --
19      BY MR. CHRISTO:
20   Q.  Yes, you did.
21   A.  Okay. When I purchased the property
22  in '96, was I aware that the property was
23  contaminated?
24   Q.  Yes.

Page 132

1    A.  Yes.
2    Q.  Okay. And to your understanding, is
3  that an important factor in the legal regulatory
4  scheme of things?
5       MR. HARTZELL: Objection.
6    A.  No.
7       BY MR. CHRISTO:
8    Q.  Okay. You have participated in
9  negotiations with Allied concerning costs for
10  the remediation, correct?
11   A.  I have participated in negotiations --
12   Q.  With Allied. Well, now Honeywell. We
13  understand that Allied has become Honeywell,
14  right?
15   A.  Yes.
16   Q.  Concerning who is going to pay for
17  remediation of the site, correct?
18   A.  Yes, I have had conversations with
19  Allied.
20   Q.  And with regard to the property owner,
21  you are the decision maker, correct?
22   A.  Yes.
23   Q.  All right. And is it fair to say that
24  in all of your discussions, you have taken the

Page 133

1  position that Honeywell will bear 100 percent of
2  the costs?
3       MR. HARTZELL: Objection.
4    A.  I don't think I've said that.
5       BY MR. CHRISTO:
6    Q.  Okay. What with regard to percentage
7  contribution have you said?
8    A.  I said they would pay 100 percent of
9  the cost of the clean-up of the contaminants
10  that they have put on the site.
11   Q.  How did I say it differently?
12   A.  My limiting is that the contaminants
13  they have brought to the site.
14   Q.  Are there any other contaminants
15  there, to your understanding?
16   A.  I don't think so, but there may be.
17   Q.  Okay. So your position is that they
18  pay 100 percent of the cost of all of the
19  contamination you know about?
20      MR. HARTZELL: Objection.
21      That's not what he said.
22   A.  I believe that they are responsible
23  for 100 percent of the costs of cleaning up the
24  coal tars.

34 (Pages 130 to 133)

JOHN M. PEREIRA
10-12-05

Page 134

1        BY MR. CHRISTO:
2        Q.   Just the coal tars?
3        A.   I believe they're responsible for
4    cleaning up 100 percent of the cost of anything
5    that they have put on the site.
6        Q.   And at this point, what do you define
7    that to be?
8        A.   At least the coal tars that I recall,
9    that's the biggest item.  I believe there's lead
10   that they're responsible.  I also believe that
11   they're responsible for the fill on the site
12   since they brought it to the site.
13       Q.   So is there any contamination on the
14   site for which you do not believe they are
15   responsible?
16       A.   I have a vague memory there are some
17   spotting or smaller issues that they may not be
18   responsible for, minor.
19       Q.   Minor ones?
20       A.   Minor, very minor.
21       Q.   So is it fair to say that for the
22   great majority of all the contamination about
23   which you are aware on the site, do you believe
24   Allied should pay 100 percent of the clean-up?

Page 135

1        A.   Yes.
2        MR. HARTZELL:  Objection.
3        BY MR. CHRISTO:
4        Q.   That has been your consistent position
5    in negotiations?
6        A.   Yes.
7        Q.   And are you aware of any significance
8    as a matter of law to the concept that you as a
9    property owner were aware of the contamination
10   at the time you bought the property --
11       MR. HARTZELL:  Objection.
12       BY MR. CHRISTO:
13       Q.   -- with regard to your position about
14   100 percent?
15       MR. HARTZELL:  Objection.
16       You can answer if you can.
17       A.   Are you asking me if I had knowledge
18   of the contamination that therefore I should
19   have some responsibility because I had
20   knowledge?
21       BY MR. CHRISTO:
22       Q.   Yes.
23       A.   I don't believe that's true.
24       Q.   Well, when you purchased the Black

Page 136

1    interest from the estate, did you do it as a
2    package or --
3        A.   The whole --
4        Q.   -- the whole kit and caboodle?
5        A.   The whole kit and caboodle.
6        Q.   At the time you had a minority in the
7    378 Commercial Street?
8        A.   Yes.
9        Q.   How minor a minority?
10       A.   It was a topic of conversation when
11   Stan passed away.
12       Q.   Okay.  And so this would have been
13   part of your compensation package?
14       A.   Yes.
15       Q.   As opposed to an investment?
16       A.   That's right.
17       Q.   I see.
18       So in buying the whole Black interest,
19   did you do a bottoms up analysis, you know,
20   evaluate each property, or did you just come to
21   a --
22       A.   I was hanging on for dear life.  No.
23       Q.   Just a whole number.  Okay.
24       Turning your attention to Exhibit 74,

Page 137

1    a written memo to Joe Carabetta from Mike
2    DiGiano dated September 20th, '88, re,
3    Wellington 21E studies.
4        (Witness reviewing document.)
5        BY MR. CHRISTO:
6        Q.   I want to ask you about something
7    toward the end of this.  Beginning at the bottom
8    of 1056, "as my letter indicates, I know CPI
9    --" I take that to mean Combined Properties,
10   Inc.?
11       A.   Yes.
12       Q.   "-- won't sign off until we get cost
13   estimates of all proposed remediation steps."
14       Is that an accurate characterization
15   of Combined Properties' position at the time, do
16   you know?
17       A.   I don't know.
18       Q.   Do you know why it was Combined
19   Properties was concerned about cost estimates in
20   or about September of '88?
21       A.   Cost estimates provided by engineers
22   in this area seemed to be unreliable.
23       Q.   But why would Combined Properties care
24   about that unless it was going to bear some of

35 (Pages 134 to 137)