UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| WELL-COM ASSOCIATES, L.P., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Docket Number 05-10056-JLT |
| | ) | |
| HONEYWELL INTERNATIONAL, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## **PLAINTIFF'S LOCAL RULE 56.1 STATEMENT OF UNDISPUTED FACTS**

Pursuant to Local Rule 56.1, the plaintiff, Well-Com Associates, L.P. ("Well-Com"), provides this statement of undisputed facts in support of its Opposition to the defendant's Motion for Summary Judgment and its Cross-Motion for Summary Judgment.

1.  Honeywell is the corporate successor to Allied-Signal, Inc. ("Allied") and the Barrett Company ("Barrett"), a chemical company that began as a wholly owned subsidiary of Allied and eventually merged into an operating division of Allied.  In 1981, Allied Chemical Corporation changed its name to Allied Corporation. (Ex. 1A, p. 9; Ex. 2A, p. 3).  In 1985, Allied-Signal, Inc., was formed when Allied Corporation combined with the Signal Companies, Inc. (Ex. 1A, p. 9; Ex. 2A, p. 3).  In 1993, Allied-Signal, Inc. changed its name to AlliedSignal, Inc. (Ex. 2A, p. 3).  In 1999, Honeywell and AlliedSignal merged and the new company has operated under the name of Honeywell. (Ex. 2B).  As a result of the merger, Honeywell has succeeded all the liabilities of Allied and otherwise continued the operation of Allied. (Ex. 2B).

2. Allied began its corporate history as Allied Chemical and Dye Corporation, which was formed in 1920 as an amalgamation of five chemical companies: Barrett, Solvay Process Company, General Chemical Company, National Aniline & Chemical Company, and Semet-Solvay Company. The five companies operated as wholly owned subsidiaries until their merger in the 1940's, at which point they became operating divisions of Allied Chemical and Dye Corporation. (Ex. 1A, p. 9; Ex. 2A, p. 3; Ex. 2B).

3. Plaintiff has traced the chain of title for the Site back to 1848. For many years the Site was held by the Webster family in common ownership with properties located to the north and to the west. Sanborn maps show that the Webster's tannery was the first industrial use of the property. (Ex. 3A-F). Subsequent owners included Bell Rock Leather & Tanning Company (Ex. 4), Eastern Metal & Refining Company (Ex. 4), and Richards & Company (Ex. 4, Ex. 5).

4. In 1932, Barrett Company ("Barrett") acquired the Site, (Ex. 6) and began to obtain permits for the construction of a coal tar processing plant. An article in the Malden Evening News, published on April 12, 1932, prior to execution of the deed, describes Barrett's purchase of the Site and states that Barrett, "which manufactures tar and tar products for roadwork and roofing," intends to relocate to Malden "during the summer, so that in the early fall the business will be underway." (Ex. 16A). The article states that Barrett "has filed at the city clerk's office petitions for the installation of some 20 steel tanks, three for the storage of some 30,000 gallons of gasoline; one for the storage of 10,000 gallons of gasoline and 16 for the storage of tar and tar products." (Ex. 16A).

5.  At the same time, Barrett began filling in the wetlands in order to prepare the site for erection of the tanks, and the coal tar processing plant. The Malden Evening News reported on April 21, 1932 that "[t]he aldermen last evening unanimously granted the Barrett Co[.] of Everett, manufacturers of tar products and their derivatives a location for some 20 tanks at the foot of Commercial [S]t[.] on the Mystic Marshlands." (Ex. 16B). The April 21, 1932 article states that Barrett had "asked for permits to install 16 steel tanks to store [397,500] gallons of tar and its products; three steel tanks for 30,000 gallons of fuel oil all to be above ground, and one tank underground for 10,000 gallons of gasoline," noting that "[t]he site is now marsh land and extensive filling and preparing will have to be done before the tanks can be erected." (Ex. 16B).

6.  A State House Photo pre-dates any filling or construction on the site, and is an accurate representation of the Site in its undeveloped, wetland site, before Barrett received a permit to fill the Site in 1932. (Ex. 17A). On May 27, 1932, Barrett received a license from the Commonwealth of Massachusetts Department of Public Works to "build and maintain pile and timber pier and two dolphins of seven piles each, and to dredge in Malden River and to fill solid in a creek tributary to said river, in the city of Malden, in conformity with the accompanying plan No. 1411 ("Plan 1411")." (Ex. 7).

