UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| WELL-COM ASSOCIATES, L.P., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Docket No. 05-10056-JLT |
| | ) | |
| HONEYWELL INTERNATIONAL INC., | ) | |
| | ) | |
| Defendant. | ) | |

## HONEYWELL'S LOCAL RULE 56.1 STATEMENT OF ADDITIONAL MATERIAL FACTS OF RECORD AS TO WHICH THERE EXISTS A GENUINE ISSUE TO BE TRIED

Defendant, Honeywell International, Inc., submits this Local Rule 56.1 statement of additional material facts of record as to which there exists a genuine issue to be tried.

### Preliminary Statement

In support of its "Statement of Undisputed Facts," Well-Com has submitted, and cites, affidavits that in varying degrees do not comply with Rule 56(e). Honeywell has moved to strike the portions of the affidavits that do not comply. If the motion is granted, in whole or in part, there will be no evidentiary support for some part of Well-Com's statement of facts.

### Statement Of Additional Facts

**A.    There Is A Genuine Issue As To The Source Of Contamination**

1.    There is substantial evidence that the operations of Honeywell's predecessors-in-interest are not the sole source of the contamination at the Site at issue. (Declaration of Kerry Tull ("Tull Dec."), ¶¶ 2-42.)

2.      There are four distinct technical and historic factors that provide an adequate basis for the view that other sources/causes of contamination exist at this Site. (Tull Dec., ¶ 4.)

3.      The Site was used for storage, operations, and/or disposal by a tannery. Wastes that may only be attributed to a tannery (e.g. animal hides, etc.) were encountered on Site. The contaminants associated with tannery wastes include many of the contaminants detected on Site including, but not limited to, heavy metals, such as chromium and lead. (Tull Dec., ¶ 5.)

4.      The Site was developed using substantial fill from the Malden River. In 1925 license was granted to Richards and Co. by the City of Malden for approximately 8,110 cubic yards of fill to be placed on this Site. (Tull Dec., ¶ 6.)

5.      During the late 1960s and the 1970s a number of commercial businesses operated on the Site after Allied left. Because of the nature of these operations, typical disposal practices, and the chemicals and materials routinely used (including vehicle paints, solvents, petroleum products and chemical coatings) these operations may have contributed to a variety of Site related contamination. (Tull Dec., ¶ 7.)

6.      Above-ground storage tanks were demolished on-Site circa 1965, leaving the bottoms of these structures in place. Buildings were constructed on top of these tank bottoms after Allied vacated the Site post 1965. Placing buildings on tank bottoms with chemicals/tar left in place may have caused a release that would not have occurred if these tanks and the bottoms had been property removed. (Tull Dec., ¶ 8.)

7.      Well-Com traced the Site title back to 1848, and this investigation indicates that the Site was owned for many years by the Webster family. Webster Tannery was the first industrial use of the property. Subsequent owners include Bell Rock Leather & Tanning

Company, Eastern Metal & Refining Company, and Richards Co. (a refiner of non-ferrous metals). (Tull Dec., ¶ 10.)

8.    All of these entities may have used the Site for disposal. Specifically, the presence of metals on the site would more likely be attributed to the tannery and metals businesses than the Barrett/Allied products. Norwood engineering conducted test pits that encountered the remains of animals from tannery processes. (Tull Dec., ¶ 11.)

9.    Well-Com cites a November 7, 1936 article that describes the Site as "part of the old Webster Tannery property." (Tull Dec., ¶ 12.)

10.    This indicates that the tannery had access to the Site for any uses, including disposal. (Tull Dec., ¶ 13.)

11.    A Norwood Engineering report includes findings of leather scraps, hide, and cloth in the test pits. (Tull Dec., ¶ 14.)

12.    Although no structures may have existed related to tannery operations, these types of waste products clearly indicate a tannery was using the Site for dumping and disposal of waste materials. (Tull Dec., ¶ 15.)

13.    Well-Com cites a November 20, 1937 article that describes the "dredging of the Malden River to fill in some of the marshy land." (Tull Dec., ¶ 16.)

14.    Fill from the Malden River would contain an amalgam of wastes disposed from over 50 years of industrial uses upstream from the Site. (Tull Dec., ¶ 17.)

15.    A TRC engineering report indicates that the sediments upstream of the Site are more contaminated than those adjacent to the Site. (Tull Dec., ¶ 18.)

16.    This further indicates the contaminated nature of the Malden River. (Tull Dec., ¶ 19.)

17.    Well-Com cites in 1975 that the Malden Public Works took an easement for drainage purposes over the Site.  (Tull Dec., ¶ 20.)

18.    This drainage may have been the recipient of a variety of wastes from the Malden DPW.  (Tull Dec., ¶ 21.)

19.    Well-Com indicates that "Rizzo has concluded that the soil and groundwater contamination at the Site is attributable to coal tar facility operations and the previous Site usage by Barrett Chemical.  Rizzo has also formed an opinion that the elevated concentrations of lead and arsenic identified in Site soils are attributable to coal ash contaminated fill (not coal tar processing related materials from the Barrett/Allied facility, but related to the import of fill to the Site) as well as to coal tar facility operations."  (Tull Dec., ¶ 22.)

20.    This clearly indicates that Rizzo recognized that materials, not directly related to Barrett, were of a different origin and brought onto the Site.  (Tull Dec., ¶ 23.)

