UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| WELL-COM ASSOCIATES, L.P., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Docket No. 05-10056-JLT |
| ) | |
| HONEYWELL INTERNATIONAL INC., ) | |
| ) | |
| Defendant. ) | |

### DECLARATION OF KERRY TULL

I, Kerry Tull, state, under the penalties of perjury, as follows:

1. I am a Senior Principal with MACTEC Engineering and Consulting, an environmental consulting firm in Wakefield, Massachusetts. A copy of my curriculum vitae is attached hereto.

2. At the request of counsel for Honeywell, MACTEC recently conducted a review and analysis of information and data relating to 378 Commercial Street, Malden, Massachusetts (the "Site"), for the purpose of determining whether it is reasonable to conclude that the sole source of contamination at this location is the operations of the predecessors of Honeywell International Inc., being Allied Signal and the Barrett Company. My opinion, to a reasonable degree of scientific certainty, is that it is not possible to exclude other sources. The basis for my opinion is as follows.

3. The following sources of information, among others, were reviewed.

   a. Deposition of Robert Timmons (DRT),

   b. Plaintiff's Local Rule 56.1 Statement of Undisputed Facts (PLRSUF),

   c. TRC's 1986 Report (TRC),

   d. Norwood 1987 Report (Norwood),

   e. Various historical maps and newspaper articles (Historical Information),

   f. Affidavit of Matthew O'Leary (AMO)

   g. United States Army Corps of Engineers, Phase I (USACE Phase I), and

   h. Various Rizzo Reports (Rizzo)

4. There are four distinct technical and historic factors that provide an adequate basis for the view that other sources/causes of contamination exist at this Site.

5. The Site was used for storage, operations, and/or disposal by a tannery. Wastes that may only be attributed to a tannery (e.g. animal hides, etc.) were encountered on Site. The contaminants associated with tannery wastes include many of the contaminants detected on Site including, but not limited to, heavy metals, such as chromium and lead.

6. The Site was developed using substantial fill from the Malden River. In 1925 license was granted to Richards and Co. by the City of Malden for approximately 8,110 cubic yards of fill to be placed on this Site.

7. During the late 1960s and the 1970s a number of commercial businesses operated on the Site after Allied left. Because of the nature of these operations, typical disposal practices, and the chemicals and materials routinely used (including vehicle paints, solvents, petroleum products and chemical coatings) these operations may have contributed to a variety of Site related contamination.

8. Above-ground storage tanks were demolished on-Site circa 1965, leaving the bottoms of these structures in place. Buildings were constructed on top of these tank bottoms after Allied vacated the Site post 1965. There was no documentation encountered during this review regarding the condition of these tanks or the contents left in place. Placing buildings on tank bottoms with chemicals/tar left in place may have caused a release that would not have occurred if these tanks and the bottoms had been properly removed. This is an area that warrants further investigation.

**FINDINGS**

9. The following are excerpts, citations, and findings from the aforementioned sources of information to support the conclusions summarized above. *My opinions follow in italics.*

10. PLRSUF – Plaintiff traced the Site title back to 1848 – indicates Site was owned for many years by Webster family. Webster Tannery was first industrial use of the Site. Subsequent owners include Bell Rock Leather & Tanning Company, Eastern Metal & Refining Company, and Richards Co. (a refiner of non-ferrous metals).

11. *All of these entities may have used the Site for disposal. Specifically, the presence of metals on the site would more likely be attributed to the tannery and metals businesses than the Barrett/Allied products. Norwood engineering conducted test pits that encountered the remains of animals from tannery processes.*

12. PLRSUF – Cites a November 7, 1936 article that describes the Site as "part of the old Webster Tannery property."

13. *Clearly the tannery had open availability to the Site for any uses including disposal.*

14. Norwood Report - Identified findings of leather scraps, hide, and cloth in the test pits.

15. *Although no structures may have existed related to tannery operations, these types of waste products clearly indicate a tannery was using the Site for dumping and disposal of waste materials.*

16. PLRSUF – Cites a November 20, 1937 article that describes the "dredging of the Malden River to fill in some of the marshy land"

17. *Fill from the Malden River would contain an amalgam of wastes disposed from over 50 years of industrial uses upstream from the Site.*

