UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| WELL-COM ASSOCIATES, L.P., )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>HONEYWELL INTERNATIONAL, INC., )<br>)<br>Defendant. )<br>) | Docket Number 05-10056-JLT<br><br>**Hearing Requested** |

**PLAINTIFF'S MOTION TO STRIKE PORTIONS OF THE
DECLARATION OF KERRY TULL**

The plaintiff, Well-Com Associates, L.P. ("Well-Com"), hereby moves to strike portions of the Declaration of Kerry Tull ("Tull Declaration") filed by Honeywell International in support of its opposition to Well-Com's Cross-Motion for Summary Judgment. As grounds for this motion, Well-Com states numerous statements made in the Tull Declaration are speculative and not based on admissible facts in the record. As a result, they should be stricken.

**I.     ARGUMENT**

**A.     STANDARD OF REVIEW.**

As summarized in Moore's Federal Practice, Rule 56(e) demands that:

Expert opinion evidence set forth in an affidavit must constitute admissible evidence. Opinions of an expert must be in a form competent to be considered, including an indication of the expert's competency, and must be relevant to the issues raised by the summary judgment motion. A court should not be forced to speculate how an unacceptable document might be reduced to an admissible form at trial. <u>An expert's conclusory affidavit is not competent evidence to be used in connection with a summary judgment motion. The opinions of an expert contained in an affidavit must generally be competent in the same measure that they would be at trial.</u>

> The expert opinion submitted in opposition to summary judgment <u>must be based on established facts</u>. To be competent to render an admissible opinion in affidavit form in support of a summary judgment motion, an expert cannot merely state that she engaged in examination of the pleadings and the record….

11 Moore's <u>Federal Practice</u>, §56.14[1][i] (Matthew Bender 3d ed.) (citations omitted). (Emphasis added.) "An expert should not be permitted to give an opinion that is based on conjecture or speculation from an insufficient evidentiary foundation." <u>Van Brode Group, Inc. v. Bowditch & Dewey</u>, 36 Mass. App. Ct. 509, 520 (1994) (citation omitted). "In making this assessment, the court will indulge all reasonable inferences in the light most hospitable to the party opposing summary judgment, but will ignore 'conclusory allegations, improbable inferences, and unsupported speculation.'" <u>Suarez v. Pueblo International, Inc.</u>, 229 F.3d 49, 53 (1st Cir. 2000) (citation omitted); <u>see</u>, <u>Schubert v. Nissan Motor Corp</u>., 148 F.3d 25, 29-30 (1st Cir. 1998) ("[u]nder Rule 56(e), affidavits supporting or opposing summary judgment must set forth facts that would be admissible in evidence. A district court may exclude expert testimony when it finds that the testimony has no foundation or rests on … speculative evidence.")

**B.  SPECULATIVE ASSERTIONS AND ASSERTIONS NOT BASED ON FACTS ESTABLISHED IN THE RECORD MUST BE STRICKEN.**

The Tull Declaration contains numerous assertions that are speculative and/or are not based on the facts established in the record before the Court. These assertions, described below, should be stricken.

**1.  Paragraph 5.**

Paragraph 5 states:

> The Site was used for storage, operations, and/or disposal by a tannery. Wastes that may only be attributed to a tannery (e.g., animal hides, etc.) were encountered on the Site. The contaminates associated with tannery wastes included many of the contaminants detected on Site including, but not limited to, heavy metals, such as chromium and lead.

2

While there is some evidence in the record that a tannery owned the Site (Well-Com's Statement of Undisputed Facts ("Well-Com SOF"), ¶3, there is nothing in the record indicating that any tannery used the Site for storage or disposal. In fact, in Paragraph 11 of the Tull Declaration, Tull backtracks and asserts that the tannery "may have used the Site for disposal."

### 2. Paragraph 6

Paragraph 6 states:

The Site was developed using substantial fill from the Malden River. In 1925 license was granted to Richards and Co. by the City of Malden for approximately 8,110 cubic yards of fill to be placed on this Site.

There is no evidence in the record that any filling of the Site occurred, other than by Barrett. Well-Com SOF, ¶¶5-7. The fact that a license to fill was issued by the City of Malden is irrelevant, absence some evidence that the filling actually took place.

