UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

<table>
<tr><td>WELL-COM ASSOCIATES, L.P.,</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>Plaintiff,</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>v.</td><td>)</td><td>Docket No. 05-10056-JLT</td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>HONEYWELL INTERNATIONAL INC.,</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>Defendant.</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
</table>

## MOTION TO AMEND ANSWER AND FOR PARTIAL SUMMARY JUDGMENT AND LOCAL RULE 56.1 STATEMENT OF UNDISPUTED FACTS

Defendant, Honeywell International Inc., hereby respectfully moves to amend its answer and moves, pursuant to Rule 56 of the Federal Rules of Civil Procedure, for partial summary judgment on Counts I, II and III, limiting Well-Com's recovery to an equitable share, not 100%, of its past and future response costs. The grounds for the motion are set forth in detail in the accompanying memorandum. Attached hereto as Exhibit A is a copy of the proposed Amended Answer, Affirmative Defenses and Counterclaims. In brief:

1.      On June 11, 2007, the Supreme Court issued a significant decision that both impacts Well-Com's CERCLA claims and affirms the fundamental principle that a PRP is subject to equitable distribution of response costs among PRPs. United States v. Atlantic Research Corporation, __ S. Ct. __, 2007 WL 1661465 (2007). The Court held that a PRP that undertakes cleanup efforts, but has not been the subject of an enforcement action under § 106 or § 107, may assert a claim against other PRPs for costs actually incurred in the cleanup, pursuant

to 42 U.S.C. § 9607 (CERCLA, § 107(a)).  The Court emphasized that its decision did <u>not</u> mean that a plaintiff PRP could avoid equitable distribution of reimbursement costs among PRPs by suing for cost recovery, and suggested that the appropriate vehicle to prevent a plaintiff PRP from attempting to avoid equitable distribution is a counterclaim for contribution by a defendant PRP.  2007 WL 1661465, *7.

2.    Honeywell seeks leave to amend its answer to state counterclaims for contribution under CERCLA and under M.G.L. c. 21E, sec. 4A.  Honeywell has consistently claimed a right to equitable apportionment and contribution; thus, no new legal theory is presented by the proposed amendment, and Well-Com will not be prejudiced thereby.

3.    Count I, a cost recovery claim under § 107 of CERCLA; Count II, a contribution claim under § 107 of CERCLA; and Count III, a Chapter 21E claim, are flawed because under them Well-Com seeks 100% of its past and future response costs.  Well-Com is not entitled to 100% because (a) when it acquired the property at issue, it knew full well that the property was contaminated, (b) it was and is a sophisticated buyer, and (c) it acquired the property at a discount to reflect its contaminated condition.

WHEREFORE, Honeywell respectfully requests that the Court grant Honeywell leave to amend its answer, and that, on Counts I, II and III, it enter partial summary judgment that Well-Com is not entitled to 100% of its past and future response costs.

## <u>LOCAL RULE 56.1 STATEMENT OF UNDISPUTED FACTS</u>[1]

### A.    <u>The Parties And The Site</u>

1.    Well-Com is a Massachusetts limited partnership.  (Christo Dec., Ex. A, ¶ 1.)

---

[1]    Citations are to the accompanying Declaration of Thomas K. Christo.

2.      Well-Com owns the real property known as 378 Commercial Street in Malden, a 9.5 acre parcel, on which are two large commercial buildings (the "Site"). (Christo Dec., Ex. A, ¶¶ 9, 25; Ex. C at 0001318.)

3.      Well-Com has been wholly owned by John M. Pereira since 1996. (Christo Dec., Ex. S at 25, 28-29.)

4.      Honeywell is a Delaware corporation. Its principal place of business is in Morristown, New Jersey. Honeywell is the corporate successor to AlliedSignal, Inc., and the Barrett Company, which at various times owned and operated a plant at the Site. (Christo Dec., Ex. A, ¶¶ 2, 3, 17.)

5.      The Site is contaminated with coal tar residues, heavy metals, and other hazardous substances. (Christo Dec., Ex. A, ¶¶ 30, 34, 35, 51.)

6.      Well-Com alleges that all or virtually all of the contamination on the site is the by-product of Honeywell's predecessors' operations there. (Christo Dec., Ex. A, ¶¶ 17, 18, 28, 29; Ex. S at 132-35.)

7.      There is evidence that this allegation is incorrect. (Christo Dec., Ex. J at 0000986.)

**B.    Plaintiff's Knowledge Concerning The Condition Of The Site Honeywell's Predecessors' Ownership Of The Site**

8.      Well-Com alleges that Honeywell's predecessors owned the Site from 1932 to 1965, when it was sold to Wellington Realty Corporation. (Christo Dec., Ex. A, ¶¶ 17, 19.)

**The 1984 Purchase And Sale Agreement.**

9.      On or about November 8, 1984, Wellington Realty Company (a successor-in-interest to Wellington Realty Corporation), entered into a Purchase and Sale Agreement (the

"P&S") with Carabetta Enterprises, Inc. ("Carabetta"), pursuant to which Wellington agreed to sell the Site to Carabetta. (Christo Dec., Ex. B.)

10.     The principal of Carabetta was Joseph Carabetta. He and Stanton Black were joint venturers (through various, distinct entities) in real estate, including the Site. (Christo Dec., Ex. S at 31-32; Ex. D at 0001588; Ex. E at 0000391; Ex. M at 0000682-92.)

