UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| WELL-COM ASSOCIATES, L.P.,         ) | |
|         ) | |
|     Plaintiff,         ) | |
|         ) | Docket No. 05-10056-JLT |
| v.         ) | |
|         ) | |
| HONEYWELL INTERNATIONAL INC.,         ) | |
|         ) | |
|     Defendant.         ) | |

## MEMORANDUM IN SUPPORT OF MOTION TO AMEND ANSWER AND FOR PARTIAL SUMMARY JUDGMENT

Dated:  July 5, 2007

HONEYWELL INTERNATIONAL INC.,

By its attorneys,

Thomas K. Christo (BBO #083240)
David B. Chaffin (BBO #549245)
HARE & CHAFFIN
160 Federal Street
Boston, Massachusetts 02110-1700
(617) 330-5000

Of Counsel:

Brian D. Israel, Esq.
Arnold & Porter, LLP
555 12th Street, NW
Washington, D.C. 20004
(202) 942-6546

## Table of Contents

**Page**

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

Preliminary Statement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Statement Of Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    A.    The Parties And The Site . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    B.    Plaintiff's Knowledge Concerning The Condition Of The Site . . . . . . . . . . . . . . 4

          Honeywell's Predecessors' Ownership Of The Site . . . . . . . . . . . . . . . . . . 4

          The 1984 Purchase And Sale Agreement . . . . . . . . . . . . . . . . . . . . . . . . 4

          The Early Environmental Studies . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

          Mr. Pereira's Early Awareness That The Site Is Contaminated . . . . . . . . . . . 5

          The 1985 Cost Estimates . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

          Carabetta And Black's Purchase Of The Site With Knowledge . . . . . . . . . . . 5

          The Early 1987 Appraisal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

          Wellington's Response To The NOR . . . . . . . . . . . . . . . . . . . . . . . . . . 6

          Mr. Pereira's Joining Of The Black Companies . . . . . . . . . . . . . . . . . . . . 7

          Events Of The Late 1980s To 1996 . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

          The Proof Of Claim Against Mr. Carabetta . . . . . . . . . . . . . . . . . . . . . . 7

          Mr. Pereira's Acquisition Of The Site With
          Knowledge Of The Contamination . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

          The Restructuring Of The Loan . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

          Well-Com's Dealings With The DEP . . . . . . . . . . . . . . . . . . . . . . . . . . 9

C.    Well-Com's Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

I.    HONEYWELL SHOULD BE PERMITTED TO AMEND
ITS ANSWER TO ASSERT COUNTERCLAIMS FOR
EQUITABLE CONTRIBUTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

II.    WELL-COM IS NOT ENTITLED TO COMPLETE
INDEMNITY ON ITS CERCLA CLAIMS OR ITS CLAIMS
UNDER CHAPTER 21E . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

A.    Any Recovery Under Section 107 Must Be Limited . . . . . . . . . . . . . . . 12

B.    Any Recovery Under Chapter 21E Must Be Limited . . . . . . . . . . . . . . 15

1.    Contribution Under Chapter 21E . . . . . . . . . . . . . . . . . . . . . . . . 15

2.    Well-Com Is Itself Liable Under Chapter 21E . . . . . . . . . . . . . . 16

3.    Well-Com's Potential Recovery Must Be Reduced . . . . . . . . . . . 19

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

**Table of Cases**

**Page**

**Cases**

Amoco Oil Co. v. Borden, Inc.,
889 F.2d 664 (5th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 19

Atlantic Research Corp. v. United States,
459 F.3d 827 (8th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Black v. Coastal Oil New England, Inc.,
699 N.E.2d 353 (Mass. App. 1998), rev. denied, 707 N.E.2d 1077 (1998) . . . . . . . . . . . . . . . 16

Church v. General Electric Co.,
138 F. Supp. 2d 169 (D. Mass. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Commonwealth v. Boston Edison Co.,
828 N.E.2d 16 (Mass. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Cooper Industries, Inc. v. Aviall Services, Inc.,
125 S. Ct. 577 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Envtl. Transp. Sys. v. ENSCO, Inc.,
969 F.2d 503 (7th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Gemme v. Applied Envtl. Tech.,
2003 WL 21500549 (Mass. Super. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Glassman v. Computervision Corp.,
90 F.3d 617 (1st Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

In re Hemingway Transport, Inc.,
993 F.2d 915 (1st Cir. 1993), cert. denied, 510 U.S. 914 (1993) . . . . . . . . . . . . . . . . . . . 14, 18, 19

Kerr-McGee Chem. Corp. v. Lefton Iron & Metal Co.,
14 F.3d 321 (7th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Martignetti v. Haigh-Farr, Inc.,
680 N.E. 2d 1131 (Mass. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 16, 17, 18, 19

Mystic Landing, LLC v. Pharmacia Corp.,
443 F. Supp. 2d 97 (D. Mass. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 14, 16

Nassr v. Commonwealth,
477 N.E.2d 987 (Mass. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

One Wheeler Road Assoc. v. The Foxboro Co.,
1995 WL 791937 (D. Mass. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

O'Neill v. Picillo,
883 F.2d 176 (1st Cir. 1989), cert. denied, 493 U.S. 1071 (1990) . . . . . . . . . . . . . . . . . . . . 15

Smith Land & Improvement Corp. v. Celotex Corp.,
851 F.2d 86 (3rd Cir. 1988), cert. denied, 488 U.S. 1029 (1989) . . . . . . . . . . . . . . . . . . . . . 13

United States v. Atlantic Research Corporation,
___ S. Ct. ___, 2007 WL 1661465 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2, 11, 12, 15

United Technologies Corp. v. Browning-Ferris Industries, Inc.,
33 F.3d 96 (1st Cir. 1994), cert. denied, 513 U.S. 1183 (1995) . . . . . . . . . . . . . . . . . . . . . . . 12

Defendant, Honeywell International Inc., respectfully submits this memorandum in support of its motion to amend its answer and for partial summary judgment.

