UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| WELL-COM ASSOCIATES, L.P., <br><br> Plaintiff, <br><br> v. <br><br> HONEYWELL INTERNATIONAL, INC., <br><br> Defendant. | Docket Number 05-10056-JLT |

## SUPPLEMENTAL LOCAL RULE 56.1 STATEMENT OF UNDISPUTED FACTS OF THE PLAINTIFF WELL-COM ASSOCIATES, L.P.

Pursuant to Local Rule 56.1 and the Court's Order of May 14, 2007, the plaintiff, Well-Com Associates, L.P. ("Well-Com") submits this Supplemental Statement of Facts in opposition and in response to defendant Honeywell International, Inc.'s ("Honeywell") Local Rule 56.1 Statement of Facts, and in support of its Opposition to Defendant's Motion to Amend Answer and for Partial Summary Judgment. Additionally, Well-Com incorporates by reference its previously filed Local Rule 56.1 Statement of Undisputed Facts.[1]

### A.   The Parties And The Site

1.  Well-Com, a limited partnership, is the owner of property located at 378 Commercial Street, Malden, Massachusetts. Pereira Aff., ¶3. John M. Pereira is the President of Combined Properties, Inc. ("Combined"). Id. at 1. Combined is the managing agent of Well-Com. Id.

---

[1] All citation herein to Well-Com's original Local Rule 56.1 Statement Of Undisputed Facts (docket # 24) is abbreviated as "SOF."

2.      The Site is contaminated with coal tar residues, heavy metals, and other hazardous substances. Ankstitus Aff., ¶¶ 21-52.

3.      Honeywell is the corporate successor to Allied-Signal, Inc. ("Allied") and the Barrett Company ("Barrett"), a chemical company that began as a wholly owned subsidiary of Allied and eventually merged into an operating division of Allied. SOF, ¶ 1. The contaminants on the Site are the direct result of past operations at the Site by Honeywell International, Inc. ("Honeywell") and its predecessors, including Allied and the Barrett Company, and their use of the Site, for over thirty years, as a coal tar facility. SOF, ¶¶ 4 - 30; Ankstitus Aff., ¶¶ 23, 25-52.

4.      In 1932, Barrett Company ("Barrett") acquired the Site, (Ex. 6) and began to obtain permits for the construction of a coal tar processing plant. SOF, ¶¶ 4, 5. Barrett, which manufactured tar and tar products for roadwork and roofing, installed over 20 above-ground and below-ground steel tanks for the storage of gasoline, tar and tar products. Id. (Ex. 16A). Additionally, Barrett began filling in the wetlands in order to prepare the site for erection of the tanks, and the coal tar processing plant. SOF, ¶¶ 5, 6.

**B.  Honeywell's Predecessor's (Barrett And Allied) Manufactured Coal Tar Products At The Site.**

5.      Barrett's coal processing plant was opened for business and was manufacturing tar and tar products by early 1937. SOF, ¶ 12. In the May 3, 1937 edition of the Malden Evening News, a Barrett advertisement states that:

> "among the Barrett products available for prompt delivery from our new Malden plant are Tarvia, Tarvia-lithic, Barrett Specifications and other Barrett built-up roofing materials, Barrett Shingles and Roll Roofings and wide variety of industrial chemicals, paints and protective coatings."

SOF, ¶ 12 (Ex. 16E). The advertisement lists Barrett's address as 378 Commercial Street and characterizes the business as manufacturing of tarvia, tarvia-lithic, bituminous concrete, Barrett specification roofs, asphalt shingles, roll roofings, sheathings and building papers, tarred and asphalt roofing pitch, coal tar, asphalt, flashing blocks and forms, creosote oil, protective products, industrial chemicals, sulphate of ammonia, and arcadian nitrate. Id. (Ex. 16E).

6. There are public records describing spills at the Site. SOF, ¶ 14. For example, in September of 1937, a coal tar holding tank at the Site exploded and caused the spill of 30,000 gallons of road tarvia onto the Site, creating Site, creating a fire that the Malden Evening News referred to as "a blazing sea of tarvia." Id. (Ex. 16G).

7. In 1941, Barrett deeded the Site to Allied Chemical and Dye Corporation in connection with the merger of the two companies. SOF, ¶ 15. The Polk Directory indicates that from 1939 to 1965, the Site was used by Barrett and Allied for the manufacturing of "coal tar products." SOF, ¶ 16 (Ex. 15A-B).