7.  Plan 1411, which was approved by the Department of Public Works, designates a side channel of the Little Creek as an "area of proposed filling." Aerial photographs of the Site dated 1955, (Ex. 17B) and 1962, (Ex. 17C), reveal that the pier described in the license was built and the side channel "area of proposed filling" on Plan 1411 was filled.
(Ex. 7).

8. An article in the Malden Evening News dated November 7, 1936 states that "[c]onstruction will commenc[e] … on a million dollar development in Edgeworth by the Barrett Co[.], manufacturers of road materials, creosote, oil and roofing materials." (Ex. 16C).

9. The November 7, 1936 article describes the Site as "that part of the old Webster tannery property which was acquired by the Barrett Co[.] … [t]he property is at the end of Commercial [S]t[.] and has a frontage on the Malden river." The article also states that:

> "[t]here will be a warehouse, which will be the largest of the buildings…'[t]here will be an office building, which will be built of the same fireproof construction. There will be a number of smaller buildings as well as a number of tanks for carrying the road material which are in liquid form and the creosote preparations."

(Ex. 16C).

10. Barrett began building its coal tar processing plant in late 1936. The Malden Evening News reported in an article, dated November 27, 1936, that Barrett "has filed a permit for a new plant at the end of Commercial [S]t[.]," that "work has already been started under a special permit," and that "[t]he buildings included in the permit are an office building, garage, boiler house, storage buildings and tanks." (Ex. 16D).

11. A 1936 Plot Plan, revised in 1937, illustrates the layout of a coal tar processing plant ("Plant") on the Site, including a number of above and below ground storage tanks across middle of the Site and a sand filter bed in the southwestern corner of the Site. (Ex. 9C).

12. Barrett's coal processing plant was opened for business and was manufacturing tar and tar products by early 1937. A Barrett advertisement appears in the

May 3, 1937 edition of the Malden Evening News and states that:

> "among the Barrett products available for prompt delivery from our new Malden plant are Tarvia, Tarvia-lithic, Barrett Specifications and other Barrett built-up roofing materials, Barrett Shingles and Roll Roofings and wide variety of industrial chemicals, paints and protective coatings."

(Ex. 16E). The advertisement lists Barrett's address as 378 Commercial Street and characterizes the business as manufacturing of tarvia, tarvia-lithic, bituminous concrete, Barrett specification roofs, asphalt shingles, roll roofings, sheathings and building papers, tarred and asphalt roofing pitch, coal tar, asphalt, flashing blocks and forms, creosote oil, protective products, industrial chemicals, sulphate of ammonia, and arcadian nitrate. (Ex. 16E).

13.   An article in the Malden Evening News dated November 20, 1937, describes the dredging of the Malden River, in connection with development, "to a width of 100 feet from the Barrett Co.[.] property" and states that "[s]ilt taken from the river bed is being placed back along the banks filling in some of the marshy land." (Ex. 16F).

14.   In September of 1937, a coal tar holding tank at the Site exploded and caused the spill of 30,000 gallons of road tarvia onto the Site, creating a fire that the Malden Evening News referred to as "a blazing sea of tarvia."  (Ex. 16G).

15.   Barrett transferred the Site of Allied by deed dated December 1, 1941, recorded in Middlesex South District Registry of Deeds in Book 10710, at pages 21-24. (Ex. 8A).  A confirmatory indenture attached to the deed states that on December 1, 1941, Barrett dissolved and merged with Allied, transferring the Site and all other assets to Allied, (Ex. 8A),  and Land Court Certificate of Title No. 50516 dated March 18, 1942, recorded in the Middlesex South District Land Registration Office in Book 337, at Page 573, confirms Allied's ownership of the Site. (Ex. 8B).

16. Thus, in 1941, Barrett deeded the Site to Allied Chemical and Dye Corporation in connection with the merger of the two companies. The Polk Directory indicates that from 1939 to 1965, the Site was used by Barrett and Allied for the manufacturing of "coal tar products." (Ex. 15A-B).

17. In 1943, the Malden News reported that there was a fire at the Site caused by the explosion of a still. (Ex. 16H).

18. In 1944, there was a fire at the Site caused by a tar heater springing a leak, allowing "hot oil to fall to the ground." The oil ignited, resulting in a fire that "covered an area of about 100 square feet." (Ex. 16I).