21.    A former Allied-Signal employee was told by a realtor for the Site that the above ground storage tanks would be cut off and the remaining contents left in place and built upon. (Tull Dec., ¶ 24.)

22.    The apparent reasoning for this approach was the tank bottoms were on a number of pilings that could be utilized by the new proposed buildings.  This type of opportunistic building practice may have resulted in the releases of tank bottoms and the exacerbation of conditions that already existed.  (Tull Dec., ¶ 25.)

23.    Rizzo's Phase II report indicates that tanks on the Site were demolished in 1966 and 1974.  (Tull Dec., ¶ 26.)

24.    Rizzo's Phase II report lists uses of the Site, other than the Barrett Company, during the 1970s that could have potentially caused releases at the Site.  These include light

4

manufacturing, Intra State Transportation, Hero Coatings, ERC Motor Lines, Coastal Inc., Gibbs

Oil, Coastal Freightways, and Wellington Truck and Auto Body.  (Tull Dec., ¶ 28.)

25.    Any of these businesses would be suspect for disposal practices that would

adversely impact the Site.  (Tull Dec., ¶ 29.)

26.    The same Rizzo report states that "the principal source origin for coal tar

contaminants detected upon the Wellington Site appears related to the previous site usage by the

Barrett Chemical Company (Barrett Division of the Allied Chemical Company) as a coal

gasification facility."  (Tull Dec., ¶ 30.)

27.    Barrett was not engaged in coal gasification.  Therefore, contamination attributed

to coal gasification would have originated at another source and have been brought onto the Site.

(Tull Dec., ¶ 31.)

28.    The same Rizzo report indicates that elevated concentrations of lead and arsenic

were also identified in Site soils that were attributed to coal ash contaminated fill at the Site as

well as former coal tar facility operations.  Additionally, the report indicates that elevated

concentrations of PAH and EPH compounds, cadmium, and cyanide were detected in Site

groundwater and are also likely attributable to coal ash fill and past coal tar operations at the

Site.  (Tull Dec., ¶ 32.)

29.    The coal ash and coal tar conditions are exclusive of each other and require

separate assessment.  While coal tar may be attributed to Barrett, coal ash is a common fill

material that is ubiquitous, and treated as a background condition by the MADEP, in this type of

urban setting.  Additionally, various compounds identified on the Site could be due to uses at the

property after 1965, when Barrett ceased operations.  (Tull Dec., ¶ 33.)

31.    Norwood Engineering attributed elevated concentrations of cyanide to former coal gasification operations at the Site. (Tull Dec., ¶ 34.)

32.    Again, no coal gasification operations were conducted at the Site; therefore contaminants related to this type of industry may have originated elsewhere. (Tull Dec., ¶ 35.)

33.    Rizzo's Phase II report indicates that no source for the detected arsenic has been identified, but is likely attributable to the coal ash contaminated fill material at the Site. (Tull Dec., ¶ 36.)

34.    Arsenic, among several metals, is typically found in tannery wastes. A tannery operated on and or directly adjacent to the Site for years prior to Barrett. Additionally, there is evidence that the tannery used the Site, prior to Barrett, as a dumping ground (see Norwood Test Pit Info). (Tull Dec., ¶ 37.)

35.    The Rizzo Phase II report references a former lagoon with no indication what the lagoon was or may have been used for. (Tull Dec., ¶ 38.)

36.    It appears from historical information that the "lagoon" may have been a depression (former stream/wetlands channel) that required filling with Malden River sediments prior to Barrett building on the Site. (Tull Dec., ¶ 39.)

37.    The Norwood report identified fuel oil related compounds between the Lombard and MDPW parcels. (Tull Dec., ¶ 40.)

39.    These adjacent parcels could be contributing petroleum related compounds (e.g. benzene, toluene, ethyl benzene) to the Site. (Tull Dec., ¶ 41.)

40.    USACE Phase I - Indicates that the former Barrett facility "was the site of diverse industrial activities including manufactured gas plant operation, tannery operations and chemical manufacturing." (Tull Dec., ¶ 42.)

41.    This indicates a variety of uses on and adjacent to this Site that may have had impacts before and after Barrett.  (Tull Dec., ¶ 43.)

**B.    There Is A Genuine Issue As To Reasonableness Of The Response Costs**

42.    The Department of Environmental Protection considers Well-Com to be in violation of the Massachusetts Contingency Plan.  (Chaffin Dec., Exhibit A.)

43.    Well-Com's principal has known about the contamination at the Site for 20 years and has had a beneficial interest in the Site for nearly that long, but little actual clean-up has been effected.  (Christo Dec., Ex. S at 13-14, 29-32; Chaffin Dec., Ex. A.)


Dated:  March 3, 2006                    HONEYWELL INTERNATIONAL INC.,

By its attorneys,

/s/David B. Chaffin
Thomas K. Christo (BBO #083240)
David B. Chaffin (BBO #549245)
HARE & CHAFFIN
160 Federal Street
Boston, Massachusetts 02110-1700
(617) 330-5000

Of Counsel:

Brian D. Israel, Esq.
Arnold & Porter, LLP
555 12th Street, NW
Washington, D.C. 20004
(202) 942-6546

## CERTIFICATE OF SERVICE

I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on March 3, 2006.

/s/David B. Chaffin
David B. Chaffin