18. TRC – Indicates that the sediments upstream of the Site are more contaminated than those adjacent to the Site.

19. *This further indicates the contaminated nature of the Malden River.*

20. PLRSUF – Cites in 1975 that the Malden Public Works took an easement for drainage purposes over the Site.

21. *This drainage may have been the recipient of a variety of wastes from the Malden DPW.*

22. PLRSUF – Indicates "Rizzo has concluded that the soil and groundwater contamination at the Site is attributable to coal tar facility operations and the previous Site usage by Barrett Chemical. Rizzo has also formed an opinion that the elevated concentrations of lead and arsenic identified in Site soils are attributable to coal ash contaminated fill (not coal tar processing related materials from the Barrett/Allied facility, but related to the import of fill to the Site) as well as to coal tar facility operations. Affidavit of Robert J. Ankstitus".

23. *This clearly indicates that Rizzo recognized that materials, not directly related to Barrett, were of a different origin and brought onto the Site.*

24. DRT – Mr. Timmons indicated during his deposition that he was told by a realtor for the Malden Site that the above ground storage tanks would be cut off and the remaining contents left in place and built upon.

25. *The apparent reasoning for this approach was the tank bottoms were on a number of pilings that could be utilized by the new proposed buildings. This type of opportunistic building practice may have resulted in the releases of tank bottoms and the exacerbation of conditions that already existed.*

26. Rizzo Report Phase II – Indicates that tanks were demolished in 1966 and 1974.

27. *There were no records providing documentation of this activity encountered in this review. Specifically, the condition of, or contents of, the tanks at the time of demolition is not provided and whether any release occurred during this operation.*

28. Rizzo Report Phase II - Lists uses of the Site, other than the Barrett Company, during the 1970s that could have potentially caused releases at the Site. These include light manufacturing, Intra State Transportation, Hero Coatings, ERC Motor Lines, Coastal Inc., Gibbs Oil, Coastal Freightways, and Wellington Truck and Auto Body.

29. *Any of these businesses would be suspect for disposal practices that would adversely impact the Site.*

30. Rizzo Phase II – This report states that "the principal source origin for coal tar contaminants detected upon the Wellington Site appears related to the previous site usage by the Barrett Chemical Company (Barrett Division of the Allied Chemical Company) as a coal gasification facility."

31. *Barrett was not engaged in coal gasification. Therefore, contamination attributed to coal gasification would have originated at another source and have been brought onto the Site.*

32. Rizzo Phase II - Indicates that elevated concentrations of lead and arsenic were also identified in Site soils that were attributed to coal ash contaminated fill at the Site as well as former coal tar facility operations. Additionally, the report indicates that elevated concentrations of PAH and EPH compounds, cadmium, and cyanide were detected in Site groundwater and are also likely attributable to coal ash fill and past coal tar operations at the Site.

33. *The coal ash and coal tar conditions are exclusive of each other and require separate assessment. While coal tar may be attributed to Barrett, coal ash is a common fill material that is ubiquitous, and treated as a background condition by the MADEP, in this type of urban setting. Additionally, various compounds identified on the Site could be due to uses at the property after 1965, when Barrett ceased operations.*

34. Norwood Engineering - Attributed elevated concentrations of cyanide to former coal gasification operations at the Site.

35. *Again, no coal gasification operations were conducted at the Site; therefore contaminants related to this type of industry may have originated elsewhere.*

36. Rizzo Phase II – Indicates that no source for the detected arsenic has been identified, but is likely attributable to the coal ash contaminated fill material at the Site.

37. *Arsenic, among several metals, is typically found in tannery wastes. A tannery operated on and or directly adjacent to the Site for years prior to Barrett. Additionally, there is evidence that the tannery used the Site, prior to Barrett, as a dumping ground (see Norwood Test Pit Info).*

6

38. Rizzo Phase II - References a former lagoon with no indication what the lagoon was or may have been used for.

39. *It appears from historical information that the "lagoon" may have been a depression (former stream/wetlands channel) that required filling with Malden River sediments prior to Barrett building on the Site.*

40. Norwood Report - Identified fuel oil related compounds between Lombard and MDPW parcels.

41. *These adjacent parcels could be contributing petroleum related compounds (e.g. benzene, toluene, ethyl benzene) to the Site.*

42. USACE Phase I - Indicates that the former Barrett facility "was the site of diverse industrial activities including manufactured gas plant operation, tannery operations and chemical manufacturing."