### 3. Paragraph 7

Paragraph 7 states:

During the late 1960s and the 1970s a number of commercial businesses operated on the Site after Allied left. Because of the nature of these operations, typical disposal practices, and the chemicals and materials routinely used (including vehicle paints, solvents, petroleum products and chemical coatings) these operations may have contributed to a variety of Site related contamination.

The statements in this paragraph do not contain citations to the record and there is nothing in the record concerning what businesses operated on the Site after Allied left, what operations they performed, what their disposal practices were, or for what they used the chemicals listed. Mr. Tull does not claim to have any personal knowledge of the statements contained therein. The conclusion that "these operations may have contributed" to the contamination is pure speculation and is not based on any facts in the record.

**4.     Paragraph 8**

Paragraph 8 states:

Above-ground storage tanks were demolished on-Site circa 1965, leaving the bottoms of these structures in place. Buildings were constructed on top of these tank bottoms after Allied vacated the Site post 1965. There was no documentation encountered during this review regarding the condition of these tanks or the contents left in place. Placing buildings on tank bottoms with chemicals/tar left in place may have caused a release that would not have occurred if these tanks and the bottoms have been properly removed. This is an area that warrants further investigation.

The statements in this paragraph have no basis in the record before the Court. Mr. Tull does not claim to have any personal knowledge of the statements contained therein. They are mere speculation on the part of Mr. Tull.

**5.     Paragraph 11**

Paragraph 11 states:

All of these entities may have used the Site for disposal. Specifically, the presence of metals on the Site would more likely be attributed to the tannery and metal businesses than the Barrett/Allied products. Norwood engineering conducted test piles that encountered the remains of animals from tannery processes.

This statement is pure speculation. Mr. Tull does not state that he has personal knowledge of what the entities described did on the Site. Mr. Tull does not state his reasoning for concluding that the presence of metals on the Site would be more likely attributed to the tannery and metal business that Barrett or Allied's operations. Also, the Norwood engineering reports are not in the record.

**6.     Paragraph 13**

Paragraph 13 states:

Clearly the tannery had open availability to the Site for any uses including disposal.

This statement is pure speculation drawn only from the fact that the Site was part of the Webster tannery property. Mr. Tull does not establish that he has any knowledge regarding what the Webster tannery did on the Site or to what portions the Webster tannery had access.

**7.    Paragraphs 14 and 15**

Paragraphs 14 and 15 state:

Norwood Report – Identified findings of leather scraps, hide and cloth in the test pits.

Although no structures may have existed related to tannery operations, these types of products clearly indicate a tannery was using the Site for dumping and disposal of waste materials.

The Norwood report is not in the record. These statements are pure speculation by Mr. Tull. He does not demonstrate that he has personal knowledge regarding for what purpose the tannery used the Site.

**8.    Paragraph 17**

Paragraph 17 states:

Fill from the Malden River would contain an amalgam of wastes disposed from the 50 years of industrial uses upstream of the Site.

This is pure speculation on the part of Mr. Tull. He has not demonstrated that he has personal knowledge regarding: (1) what portions of the Malden River were dredged for fill; (2) what wastes were allegedly deposited in those portions of the Malden River; (3) whether there were any industrial uses upstream from those portions of the Malden River.

**9.    Paragraph 21**

Paragraph 21 states:

This drainage may have been the recipient of a variety of wastes from the Malden River.

5

This is pure speculation on the part of Mr. Tull. He has not demonstrated that he has personal knowledge regarding: (1) whether the drainage easement was ever used; or (2) whether any drainage contained waste from the Malden River.

**10.    Paragraph 23**

Paragraph 23 states:

This clearly indicates that Rizzo recognized that materials, not directly related to Barrett were of a different origin and brought onto the Site.

Mr. Tull merely interprets the affidavit of Well-Com's expert. Moreover, the implication of the statements made by Well-Com's expert is that the materials were brought on Site by Barrett as part of Barrett's filling of portions of the Site.

**11.    Paragraphs 24 and 25**

Paragraphs 24 and 25 state:

DRT – Timmons indicated during his deposition that he was told by a realtor for the Malden Site that the above ground storage tanks would be cut off and the remaining contents left in place and built upon.

The apparent reasoning for this approach was the tank bottoms were on a number of pilings that could be utilized by the new proposed buildings. This type of opportunistic building practice may have resulted in the releases of tank bottoms and the exacerbation of conditions that already existed.