11.     The purchase price under the P&S was $3.8 million. (Christo Dec., Ex. B at 0000366.)

12.     The P&S called for the closing to occur on or before December 31, 1986. (Christo Dec., Ex. B at 0000371.)

13.     Carabetta's obligation to purchase the Site was conditional on, among other things, the Site being "in conformity with all applicable . . . environmental requirements . . .." The P&S gave Carabetta the right to enter the "property for the purpose of inspecting the property, making surveys of the same, conducting borings, percolation tests, soil tests and the like." (Christo Dec., Ex. B at 0000371, 0000373-74.)

14.     In 1984, Mr. Pereira was a real estate attorney with Sherin & Lodgen. (Christo Dec., Ex. S at 12-13.)

15.     He acted as an attorney for Messrs. Black and Carabetta in connection with the purchase of the Site. (Christo Dec., Ex. S at 31-32.)

**The Early Environmental Studies.**

16.     In 1985 and 1986, environmental firms, including TRC Environmental Consultants ("TRC") and Norwood Engineering ("Norwood"), conducted environmental

assessments of the Site and nearby properties and prepared reports on their work. They reported

that the Site was contaminated. TRC, for example, wrote:

> Coal tar wastes were detected at depths from five to ten feet across parts of the
> [Site] . . .. Most of the tars which underlay the [Site] were not free flowing but
> were bound up either in sediment, fill or peat. The exception to this was in the
> area immediately to the west of the trucking terminal section of the [Site]. There,
> a distinct floating fraction was noted on the ground water. . . . A trace (sic)
> dichlorobenzene, not typically associated with the coal tar wastes was noted in a
> ground water sample from the east side of the property (MW-5).
>
> [Certain] readings across the site . . . would appear to indicate the presence of
> light coal tar fractions (i.e., benzene and toluene) at the water table.
>
> Several metals are found in the soils on the [Site] which generally exceed
> background levels. Of particulate note are the arsenic levels in TP-3 and the
> generally elevated levels of the lead and nickel in MW-1. . . .
>
> Cyanides and phenols are typically associated with coal tars and are detected in
> both soil and water samples on the [Site]. Elevated concentrations of cyanide
> were found in ground water samples . . ..

(Christo Dec., Ex. C at 0001333, 0001339, 0001342.)

### Mr. Pereira's Early Awareness That The Site Is Contaminated.

17.    The P&S gave Messrs. Carabetta and Black a two year window within which to

assess the environmental condition of the Site and, if dissatisfied, to back out of the deal.

(Christo Dec., Ex. S at 75.)

18.    During this period, Mr. Pereira, as attorney for Messrs. Black and Carabetta,

reviewed the environmental reports on the Site. (Christo Dec., Ex. S at 31-32.)

19.    In addition, he had discussions with the engineers from TRC and other firms

concerning the environmental condition of the Site. (Christo Dec., Ex. S at 32-33.)

20.    He was attempting, as counsel for Messrs. Black and Carabetta, to gain an

understanding of the contamination of the Site. (Christo Dec., Ex. S at 34.)

- 5 -

**The 1985 Cost Estimates.**

21.     On December 20, 1985, Mr. Carabetta forwarded to Mr. Black "site recommendations which we spoke about." The "site recommendations" estimated that it would cost in excess of $4 million to remediate the Site and an adjacent property, with the bulk of that amount related to the Site. (Christo Dec., Ex. D at 0001588-89, 0001591-94.)

**Carabetta And Black's Purchase Of The Site With Knowledge.**

22.     Although fully aware that the Site was contaminated, Messrs. Carabetta and Black went ahead with the purchase, at the contract price, in December 1986. (Christo Dec., Ex. E.)

23.     Wellington deeded the Site to three entities, with two Black-affiliated entities receiving a 50% undivided interest and one Carabetta-affiliated entity receiving a 50% undivided interest. (Christo Dec., Ex. E at 0000391; Ex. F.)

24.     The last paragraph of the deed provides:

Pursuant to the provisions of Massachusetts General Laws Chapter 21C Section 7, the Grantor hereby notifies Grantee, its successors and assigns, that a release of hazardous materials has occurred at the premises conveyed herein.

(Christo Dec., Ex. F at 0000138.)

**The Early 1987 Appraisal.**

25.     At the request of Mr. Black, on March 6, 1987, Robert Donnelly, R.A., of Donnelly & Reed Real Estate, provided to Bank of Boston Connecticut an Appraisal Report on the Site. (Christo Dec., Ex. G at 000517.)

26.     The report acknowledged that the Site was contaminated, yet estimated the "Market Value of the [Site] as of February 20, 1987, for the purpose of a possible sale, to be: TEN MILLION DOLLARS ($10,000,000)." The report also included an appraisal based on the

income approach of the market value as of February 20, 1987, of approximately $5.6 million.

(Christo Dec., Ex. G at 000519, 000525 000542.)

27.    The $10 million estimate is $6.2 million more than the price Messrs. Black and

Stanton had paid less than two months earlier, and the $5.6 estimate is $1.8 million more than

that price.

28.    Mr. Pereira acknowledges that Messrs. Black and Stanton purchased the Site for

substantially less than its appraised value.  (Christo Dec., Ex. S at 68.)