## Preliminary Statement

Plaintiff, Well-Com Associates, L.P., owns 378 Commercial Street in Malden. Predecessors to Honeywell used to own the property. The property is contaminated. Well-Com alleges that Honeywell's predecessors caused the contamination, and it sues for its past and future response costs. The Complaint contains three counts. The first is a cost recovery claim under § 107 of CERCLA. The second count is a contribution claim under § 107, and the third is a claim under Chapter 21E of the Massachusetts General Laws.

Well-Com is laboring under the mistaken impression that it can recover 100% of its response costs on its claims, with no equitable apportionment. It cannot. Well-Com is sophisticated in real estate matters. When it acquired the property in 1996, it knew full well that the property was contaminated and that it could cost millions to clean it up. Further, it acquired the property at a discount. Under these circumstances, Well-Com is not entitled to recover 100% of its response costs. The purpose of Honeywell's motion is to establish that Well-Com's claims are subject to equitable apportionment and contribution among PRPs.

On June 11, 2007, the Supreme Court issued a significant decision that both impacts Well-Com's CERCLA claims and affirms the fundamental principle that a PRP is subject to equitable distribution of response costs among PRPs. United States v. Atlantic Research Corporation, __ S. Ct. __, 2007 WL 1661465 (2007). The Court held that a PRP that undertakes cleanup efforts, but has not been the subject of an enforcement action under § 106 or § 107, may assert a claim against other PRPs for costs actually incurred in the cleanup, pursuant to 42 U.S.C. § 9607 (CERCLA, § 107(a)). In doing so, the Court rejected arguments, and a large body of prior case law, to the effect

that only "innocent," or non-liable parties may sue for cost recovery. The Court emphasized, however, that its decision does <u>not</u> mean that a PRP can "avoid § 113(f)'s equitable distribution of reimbursement costs among PRPs by instead choosing to impose joint and several liability on another PRP in an action under § 107(a)." 2007 WL 1661465, *7.  A plaintiff PRP has no choice of remedies because the Court set forth an "either-or" rule depending on the procedural circumstances of the PRP: PRPs that have been the subject of enforcement actions under § 106 or § 107 must proceed under § 113(f), while PRPs who incur clean-up costs but have not been subject to enforcement actions must proceed to seek cost recovery under § 107.  <u>Id</u>.

Equitable contribution among PRPs applies in <u>both</u> scenarios.  PRPs may not "avoid" equitable distribution of costs merely because the form of the action is for cost recovery under § 107.  The Court suggested that the proper vehicle for obtaining equitable distribution in an action by a plaintiff PRP for cost recovery would be a counterclaim for contribution by a defendant PRP under § 113(f).  <u>Id</u>.

<u>Atlantic Research</u> has the following consequences for Well-Com's CERCLA claims.  Well-Com's cost recovery claim under Count I is unquestionably subject to principles of equitable distribution of costs among PRPs.  Well-Com's recovery, if any, should be limited accordingly. Well-Com's claim for contribution under § 107 is by definition subject to equitable distribution.[1] In light of <u>Atlantic Research</u>, Honeywell respectfully moves for leave to amend its answer to state counterclaims for contribution under § 113(f) and Chapter 21E.  Honeywell has consistently asserted its rights to fair and equitable contribution in this action, including by affirmative defenses,

---

[1]    Because the Supreme Court ruled that § 107 expressly permits PRPs to seek cost recovery, it did not address the alternative holding of the Eighth Circuit that § 107(a) contains an implied right of contribution for PRPs who cannot sue under § 113(f). 2007 WL 1661465, *7 n.8.  Presumably Well-Com is asserting such an implied right under § 107, since it has not pled a cause of action under § 113(f), nor can it do so.

and indeed Well-Com itself asserts a contribution claim. Thus the proposed counterclaims would not introduce a new legal theory or prejudice Well-Com.

Honeywell moves for partial summary judgment under Counts I, II and III to the effect that Well-Com's cost recovery claims under CERCLA and under Massachusetts law are subject to equitable contribution, and, therefore, that Well-Com is not entitled to recover 100% of its costs.

### Statement Of Facts

**A.    The Parties And The Site**

Well-Com is a Massachusetts limited partnership that has been wholly owned by John M. Pereira since 1996. Well-Com owns 378 Commercial Street in Malden, a 9.5 acre parcel, on which are two large commercial buildings (the "Site").

Honeywell is a Delaware corporation. Its principal place of business is in Morristown, New Jersey. Honeywell is the corporate successor to AlliedSignal, Inc., and the Barrett Company, which at various times owned and operated a plant at the Site.

The Site is contaminated with coal tar residues, heavy metals, and other hazardous substances. Well-Com alleges that all or virtually all of the contamination on the site is the by-product of Honeywell's predecessors' operations there. Whether Well-Com's allegation is correct is not relevant to this motion, and it is assumed to be correct for present purposes.[2] Even if Honeywell's predecessors did cause all of the contamination at the Site, Well-Com would not be entitled to recover all of its response costs.

---

[2]        There is evidence that the allegation is not correct.

**B.**     <u>**Plaintiff's Knowledge Concerning The Condition Of The Site**</u>

<u>**Honeywell's Predecessors' Ownership Of The Site.**</u>  Well-Com alleges that Honeywell's

predecessors owned and occupied the Site from 1932 to 1965, when it was sold to Wellington

Realty Corporation.