8. Allied began its corporate history as Allied Chemical and Dye Corporation, which was formed in 1920 as an amalgamation of five chemical companies: Barrett, Solvay Process Company, General Chemical Company, National Aniline & Chemical Company, and Semet-Solvay Company. SOF, ¶ 2. The five companies operated as wholly owned subsidiaries until their merger in the 1940's, at which point they became operating divisions of Allied Chemical and Dye Corporation. Id. (Ex. 1A, p. 9; Ex. 2A, p. 3; Ex. 2B).

9. Thus, in 1941, Barrett deeded the Site to Allied Chemical and Dye Corporation in connection with the merger of the two companies. The Polk Directory indicates that from 1939 to 1965, the Site was used by Barrett and Allied for the manufacturing of "coal tar products." SOF, ¶ 16 (Ex. 15A-B).

10. In 1943, the Malden News reported that there was a fire at the Site caused by the explosion of a still. SOF, ¶ 17 (Ex. 16H).

11. In 1944, there was a fire at the Site caused by a tar heater springing a leak, allowing "hot oil to fall to the ground." The oil ignited, resulting in a fire that "covered an area of about 100 square feet." SOF, ¶ 18 (Ex. 16I).

12. In 1947, there was a fire at the Site caused by the ignition of vapor from a leaking still. SOF, ¶ 19 (Ex. 16J).

### C. Allied Deeded The Property To Wellington In 1965

13. On June 29, 1965, Allied deeded the site to Wellington Realty Corporation ("Wellington") for a purchase price of $350,000. SOF, ¶ 25. John Kazanjian was the President and Treasurer of Wellington, as well as the principal of three subsequent grantees between 1981 and 1986. SOF, ¶ 28. Allied's sale of the site to Wellington Realty Corp., for $350,000, ended Allied's ownership interest in the site. Neither Well-Com, nor any of its predecessors, were involved in the sale of the site from Allied to Wellington in 1965, for the amount of $350,000. SOF, ¶ 29.

14. A 1965 plan of the "leased area" indicates that Allied leased back from Wellington a portion of the Site lying to the west of Commercial Street, which included underground storage tanks and a filter bed. SOF, ¶¶ 27, 30.

### D. The 1984 Purchase And Sale Agreement

15. In 1984, John Pereira was an attorney for entities owned, at least in part, by Joseph Carabetta and Stanton Black (who is now deceased) in connection with a purchase of the Site by Carabetta Enterprises, Inc. ("Carabetta"). Pereira Aff., ¶ 5.

16. On November 8, 1984, Carabetta Enterprises entered into a Purchase and Sale Agreement with Wellington Realty Company in connection with the Site. Pereira Aff., ¶ 6.

17. At the time that the parties executed the Purchase and Sale Agreement for the Site, Mr. Pereira had no knowledge of contamination at the Site. Pereira Aff., ¶ 7. Based upon discussions he had with Mr. Carabetta and Mr. Black, Mr. Pereira believes that they also lacked knowledge of contamination at the Site. Id.

18. Mr. Pereira first learned of the possible presence of contaminants at the Site after reviewing the 1985 and 1986 reports of TRC Environmental Consultants and Norwood Engineering. Pereira Aff., ¶ 8. On December 17, 1986, the Massachusetts Department of Environmental Quality Engineering ("DEQE") issued a Notice of Responsibility ("NOR") to Wellington Realty Corp. and Allied Corporation. Pereira Aff., ¶ 7.

E. **The Purchase Price Was Based Upon Fair Market Value In 1984, And Was Agreed Upon Before The 1985 And 1986 Reports Of TRC Environmental And Norwood Engineering**

19. The purchase price of $3,800,000 for the Site stated in the Purchase and Sale Agreement was agreed upon before the 1985 and 1986 reports of TRC Environmental Consultants and Norwood Engineering were drafted, and was based on the fair market value of the Site in November 1984. Pereira Aff., ¶ 9.

20. After receiving the 1985 and 1986 reports of TRC Environmental Consultants and Norwood Engineering, Carabetta Enterprises asked Wellington Realty Company for a $600,000 discount on the purchase price for the Site stated in the Purchase and Sale Agreement. Pereira Aff., ¶ 10.