19. In 1947, there was a fire at the Site caused by the ignition of vapor from a leaking still. (Ex. 16J).

20. The revised 1904-1955 Sanborn Map notes Allied's use of the Site. (Ex. 9F).

21. The 1955 and 1962 aerial photographs, (Ex. 17B-C), depict a Plant layout consistent with the 1936 Plat Plan. (Ex. 9C).

22. A 1949 Norwood Engineering plan of land, (Ex. 9F), also depicts a Plant layout consistent with the 1936 Plat Plan. (Ex. 9C).

23. The 1955 and 1962 photos, (Ex. 17B-C), reveal the filling of the site, after it was acquired by Barrett and Allied, when compared to the State House Photo illustrating the Site in its undeveloped, wetland state. (Ex. 9A).

24. The 1955 and 1962 photos illustrate the filling at the Site since purchase of the Site by Barrett, as shown on the State House Photo, and also show that between 1955 and 1962 additional filling took place in order to construct the southernmost structure on the Site, which appears on the 1962 photo but not the 1955 photo. (Ex. 17B-

C).

25.     In 1958, Allied Chemical and Dye Corporation changed its name to Allied Chemical and Dye Corporation. (Ex. 20A, p. 9; Ex. 21A, p.3).

26.     In 1965, Allied sold the property to Wellington Realty Corporation ("Wellington").  The tax stamps on the 1965 deed to Wellington total $385.45 in State excise taxes, (Ex. 10A), and the applicable tax rate in 1965 was $1.00 for the first $500 paid and $.55 for every $500 thereafter. (Ex. 10C).  Thus, it appears that the purchase price paid by Wellington to Allied for the Site in 1965 was $350,000.

27.     A 1965 plan of "leased area" indicates that Allied leased back from Wellington a portion of the Site lying to the west of Commercial Street, which included underground storage tanks and the filter bed.  (Ex. 10D).

28.     John Kazanjian was the President and Treasurer of Wellington, as well as the principal of three subsequent grantees between 1981 and 1986.   (Ex. 12A-C).

29.     Neither Well-Com, nor any of its predecessors, were involved in the sale of the site from Allied to Wellington in 1965, for the amount of $350,000.  Affidavit of John M. Perreira, ¶4.

30.     Malden Building Department records state that on December 27, 1965, Allied's Plastics Division received a permit to "Erect Boiler Room" at 378 Commercial Street.  (Ex. 18A).  The 1965 plan of "leased area" contains a notation referring to the "Boiler House & Boiler to be Installed by Plastics Division."  (Ex. 10D).

31.     Malden Building Department records indicate that the demolition of storage tanks began in 1966.  (Ex 18A).  In 1974, the Malden Redevelopment Authority ("MRA") took a western portion of the Site, (Ex. 11G), and received a permit to "Demolish 5 [buildings] and underground tanks."  (Ex. 18A).

32. In 1975, the Malden Public Works Commission took: 1) an easement for drainage purposes over the Site; and 2) the western portion of the Site for the purpose of laying out Commercial Street. (Ex. 11B),

33. On November 10, 1977, the Department of the Army issued a permit to the MRA for, among other things, the construction of an embankment along the eastern border of the Site and the removal of the pier at the Site. (Ex. 11D).

34. On November 10, 1977, the Department of Environmental Quality Engineering ("DEQE") issued a license to the MRA for the removal of the pier, construction of an embankment along the Malden River and Little Creek, filling along the embankment, and the installation of drainage pipes in the fill area and embankment. (Ex. 11E).

35. Plans dated 1977 and 1986 reflect the changes to the Site as a result of MRA activities during the 1970's. (Ex. 11F-G).

36. An Aerial photograph dated March 29, 1978, reveals a building configuration at the Site that is the same as the present. (Ex. 17D).

37. On December 22, 1986, Wellington LLP deeded a 50% undivided interest in the Site to Commercial Street Properties, Inc., a 49% undivided interest in the site to Well-Com Associates, Inc., and a 1% undivided interest in the site to Well-Com, Inc. (collectively "1986 Grantees") for consideration of $3,600,000. (Ex. 13A-B).

38. The sale to the 1986 Grantees ended Wellington's and John Kazanjian's interest in the Site.

39. The underlying principals of the 1986 Grantees were Stanton L. Black, President and Treasurer of Well-Com, Inc. and Well-Com Associates, Inc., and Joseph F. Carabetta, Treasurer and Vice President of Commercial Street Properties, Inc. Affidavit

of John Pereira, Ex. 19A, p. 4-5, Ex. 19B, Ex. 19C.