43. *This indicates a variety of uses on and adjacent to this Site that may have had impacts before and after Barrett.*

SIGNED UNDER THE PENALTIS OF PERJURY
THIS 1st DAY OF MARCH 2006

/s/Kerry Tull
Kerry Tull

**CERTIFICATE OF SERVICE**

I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on March 3, 2006.

/s/David B. Chaffin

### KERRY R. TULL, PG, LSP – SENIOR PRINCIPAL

**Total Years of Experience:** 21
Years with this firm: 1
Years with other firms: 20

**Career Summary**

Mr. Tull has over 20 years of experience in the environmental consulting field including work for commercial, industrial, institutional, municipal, state, and federal sectors. He has provided project management for environmental investigations; remediation design and implementation; industrial clean-up programs; nationwide multi-site assessment packages for corporate acquisition, and regulatory compliance throughout New England, New York, New Jersey, Indiana, Pennsylvania, Florida, Texas, California and Idaho. He has provided technical and management oversight for test drilling, soil and bedrock subsurface exploration, soil, surface water, sediment, air, and groundwater analyses.

Mr. Tull has performed review of industrial facilities for regulatory guidance, including assessment of SPCC Plans, UST and AST management plans, and assessment of oil and hazardous materials storage and management. He has provided nationwide facility inspections and employee interviews for ISO 14001 certification of a Fortune 500 Company.

Mr. Tull has taught Environmental Chemistry and Hydrogeology to federal, state and local agencies located in EPA Regions throughout the U.S. Mr. Tull taught geochemistry, subsurface investigation, groundwater mapping, landfill investigation and closure, and remediation chemistry.

Mr. Tull is an active member of the Licensed Site Professional Association (LSPA) and an expert in the Massachusetts Contingency Plan (MCP), including Phase I through Phase V projects, Immediate Response Actions (IRAs), Release Abatement Measures (RAMs), Response Action Outcomes (RAOs), Activity and Use Limitations (AULs), and Public Involvement Plans (PIPs).

As a member of the LSPA Regulations Committee and Disciplinary Review Committee Mr. Tull helped rewrite the latest MCP revisions regarding Public Involvement and provides guidance to the LSPA Board regarding review of disciplinary proceedings.

**Education**
LSPA Continuing Education
Graduate Work, Hazardous Materials Science, Northeastern University, MA, 1992
Graduate Work, Environmental Compliance/Regulations, Tufts University, MA, 1989
Bachelor of Science, Geology, Northeastern University, MA, 1985

**Licenses / Registrations / Certifications**
Professional Geologist, NH, #244, 2002
Professional Geologist, DE, #733, 1992
Licensed Site Professional, MA, #3656, 1993
NJ UST Installation, Closure, Tank Testing, Sub. E, #3735 1993
OSHA 40-hour HAZWOPER, 1989
OSHA 8-Hour Supervisor, 1992
OSHA 8-hour Refresher, 2005
USACE Construction Quality Management Contractor, 2002

**Project Experience**
**Senior Manager: Federated Lithograph Site, Providence, RI.** Provided assessment and technical recommendations to the Rhode Island Department of Environmental Management (RIDEM) for the use of Hydrogen Release Compound (HRC) for the Federated Lithographic Site.

**Senior Manager: Former Industrial Facility, Groton, MA.** Currently preparing Site Strategic Plan for Fortune 500 Company. Site has extensive solvent and chromium contamination throughout overburden and bedrock aquifer. Current pump and treat system will be augmented with new remediation approach under consideration through pilot program.

**Senior Manager: Retail Development, Marlborough, MA.** Providing regulatory and technical guidance to client for redevelopment of land located downgradient of a gasoline station. The gasoline station has adversely impacted the client's site soils and groundwater which will require extensive management plan for site redevelopment.

**Senior Manager: U.S Navy, Newport, RI.** Under the Navy Clean Contract Mr. Tull conducted an assessment for the demolition and remediation of a 500,000-gallon fuel oil tank constructed in 1915. The ½ million gallon concrete tank had been built into a hill side and required removal and remediation of the surrounding soils and bedrock. Mr. Tull provided senior oversight for the preparation of the bids and specifications for this demolition project while coordinating closely with the Navy Facility Director and the RIDEM Underground Storage Tank Department.