This opinion by Tull rests solely on inadmissible hearsay of an unidentified realtor. Moreover, this is speculation. Tull does not establish that he has personal knowledge of: (1) what, if anything, was contained in the "tank bottoms"; (2) whether the storage tanks were cut off and the remaining contents left in place; (3) whether the building was actually built on the pilings that supported the tanks; (4) whether or not these building practices resulted in releases; or (5) whether or not the alleged releases exacerbated existing conditions.

**12.     Paragraph 29**

Paragraph 29 states:

Any of these businesses would be suspect for disposal practices that would adversely impact the Site.

This statement is based on the "Rizzo Report Phase II" that is not in the record. Moreover, Tull does not establish that he has knowledge of: (1) what type of operations the businesses performed; (2) what their "disposal practices" were; or (3) whether anything they did adversely impacted the Site.

**13.     Paragraph 31**

Paragraph 31 states:

Barrett was not engaged in coal gasification. Therefore, contamination attributed to coal gasification would have originated at another source and have been brought onto the Site.

This statement is based on the "Rizzo Report Phase II" that is not in the record. Tull also does not establish that he has knowledge of the operations of Barrett at the Site including whether or not it engaged in coal gasification.

**14.     Paragraph 33**

Paragraph 33 states:

The coal ash and coal tar conditions are exclusive of each other and require separate assessment. While coal tar may be attributable to Barrett, coal ash is a common fill material that is ubiquitous, and treated as a background condition by the MADEP, in this type of urban setting. Additionally various compounds identified at the Site could be due to uses at the property after 1965, when Barrett ceased operations.

This statement is based on the "Rizzo Report Phase II" that is not in the record. Tull also does not establish that he has knowledge of whether or not any compounds identified were due to operations of the Site after Barrett ceased operations. This is pure speculation.

**15.    Paragraph 35**

Paragraph 35 states:

Again, no coal gasification operations were conducted at the Site; therefore contaminants related to this type of industry may have originated elsewhere.

This statement is based on a Norwood Engineering report that is not in the record. Tull also does not establish that he has knowledge of the operations of Barrett at the Site including whether or not it engaged in coal gasification.

**16.    Paragraph 39**

Paragraph 39 states:

It appears from historical information that the "lagoon" may have been a depression (former stream/wetlands channel) that required filling with Malden River sediments prior to Barrett building on the Site.

This statement is based on the "Rizzo Report Phase II" that is not in the record. Tull does not state what "historical information" he is relying upon. Tull also does not establish that he has knowledge of: (1) what the lagoon was; (2) whether it was filled using sediments from the Malden River; or (3) who filled the lagoon and when. This is pure speculation.

**17.    Paragraph 41**

Paragraph 41 states:

These adjacent parcels could be contributing petroleum related compounds (e.g., benzene, toluene, ethyl benzene) to the Site.

This statement is based on a Norwood Report that is not in the record. Tull also does not establish that he has any knowledge regarding whether any adjacent parcels are contributing petroleum related compounds to the Site. This is speculation.

**18.    Paragraph 43**

Paragraph 43 states:

8

This indicates a variety of uses on and adjacent to this Site that may have had impacts before and after Barrett.

This statement is based on a report by the Army Corps of Engineers that is not in the record. Moreover, Tull merely speculates about whether or not any uses on adjacent site had impacts on the Site and when.

## II.     CONCLUSION

For the foregoing reasons, Well-Com requests that this Court GRANT its motion to strike portions of the Tull Declaration described above.

## RULE 7.1(A)(2) CERTIFICATION

Counsel for Well-Com hereby certifies that they have conferred with counsel for Honeywell and in good faith to resolve or narrow the issues of disagreement.

## REQUEST FOR HEARING

Well-Com hereby requests a hearing on its motion in the event it is deemed necessary by the Court.

          Well-Com Associates, L.P.
          By its attorneys,

          /s/ A. Neil Hartzell
          A. Neil Hartzell (BBO #544752)
          Patricia B. Gary (BBO #554731)
          Matthew M. O'Leary (BBO #652033)
          Donovan Hatem LLP
          Two Seaport Lane
          Boston, MA  02110
          (617) 406-4500

Dated: March 31, 2006
00987713.DOC

**CERTIFICATE OF SERVICE**

    I, Patricia B. Gary, hereby certify that on this 31st day of March, 2006, a copy of the foregoing was served on the attorney for the defendant by electronic means pursuant to Local Rule 5.4(c).

                                        /s/ Patricia B. Gary
                                        Patricia B. Gary