**Wellington's Response To The NOR.**

29.    On March 12, 1987, Rosanna Sattler, counsel for Wellington, wrote to Richard

Chalpin of the Massachusetts DEQE in response to a Notice of Responsibility as to the Site that

the DEQE had issued to Wellington on December 17, 1986.  (Christo Dec., Ex. H.)

30.    Ms. Sattler copied Mr. Pereira's partner Morton Brown on the letter.  (Christo

Dec., Ex. H at 0001167.)

31.    She said, among other things:

The purchase and sale agreement governing the sale of the Property was signed in
November, 1984 at a price approximately $2,000,00 (sic) below 1985 fair market
value.  Under the terms of the purchase and sale agreement, Carabetta and Black
(the "Buyers") represented to our client (the "Seller"), that environmental studies
would be performed upon the property as part of its "development costs".  The
Buyers had the option of cancelling the agreement in the event they were not
satisfied with the environmental condition of the property.

After receiving the environmental site assessment for the Property, the Buyers
asked our client to lower the purchase price by $600,000 to compensate them for
their anticipated clean-up costs.  Our client offered to cancel the agreement and to
return the deposit to the Buyers.  However, the Buyers opted to go forward with
the purchase at the original purchase price and waived cancellation of the
transaction under the terms of the agreement.  At the closing on December 30,
1986, our client placed an acknowledgement on the deed transferring the

Property, pursuant to M.G.L. c.21c, and the deed was accepted by the Buyers'
nominees.

(Christo Dec., Ex. H at 0001166.)

32.    There is no evidence that Messrs. Black, Stanton, Pereira, or anyone on their

behalf disputed Ms. Sattler's statements.

**Mr. Pereira's Joining Of The Black Companies.**

33.    In November 1987, Mr. Pereira became Vice President and General Counsel of

Combined Properties, Inc., one of Mr. Black's companies.  He received equity in the company.

In 1989 or 1990, he was promoted to Executive Vice President.  In 1991, he became President.

(Christo Dec., Ex. S at 13, 16-17.)

**Events Of The Late 1980s To 1996.**

34.    During the late 1980s and early to mid-1990s, there was extensive

correspondence, and there were numerous meetings, among the Site owners (and Combined

Properties, their affiliate), the Malden Redevelopment Authority, Wellington, Allied, the

environmental consultants working on the Site, and the DEQE concerning the contamination of

the Site.  The substance of the correspondence and meetings leaves no doubt that Mr. Pereira was

fully aware of the condition of the Site.  For example:

- On June 21, 1988, Mr. Pereira attended a meeting among representatives of the
  Malden Redevelopment Authority, Carabetta, Combined Properties, Allied, and
  Norwood Engineering.  The participants "determined ("crudely") long term
  remediation costs" for the Site and the adjacent property to be nearly $6 million.

- On February 14, 1990, Combined Properties wrote Allied and the prior owner of
  the Site, the latter care of Ms. Sattler, proposing further environmental studies of
  the Site conditions and a cost-sharing arrangement among the owners, Allied, and
  the prior owner.  "Combined Properties, Inc./Carabetta Enterprises, Inc." offered
  to act as coordinator for the studies.

- On March 13, 1990, Ms. Sattler responded to the February 14, 1990, letter. She repeated the points in her March 12, 1987, letter to the DEP, pointing out that there had been an "assumption of the risk by the Buyers."

(Christo Dec., Ex. I; Ex. J at 000986-87; Ex. K at 000826-27; Ex. L at 0000478.)

### The Proof Of Claim Against Mr. Carabetta.

35.    On or about October 5, 1992, Mr. Black filed two proofs of claim in Mr. Carabetta's bankruptcy proceedings in Connecticut. One of them related to the Site. In it, Mr. Black sought $933,153 based on "[a]mounts due on a personal guarantee and other alleged joint liability for environmental clean-up." A rider attached to the proof of claim said:

> In addition to the liability described in the Proof of Claim, [Carabetta] and [Black] may be required to remove certain hazardous materials and oil from [the Site]. [Carabetta] is jointly liable with [Black] for the cost of such removal.

(Christo Dec., Ex. M at 0000708-09.)

### Mr. Pereira's Acquisition Of The Site With Knowledge Of The Contamination.

36.    In early 1996, Mr. Pereira, who already had a minority interest in the Site, acquired from Mr. Black's estate all of Mr. Black's remaining interest in the Site and numerous other properties. (Christo Dec., Ex. S at 8-9, 29-30, 135-36.)

37.    For these interests, Mr. Pereira paid a small amount of money and assumed all of the associated liabilities. The liabilities associated with the Site included a mortgage loan from Bank of Boston Connecticut that Messrs. Carabetta and Black had obtained in 1987. (Christo Dec., Ex. S at 142-43; Ex. N at 0000149; Ex. Q at 0000752-53.)

38.    In the Summer of 1996, Mr. Carabetta conveyed his 50% interest in the Site and his interest in another property that Carabetta and Black had jointly owned to Well-Com Associates, Inc., which by then apparently was wholly-owned by Mr. Pereira. In exchange,

Carabetta received no cash, but (a) an agreement that Mr. Pereira (or his affiliates/nominees) would indemnify Carabetta against any and all liability, including environmental liability, involving the Site and the other property; (b) an agreement by Mr. Pereira (or his affiliates/nominees) to share a small percentage of any profits on any sale or transfer of the Site and the other property before July 16, 2006; and (c) the withdrawal of the proofs of claim filed by Mr. Black and any affiliates in the Carabetta bankruptcy. The conveyance was conditional on Carabetta's receipt of a release from Bank of Boston and its affiliates in respect to the Site. (Christo Dec., Ex. M at 0000682-92; Ex. N.)