<u>**The 1984 Purchase And Sale Agreement.**</u>  On or about November 8, 1984, Wellington

Realty Company (a successor-in-interest to Wellington Realty Corporation), entered into a Purchase

and Sale Agreement (the "P&S") with Carabetta Enterprises, Inc. ("Carabetta"), pursuant to which

Wellington agreed to sell the Site to Carabetta.  The principal of Carabetta was Joseph Carabetta.

He and Stanton Black were joint venturers in real estate, including the Site.

The purchase price under the P&S was $3.8 million.  The P&S called for the closing to

occur on or before December 31, 1986.  Carabetta's obligation to purchase the Site was conditional

on, among other things, the Site being "in conformity with all applicable . . . environmental

requirements . . .."  The P&S gave Carabetta the right to enter the "property for the purpose of

inspecting the property, making surveys of the same, conducting borings, percolation tests, soil tests

and the like."

In 1984, Mr. Pereira was a real estate attorney with Sherin & Lodgen.  He was counsel to

Messrs. Black and Carabetta in connection with the purchase of the Site.

<u>**The Early Environmental Studies.**</u>  In 1985 and 1986, environmental firms, including

TRC Environmental Consultants ("TRC") and Norwood Engineering ("Norwood"), conducted

environmental assessments of the Site and nearby properties and prepared reports on their work.

They reported that the Site was contaminated.  TRC, for example, wrote:

> Coal tar wastes were detected at depths from five to ten feet across parts of the [Site]
> . . .. Most of the tars which underlay the [Site] were not free flowing but were bound
> up either in sediment, fill or peat.  The exception to this was in the area immediately
> to the west of the trucking terminal section of the [Site].  There, a distinct floating

fraction was noted on the ground water. . . . A trace (sic) dichlorobenzene, not typically associated with the coal tar wastes was noted in a ground water sample from the east side of the property (MW-5).

[Certain] readings across the site . . . would appear to indicate the presence of light coal tar fractions (i.e., benzene and toluene) at the water table.

Several metals are found in the soils on the [Site] which generally exceed background levels. Of particular note are the arsenic levels in TP-3 and the generally elevated levels of the lead and nickel in MW-1. . . .

Cyanides and phenols are typically associated with coal tars and are detected in both soil and water samples on the [Site]. Elevated concentrations of cyanide were found in ground water samples . . . .

**Mr. Pereira's Early Awareness That The Site Is Contaminated.** The P&S gave Messrs. Carabetta and Black a two-year window within which to assess the environmental condition of the Site and, if dissatisfied, to back out of the deal. During this period, Mr. Pereira, as counsel for Messrs. Black and Carabetta, reviewed the environmental reports on the Site. In addition, he had discussions with the engineers from TRC and other firms concerning the environmental condition of the Site. He was attempting, as counsel for Messrs. Black and Carabetta, to gain an understanding of the contamination of the Site.

**The 1985 Cost Estimates.** On December 20, 1985, Mr. Carabetta forwarded to Mr. Black "site recommendations which we spoke about." The "site recommendations" estimated that it would cost in excess of $4 million to remediate the Site and an adjacent property, with the bulk of that amount related to the Site.

**Carabetta And Black's Purchase Of The Site With Knowledge.** Although fully aware that the Site was contaminated, Messrs. Carabetta and Black went ahead with the purchase, at the contract price, in December 1986. Wellington deeded the Site to three entities, with two Black-affiliated entities receiving a 50% undivided interest and one Carabetta-affiliated entity receiving a 50% undivided interest. The last paragraph of the deed provides:

Pursuant to the provisions of Massachusetts General Laws Chapter 21C (sic) Section 7, the Grantor hereby notifies Grantee, its successors and assigns, that a release of hazardous materials has occurred at the premises conveyed herein.

**The Early 1987 Appraisal**. At the request of Mr. Black, on March 6, 1987, Robert Donnelly, R.A., of Donnelly & Reed Real Estate provided to Bank of Boston Connecticut an Appraisal Report on the Site. The report acknowledged that the Site was contaminated, yet estimated the "Market Value of the [Site] as of February 20, 1987, for the purpose of a possible sale, to be: TEN MILLION DOLLARS ($10,000,000)." This is $6.2 million more than the price Messrs. Black and Stanton had paid less than two months earlier. The report also included an estimate, based on the income approach, of the market value as of February 20, 1987, of approximately $5.6 million. This is $1.8 million more than the price Messrs. Black and Stanton paid. Mr. Pereira acknowledges that Messrs. Black and Stanton purchased the Site for substantially less than its appraised value.

**Wellington's Response To The NOR.** On March 12, 1987, Rosanna Sattler, counsel for Wellington, wrote to Richard Chalpin of the Massachusetts DEQE in response to a Notice of Responsibility as to the Site that the DEQE had issued to Wellington on December 17, 1986. Ms. Sattler copied Mr. Pereira's partner Morton Brown on the letter. She said, among other things:

> The purchase and sale agreement governing the sale of the Property was signed in November, 1984 at a price approximately $2,000,00 (sic) below 1985 fair market value. Under the terms of the purchase and sale agreement, Carabetta and Black (the "Buyers") represented to our client (the "Seller"), that environmental studies would be performed upon the property as part of its "development costs". The Buyers had the option of cancelling the agreement in the event they were not satisfied with the environmental condition of the property.

> After receiving the environmental site assessment for the Property, the Buyers asked our client to lower the purchase price by $600,000 to compensate them for their anticipated clean-up costs. Our client offered to cancel the agreement and to return the deposit to the Buyers. However, the Buyers opted to go forward with the purchase at the original purchase price and waived cancellation of the transaction under the terms of the agreement. At the closing on December 30, 1986, our client

placed an acknowledgement on the deed transferring the Property, pursuant to
M.G.L. c.21c (sic), and the deed was accepted by the Buyers' nominees.

There is no evidence that Messrs. Black, Stanton, Pereira, or anyone on their behalf disputed Ms.