21. Wellington Realty Company refused to provide the requested discount. Pereira Aff.,10.

F.        **Wellington Refused To Provide A Discount To The 1986 Grantees**

22.    In December 1986, the 1986 Grantees (Commercial Street Properties, Well-Com Associates, Inc. and Well-Com, Inc.) purchased the Site despite the fact that no discount was granted because they believed that they had a cause of action against Allied-Signal, Inc. for the cost of any cleanup at the Site. Pereira Aff., ¶ 11.

23.    The underlying principals of the 1986 Grantees were Stanton L. Black, President and Treasurer of Well-Com, Inc. and Well-Com Associates, Inc., and Joseph F. Carabetta, Treasurer and Vice President of Commercial Street Properties, Inc.. Pereira Aff., ¶ 12.

24.    The February 20, 1987 appraisal of the Site for $10,000,000 (attached to the Declaration of Thomas K. Christo as Exhibit G) was not based on the fair market value of the Site. Pereira Aff., ¶ 13.

25.    The $10 million appraisal was based on the development rights of the Site under optimal circumstances, for example the receipt of all necessary permits. Pereira Aff., ¶ 14.

26.    The February 20, 1987 appraisal contains a separate $5.6 million appraisal that was based on the fair market value of the Site on that date. Pereira Aff., ¶ 15.

F.    **In 1996, Well-Com Acquired A 100% Ownership In The Site**

27.    In 1996, Well-Com Associates, L.P., acquired a 100% ownership interest in the site through a series of conveyances from Commercial Street Properties, Inc., Well-Com Associates, Inc., and Well-Com, Inc. SOF, ¶ 53.

G. **Mr. Pereira Acquired 100% Of The Limited Partnership In Well-Com As Part Of A Larger Transaction In Which He Acquired Limited Partnership Interests In Numerous Properties And Assumed Liabilities With Full Debt**

28. Mr. Pereira acquired 100% of the limited partnership interest in Well-Com as part of a larger transaction in which he acquired numerous limited partnership interests in numerous properties, including the Site. Supp. Pereira Aff., ¶ 4.

29. In assuming the assets associated with the numerous limited partnership interests, Mr. Pereira also assumed the liabilities associated with those partnership interests. Supp. Pereira Aff., ¶ 6.

30. Those liabilities were assumed with full debt, and significantly outweighed the assets. Those liabilities included the personal guarantee of multiple bank loans. Supp. Pereira Aff., ¶ 7.

31. In late 1996, a mortgage loan with Bank of Boston Connecticut (one of many bank loans that Mr. Pereira had personally guaranteed) was restructured. Supp. Pereira Aff., ¶ 7.

32. The numerous limited partnership interests were acquired before the restructuring of the Bank of Boston Connecticut mortgage loan, and at the time that Mr. Pereira acquired the numerous limited partnership interests in early 1996, he did not know that such a restructuring would occur in the future. Supp. Pereira Aff., ¶ 8.

H. **Well-Com Has Not Caused Or Contributed To Contamination At The Site**

33. Well-Com has not caused or contributed to the contamination at the Site in any way. SOF, ¶ 68; Ankstitus Aff., ¶ 24.

34.     On or about 2000, Well-Com engaged Rizzo Associates ("Rizzo") to perform a site investigation and develop a remediation plan for the Malden site. SOF, ¶ 55-70. Ankstitus Aff., ¶ 20.

I.     **Well-Com Engaged Rizzo Associates To Perform Site Investigation And Remediation**

35.     In 2000, Rizzo prepared a Phase I Initial Site Investigation and Tier Classification Submittal for the Site and submitted it to DEP on behalf of Well-Com. SOF, ¶ 57; Ankstitus Aff., ¶ 20 . The Phase I report classified the Site as a Tier II disposal site pursuant to the Massachusetts Contingency Plan ("MCP"). SOF, ¶ 59; Ankstitus Aff., ¶ 22.

36.     Rizzo attributes the soil and groundwater contamination to Plant operations at the site by the Barrett Chemical Company and its successor, Allied, who utilized the site as a coal tar facility. SOF, ¶¶ 66, 4 – 29, Ankstitus Aff., ¶¶ 25-52.

37.     The contaminants on the Site are the direct result of past operations at the Site by Honeywell and its predecessors, including Allied and the Barrett Company. Ankstitus Aff., ¶¶ 23, 25-52.