40. At the time that Carabetta Enterprises, Inc. ("Carabetta") executed the purchase and sale agreement for the Site in November of 1984, the contamination was not known to Mr. Carabetta or Mr. Black . Affidavit of John M. Pereira, ¶7.

41. The contamination at the Site was revealed in reports prepared by TRC Environmental Consultants and Norwood Engineering in 1985 and 1986. Affidavit of John M. Pereira, ¶7.  On December 17, 1986, the Massachusetts Department of Environmental Quality Engineering ("DEQE") issued a Notice of Responsibility ("NOR") to Wellington Realty Corp. and Allied Corporation.  Affidavit of John Pereira, Ex. 20A, Ex. 20B.

42. The purchase price for the Site stated in the Purchase and Sale Agreement was agreed upon before the 1985 and 1986 TRC Environmental Consultants and Norwood Engineering reports were drafted, and was based on the fair market value of the Site in November 1984.  Affidavit of John M. Pereira, ¶9.

43. After receiving the 1985 and 1986 TRC Environmental Consultants and Norwood Engineering reports, Carabetta Enterprises asked Wellington Realty Company for a $600,000 discount on the purchase price for the Site stated in the Purchase and Sale Agreement.  Affidavit of John M. Pereira, ¶10; Declaration of Thomas K. Christo, Exhibit H.

44. Wellington Realty Company would not give Carabetta the requested "discount."  Affidavit of John M. Pereira, ¶10.

45. The February 20, 1987 appraisal of the Site for $10,000,000 (attached to the Declaration of Thomas K. Christo as Exhibit G) was not based on the fair market value of the Site.  Affidavit of John M. Pereira, ¶13; Declaration of Thomas K. Christo,

Exhibit G at 0000542.

46.     The $10,000,000 appraisal was based on the development rights of the Site under optimal circumstances, for example the receipt of all necessary permits. Affidavit of John M. Pereira, ¶14; Declaration of Thomas K. Christo, Exhibit G.

47.     The February 20, 1987 appraisal contains a separate $5.6 million appraisal that was based on the fair market value of the Site on that date. Affidavit of John M. Pereira, ¶15; Declaration of Thomas K. Christo, Exhibit G at 0000542.

48.     The "Site Recommendations" attached to Declaration of Thomas K. Christo as Exhibit D relate to two different properties, only one of which is the Site at issue in this case Affidavit of John M. Pereira, ¶ 19.

49.     The 1986 Grantees (Commercial Street Properties, Well-Com Associates, Inc. and Well-Com, Inc.) purchased the Site in December 1986 despite the fact that no discount was granted because they believed that they had a cause of action against Allied-Signal, Inc. for the cost of any cleanup at the Site. Affidavit of John M. Pereira, ¶ 11.

50.     The 1986 Grantees granted Wellington LP a promissory note with mortgage covenants in the amount of $2,800,000, towards the $3,600,000 purchase price. Affidavit of John Pereira, Ex. 19A, p. 4-5; Ex. 19B-C.

51.     The underlying principals of the 1986 Grantees were Stanton L. Black, President and Treasurer of Well-Com, Inc. and Well-Com Associates, Inc., and Joseph F. Carabetta, Treasurer and Vice President of Commercial Street Properties, Inc. (Ex. 19B, p. 4). In addition to the $2,800,000 loan described above, Black and Carabetta personally borrowed $750,000 from Bank of Boston Connecticut towards the purchase of the Site, as shown by a December 24, 1986 promissory note. Affidavit of John Pereira,

Ex. 19C.

52. Prior to Plaintiff's acquisition of the Site in 1996, Bank of Boston Connecticut had not been receiving payments from Stanton L. Black and had attempted to foreclose on the Site. Bank of Boston of Connecticut agreed to reduce the principal on the $4,500,000 loan down to $2,000,000, contingent on Plaintiff not selling the Site prior to December 1999, in order to provide Plaintiff with an incentive to take over ownership of the site. Affidavit of John Pereira, Ex. 19F.

53. Plaintiff, Well-Com Associates, L.P. acquired the Site in 1996. Plaintiff acquired a 100% ownership interest in the site through a series of three separate conveyances from (1) Commercial Street Properties, Inc. (Ex. 14A); (2) Well-Com, Inc., (Ex. 14B); and (3) Well-Com Associates, Inc. (Ex. 14C). Affidavit of John M. Pereira, ¶ 3.