**Senior Manager: U.S. Department of Transportation, Volpe Engineering Center, MA.** Mr. Tull was the point of contact and senior manager for a variety of projects conducted for USDOT. He provided services for hazardous materials investigations, geologic, and regulatory services including the investigation of a former woolen mill under an EPA Brownfields Program, investigation of a radar surveillance facility for the FAA, and data validation for the U.S. Coast Guard.

**Senior Project Manager: Caryville Woolen Mill, Bellingham, MA.** Mr. Tull oversaw investigation of the former wool and textile mill located on the Charles River. This mill consists of several interconnected buildings with over 150,000 square feet. The mill has been closed for several years and has undergone extensive investigation and review. As part of this work conducted for the EPA, Mr. Tull has provided assessment of a variety of environmental and safety regulatory concerns for the interior and exterior of the facility. He has provided a Phase II Comprehensive Site Assessment supported by an EPA approved QAPP. He has also provided a technical and fiscal plan for investigation, remediation, and closure. Work conducted to date has included a Phase II Assessment, a detailed cost estimate for remediation, and completion of emergency interim regulatory guidelines due to the storage of unsecured hazardous materials within the building. An Immediate Response Action has been completed to address this concern.

**Senior Project Manager: Roman Catholic Archdiocese of Boston (RCAB).** Mr. Tull worked closely with the RCAB Facilities Director for 4 years to provide guidance for over 20 facilities for review of applicable and relevant environmental regulations. Provided the RCAB with assessments, investigations, and remediation of various properties throughout eastern Massachusetts. He has managed several sites that included Immediate Response Actions (IRAs), petroleum recovery, groundwater assessment, regulatory report preparation, soil excavation and site closure with a Response Action Outcome.

**Project Manager: Quincy Department of Public Works and the Parks Department, Quincy, MA.** Provided LSP assistance to the City of Quincy, MA. This work involved four sites impacted by oil and hazardous materials, including asbestos, polychlorinated biphenyls (PCBs), lead, and polycyclic aromatic hydrocarbons (PAHs). He served as Public Relations liaison for investigations and closure activities, including excavation and capping under RAM plans. Also provided the City with public involvement

activities including numerous presentations of site conditions and proposed closure designs to various city boards and public activist groups.

**Legal Support: Brookline Housing Authority (BHA), Brookline, MA.** As a LSP, provided extensive investigation and legal support for BHA properties involved with petroleum releases. Mr. Tull provided regular presentations to the BHA Board of Directors regarding BHA compliance with the MCP. This work included preparation and presentation of PIPs, investigation of surrounding properties, and downgradient property status (DPS) submittal. He aided the BHA in the successful defense of a contested DPS with an adjacent property owner.

**Project Manager: Seal Corporation, Wastewater Sludge Lagoons, CT.** Assessment and closure of industrial wastewater sludge lagoons. The lagoons contained metallic hydroxide sludge, which required dewatering, excavating, stabilizing, and transport to a secure landfill. Follow-up investigations included multi-tier monitoring well investigation in bedrock and overburden aquifers. An environmental and hydrogeologic study was presented to the Connecticut Department of Environmental Protection (DEP).

**Task Manager: Pratt & Whitney Aircraft Engine Manufacturing Facility RI/FS, CT.** Site contaminants involved a 40-year old mixture of industrial waste products. Mr. Tull provided on-site supervision of the installation of 95 monitoring wells in five different hydrostratigraphic zones, drilling stratigraphic bedrock borings (nine of which cored a minimum of 50-feet into the bedrock using oriented rock coring technologies).

**Site Coordinator: U.S. Army Arsenal, Joliet, IN.** On-site coordinator and senior author of a Comprehensive Environmental Response and Liability Act (CERCLA) RI/FS Report describing the nature and extent of explosive contaminants across a 20-square mile arsenal. The RI/FS was submitted to the USEPA. Tasks included drilling, surface soil, sediment, and water sampling and analyses.

## Training
Constant training for continuing education requirements for LSP

## Memberships
Member, Licensed Site Professional Association
Boston Society of Architects
LSPA Regulations Committee

## Previous Employer
Nobis Engineering, Inc. – Lawrence, MA