      39.    In November 1996, title to the Site was consolidated in Well-Com, which as noted, is wholly owned by Mr. Pereira. (Christo Dec., Ex. O; Ex. P; Ex. A, ¶ 25.)

      40.    Mr. Pereira was well aware in 1996 that the Site was contaminated. He admitted during his deposition that when he acquired full ownership of the Site, he was aware that it was contaminated:

> A.    Okay. When I purchased the property in '96, was I aware that the property was contaminated?
> Q.    Yes.
> A.    Yes.

(Christo Dec., Ex. S at 131-32; see also Ex. S at 39-40.)

**The Restructuring Of The Loan.**

      41.    In December 1996, Mr. Pereira restructured the mortgage loan on the Site with Bank of Boston Connecticut. The amount due on the loan at the time was roughly $3.9 million. By making a one-time payment of $188,129 and providing certain guarantees, commitments, and security, Mr. Pereira succeeded in reducing the principal amount due to $2 million, with a further $1.7 million due and payable only upon the occurrence of certain events, including a sale or

refinancing of the Site before December 31, 1999, on which date, if no such event had occurred the $1.7 million obligation would be forgiven. Apparently, none of these events has occurred, and the $1.7 million obligation has been forgiven. (Christo Dec., Ex. Q at 000751-58, 0000761-63.)

### Well-Com's Dealings With The DEP.

42.     Well-Com has had extensive dealings with the DEP since at least 2000 concerning the contamination at the Site. On October 2, 2005, the DEP issued a proposed Administrative Consent Order to Well-Com, owing to, DEP stated, Well-Com's failure to comply with requirements of the Massachusetts Contingency Plan, the regulatory scheme governing hazardous waste site clean-ups. As the proposed Administrative Consent Order indicates, the DEP views Well-Com, as the Site owner and operator, as liable under Chapter 21E with respect to the contamination. (Christo Dec., Ex. R at 1-3.)

43.     On March 2, 2006, Associate Counsel for Well-Com stated that Well-Com intended to enter into Administrative Consent Order, ACO-NE-05-3A014. As the proposed Administrative Consent Order indicates, the DEP views Well-Com, as the Site owner and operator, as liable under Chapter 21E with respect to the contamination. (Christo Dec., Ex. T at 1-3.)

### C.      Well-Com's Claims.

44.     Well-Com's Complaint contains three counts. The first is entitled "CERCLA cost recovery" and is brought pursuant to 42 U.S.C. § 9607. Well-Com alleges that it is entitled on this claim to:

> a) recover from Honeywell all of its necessary costs of response expended, including all costs spent by Well-Com in researching the Site History; and b) a

judgment declaring Honeywell liable for necessary costs of response that Well-Com will expend in the future, in accordance with its final remediation plan.

(Christo Dec., Ex. A, ¶ 74.)

45.    Well-Com's second count is entitled "CERCLA contribution" and also is brought pursuant to 42 U.S.C. § 9607.  On this claim, Well-Com alleges that it is entitled to:

a) recover from Honeywell an equitable allocation of all its necessary costs of response expended, including all costs spent by Well-Com in researching the Site history; and b) a judgment declaring Honeywell liable for necessary costs of response that Well-Com will expend in the future, in accordance with its final remediation plan.

(Christo Dec., Ex. A, ¶ 77.)

46.    Well-Com's third count is entitled "Massachusetts G.L. 21E."  On this claim, Well-Com alleges that it is entitled "to recover from Honeywell all of its response costs, both past and future, including all costs spent by Well-Com in researching the Site history, and all reasonable attorneys' fees, pursuant to G.L. c. 21E §§ 4 and 4A."  (Christo Dec., Ex. A, ¶ 82.)

47.    During his deposition, Mr. Pereira testified that (a) his position is that Honeywell should pay 100% of the costs to clean up the contaminants that Honeywell's predecessors put there, (b) he does not think that there are any contaminants at the site that Honeywell did not put there, and (c) it is irrelevant that he acquired the property knowing it was contaminated.  His position is, in other words, that Honeywell is responsible for 100% of the response costs associated with the Site. (Christo Dec., Ex. S at 132-35.)

Dated:  July 5, 2007

HONEYWELL INTERNATIONAL INC.,

By its attorneys,

/s/David B. Chaffin
Thomas K. Christo (BBO #083240)
David B. Chaffin (BBO #549245)
HARE & CHAFFIN
160 Federal Street
Boston, Massachusetts 02110-1700
(617) 330-5000

Of Counsel:

Brian D. Israel, Esq.
Arnold & Porter, LLP
555 12th Street, NW
Washington, D.C. 20004
(202) 942-6546

## CERTIFICATE OF CONSULTATION

I certify that counsel have conferred and have attempted in good faith to resolve or narrow the issues presented by this motion.

/s/David B. Chaffin

## CERTIFICATE OF SERVICE

I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on July 5, 2007.