Sattler's statements.

**Mr. Pereira's Joining Of The Black Companies.**  In November 1987, Mr. Pereira became

Vice President and General Counsel of Combined Properties, Inc., one of Mr. Black's companies.

He received equity in the company.  In 1989 or 1990, he was promoted to Executive Vice President.

In 1991, he became President.

**Events Of The Late 1980s To 1996.**  During the late 1980s and early to mid-1990s, there

was extensive correspondence, and there were numerous meetings, among the Site owners (and

Combined Properties, their affiliate), the Malden Redevelopment Authority, Wellington, Allied, the

environmental consultants working on the Site, and the DEQE concerning the contamination of the

Site.  The substance of the correspondence and meetings leaves no doubt that Mr. Pereira was fully

aware of the condition of the Site.  For example:

- On June 21, 1988, Mr. Pereira attended a meeting among representatives of the
  Malden Redevelopment Authority, Carabetta, Combined Properties, Allied, and
  Norwood Engineering.  The participants "determined ("crudely") long term
  remediation costs" for the Site and the adjacent property to be nearly $6 million.

- On February 14, 1990, Combined Properties wrote Allied and the prior owner of the
  Site, the latter care of Ms. Sattler, proposing further environmental studies of the
  Site conditions and a cost-sharing arrangement among the owners, Allied, and the
  prior owner.  "Combined Properties, Inc./Carabetta Enterprises, Inc." offered to act
  as coordinator for the studies.

- On March 13, 1990, Ms. Sattler responded to the February 14, 1990, letter.  She
  repeated the points in her March 12, 1987, letter to the DEP, pointing out that
  there had been an "assumption of the risk by the Buyers."

**The Proof Of Claim Against Mr. Carabetta.**  On or about October 5, 1992, Mr. Black

filed two proofs of claim in Mr. Carabetta's bankruptcy proceedings in Connecticut.  One of them

related to the Site. In it, Mr. Black sought $933,153 based on "[a]mounts due on a personal guarantee and other alleged joint liability for environmental clean-up." A rider attached to the proof of claim said:

> In addition to the liability described in the Proof of Claim, [Carabetta] and [Black] may be required to remove certain hazardous materials and oil from [the Site]. [Carabetta] is jointly liable with [Black] for the cost of such removal.

### Mr. Pereira's Acquisition Of The Site With Knowledge Of The Contamination. In

early 1996, Mr. Pereira acquired from Mr. Black's estate all of Mr. Black's remaining interest in the Site and numerous other properties. For these interests, Mr. Pereira paid a small amount of money and assumed the associated liabilities. The liabilities associated with the Site included a mortgage loan from Bank of Boston Connecticut that Messrs. Carabetta and Black had obtained in 1987.

In the summer of 1996, Mr. Carabetta conveyed his 50% interest in the Site and his interest in another property that Carabetta and Black had jointly owned to Well-Com Associates, Inc., which by then apparently was wholly-owned by Mr. Pereira. In exchange, Carabetta received no cash, but (a) an agreement that Mr. Pereira (or his affiliates/nominees) would indemnify Carabetta against any and all liability, including environmental liability, involving the Site and the other property; (b) an agreement by Mr. Pereira (or his affiliates/nominees) to share a small percentage of any profits on any sale or transfer of the Site and the other property before July 16, 2006; and (c) the withdrawal of the proofs of claim filed by Mr. Black and any affiliates in the Carabetta bankruptcy. The conveyance was conditional on Carabetta's receipt of a release from Bank of Boston and its affiliates in respect to the Site. In November 1996, title to the Site was consolidated in Well-Com, which as noted, is wholly owned by Mr. Pereira.

Mr. Pereira was well aware in 1996 that the Site was contaminated. He admitted this during his deposition:

A.    Okay.  When I purchased the property in '96, was I aware that the property
      was contaminated?
Q.    Yes.
A.    Yes.

**The Restructuring Of The Loan.**  In December 1996, Mr. Pereira restructured the

mortgage loan on the Site with Bank of Boston Connecticut.  The amount due on the loan at the

time was roughly $3.9 million.  By making a one-time payment of $188,129 and providing certain

guarantees, commitments, and security, Mr. Pereira succeeded in reducing the principal amount due

to $2 million, with a further $1.7 million due and payable only upon the recurrence of certain

events, including a sale or refinancing of the Site before December 31, 1999, on which date, if the

events had not occurred, the $1.7 million obligation would be forgiven.  Apparently, none of these

events has occurred, and the $1.7 million obligation has been forgiven.

**Well-Com's Dealings With The DEP.**  Well-Com has had extensive dealings with the DEP

since at least 2000 concerning the contamination at the Site.  On October 21, 2005, the DEP issued

a proposed Administrative Consent Order to Well-Com, owing to, DEP stated, Well-Com's failure

to comply with requirements of the Massachusetts Contingency Plan, the regulatory scheme

governing hazardous waste site clean-ups.  As the proposed Administrative Consent Order

indicates, the DEP views Well-Com, as the Site owner and operator, as liable under Chapter 21E

with respect to the contamination.

On March 2, 2006, Associate Counsel for Well-Com stated that Well-Com intended to enter

into Administrative Consent Order, ACO-NE-05-3A014.  As the proposed Administrative Consent

Order indicates, the DEP views Well-Com, as the Site owner and operator, as liable under Chapter

21E with respect to the contamination.

C.    **Well-Com's Claims.**

Well-Com's Complaint contains three counts.  The first is entitled "CERCLA cost recovery" and is brought pursuant to 42 U.S.C. § 9607.  Well-Com alleges that it is entitled on this claim to:

> a) recover from Honeywell all of its necessary costs of response expended, including all costs spent by Well-Com in researching the Site History, and b) a judgment declaring Honeywell liable for necessary costs of response that Well-Com will expend in the future, in accordance with its final remediation plan.