38.     Well-Com's response actions with regard to the hazardous materials have been necessary, appropriate and consistent with the Massachusetts Contingency Plan, within the meaning of M.G.L. c. 21E, § 4, and the National Contingency Plan, within the meaning of 42 U.S.C. § 9607(a)(4)(B). SOF, ¶ 69. Ankstitus Aff., ¶¶ 53, 54.

39.     Well-Com has expended sums in connection with preparation and implementation of the following:  (a) Phase I Initial Site Investigation of August 18, 2000; (b) Tier Classification Submittal of August 18, 2000; (c) Phase II Comprehensive Site Assessment of August 6, 2004;  (d) Phase III Remedial Action Alternatives Report of August 27, 2004;  (e)

Phase IV Remedy Implementation Plan of April 29, 2005; (f) Release Abatement Measure Plan of May 24, 2005; (g) Tier II Extension of September 1, 2005.  SOF, ¶ 70; Ankstitus Aff., ¶¶ 20, 21. Supp. Ankstitus Aff., ¶¶ 27- 30, Ex. A - C.

40.    The Phase I facilitated the evaluation and Tier Classification of the Site.  The Phase I consisted of the advancement of 15 soil borings and the installation of three groundwater monitoring wells at the Site.  Supp. Ankstitus Aff., ¶¶ 27- 30, Ex. A.  Soil samples were collected during the advancement of soil borings for field screening and/or laboratory analysis. The Phase I identified stratified layers of coal tar, and elevated concentrations of lead, arsenic, polynuclear aromatic hydrocarbon and extractable petroleum hydrocarbon compounds, cadmium and cyanide.  Id.

41.    The Phase II facilitated the development of the scope of work at the Site, documented information obtained as a result of Comprehensive Site Assessment ("CSA") activities, and supported conclusions and Opinions based upon the finding of the CSA.  Supp. Ankstitus Aff., ¶¶ 27- 30, Ex. B.  The Phase II consisted of the advancement of 89 soil borings and the installation of seven groundwater monitoring wells at the Site, and the sampling of soil, sediment, groundwater and surface water.  Id.  The investigation included a subsurface investigation, a groundwater elevation survey, an assessment of Little Creek and the Malden River, and a review of existing data to facilitate the preparation of a risk characterization of the Site.  Id.  Phase II identified elevated concentrations of Site Contaminants of Concern ("COCs") in soil and groundwater within six distinct source areas at the Site and within the sediments of Little Creek.  Id.

42.    The Phase III assessed the existence of technically and financially feasible remedial alternatives that could be implemented at the Site to achieve either a Permanent

Solution or Temporary Solution at the Site under the Massachusetts Contingency Plan. Supp. Ankstitus Aff., ¶¶ 27- 30, Ex. C. The assessment identified ten remedial alternatives for soil and six remedial alternatives for groundwater that were evaluated during initial screening to determine which were potentially suitable for implementation at the Site. Id. Following the initial screening, two alternatives with the potential to mitigate or eliminate the risks associated with soil contamination at the Site and four alternatives with the potential to mitigate or eliminate the risks associated with groundwater contamination at the Site were selected for a detailed evaluation of their suitability for implementation at the Site. Id.

43. The Phase IV contained requirements for the design, construction, and implementation of the CRA alternative selected as a result of the Phase III evaluation. Supp. Ankstitus Aff., ¶¶ 27- 30, Ex. D.

44. In accordance with the Phase IV, the goal of CRA implementation was to remediate coal tar related COCs in Site soils, Little Creek sediments, and groundwater in order to achieve a level of "No Significant Risk" and achieve a Response Action Outcome ("RAO") under 310 CMR 40.1000. Ankstitus Aff., ¶ 31, Ex. D.

45. Rizzo submitted the above documents to the Department of Environmental Protection on behalf of Well-Com. Supp. Ankstitus Aff., ¶ 22.

46. By virtue of these response actions, Well-Com has exercised due care with respect to the oil or hazardous material on the Site. Ankstitus Aff., ¶21.