54. Plaintiff, Well-Com Associates, L.P., is the present owner of the Site. John Pereira owns 100% of the limited partnership interest. The general partner of Well-Com is 378 Commercial Street Associates, Inc. Mr. Pereira owns 100% of the stock of 378 Commercial Street Associates, Inc. Affidavit of John Pereira, ¶3.

55. In 2000, after it acquired the Site, Well-Com engaged Rizzo Associates ("Rizzo") to perform a site investigation and develop a remediation plan for the Malden site. Affidavit of Robert J. Ankstitus, ¶¶ 3, 20.

56. To date, Well-Com and its predecessors-in-interest have expended over $450,000 in response costs in order to clean-up the contamination on the Site. Affidavit of John M. Pereira, ¶18.

57. In 2000, Rizzo prepared a Phase I Initial Site Investigation and Tier Classification Submittal for the Site and submitted it to DEP on behalf of Well-Com.

Affidavit of Robert J. Ankstitus, ¶¶20, 21.

58. Well-Com has, therefore, complied with the notification provisions of M.G.L. c. 21E, §7. Affidavit of Robert J. Ankstitus, ¶21.

59. The Phase I report classified the Site as a Tier II disposal site pursuant to the Massachusetts Contingency Plan ("MCP"). Affidavit of Robert J. Ankstitus, ¶¶20-21.

60. In preparing the report, Rizzo conducted a subsurface investigation that revealed elevated concentrations above the Reportable Concentrations ("RCs") under the MCP of polycyclic aromatic hydrocarbon ("PAH") compounds, lead, and arsenic in the soil. Affidavit of Robert J. Ankstitus, ¶¶ 30-33.

61. The Phase II study describes elevated concentrations above the applicable RCs of PAH compounds, extractable petroleum hydrocarbon ("EPH") compounds, cadmium, and cyanide in the groundwater. Affidavit of Robert J. Ankstitus, ¶¶ 36-37.

62. Rizzo has concluded that the soil and groundwater contamination at the Site is attributable to coal tar facility operations and to the previous Site usage by Barrett Chemical. Rizzo has also formed an opinion that the elevated concentrations of lead and arsenic identified in Site soils are attributable to coal ash contaminated fill (not a coal tar processing related material from the Barrett/Allied facility, but related to the import of fill to the Site) as well as to coal tar facility operations. Affidavit of Robert J. Ankstitus, ¶¶23-52.

63. Three types of coal tar impacted materials were identified as being released at the Site: (1) viscous or semi-viscous coal tar; (2) non-viscous coal tar; and (3) sand/ash mix, and hardened (asphalt-like) coal tar and gravel. Affidavit of Robert J. Ankstitus, ¶

42.

64. The sand filter bed located on the southwestern corner of the Site, as show on the 1936 Plat Plan, (Ex. 9C), and the aerial photos, (Ex. 17), also suggests that direct dumping of hazardous substances occurred on the Site, in addition to the placement of fill.

65. A 1965 plan of land shows that Allied retained control of the filter bed, after its sale to Wellington, as a result of a lease back of a portion of the Site. (Ex. 10D).

66. Rizzo attributes the soil and groundwater contamination to Plant operations at the site by the Barrett Chemical Company and its successor, Allied, who utilized the site as a coal tar facility. Affidavit of Robert J. Ankstitus, ¶¶25-52.

67. The contaminants on the Site are the direct result of past operations at the Site by Honeywell and its predecessors, including Allied and the Barrett Company. Affidavit of Robert J. Ankstitus, ¶¶23, 25-52.

68. Well-Com did not contaminate the Site or contribute to the contamination at the Site in any way. Affidavit of Robert J. Ankstitus, ¶24.

69. The expenses and actions of Well-Com to date were necessary and appropriate and consistent with the Massachusetts Contingency Plan, within the meaning of M.G.L. c. 21E, §4 and the Federal Contingency Plan, within the meaning of 42 U.S.C. §9607(a)(4)(B). Affidavit of Robert J. Ankstitus, ¶53.