/s/David B. Chaffin

104114.0628

- 13 -

# EXHIBIT A

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| WELL-COM ASSOCIATES, L.P., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 05-10056-JLT |
| ) | |
| HONEYWELL INTERNATIONAL INC., ) | |
| ) | |
| Defendant. ) | |

## AMENDED ANSWER, AFFIRMATIVE DEFENSES AND COUNTERCLAIMS

COMES NOW the defendant in the above-captioned cause, Honeywell International, Inc. ("Honeywell"), and as and for its Answer, Affirmative Defenses and Counterclaims to the Complaint in that action, states as follows:

### THE PARTIES

1.     Admitted.

2.     Admitted.

3.     Admitted.

### JURISDICTION AND VENUE

4.     Honeywell Admits that this Court has jurisdiction over the subject matter hereof.

5.     Honeywell Admits that venue is proper in this District.

## FACTS

### The Defendant

6.      Admitted.

7.      Admitted.

8.      Admitted.

### The Site

9.      Admitted.

10.     Honeywell is without sufficient information to either admit or deny the condition of the site in or around 1932, and demands proof thereof. And further answering, Honeywell states that it is informed and believes, and on that basis alleges, that Bell Rock Leather Tanning Corp., Eastern Metals & Refinishing Co., and Richards and Company (a metal finishing company) all previously held title to the Site; and the extent to which (if at all) these entities utilized the site and contributed to its current environmental condition remains unclear.

11.     Honeywell Admits that Barret had certain licenses from the Commonwealth of Massachusetts, which licenses speak for themselves, and further Admits that Barret exercised some rights under said licenses. In all other respects, Honeywell is without sufficient information to either admit or deny the material allegations of paragraph 11 of the Complaint and demands proof thereof.

12.     Honeywell Admits that, on or about 1936, Barret began construction of a coal tar processing plant at the Site ("Plant"), and that on or about 1937

Barret opened the Plant for the business of manufacturing and selling a variety of coal tar products. In all other respects, Honeywell is without sufficient information to either admit or deny the material allegations of paragraph 12 of the complaint, and demands proof thereof.

13.    Honeywell is without sufficient information to either admit or deny the material allegations of paragraph 13 of the Complaint, and demands proof thereof.

14.    Honeywell Admits that the Plant included a number of above and below ground tanks for the storage and processing of coal tar and other chemicals. In all other respects, Honeywell is without sufficient information to either admit or deny the material allegations in paragraph 14 of the Complaint, and demands proof thereof.

15.    Honeywell Admits that certain drawings depict a filter bed on the southwestern corner of the Site, and further Admits that Exhibit A to the Complaint is a photograph that includes the Site taken in or about 1939. In all other respects, Honeywell is without sufficient information to either Admit or Deny the material allegations of paragraph 15 of the Complaint and demands proof thereof.

16.    Admitted.

17.    Honeywell Admits that, during the period between 1937 and 1965, there were certain press reports of incidents and the like, but is without any further information to either Admit or Deny the material allegations of paragraph 17 of the Complaint and demands proof thereof.

18.      Honeywell does not understand what is meant by "filling the site" or "hazardous substances and materials", and therefore cannot respond to same. Honeywell is without sufficient information to either Admit or Deny the remaining allegations of paragraph 18 of the Complaint and demands proof thereof.

19.      Honeywell Admits that, in 1965, Allied Chemical Corporation sold the Site to Wellington Realty Corporation; and in all other respects Denies the material allegations of paragraph 19 of the Complaint. Further answering, Honeywell states that the term "contaminated condition" as used therein is vague and ambiguous, and therefore cannot be responded to; and the condition of the Sites, as well as its past and then-current uses, were open, obvious, and well known to Wellington Realty Corporation at the time of its purchase of the Site.

20.      Admitted.

21.      Based upon information provided by Well-Com to date and subject to further discovery, admitted. Further answering, Honeywell states that it is unclear to what extent, if at all, the various transactions transferring all or a portion of the title to the Site from and to various entities as pled in paragraphs 21 through 25 of the Complaint were at arms' length, between unrelated parties, and for value, and demands proof thereof.

22.      Based upon information provided by Well-Com to date and subject to further discovery, admitted. Further answering, Honeywell states that it is unclear to what extent, if at all, the various transactions transferring all or

a portion of the title to the Site from and to various entities as pled in paragraphs 21 through 25 of the Complaint were at arms' length, between unrelated parties, and for value, and demands proof thereof.

23.    Based upon information provided by Well-Com to date and subject to further discovery, admitted.  Further answering, Honeywell states that it is unclear to what extent, if at all, the various transactions transferring all or a portion of the title to the Site from and to various entities as pled in paragraphs 21 through 25 of the Complaint were at arms' length, between unrelated parties, and for value, and demands proof thereof.

24.    Based upon information provided by Well-Com to date and subject to further discovery, admitted.  Further answering, Honeywell states that it is unclear to what extent, if at all, the various transactions transferring all or a portion of the title to the Site from and to various entities as pled in paragraphs 21 through 25 of the Complaint were at arms' length, between unrelated parties, and for value, and demands proof thereof.

25.    Based upon information provided by Well-Com to date and subject to further discovery, admitted.  Further answering, Honeywell states that it is unclear to what extent, if at all, the various transactions transferring all or a portion of the title to the Site from and to various entities as pled in paragraphs 21 through 25 of the Complaint were at arms' length, between unrelated parties, and for value, and demands proof thereof.