Well-Com's second count is entitled "CERCLA contribution" and also is brought pursuant to 42 U.S.C. § 9607.  On this claim, Well-Com alleges that it is entitled to:

> a) recover from Honeywell an equitable allocation of all its necessary costs of response expended, including all costs spent by Well-Com in researching the Site history; and b) a judgment declaring Honeywell liable for necessary costs of response that Well-Com will expend in the future, in accordance with its final remediation plan.

Well-Com's third count is entitled "Massachusetts G.L. 21E."  On this claim, Well-Com alleges that it is entitled:

> to recover from Honeywell all of its response costs, both past and future, including all costs spent by Well-Com in researching the Site history, and all reasonable attorneys' fees, pursuant to G.L. c. 21E §§ 4 and 4A.

During his deposition, Mr. Pereira testified that (a) his position is that Honeywell should pay 100% of the costs to clean up the contaminants that Honeywell's predecessors put there, (b) he does not think that there are any contaminants at the Site that Honeywell did not put there, and (c) it is irrelevant that he acquired the Site knowing it was contaminated.  His position is, in other words, that Honeywell is responsible for 100% of Well-Com's response costs associated with the Site.[3]

---

[3]    On multiple occasions, Honeywell has offered to pay the lion's share of reasonable response costs associated with the contamination of the Site.  These offers have been rejected.  Mr. Pereira's position explains why the offers have been rejected.  (In view of Well-Com's claim under Mass. Gen. L. ch. 21E, §4A, evidence as to the parties' settlement discussions is admissible.)

## ARGUMENT

### I.    HONEYWELL SHOULD BE PERMITTED TO AMEND ITS ANSWER TO ASSERT COUNTERCLAIMS FOR EQUITABLE CONTRIBUTION

As discussed above, the Supreme Court emphasized that its decision in <u>Atlantic Research</u> does not mean that a PRP can "avoid" equitable contribution merely because the claim is brought under § 107 for cost recovery.  The Court suggested that a counterclaim by a defendant PRP would be the appropriate method to "blunt any inequitable distribution of costs." 2007 WL 1661465, *7. "Resolution of a § 113(f) counterclaim would necessitate the equitable apportionment of costs among the liable parties, <u>including</u> the PRP that filed the action." <u>Id</u>. (Emphasis added.)  In accordance with the suggestion in <u>Atlantic Research</u>, Honeywell seeks leave to amend to state a counterclaim under § 113(f), as well as under M.G.L. c. 21E, sec. 4A.[4]  Rule 15 requires that leave to amend shall be freely granted where justice so requires, and will not be denied without adequate reason, such as undue delay, bad faith, dilatory motive, futility of amendment, or prejudice.  <u>See</u>, e.g., <u>Glassman v. Computervision Corp.</u>, 90 F.3d 617, 622 (1st Cir. 1996).

In addition to the suggestion by the Supreme Court, the proposed amendment is appropriate for several reasons.  First, Well-Com itself brought a claim for contribution in Count II.  That claim inherently involves equitable apportionment; thus, the issue has always been present in the case. Second, since Honeywell asserted its rights to equitable apportionment in its Answer, including, but not limited to, Affirmative Defenses "O" and "P," Well-Com was promptly put on notice of Honeywell's claim.  Third, as noted by the Supreme Court in <u>Atlantic Research</u>, many Courts of Appeal had held previously that an action for contribution was the exclusive remedy of a PRP,

---

[4]    <u>Atlantic Research</u> involved only CERCLA.  It is Honeywell's position that Well-Com's claim under M.G.L. c. 21E requires equitable contribution in any event (just as Well-Com's contribution claim under CERCLA), without the necessity of a counterclaim.  Out of an abundance of caution, however, Honeywell seeks leave to amend to expressly assert a counterclaim under M.G.L. c. 21E, sec. 4A.

including the First Circuit.[5] Again, such a claim inherently involves equitable distribution. Fourth, the course of this lawsuit has been characterized, on the one hand, by an attempt by Well-Com to obtain 100% of its response costs, and, on the other hand, an attempt by Honeywell to point out equitable considerations militating against a 100% recovery. Well-Com would not be surprised or prejudiced by an amendment. The amended counterclaim would result in the addition of no new legal theories to the case. Well-Com would thus not be able to "avoid," based upon a technicality of pleading, the principles of equitable contribution that clearly apply.

## II.     WELL-COM IS NOT ENTITLED TO COMPLETE INDEMNITY ON ITS CERCLA CLAIMS OR ITS CLAIMS UNDER CHAPTER 21E

As noted above, Well-Com contends that it is entitled to 100% of its response costs in connection with the Site (and more). To the extent it contends that this entitlement arises under Section 107 of CERCLA (Counts I and II) or Chapter 21E (Count III), it is in error.

### A.     Any Recovery Under Section 107 Must Be Limited

Well-Com cannot recover 100% of its response costs from Honeywell on its Section 107 cost recovery claim or its Section 107 contribution claim. In Atlantic Research Corp. v. United States, 459 F.3d 827 (8th Cir. 2006), the case the Supreme Court recently affirmed, the Eighth Circuit Court of Appeals, while ruling that PRPs are entitled to bring a cost recovery action under § 107, also ruled that "a liable party may not use § 107 to recover its full response costs." 459 F.3d at 835. The Court of Appeals explained that while the words of the statute permitting recovery of "any other necessary costs of response" may suggest full recovery, "they do not compel it." Id.

---

[5]     In Atlantic Research, the Court referenced cases collected in Cooper Industries, Inc. v. Aviall Services, Inc., 125 S. Ct. 577, 585 (2004), which collection included United Technologies Corp. v. Browning-Ferris Industries, Inc., 33 F.3d 96, 99-101 (1st Cir. 1994), cert. denied, 513 U.S. 1183 (1995), and numerous other decisions. 2007 WL 1661465, *3.