47. Rizzo submitted a Release Abatement Measure ("RAM") Plan to the Department of Environmental Protection on behalf of Well-Com on May 24, 2005. Supp. Ankstitus Aff., ¶ 32, Ex. E. The RAM was filed pursuant to the Massachusetts Contingency Plan, 310 CMR 40.0440. The goal of the RAM was to stabilize and/or remove quantities of coal tar and coal tar

products that recently surfaced onto the asphalt pavement surface at the Site in order to control and/or minimize the potential risk of harm to human health and the environment caused by the presence of accessible coal tar and coal tar product materials at the Site. Id. The new presence of coal tar and coal tar products upon the asphalt pavement at the Site has resulted in a potential risk to human health and the environment due to the potential for direct contact with coal tar products. Id. In order to reduce the risk and to minimize the effects of the coal tar and coal tar product materials on the asphalt pavement surface, RAM activities have been undertaken and will be maintained at the Site until the CRA under the Phase IV can be implemented. Id.

48. Response actions to date and going forward in the future have been and are reasonably calculated to be successful. Such calculations are the result of assessment work and remediation design at the Site. Ankstitus Aff., ¶32-38.

### J. Well-Com Filed A Response Action Outcome Statement (RAO) With The DEP On June 12, 2007

49. From May 1999 through January 2006, Well-Com has paid Rizzo $231,823.50 for services related to the Site. Supp. Pereira Aff., ¶ 13 (attaching invoices as exhibits). The exhibits (invoices) attached to the Supplemental Affidavit of John M. Pereira reflect only the costs associated with Rizzo. Id. However, Well-Com has incurred additional costs and fees in connection with work at the Site, including legal fees. Id.

50. The $231,823.50 includes (1) the preparation and submission of a Phase I Initial Site Investigation, Tier Classification, Phase II Comprehensive Site Assessment, Phase III Remedial Action Alternatives Report, Phase IV Remedy Implementation Plan, a Release Abatement Measure Plan, and a Tier II Extension to the Department of Environmental Protection, pursuant to the Massachusetts Contingency Plan; (2) actual remediation at the Site;

and (3) other costs associated with the remediation of the Site, including but not limited to, meetings, phone calls, and other correspondence. Supp. Pereira Aff., ¶ 14.

51. Since January 2006, Rizzo has performed additional work, including preparation of a revised Phase III Feasibility Analysis with a revised Remedial Action Plan and a revised Phase IV Remedy Implementation Plan, pursuant to the Massachusetts Contingency Plan. Supp. Pereira Aff., ¶ 15.

52. Well-Com filed a Response Action Outcome Statement (RAO) with the DEP on June 12, 2007.

### K. Honeywell's Predecessor (Allied Signal, Inc.) Recovered Insurance Proceeds For Sums It will Be Required To Pay To Remediate Releases Of Hazardous Materials At Various Properties, Including The Site

53. Honeywell's predecessor, Allied Signal, Inc., has recovered insurance proceeds from its insurer, The Travelers Indemnity Co. ("Travelers") for sums that it will be required to pay in connection with releases of hazardous materials at various properties, including the Malden site at issue in this lawsuit. SOF, ¶¶ 73 - 81; See Union Texas Petroleum Holdings, Inc. v. Travelers Indemnity Co., 1998 Del. Ch. Lexis 27 (Court of Chancery of Delaware, New Castle 1998). The Settlement Agreement "obligated Travelers to pay a multi-million dollar lump sum to Allied-Signal in exchange for Allied-Signal's releasing and discharging Travelers for liability for any and all present and future environmental property damage claims." SOF, ¶¶ 73 – 81; Union Texas Petroleum Holdings, 1998 Del. Ch. Lexis 27, at *4.

54. Although Allied received insurance proceeds from Travelers to remediate the site, neither Allied nor its successor corporation, Honeywell, have ever done so. Declaration of Thomas K. Christo, Exhibit R, Proposed Consent Order.

          Respectfully submitted,

          Well-Com Associates, L.P.
          By its attorneys,

          /s/ A. Neil Hartzell
          A. Neil Hartzell (BBO # 544752)
          Patricia B. Gary (BBO #554731)
          Donovan Hatem LLP
          World Trade Center East
          Two Seaport Lane
          Boston, MA 02210
Dated: July 20, 2007    617-406-4500

## CERTIFICATE OF SERVICE

I, Patricia B. Gary, hereby certify that on this 20th day of July, 2007, a copy of the foregoing was served on the attorney for the defendant by electronic means pursuant to Local Rule 5.2(b).

          /s/Patricia B. Gary
          Patricia B. Gary

01106463