70. Well-Com has incurred necessary response costs in preparing and implementing the following:

      a. Phase I Initial Site Investigation of August 18, 2000
      b. Tier Classification Submittal of August 18, 2000
      c. Phase II Comprehensive Site Assessment of August 6, 2004
      d. Phase II Remedial Action Alternatives Report of August 27, 2004
      e. Phase IV Remedy Implementation Plan of April 29, 2005
      f. Release Abatement Measure Plan of May 24, 2005

       g.    Tier II Extension of September 1, 2005

Affidavit of Robert J. Ankstitus, ¶20.

71.    The expenses and actions of Well-Com that are anticipated in the future are necessary and appropriate and consistent with the Massachusetts Contingency Plan within the meaning of M.G.L. c. 21E, §4, and the Federal Contingency Plan, within the meaning of 42 U.S.C. §9607(a)(4)(B).  Affidavit of Robert J. Ankstitus, ¶54.

72.    By virtue of these response actions, Well-Com has exercised due care with respect to the oil or hazardous material on the Site.  Affidavit of Robert J. Ankstitus, ¶21.

73.    On or about June 30, 1989, Allied and UOP, Inc. filed a lawsuit in the Superior Court of New Jersey captioned, <u>Allied Signal, Inc., et al. v. Abeille-Paix Reassurances</u>, Superior Court of New Jersey, Morris County, Docket No. MRSL 226-88 ("<u>Abeille Action</u>").  (Ex. 1A)

74.    In the <u>Abeille</u> action, Allied sought a declaratory judgment that the defendant insurance companies were required to defend and indemnify Allied "in connection with proceedings commenced and claims made by the United States Envirnomental Protection Agency ("EPA") and state and local environmental regulatory authorities . . . or private third-parties on their own behalf . . . relating to alleged groundwater, surface water, soil and air contamination existing at various sites throughout the United States."  (Ex. 1A).

75.    The Site, identified by Allied as the "Malden Tar" site, was one of the properties for which Allied sought insurance coverage.  (Ex. 1B, p. 5).

76.    On or about January 14, 1988, The Travelers Indemnity Company ("Travelers") filed a complaint against Allied in the United States District Court for the District of Maryland captioned <u>The Travelers Indemnity Co. v. Allied-Signal, Inc.</u>,

Docket No. 88-cv-00099 ("Deleware Action") in which Travelers sought a declaratory judgment that, inter alia, its insurance policies issued to Allied did not cover the release of hazardous materials at properties owned by Allied, including the Site. See Union Texas Petroleum Holdings, Inc. v. Travelers Indemnity Co., 1998 Del. Ch. Lexis 27 (Court of Chancery of Delaware, New Castle 1998).

77. On or about September 13, 1990, Allied and Travelers entered into a comprehensive settlement agreement ("Settlement Agreement") that resolved the New Jersey Action and Deleware Action. See Union Texas Petroleum Holdings, 1998 Del. Ch. Lexis 27, at *5, fn 3.

78. The Settlement Agreement "obligated Travelers to pay a multi-million dollar lump sum to Allied-Signal in exchange for Allied-Signal's releasing and discharging Travelers for liability for any and all present and future environmental property damage claims." Union Texas Petroleum Holdings, 1998 Del. Ch. Lexis 27, at *4

79. The Settlement Agreement covered "any site that is, was, or may be the subject of an Environmental Pollution Claim." See Union Texas Petroleum Holdings, 1998 Del. Ch. Lexis 27, at *5, fn 3.

80. The Site is a "site that is, was, or may be the subject of an Environmental Pollution Claim." Id. ; see also Affidavit of John Pereira, Ex. 20B, Ex. 20A.

81. Despite having received money from Travelers under the Settlement Agreement to remediate the Site, Allied did not do so. Declaration of Thomas K. Christo, Exhibit R, Proposed Consent Order.

                                                                       Well-Com Associates, L.P.
                                                                       By its attorneys,

/s/ A. Neil Hartzell<br>
A. Neil Hartzell (BBO #544752)<br>
Patricia B. Gary (BBO #554731)<br>
Matthew M. O'Leary (BBO #652033)<br>
Donovan Hatem LLP<br>
Two Seaport Lane<br>
Boston, MA 02110<br>
(617) 406-4500

Dated: February 13, 2006
00979356.DOC

## CERTIFICATE OF SERVICE

I, Matthew M. O'Leary, hereby certify that on this 13th day of February, 2006, a copy of the foregoing was served on the attorney for the defendant by electronic means pursuant to Local Rule 5.2(b).

/s/ Matthew M. O'Leary<br>
Matthew M. O'Leary