26.    Based upon information provided by Well-Com to date and subject to further discovery, Honeywell admits that certain tanks were removed from

the Site.  Honeywell is informed and believes, and on that basis alleges, that these tanks were removed by and/or at the direction of Wellington and the Malden Redevelopment Authority.  In all other respects, Honeywell is without information to either admit or deny the material allegations of paragraph 26 of the Complaint, and demands proof thereof.

27.    Based upon information provided by Well-Com to date and subject to further discovery, admitted. Further answering, Honeywell states it does not know to what extent, if at all, such demolition and construction created environmental issues at the site, and is currently investigating same.

28.    Honeywell admits that Wellington Realty Corporation and its various successors in interest have utilized the site for various purposes.  In all other respects Honeywell is without sufficient information to either Admit or Deny the material allegations of paragraph 28 of the Complaint, and demands proof thereof.  And further answering, Honeywell, upon information and belief, alleges that Wellington Realty Corporation and its various successors in interest, in utilizing the site, have introduced contaminants of concern to the Site, have adversely affected the environmental condition of the Site; and Honeywell is conducting an ongoing investigation to determine the extent of same.

29.    Denied.

30.    Honeywell Admits that a number of environmental studies of the area specified were conducted on or about the mid to late 1980s, which studies

speak for themselves.  In all other respects, Honeywell Denies the material allegations of paragraph 30 of the Complaint.

31.    Honeywell Admits that, prior to 1986, it shared in the costs of certain environmental investigations; and that the parties received a "Notice of Responsibility Pursuant to M.G.L. Chapter 21E" in or about December of 1986; and that, thereafter, Honeywell shared, to a lesser extent, in an environmental investigation of the Site.  In all other respects, Honeywell Denies the material allegations of paragraph 31 of the Complaint.

32.    Admitted.

33.    Honeywell Admits that, at some time during 2000, Rizzo submitted a document entitled "Phase I Initial Site Investigation and Tier Classification Submittal", which document speaks for itself.  In all other respects, Honeywell Denies the material allegations of paragraph 33 of the Complaint.

34.    Honeywell Admits that the Phase I report identified certain substances, and refers to that report, which speaks for itself.  In all other respects, Honeywell Denies the material allegations of paragraph 34 of the Complaint.

35.    Honeywell Admits that the Phase I report identified certain substances, and refers to that report, which speaks for itself.  In all other respects, Honeywell Denies the material allegations of paragraph 35 of the Complaint.

36.    Honeywell Admits that, in or about April, 2001, Rizzo provided Well-Com with a proposal, which proposal speaks for itself. In all other respects, Honeywell Denies the material allegations of paragraph 36 of the Complaint.

37.    Honeywell Admits, that on or about July 3, 2001, Well-Com served Honeywell with a notice, which notice speaks for itself. In all other respects, Honeywell Denies the material allegations of paragraph 37 of the Complaint.

38.    Honeywell Admits that, on or about November 2001, representatives of Well-Com and Honeywell engaged in a confidential settlement meeting which did not resolve the outstanding issues between them. In all other respects, Honeywell Denies the material allegations of paragraph 38 of the Complaint.

39.    Honeywell does not know what Well-Com has done, further answering, Honeywell alleges that such efforts have been neither necessary nor effective, and Well-Com failed to meet its obligations under the MCP.

40.    Honeywell does not know what Well-Com has done, further answering, Honeywell states that such efforts have been neither necessary nor effective, and Well-Com failed to meet its obligations under the MCP.

41.    Admitted.

42.    Honeywell Admits that, on or about December 9, 2003, Well-Com received a revised "Notice of Non-Compliance with the MCP", which notice speaks for itself, and set forth certain dates as stated therein. In all

8

other respects, Honeywell Denies the material allegations of paragraph 42 of the Complaint.

43.    Honeywell Admits that, on or about March 25, 2004, Rizzo submitted to Well-Com, and on or about March 26, 2004, Well-Com submitted to Honeywell, a document entitled, "Proposal for Supplemental Subsurface Investigation", which document speaks for itself.  In all other respects, Honeywell Denies the material allegations of paragraph 43 of the Complaint.

44.    Admitted.

45.    Honeywell is informed and believes, and on that basis alleges, that Rizzo performed certain soil borings at the Site in or about April, 2004.  In all other respects, Honeywell Denies the material allegations of paragraph 45 of the Complaint.

46.    Honeywell Admits that, on or about June 1, 2004, it entered into an agreement entitled "Memorandum of Agreement and Tolling Agreement," which document speaks for itself.  In all other respects, Honeywell Denies the material allegations of paragraph 46 of the Complaint.

47.    Admitted.

48.    Honeywell Admits that Well-Com applied for and received an extension to July 21, 2004 for the filing of the Phase II/III report.  In all other respects, Honeywell Denies the material allegations of paragraph 48 of the Complaint.

49.     Honeywell Admits that Well-Com applied for and received additional
extensions to August 6, 2004 for the filing of the Phase II Comprehensive
Site Assessment, August 27, 2004 for the Phase II Remedial Action
Alternative Report, and December 17, 2004 for the Phase IV plan. In all
other respects, Honeywell Denies the material allegations of paragraph
49of the Complaint.

50.     Honeywell Admits that, during various times in the month of July, 2004,
its representatives made comments about and circulated revisions to a
draft Phase II Comprehensive Site assessment, in consultation with
various Well-Com representatives, including Rizzo; and that a Phase II
Comprehensive Site assessment was filed on or about August 6, 2004. In
all other respects, Honeywell Denies the material allegations of paragraph
50 of the Complaint.