"CERCLA itself checks overreaching liable parties:  If a plaintiff attempted to use § 107 to recover more than its fair share of reimbursement, a defendant would be free to counterclaim for contribution under § 113(f)."  Id.  That reasoning is entirely consistent with that expressed by the Supreme Court in affirming the decision.  Both the Eighth Circuit Court of Appeals and the Supreme Court explained that a plaintiff PRP should not be allowed to avoid equitable contribution.  The mere availability of a § 107 cost recovery action to a plaintiff PRP does not insulate it from contribution to other PRPs or allow it to "overreach."

In a CERCLA contribution action, a court may use "such equitable factors as the court determines are appropriate" in allocating liability.  42 U.S.C. § 9613(f)(1); see, e.g., One Wheeler Road Assoc. v. The Foxboro Co., 1995 WL 791937 at * 11 (D. Mass. 1995) ("the apportionment of remediation costs is typically an inexact science"); Kerr-McGee Chem. Corp. v. Lefton Iron & Metal Co., 14 F.3d 321, 326 (7th Cir. 1994); Envtl. Transp. Sys. v. ENSCO, Inc., 969 F.2d 503, 509 (7th Cir. 1992) (a court may consider any appropriate factors to "balance the equities" under the circumstances).

Many courts have held that pre-acquisition knowledge of contamination, a reduced purchase price, and sophistication on the part of a buyer are equitable factors that weigh against a plaintiff landowner.  In Mystic Landing, LLC v. Pharmacia Corp., 443 F. Supp.2d 97, 106 (D. Mass. 2006), the buyer knew of the contamination when it purchased the property and there was evidence of a discounted purchase price.  The court noted that in equitably allocating responsibility, courts have discretion to consider a discount to account for environmental contamination, and considered the current owner's "potential windfall."  The Court also noted that the owner's delay in remediation had resulted in increased cost, and arrived at an allocation of 90% of the costs to the prior owner, based on several factors.  443 F. Supp.2d at 105-06.  See, also Smith Land & Improvement Corp. v.

Celotex Corp., 851 F.2d 86, 90 (3rd Cir. 1988), cert. denied, 488 U.S. 1029 (1989).  In Celotex

Corp., as here, the plaintiff's predecessor in title, a "sophisticated company which had inspected the

land" multiple times, purchased the property from the defendant "without concealment" at a price

that "reflected the possibility of environmental risks."  851 F.2d at 88.  In language that applies

foursquare here, the court explained:

> [I]f the tract's price is reduced to allow for future environmental clean-up claims,
> the purchaser should not be entitled to double compensation.  Nonetheless, the
> amount of the discount, if any, the cost of response, and other considerations may
> enter into the allocation of contribution by the district court in its exercise of
> discretion.

Id. at 90.  Accord Amoco Oil Co. v. Borden, Inc., 889 F.2d 664, 673 (5th Cir. 1989) ("the

circumstances and conditions involved in the property's conveyance, including the price paid and

discounts granted, should be weighed in allocating response costs").  Notably, in In re Hemingway

Transport, Inc., 993 F.2d 915, 933 (1st Cir. 1993), cert. denied, 510 U.S. 914 (1993), the First

Circuit cited Celotex with approval.

Well-Com, a sophisticated buyer, acquired the Site at a discounted price,[6] knowing that the

Site was contaminated.  Well-Com would receive a windfall if it recovered 100% of its costs.  It

would be unjustly enriched by paying for a contaminated property and receiving a more valuable,

remediated property.  Like the buyer in Mystic Landing, Well-Com is also guilty of delay in

remediation, as recited in the Administrative Consent Order with the DEP.  (Christo Dec., Ex. T at

¶¶ 25, 30, 55.)  Therefore, Well-Com may not recover 100% of its response costs on its contribution

claim under CERCLA.  Partial summary judgment on Counts I and II indicating that Well-Com's

---

[6]     It would appear that Mr. Pereira obtained full ownership of the Site by, at most, paying a small amount to the
Black estate and assuming $3.9 million in debt, which he promptly reduced substantially.  Honeywell is exploring when
Mr. Pereira obtained the commitment to restructure the financing; if it pre-dated the conveyances from the Black estate
and Carabetta, he actually assumed much less than $3.9 in debt.  In any event, $3.9 million is far less than $10 million,
the appraised value in 1987, and far less than the $5.6 million income approach estimate.  Land values certainly have
not decreased since 1987.

potential recovery shall be reduced to reflect its sophistication, knowledge, and discount should enter.[7]

## B.      Any Recovery Under Chapter 21E Must Be Limited

### 1.      Contribution Under Chapter 21E

Section 4 of Chapter 21E provides the cost recovery mechanism for one who has incurred response costs.  Section 4 provides only for several liability:

> Any person who undertakes a necessary and appropriate response action regarding the release or threat of release of oil or hazardous material shall be entitled to reimbursement from any other person liable for such release or threat of release for the reasonable costs of such response action.  If two or more persons are liable pursuant to section five for such release or threat of release, each shall be liable to the others for their equitable share of the costs of such response action . . . .

Mass. Gen. Laws c. 21E § 4.  Under this express language, when a plaintiff is itself liable under Chapter 21E, it is entitled to recover from other liable parties only their equitable shares of response costs; it may not obtain "complete indemnity."  See, e.g., Commonwealth v. Boston Edison Co., 828 N.E.2d 16, 31-33 (Mass. 2005); Martignetti v. Haigh-Farr, Inc., 680 N.E.2d 1131, 1140-45 (Mass. 1997).