51.     Honeywell states that the Phase II report is a written document which
speaks for itself. In all other respects, Honeywell Denies the material
allegations of paragraph 51 of the Complaint, including (but not limited
to) the characterizations and/or accuracy of the document.

52.     Honeywell states that the Phase II report is a written document which
speaks for itself. In all other respects, Honeywell Denies the material
allegations of paragraph 52 of the Complaint, including (but not limited
to) the characterizations and/or accuracy of the document.

53.     Honeywell Admits that, on or about August 20, 2004, Well-Com and
Honeywell representatives had certain confidential settlement discussions.

In all other respects, Honeywell Denies the material allegations of paragraph 53 of the Complaint.

54.    Honeywell admits that, on or about August 27, 2004, a document purporting to be a "Phase III Report" was filed. In all other respects, Honeywell Denies the material allegations of paragraph 54 of the Complaint.

55.    Honeywell states that the Phase III report is a written document which speaks for itself. In all other respects, including (but not limited to) the characterizations and/or accuracy of the document, Honeywell Denies the material allegations of paragraph 55 of the Complaint.

56.    Honeywell Admits that, on or about September 14, 2004, the parties entered into an agreement entitled "First Amendment and Extension of Memorandum of Agreement and Tolling Agreement of June 1,2004" which document speaks for itself. In all other respects Honeywell Denies the material allegations of paragraph 56 of the Complaint.

57.    Honeywell Admits that, at its request, some time after November 5, 2004, its contractor, MACTEC, Inc., received certain samples from Rizzo, which were collected at various locations on the Site. In all other respects, Honeywell is without sufficient information to either Admit or Deny the material allegations of paragraph 57 of the Complaint, and demands proof thereof.

58.    Honeywell Admits that, on or about November 18, 2004 and December 8, 2004, the parties entered into certain letter agreements , which documents

speak for themselves. In all other respects, Honeywell Denies the material allegations of paragraph 58 of the Complaint.

59.   Honeywell admits that, on or about December 1, 2004, it provided to Well-Com a letter entitled "Preliminary Draft - Settlement Confidential" which document speaks for itself, and is inadmissible. In all other respects, Honeywell Denies the material allegations of paragraph 59 of the Complaint.

60.   Honeywell Admits that its representatives met with Well-Com representatives on or about December 16, 2004 to discuss various matters concerning the Site, which meeting was designated "settlement confidential". In all other respects, Honeywell Denies the material allegations of paragraph 60 of the complaint.

61.   Honeywell Admits that the parties have been unable to resolve the differences between them. In all other respects, Honeywell Denies the material allegations of paragraph 61 of the Complaint.

62.   Honeywell does not know what "substantial sums" means, and does not know what amounts, if any, Well-Com has expended, and to what extent, if at all, such expenditures (if any) were necessary, appropriate reasonable or in accordance with either the MCP or the NCP; and demands proof thereof.

63.   Honeywell is without sufficient information to either admit or deny the extent (if any) of Well-Com's response costs, or their necessity, appropriateness, reasonableness and the extent to which (if at all) they are

12

in accordance with either the MCP or the NCP; and demands proof thereof.

64.    Denied.

## COUNT I

### (CERCLA Cost Recovery)

65.    Honeywell incorporates by reference its responses to paragraphs 1 through 64 as if fully set forth herein.

66.    Denied.

67.    Denied.

68.    Denied.

69.    There is no paragraph numbered 69 in the Complaint, and no answer thereto is therefore required.

70.    There is no paragraph numbered 70 in the Complaint, and no answer thereto is therefore required.

71.    Denied.

72.    Denied.

73.    Denied.

74.    Denied.

## COUNT II

### (CERCLA Contribution)

75.    Honeywell incorporates by reference its responses to paragraphs 1 through 74 as if fully set forth herein.

76.    Denied.

77.    Denied.

## COUNT III

### (Massachusetts G.L. c. 21E)

78.    Honeywell incorporates by reference its responses to paragraphs 1 through 77 as if fully set forth herein.

79.    Honeywell Admits that, for purposes of Mass. G.L. c. 21E, sec. 5(a)(2), it is a "person", but Denies that it is liable thereunder.

80.    Denied.  And further answering, Honeywell states that Well-Com and its various predecessors in interest took title to the Site fully aware of its environmental condition, and did so nevertheless, and that they then knew or should have known what costs, if any would ensue thereby, and that they therefore took the obligation upon themselves to pay such costs.

81.    Denied.

82.    Denied.

## AFFIRMATIVE DEFENSES

A.    Plaintiff's claims are barred, in whole or in part, by applicable statutes of limitations.

B.    Plaintiff is liable for 100% of all response costs under applicable statutory law.

C.    All or part of Plaintiff's costs were unnecessary, inappropriate and unreasonable under M.G.L. c. 21E, sec. 4, and were incurred in a manner inconsistent with the Massachusetts Contingency Plan.

D.    All or part of Plaintiff's costs were excessive, inappropriate and unnecessary and were incurred in a manner inconsistent with CERCLA and/or the National Contingency Plan.

E.    Plaintiff's failure to promptly address the environmental situation at the Site exacerbated subsurface conditions and increased response costs, and, under M.G.L. c. 21E and CERCLA, Plaintiff therefore bears equitable responsibility for those increased costs.