---

[7]      Well-Com has previously argued that cost recovery damages under § 107 may only be "apportioned" if the harm is divisible, and that it is not divisible here.  See, e.g., Plaintiff's Memorandum in Support of Its Cross-Motion For Partial Summary Judgment at 27 n.3.  (Docket # 26.)  Even assuming the harm at the Site is indivisible, this argument is flawed.  First, the Supreme Court in Atlantic Research ruled that a defendant PRP may pursue equitable contribution in response to a cost recovery action by another PRP.  2007 WL 1661465, *7.  Nowhere is divisibility mentioned as a prerequisite to that ability.  The Supreme Court noted that the Government improperly "uses the word 'contribution' as if it were synonymous with any apportionment of expenses among PRPs," and explained that equitable contribution is different: it is simply the traditional tort notion of contribution among tortfeasors.  Id. at 6.  Atlantic Research conclusively puts Well-Com's divisibility argument to rest.  Second, even prior to Atlantic Research, the courts, including the First Circuit, drew a similar distinction between apportionment as related to divisibility and contribution among PRPs.  In a § 107 cost recovery action involving multiple PRP defendants, brought by a non-liable party, a particular PRP can avoid being held jointly and severally liable for the entire harm at the site in question by showing that the harm is divisible and that it is not responsible for some divided portion of the harm to the site.  See, e.g., O'Neill v. Picillo, 883 F.2d 176, 178-79 (1st Cir. 1989), cert. denied, 493 U.S. 1071 (1990) (State of Rhode Island cost recovery action against PRPs).  The O'Neill court recognized that even where a PRP is incapable of establishing divisibility, "a right of contribution [as against other PRPs] undoubtedly softens the blow . . .."  Id. at 179.  In other words, a PRP still is entitled to pursue contribution from other PRPs even if the harm is indivisible.  Divisibility is irrelevant to the rights of contribution as between Well-Com and Honeywell.

In Martignetti, for example, the Supreme Judicial Court ruled that because the plaintiff site owner was itself strictly liable to the Massachusetts Department of Environmental Protection under § 5(a)(1), any action by the plaintiff against other liable parties was one for contribution, entitling the plaintiff to recover only an equitable share from such other liable parties.  680 N.E.2d at 1140-45.  The Martignetti court explained that the language of § 4 "authoriz[es] an action for the sharing of response costs, i.e., contribution, among parties whose underlying liability to the Commonwealth is imposed by the provisions of § 5."  Id. at 1141-42.  It also explained that such a contribution action is only for the recovery of a party's proportionate share, "and the party seeking contribution may do so only for what it has paid in excess of such a share."  Id. at 1145 (citations omitted).  See also Boston Edison, 828 N.E.2d at 31-33 (same).

Well-Com may not recover response costs pursuant to § 5 of Chapter 21E.  Suits by private parties under Section 5 are limited to property damages.  See, e.g., Mystic Landing, LLC, 443 F. Supp.2d at 103.  Only the Commonwealth can recover response costs under that section.  See, e.g., Church v. General Electric Co., 138 F. Supp. 2d 169, 174-75 (D. Mass. 2001) (recognizing distinction between § 4 claim for response costs and § 5 claim for property damage); Black v. Coastal Oil New England, Inc., 699 N.E.2d 353, 354-57 (Mass. App. 1998) (response costs available under § 4, not § 5), rev. denied, 707 N.E.2d 1077 (1998).  Well-Com's claim is not for property damage.

## 2.    Well-Com Is Itself Liable Under Chapter 21E

Well-Com is liable under Chapter 21E, just as it is liable under Chapter 21E's federal counterpart.  Section 5(a)(1) of Chapter 21E, Mass. Gen. L. ch. 21E, § 5(a)(1), provides, "Except as otherwise provided in this section, (1) the owner or operator of a . . . site from or at which there is or has been a release or threat of release of . . . oil or hazardous material . . . shall be liable, without

regard to fault, . . .." Thus, a site owner is strictly liable under Chapter 21E, unless, as under CERCLA, it can establish one of the exclusive statutory defenses to liability. See, e.g., Martignetti, 680 N.E.2d at 1135-39.

Although it has not properly pleaded it (see Complaint, ¶¶ 78-82), Well-Com apparently will attempt to rely on the "innocent landowner" defense to liability under Chapter 21E.[8] The attempt will fail. Chapter 21E's third-party/innocent landowner defense is found in § 5(c)(3) of Chapter 21E, which is virtually identical to Section 107(b) of CERCLA. Section 5(c)(3) provides:

> [T]here shall be no liability under paragraph (a) for a person otherwise liable who can establish by a preponderance of the evidence, (A) that the release or threat of release of oil or hazardous material and the damages resulting therefrom were caused by: (1) an act of God; (2) an act of war; (3) an act or omission of a third party other than an employee or agent of the person, or than one whose act or omission occurs in connection with a contractual relationship existing directly or indirectly, with the person, . . ..

Mass. Gen. L. ch. 21E, § 5(c)(3).

The Massachusetts courts have not had occasion to address whether, as under CERCLA, the third party defense is unavailable to a party that acquired a site with knowledge that it was contaminated.[9] By its terms, the third-party defense under CERCLA does not apply where the act or omission in question occurs in connection with a "contractual relationship," a term that is not

---

[8]     "Generally, a failure to plead an affirmative defense results in the waiver of that defense and its exclusion from the case." 5 C.A. Wright & A.R. Miller, Federal Practice and Procedure § 1278 at 477 (2d ed. 1990).

[9]     In neither of the reported Massachusetts decisions discussing the innocent landowner defense, Oliveira v. Pereira, 605 N.E.2d 287, 288-89 n.5 (Mass. 1992), and Nassr v. Commonwealth, 477 N.E.2d 987, 992 n.5 (Mass. 1985), is the defense addressed in the context of an owner's knowing acquisition of contaminated property.

defined in Chapter 21E.[10]  In Gemme v. Applied Envtl. Tech., 2003 WL 21500549 (Mass. Super.