F.    Plaintiff has failed and continues to fail to mitigate its damages.

G.    Any costs incurred by the Plaintiff resulted from acts or omissions of third parties who are not employees or agents of Honeywell and had no contractual relationship with Honeywell.

H.    The Complaint fails to join all indispensable parties.

I.    Plaintiff has failed to comply with the statutory prerequisites to filing its claim pursuant to M.G.L. c. 21E and CERCLA,  and, therefore, is barred from obtaining relief.

J.    Plaintiff failed to comply with M.G.L. c. 21E sec. 4A(d) and, therefore, is not entitled to an award of attorney fees.

K.    The substances allegedly released at the Site do not constitute "hazardous material," within the definition of M.G.L. c. 21E, or "hazardous substances," within the definition of CERCLA.

L.    All, or a portion of, the contamination at the Site is attributable to petroleum releases, and the Complaint fails to state a claim for costs attributed to such releases.

15

M.   Plaintiff knew or had reason to know of the Site's condition at the time it took title to the Site.

N.   Honeywell's predecessor in interest sold the property on an "as is" basis and Honeywell is therefore entitled to indemnification or should otherwise be held harmless by Well-Com and/or its predecessors in interest.

O.   The statutes relied upon by the Plaintiff in its Complaint do not authorize the imposition of joint and several liability upon Honeywell.

P.   In the event Honeywell is held liable for any of the Plaintiff's damages as alleged in the Complaint, then Honeywell's liability should be limited to its fair, equitable and proportionate contribution to the alleged harm at the Site.

Q.   In the event Honeywell is held liable for any of the Plaintiff's damages as alleged in the Complaint, then Honeywell's liability should be off-set by its response costs incurred at the Site to date.

R.   Plaintiff fails to plead a claim for which relief may be granted.

S.   Plaintiff lacks standing to assert any claim against Honeywell under CERCLA.

T.   Plaintiff's claims are barred by the doctrines of laches and estoppel.

### PRAYER FOR RELIEF

WHEREFORE, Honeywell respectfully requests that this Court enter:

1.   Against Well-Com, a judgment for attorneys' fees, pursuant to M.G.L. c. 21E, sec. 4A(f);

16

2.      Against Well-Com, a judgment in Honeywell's favor on all Counts

brought by Well-Com against Honeywell;

3.      Such other relief which to this Court seems appropriate.

## COUNTERCLAIMS

1.      Honeywell is a Delaware corporation with its principal place of business

in Morristown, New Jersey.

2.      Well-Com is a limited partnership organized and existing under the laws

of Massachusetts with its principal place of business in Malden, Massachusetts.

3.      Well-Com is the current owner of the Site, as defined in the Complaint.

4.      Honeywell has incurred necessary costs of responding to releases or

threatened releases of hazardous substances at the Site within the meaning of 42 U.S.C. §

9607(a)(4)(B), and such costs have been reasonable and consistent with the National

Contingency Plan.

## COUNT I

(Equitable Contribution Under CERCLA)

5.      Honeywell repeats and incorporates herein the allegations of paragraphs 1

through 4 above.

6.      Well-Com is a current owner and operator of a facility from which there

has been a release or threatened release of hazardous substances, and is thus a liable party

under Section 107(a) of CERCLA, 42 U.S.C. § 9607(a)(1).

7.      Honeywell is entitled under Section 113(f) of CERCLA, 42 U.S.C. §

9613(f)(1) to equitable contribution from Well-Com for the response costs that

Honeywell has incurred or will incur with respect to the Site.

17

WHEREFORE, Honeywell requests that judgment be entered in favor of Honeywell and against Well-Com in the amount of Well-Com's fair, equitable and proportionate of the response costs at the Site, and that Honeywell's liability be off-set by its response costs incurred at the Site to date.

## COUNT II

(Equitable Contribution Under M.G.L. c. 21E, sec. 4A)

8.      Honeywell repeats and incorporates herein the allegations of paragraphs 1 through 7 above.

9.      Well-Com is a current owner and operator of a facility from which there has been a release or threatened release of hazardous substances, and is thus a liable party under M.G.L. c. 21E, sec. 5(a)(1).

10.      Honeywell is entitled under M.G.L. c. 21E, sec. 4 to equitable contribution from Well-Com for the response costs that Honeywell has incurred or will incur with respect to the Site.

WHEREFORE, Honeywell requests that judgment be entered in favor of Honeywell and against Well-Com in the amount of Well-Com's fair, equitable and proportionate share of the response costs at the Site, and that Honeywell's liability be off-set by its response costs incurred at the Site to date.

Dated:  July 5, 2007                           HONEYWELL INTERNATIONAL INC.,

                                               By its attorneys,

                                               s/David B. Chaffin
                                               Thomas K. Christo
                                               BBO No. 083240
                                               David B. Chaffin
                                               BBO No. 549245
                                               Hare & Chaffin
                                               160 Federal Street
                                               Boston, MA 02110
                                               (617) 330-5000

                                               Of Counsel:

                                               Brian D. Israel, Esq.
                                               Arnold & Porter, LLP
                                               555 12th Street, NW
                                               Washington, D.C. 20004
                                               (202) 942-6546

## CERTIFICATE OF SERVICE

I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on July 5, 2007.

                                               /s/David B. Chaffin