2003, the court looked for guidance in interpreting Chapter 21E's third party defense to the

definition of a contractual relationship in CERCLA's parallel third party defense, which includes

"land contracts, deeds, . . . or other instruments transferring title or possession." 42 U.S.C. §

9607(b)(3).  2003 WL 21500549, at *3 n.4.  The court concluded that "the plain language

contained in G.L.c. 21E § 5(c) demonstrates that the Legislature envisioned a broad reading of the

term "contractual relationship." Id. at *3.

     The Supreme Judicial Court has instructed that "CERCLA and G. L. c. 21E have similar

objectives and overlap in coverage.  To the extent that there are similarities in language and

structure, it is desirable to arrive at similar interpretations . . . ." Martignetti, 680 N.E.2d at 1137

---

[10]    The phrase "contractual relationship is defined in § 101(35)(A):

    The term "contractual relationship," for the purpose of section 9607(b)(3), includes, but is not limited to, land contracts, deeds, easements, leases, or other instruments transferring title or possession, unless the real property on which the facility concerned is located was acquired by the defendant after the disposal or placement of the hazardous substance on, in, or at the facility, and one or more of the circumstances described in clause (i), (ii), or (iii)[10] is also established by the defendant by a preponderance of the evidence: (i) At the time the defendant acquired the facility the defendant did not know and had no reason to know that any hazardous substance which is the subject of the release or threatened release was disposed of on, in, or at the facility . . . .

42 U.S.C. § 9601(35)(A) (emphasis added).  Under this express language, the third-party defense is not available to a party that acquired a contaminated facility with knowledge of the contamination.

    In In re Hemingway Transport, Inc., the First Circuit confirmed the limited scope of the third-party defense. The court noted that once a party falls within one of the categories of "covered persons" under § 107(a), "[t]he harsh effects of the strict liability rule are subject to mitigation through resort to certain affirmative defenses." 993 F.2d at 932.  Explaining the third-party/innocent landowner defense, the court wrote, "Section 9607(b)(3) would afford a complete defense to CERCLA liability" if the facility owner were to establish by a preponderance of the evidence that: (1) it acquired the facility after the deposit of hazardous substances; (2) "at the time of its acquisition, it did not know and had 'no reason to know' that any hazardous substance was deposited at the facility"; and (3) it exercised due care with respect to the hazardous substances.  Id.  If these three criteria are not met, the court explained, the facility owner would be "exposed . . . to the harsh consequences of strict, joint and several liability under CERCLA." Id. at 934.

    When it acquired the Site, Well-Com was fully aware that the Site was contaminated.  Therefore, under the statutory provisions discussed above, and as a matter of law, Well-Com cannot establish the third-party/innocent landowner defense.  Accordingly, Well-Com is a PRP.

n.12. Under this directive, because the language of ch. 21E, § 5(c)(3) , is virtually identical to the language of CERCLA's third party defense, § 5(c)(3) should be interpreted in the same way that the third party defense under CERCLA is interpreted.  Under this interpretation, the defense is not available to a party, such as Well-Com, that acquires a site with knowledge that it is contaminated. There is no rational basis to conclude that the Massachusetts legislature intended an opposite result to apply under state law than under CERCLA, with the result of lessening the liability of owner-operators under state law.  Accordingly, Well-Com is strictly liable under chapter 21E and is ineligible for the innocent landowner defense.  It therefore may pursue from Honeywell only Honeywell's equitable share of response costs.

### 3.    Well-Com's Potential Recovery Must Be Reduced

The Supreme Judicial Court has not provided a precise formula for determining a responsible party's equitable share under Chapter 21E, much less done so in circumstances such as this case presents.  The court has said simply that the determination must "be done on a case-by-case basis."  Martignetti, 680 N.E.2d at 1145.  At the same time, the court has indicated, as noted above, that precedent under CERCLA should guide the interpretation and application of Chapter 21E.  There is ample relevant precedent under CERCLA.  Applying this precedent to Chapter 21E pursuant to the Supreme Judicial Court's directive in Martignetti, the share that Well-Com may pursue from Honeywell must be reduced to reflect that Well-Com is a sophisticated buyer that acquired the Site at a discounted price and with full knowledge that it was contaminated.  See, e.g., Celotex Corp., 851 F.2d at 90; Amoco Oil Co., 889 F.2d at 673; In re Hemingway Transp., 933 F.2d at 933.  Partial summary judgment on Count III indicating that Well-Com's potential recovery shall be reduced to reflect its sophistication, knowledge, and discount should enter.

## Conclusion

For the foregoing reasons, Honeywell respectfully requests that the Court grant Honeywell

leave to amend its answer as stated herein, and that the Court enter partial summary judgment on

Counts I, II, and III, that Well-Com is not entitled to 100% of its past and future response costs.

Dated:  July 5, 2007

HONEYWELL INTERNATIONAL INC.,

By its attorneys,

/s/David B. Chaffin
Thomas K. Christo (BBO #083240)
David B. Chaffin (BBO #549245)
HARE & CHAFFIN
160 Federal Street
Boston, Massachusetts 02110-1700
(617) 330-5000

Of Counsel:

Brian D. Israel, Esq.
Arnold & Porter, LLP
555 12th Street, NW
Washington, D.C. 20004
(202) 942-6546

## CERTIFICATE OF SERVICE

I hereby certify that this document(s) filed through the ECF system will be sent
electronically to the registered participants as identified on the Notice of Electronic Filing (NEF)
and paper copies will be sent to those indicated as non-registered participants on July 5, 2007.

/s/David B. Chaffin